IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CARLOS A. ARREDONDO, in his capacity as Trustee of The 2000 Trust for the Grandchildren of Carlos A. Arredondo and Mari V. Arredondo, General Partner of Arredondo Properties Limited Partnership,<br><br>      Plaintiff,<br><br>v.<br><br>CAESAR A. ARREDONDO, individually and in his capacity as Trustee of The 2000 Trust for the Grandchildren of Caesar A. Arredondo and Carolyn Abad Arredondo; THE 2000 TRUST FOR THE GRANDCHILDREN OF CAESAR A. ARREDONDO AND CAROLYN ABAD ARREDONDO, in its capacity as General Partner of Arredondo Properties Limited Partnership; and ARREDONDO & CO., LLC,<br><br>      Defendants. | CIVIL ACTION NO.:<br>3:02 CV 02200 (CFD)<br><br><br><br><br>NOVEMBER 12, 2004 |

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

I.     SUMMARY OF ARGUMENT ................................................................ 1

II.    STATEMENT OF UNDISPUTED FACTS ........................................... 4

    A.    Two Brothers, Caesar And Carlos, Formed Three Entities: A&Co., APLP, And WCI.......................................................................................... 4

    B.    Caesar And Carlos Created the WESTY Self-Storage Business And The WESTY Trademarks.......................................................................... 5

    C.    Caesar And Carlos Decided in 1991 That WCI Should Own The WESTY Marks..... 6

    D.    WCI, Not APLP, Controlled Use Of WESTY Marks and the WESTY Trademarks And The WESTY Business.......................................................... 8

    E.    Carlos Left The WESTY Business In 1999 When WCI Assigned The WESTY Marks To A&Co., And Carlos Sold His Interest In A&Co. To Caesar ..................... 11

        1.    WCI Assigned The WESTY Trademarks To A&Co. in December 1999 ..... 12

        2.    Carlos Sold His Interest In A&Co. And The WESTY Marks To Caesar In January 2000 ...................................................................... 13

    F.    More Than Eleven Years After Deciding That WCI Owned The WESTY Marks, Carlos Does an About Face and Claims That APLP Owns The WESTY Marks ...... 14

    G.    Carlos Did Not File This Action Until Approximately Three Years After He Left The WESTY Business And Sold His Interest A&Co. To Caesar .............................. 15

III.   LEGAL ANALYSIS............................................................................... 16

    A.    Summary Judgment Standard ................................................................. 16

    B.    The Undisputed Facts Show That Defendants Are Entitled To Summary Judgment In Their Favor On Count One Because A&Co. Is The Rightful Owner Of The WESTY Trademarks ............................................................. 17

        1.    Caesar And Carlos Intended That WCI Own The WESTY Trademarks, And WCI Did So From 1991 To December 1999 ......................................... 17

        2.    A&Co. Owned The WESTY Trademarks From December 1999 To The Present............................................................................... 18

3.  As A Matter Of Law, Caesar And Carlos Had Every Right To Put
    Ownership Of The WESTY Trademarks In WCI ........................................ 19

    a.  Carlos And Caesar, As The Creators of the WESTY Trademarks
        And Business And As The "Leading Lights" Of The Arredondo
        Family Businesses, Properly Put Ownership Of The Trademarks In
        WCI .................................................................................................... 19

    b.  Caesar And Carlos' Complete Control Over APLP And Use Of
        The WESTY Trademarks Makes APLP A "Related Company"
        Under The Lanham Act ..................................................................... 21

    c.  APLP's Mere Ownership Of The First Operational WESTY
        Facility Does Not Confer Any Rights To The WESTY Trademarks. 26

    d.  The Equities Compel Ownership Of The WESTY Trademarks As
        Caesar And Carlos Decided, i.e., By WCI And Then A&Co. ........... 27

    4.  Carlos' Actions Regarding The Dissolution And Reformation Of WCI
        Further Support Summary Judgment In Defendants' Favor.......................... 28

C.  As To Count Two, Defendants Are Entitled To Summary Judgment  In Their
    Favor Because APLP'S Partnership Agreement Does Not Allow Carlos To
    Recover Attorneys' Fees And Costs For Meritless Claims ....................................... 31

D.  As To Count Three, Defendants Are Entitled To Summary Judgment In Their
    Favor Because Conn. Gen. Stat. Section 34-335 Does Not Apply To Limited
    Partnerships Such As APLP .................................................................................... 31

IV.  CONCLUSION.......................................................................................................... 32

## I.    **SUMMARY OF ARGUMENT**

The Defendants respectfully submit this Memorandum of Law in support of their November 12, 2004 Motion for Summary Judgment. The defendants move for Summary Judgment in their favor on all three counts in the Plaintiff's July 21, 2004 First Amended Complaint For Declaratory Judgment.

At its heart, this case is a family dispute between two brothers, Caesar A. Arredondo ("Caesar") and Carlos A. Arredondo ("Carlos"), over the trademarks of a family business known as WESTY'S or WESTY ("WESTY") self-storage, which business the brothers once operated together. On one side is the defendant Caesar and his family, which still actively operates the WESTY business. On the other side is his brother, the plaintiff Carlos, and his family. The trademarks at issue include WESTY, WESTY'S, a Terrier dog logo (the "Westy Logo"), and WESTY AT YOUR DOOR (collectively, "Westy Trademarks"). Caesar and Carlos together decided in 1989 to enter the self-storage business, and as individuals they created the WESTY Trademarks and the WESTY business model.

The WESTY business is a successful one. The first WESTY facility opened in 1991, and there are now twelve WESTY facilities with three more in development. The brothers intended that the WESTY business would benefit both themselves as well as their descendants. The ownership of WESTY facilities confirms this intention: Caesar and Carlos, through companies they jointly and equally own, own three WESTY facilities; Arredondo Properties Limited Partnership ("APLP"), a passive real estate vehicle that Caesar and Carlos created and funded to generate income for their children and future generations of Arredondos, owns eight; and Arredondo 2000, LLC, a company owned by Caesar's descendants, owns one and is developing

others. Either Caesar and Carlos' jointly-owned companies (1991-1999) or Caesar's family
(2000-present) have operated and managed every WESTY facility on a day-to-day basis,
including controlling use of the WESTY Trademarks. APLP has never played a role in the daily
operation or management of any WESTY facility, and APLP has not controlled use of the
WESTY Trademarks. Today, Arredondo and Co., LLC ("A&Co."), a company that Caesar and
Carlos owned on a 50/50 basis until Carlos sold his interest to Caesar almost five years ago,
operates and manages every WESTY facility.

Before the first WESTY facility opened in May 1991, Caesar and Carlos decided to place
ownership of the WESTY Trademarks in Westy's Connecticut, Inc. ("WCI"), a company they
equally owned. This decision made perfect sense because it was Caesar and Carlos who
developed the concept, who came up with the WESTY name and logo, and who personally ran
and developed the fledgling business. In contrast, as of May 1991, none of Caesar and Carlos'
children—the owners of APLP at that time—even knew that APLP existed. Although APLP, as
a passive real estate investment vehicle, ultimately owned the first WESTY facility, it had no
role in the creation of the trademarks and no role in the day-to-day operations of the first facility
or the WESTY business. Rather, Caesar and Carlos controlled the first WESTY facility and use
of the WESTY marks, just as they did with every additional facility as the business took root and
grew.

Ownership of the WESTY marks stayed in WCI until the end of 1999 when ownership
was transferred to A&Co. WCI's ownership of the WESTY Trademarks between 1991 and 1999
is well-documented. In January 2000, Carlos sold his interest in the WESTY marks to Caesar
voluntarily and with advice of an attorney and accountant. The sale was part of an admittedly

2

"arms-length" transaction that Carlos personally structured to facilitate his exit from the family business. Carlos' sale of his interest in the WESTY marks to Caesar in 2000 is also well-documented. Indeed, Carlos admitted in his recent deposition that both he and Caesar intended to and did place ownership of the WESTY marks in WCI starting in 1991 and continuing to the end of 1999, and Carlos admitted that he sold his rights in the trademarks to Caesar in 2000.

~~In a startling about-face, Carlos now claims that APLP owns the WESTY Trademarks.~~[1] This claim is dubious on its face given Carlos' admissions and the decade-long paper trail confirming WCI's and then A&Co.'s ownership of the WESTY Trademarks. The reason for this lawsuit became clear, however, during Carlos' deposition. Carlos' daughter Fabiola came to regret Carlos' decision to sell his interest in the WESTY Trademarks through A&Co. to Caesar. As a result, just months before filing suit, Carlos, at the urging of Fabiola, asked Caesar to assign the trademarks to APLP. When Caesar declined, Fabiola, with assistance of counsel, devised a strategy to undo the decisions and the "arms-length" transaction between Caesar and Carlos. The strategy they came up with was not to deny that the trademarks were placed in WCI's name between 1991 and 1999, or that Carlos transferred the trademarks to Caesar in 2000. Nor does Carlos contend that his deal with Caesar was somehow a sham. Instead, Carlos now insists that his decade-long conviction about who owned the WESTY trademarks is undone by a mistake of law: that contrary to the brothers' clear and express intent and understanding, APLP has owned the trademarks all along simply because it owned the first WESTY facility in Port Chester, New

---

[1] Carlos purports to bring this suit to benefit APLP. Carlos ostensibly has brought this lawsuit on behalf of his heirs, which represent only half of the ownership of APLP. (Caesar Aff., ¶¶ 27-32.) However, the limited partners and trustee of the limited partners that comprise the other half of APLP (i.e., Caesar's children and the trustees of the trusts established for Caesar's descendants) have submitted supporting affidavits stating that: (1) this action was brought without their knowledge or consent and (2) that they are opposed to this action. (See Exhibits F through J.)

York. This ownership interest, Carlos now says, makes APLP the "first user" of the WESTY Trademarks.

In short, Carlos disputes no material facts. His case depends entirely on the legal fiction that APLP's mere ownership of the first WESTY facility trumps every express and unambiguous intention, decision, and transaction under which the brothers operated the WESTY business, a business they solely created and developed, for more than a decade. Not surprisingly, the trademark laws do not permit the illogical and grossly inequitable result that Carlos seeks. Carlos' "first use" argument has no relevance to this case because the argument does not apply to disputes involving related companies like this case. Here, Carlos admits that Caesar and Carlos, through companies they owned, controlled use of the WESTY marks as well as *all* operations of the WESTY business. Moreover, when the "leading lights" of closely-held family businesses decide to place trademarks in a certain entity, that ownership decision is valid, binding, and final. Here, the indisputable decisions and decade-long actions of Caesar and Carlos to make their jointly owned businesses—WCI and then A&Co.—the owner of the WESTY Trademarks was both logical and legally correct. Caesar and Carlos abided by this legally correct decision for more than ten years. Their decision cannot be undone simply because family dynamics or interests have changed. Accordingly, as a matter of law, A&Co., not APLP, owns the WESTY Trademarks and defendants are entitled to summary judgment in their favor.

## II.    STATEMENT OF UNDISPUTED FACTS

### A.    Two Brothers, Caesar And Carlos, Formed Three Entities:  A&Co., APLP, And WCI

In 1961, Caesar and Carlos formed C.A. Arredondo & Co. to engage in the real estate business. (Plaintiff's June 23, 2004 Local Rule 56(a)(2) Statement, "Pl. Stmt.," ¶ 1; Transcript

4

of June 24, 2004 Deposition of Caesar A. Arredondo, "Caesar Tr.," at 69:14-24 (Ex. A.))

Shortly thereafter the name was changed to Arredondo & Co. ("A&Co."). (Affidavit of Caesar

A. Arredondo, "Caesar Aff.," dated November 10, 2004, ¶ 3 (Ex. C)). From 1961 until

January 1, 2000, both Caesar and Carlos owned equal shares in A&Co. (Pl. Stmt. ¶ 2.) During

that time, the brothers successfully engaged in the real estate business on a national basis.

(Transcript of June 23, 2004 Deposition of Carlos A. Arredondo, "Carlos Tr.," at 102:12-103:12

(Ex. B).) From 1967 until the late 1980s, Carlos and Caesar's business ownership activities were

confined almost entirely to sale-leasebacks for properties that they owned as individuals.[2]

(Carlos Tr. 103:7-12.) After Caesar and Carlos formed and funded APLP in 1980, they decided

that some but not all of the sale-leaseback properties would be owned passively by APLP so that

APLP would receive the profits from those transactions that Caesar and Carlos sought out,

negotiated, and concluded. (Carlos Tr. 68:2-68-9; Caesar Aff., ¶ 7.) While the sale-leaseback

properties were owned in part by either the brothers or APLP, A&Co. managed and controlled

all of them. (Caesar Aff., ¶ 8.)

### B.   Caesar And Carlos Created the WESTY Self-Storage Business And The WESTY Trademarks

As the sale-leaseback market waned in the late 1980s, Carlos and Caesar looked

elsewhere to invest their own capital as well as APLP's capital. (Caesar Aff., ¶ 9.) In

approximately 1989, the brothers saw an opportunity to develop high-end, self-storage facilities

in southern Connecticut and suburban New York City areas. (Pl. Stmt. ¶ 4; Caesar Tr. 89:2-

---

[2] A sale-leaseback is a transaction that involves the seller of a property immediately leasing the property from the buyer. (Caesar Aff., ¶ 5.) Caesar and Carlos' sale-leaseback transactions involved major corporations executing long-term leases. (Caesar Aff., ¶ 6.)

92:9.)  Their purpose of entering the self-storage business was twofold.  (Caesar Aff., ¶ 10.)

First, it would generate income for themselves individually because the brothers would own

some of the facilities[3] and manage all of them.  (Caesar Aff., ¶ 10.)  Second, just as Caesar and

Carlos did with the sale-leaseback business, they would also generate income for their

descendants by having APLP passively own some of the self-storage facilities.  (Caesar Tr.

128:3-10; Caesar Aff., ¶ 10.)

To operate and manage the WESTY self-storage facilities, the brothers formed WCI and

WESTY'S New York, Inc. ("WNY") with the assistance of Attorney Alan M. Shaver of Weber,

Neville & Shaver.  (Carlos Tr. 140:1-141:7.)  The brothers had equal ownership interests in

WCI, but Caesar solely owned WNY because of Carlos' tax dispute with the New York taxing

authorities.  (Pl. Stmt ¶ 6; Carlos Tr. 24:1-2.)  WCI and WNY were formed to, and did serve, as

the operating entities for WESTY self-storage facilities in Connecticut and New York,

respectively.  (Carlos Tr. 140:4-141:7.)

### C.   Caesar And Carlos Decided in 1991 That WCI Should Own The WESTY Marks

Caesar, who owned West Highland White Terriers, originated the concept of and design

for the WESTY name and the Westy Logo.  (Pl. Stmt. ¶ 13.)  The brothers decided to place

ownership of the WESTY Trademarks that they solely created in WCI.  (Carlos Tr. 148:3-7;

Caesar Tr. 135:1-10.)  WCI was the logical option because the brothers jointly owned WCI.  In

---

[3] For example, one of the first two WESTY projects that Caesar and Carlos tried to develop was owned by Caesar and Carlos and their wives, as individuals, who acquired in 1989 a property on Rowe Avenue in Milford, Connecticut; APLP was neither a party to that contract nor involved in the development of that project.  (Carlos Tr. 162:8-24; Caesar Aff., ¶¶ 11-12; a copy of the Rowe Avenue Contract is attached to Caesar's affidavit as Ex.1.)  Although the Milford facility received municipal approval, Carlos and Caesar eventually terminated that project in July 1991, months after applying to register the WESTY trademarks in WCI's name, because a competitor sued to stop the project.  (Caesar Aff., ¶ 13.)

contrast, WNY was owned solely by Caesar, and APLP was a passive real estate investment vehicle that the brothers did not own. (Caesar Tr. 84:22-85:9; 125:5-18.) Carlos does not recall even considering APLP as a possible owner of the marks. (Carlos Tr. 161:24-162:4.) Accordingly, and indisputably, in 1991 Carlos and Caesar together decided to place ownership of the WESTY Trademarks in WCI and to register them in WCI's name. (Carlos Tr. 148:3-7; Caesar Tr. 124:12-124:25.)

The brothers retained Attorney Shaver to assist them in registering the WESTY Trademarks in WCI's name. (Carlos Tr. 138:8-18.) Carlos contacted Attorney Shaver, and Carlos concedes that he had more dealings with Attorney Shaver than Caesar did; indeed, the evidence reveals that Carlos had almost all of the interaction with Attorney Shaver. (See, e.g., Carlos Tr. 146:25-147:4.)

Carlos agrees that the trademark WESTY'S and the Westy Logo were filed in 1991 with the United States Patent and Trademark Office ("PTO") with WCI as the owner of both marks. (Carlos Tr. 151:10-16; 151:21-152:2.) Prior to their filing, Attorney Shaver faxed draft copies of both trademark applications to Carlos with a cover letter identifying WCI as the trademark owner in both cases. (Shaver Facsimile, dated 2/22/91 at Caesar Aff. Ex. 2.) In addition, both draft applications clearly identified WCI as the trademark applicant and owner. (Id.) Carlos approved the two draft applications for WESTY'S and the WESTY Logo, and Attorney Shaver's office then finalized and filed the applications with the PTO on March 11, 1991. (Caesar Aff. Exs. 3

7

and 4.)  In sending copies of the as-filed applications to Carlos, Attorney Shaver specifically
noted that they were filed on behalf of WCI.  (Id.)[4]

On March 1, 1992, Carlos received the original certificate of registration of the
WESTY'S trademark from Attorney Shaver.  (Shaver Memo, dated 2/28/92 (Caesar Aff. Ex 6).)
The certificate clearly and prominently identified WCI as the owner of the WESTY'S trademark.
(Id.)  Attorney Shaver forwarded the original certificate of registration of the Westy Logo to
Carlos on March 12, 1992.  (Shaver Memo, dated 3/12/92 (Caesar Aff. Ex. 7).)  That certificate
also clearly and prominently identified WCI as the trademark owner.  (Id.)[5]

### D.  WCI, Not APLP, Controlled Use Of WESTY Marks and the WESTY Trademarks And The WESTY Business

Throughout the 1990s, WCI and WNY controlled use of the WESTY Trademarks and
operated the WESTY facilities on a day-to-day basis.  (Caesar Aff., ¶ 14.)  Caesar and Carlos
performed the management roles of WCI and WNY in operating the WESTY facilities.  (Caesar
Aff., ¶ 15.)  Both WCI and WNY used the WESTY Trademarks in the operation of the business.
(Caesar Aff., ¶ 14.)  In fact, WCI executed a license agreement granting to WNY a trademark
license for facilities operated by WNY.  Carlos signed this agreement on behalf of WCI on

---

[4] Subsequently, on a November 6, 1991 facsimile from Shaver to Carlos advising that the Examiner at the PTO had approved WCI's application for the WESTY'S mark, Carlos scribed "GREAT!" and signed his name on the facsimile. (Caesar Aff. Ex. 5.)

[5] In 1992 and 1993, respectively, WCI and WNY's corporate statuses with the States of Connecticut and New York were dissolved.  (Caesar Aff. Ex. 9.)  In July 1996, Caesar and Carlos re-formed WCI and WNY, with the identical ownership interest (i.e., 50/50 for WCI and sole ownership of WNY for Caesar) that existed before the dissolution. (Pl. Stmt ¶ 6; Carlos Tr. 24:1-2.)  Carlos admits that he intended that the re-formed WCI created in 1996 would continue to operate as if "nothing had changed" from the WCI entity created in 1991 and he intended that the re-formed WCI would also own the WESTY trademarks. (Carlos Tr. 178: 11-18; 180:12-16.)  To be certain that ownership of the marks remained with WCI after the corporate reformation, in 1996, Carlos specifically asked A&Co.'s attorney, Jeffrey Stephens, to confirm that WCI owned the WESTY trademarks.  (Carlos Tr. 173:2-178:21.)  Attorney Stephens did so and sent Carlos a memorandum dated December 18, 1996 confirming WCI's ownership of the trademarks.  (Caesar Aff. Ex. 10.)

January 1, 1992. ("License Agreement" (Caesar Aff. Ex. 8)).  Therefore, as to the marks, Caesar

and Carlos fully controlled and dictated use of those marks, including, but not limited to,

designing the marks and deciding how and where they would be displayed.  (Caesar Aff., ¶ 14.)

Moreover, Caesar and Carlos completely controlled and dictated the quality of services offered

under the WESTY marks by developing the WESTY business model, training the WESTY

employees, and by managing all aspects of the WESTY business through management

agreements.  (Caesar Aff., ¶ 16.)

Twelve WESTY self-storage centers have been opened since 1991.  (Caesar Aff., ¶ 17.)

Consistent with Caesar and Carlos' plan from the very beginning, both the brothers and APLP

own some of the facilities.  (Caesar Aff., ¶ 18.)  APLP owns eight facilities.  (Carlos Tr. 77:6-

12.)  Caesar and Carlos, as individuals, jointly own three, with each brother holding a 50%

interest in the limited liability companies that own each facility.  (Carlos Tr. 77:15-77:23.) The

twelfth facility, which opened after the filing of this action, is owned by Arredondo 2000, LLC,

which Caesar and his descendants control.  (Caesar Aff., ¶ 19.)  Three additional WESTY

facilities are in the construction and/or development stage.  (Caesar Aff., ¶ 20.)  APLP has no

connection to the facilities owned by Caesar and Carlos or Arredondo 2000 or the facilities under

development.  (Carlos Tr. 77:6-12.)  A&Co. will operate the new facilities, just as it operates all

existing WESTY facilities.  (Caesar Aff., ¶ 21.)

APLP has never been involved in the daily operation of any of the WESTY facilities.

(Caesar Aff., ¶ 22.)  In fact, APLP has never had any day-to-day operations and meets only once

per year.  (Caesar Aff., ¶ 23.)  This lack of involvement is no surprise given APLP's purpose.

APLP was intended to be, and has always been operated as, a passive real estate investment

vehicle created and controlled by Caesar and Carlos to generate income through real estate investment for the benefit of future Arredondo generations. (Caesar Tr. 125:11-18; Carlos Tr. 67:25-70:13.) While Carlos and Caesar do not own an interest in APLP, they manage APLP as trustees of the general partners of APLP, which, in shorthand, are the Caesar Arredondo Grandchildren Trust and the Carlos Arredondo Grandchildren Trust. (Amended Complaint ¶ 9.)

The owners of APLP did not decide to enter the storage business. As noted above, that decision was made individually by Caesar and Carlos in 1989, and it was not made at one of APLP's annual meetings. (Carlos Tr. 166:17-20.) In fact, in 1989 when the brothers developed the WESTY concept, *none* of Caesar and Carlos' children—the owners of APLP at that time— even knew that APLP existed. This is because Caesar and Carlos had structured APLP so that each child would not learn of his or her APLP interest until he or she turned 25, which first occurred in December 1991, *after* the first WESTY facility opened. (Carlos Tr. 19:19-22; 79:4-79:17; 78:3-9.) Similarly, the decision to change the business name from WESTY'S to WESTY in 1997 was not made at an APLP annual meeting. (Caesar Aff., ¶ 24.) In fact, the brothers treated at least one member of APLP's after-the-fact objection to that change as irrelevant. (Carlos Tr. 167:2-16.)

APLP's complete lack of involvement in deciding to enter the self-storage business, in selecting the WESTY marks, in developing the WESTY business model, and in operating the WESTY facilities on a daily basis, is consistent with APLP never claiming ownership of the WESTY marks until just before it filed this suit. As important examples, unlike WCI, APLP has never filed an application to register any of the WESTY marks and has never licensed use of the trademarks. (Carlos Tr. 167:17-167:10.) Indeed, Carlos admits that he did not ask Attorney

10

Shaver to register the marks in APLP's name, and he does not recall even considering placing

ownership of the marks in APLP in 1991. (Carlos Tr. 161:24-162:4.)

### E.    Carlos Left The WESTY Business In 1999 When WCI Assigned The WESTY Marks To A&Co., And Carlos Sold His Interest In A&Co. To Caesar

In late 1999, Carlos, who was then almost 65, advised Caesar that he intended to end his

day-to-day involvement with the WESTY business. (Carlos Tr. 17:19-21:18; 22:12-22:19.)  This

decision appears to have been motivated by several factors: Carlos' tremendous success in the

stock market during the 1990s, when his personal portfolio of stocks and mutual funds grew to

over $50,000,000 (Carlos Tr. 18:4-5; 40:7-14); his interest in renovating an apartment that his

wife was acquiring in her native Madrid, Spain (Carlos Tr. 54:9-55:3); and/or his desire to spend

more time at his property in the Cayman Islands (Carlos Tr. 55:4-9; 201:2-10).  Regardless,

Carlos made a series of offers to sell his one-half interest in A&Co. to Caesar, culminating in an

offer of $100,000 and conclusion of his daily involvement with the WESTY business by the end

of 1999. (Carlos Tr. 17:19-21:18).  Additionally, he agreed with Caesar's request that WCI and

WNY be dissolved as part of the transaction. (Carlos Tr. 21:19-23:11.)  Carlos further agreed

that ownership of the WESTY Trademarks would be transferred to A&Co. (Carlos Tr. 16:4-

16:23.)  At his deposition, Carlos defined the WESTY Trademarks to include WESTY'S,

WESTY, and the Westy Logo. (Carlos Tr. 44:12-19.)

The transactions transferring Carlos' interest in A&Co., dissolving WCI and WNY, and

assigning WCI's WESTY trademark rights to A&Co., were developed and memorialized

through a series of meetings and an admittedly "arm's length negotiation" in December 1999 and

January 2000.  These transactions involved Carlos; Caesar; Accountant Peter Formanek; and

11

Attorney Jeffrey Stephens. (Carlos Tr. 19:10-24:16, 29:12-35:25, 41:21-46:16, 111:4-15;

Affidavit of Peter Formanek ("Formanek Aff.") ¶¶ 3-5 (Ex. D).) The record of these

transactions—and Carlos' intent—is clear and undisputed.

1.    **WCI Assigned The WESTY Trademarks To A&Co. in December 1999**

At these meetings, Carlos and Caesar, as equal owners of A&Co. and WCI, instructed

Mr. Formanek to assist with the transfer of WCI's trademarks to A&Co. (Formanek Aff., ¶¶ 4,

5; Carlos Tr. 33:16-34:3; 42:24-44:19) Carlos initially understood that the WESTY Trademarks

would be assigned to Caesar personally (Carlos Tr. 33:25-34:3), but prior to signing the

transaction documents, Attorney Stephens informed Carlos that the trademarks would instead be

assigned to A&Co. (Carlos Tr. 42:12-45:5.) Of course, with Carlos' departure, Caesar would

solely own A&Co. (Carlos Tr. 42:24-43:23.) Fully aware of and accepting these facts and

circumstances, Carlos executed the transaction documents. (Carlos Tr. 45:21-46:2.)

Consistent with Carlos and Caesar's intentions and instructions, virtually all of the

remaining non-cash assets and liabilities of WCI and WNY were transferred to A&Co, and WCI

and WNY were dissolved. (Formanek Aff., ¶¶ 4, 5.) As part of this transfer, WCI specifically

assigned all of its rights in its trademarks to A&Co. on December 21, 1999 for $20,000.

(Trademark Assignment, dated 12/21/99 (Caesar Aff. Ex. 11); Bill of Sale, dated 12/28/99

(Caesar Aff. Ex.12); endorsed check for $20,000, 12/28/99 (Caesar Aff. Ex.13).)[6] In the tax

return that Mr. Formanek prepared for Carlos for 1999, Carlos declared a $10,000 capital gain

---

[6] Just as the brothers intended and the transaction called for, WCI recorded the assignment of the WESTY
trademarks from WCI to A&Co. with the PTO on January 3, 2000. (Assignment Form, dated 1/3/00 (Caesar Aff.
Ex.14).) The PTO sent a Notice of Recordation of Assignment to Perman & Green, attorneys for A&Co., reflecting
that WCI "assign[ed] the entire interest and the goodwill" of its trademarks to A&Co. (PTO Notice of Recordation
of Assignment, dated 4/18/00 (Caesar Aff. Ex. 15).)

for his half of the $20,000 assignment fee. (Formanek Aff., ¶ 12.) Mr. Formanek reviewed this

return with Carlos, thereby reaffirming that Carlos knew and intended that A&Co. would own

the WESTY Trademarks as of January 1, 2000. (Id.)

> **2.    Carlos Sold His Interest In A&Co. And The WESTY Marks**
> **To Caesar In January 2000**

~~After WCI executed the documents transferring the WESTY trademarks to A&Co.,~~

Carlos signed a written agreement dated January 1, 2000 selling his entire interest in A&Co. to

Caesar. ("Sale Agreement" (Caesar Aff. Ex. 16).) Notably, the sale of Carlos' A&Co. interest

expressly included "trademark rights." (Id.). Specifically, in addition to reciting his desire to

enter into the transaction, Carlos "transfer[red] all of his right, title and ownership interest in

[A&Co.] to Caesar" and further "relinquishe[d] all rights and claims to any assets of [A&Co.],

tangible or intangible, now owned or to be owned in the future, including without limitation ...

good will, *trademark rights* and vehicles . . .." (Id.) (emphasis added). The Sale Agreement

expressly excluded only two assets—an automobile and an office safe—from the assets that

Carlos knowingly and deliberately relinquished and transferred to Caesar. (Id.) The Sale

Agreement did not exclude any trademark assets. (Id.) As a result of the express use of the term

"trademark rights" in the Sale Agreement, Carlos understood and intended that A&Co. would

become the owner of all of the WESTY Trademarks, including WESTY, WESTY'S and

WESTY AT YOUR DOOR. (Carlos Tr. 16:4-14 ("I believed I had given the marks to Caesar

and that he put [them] in A&Co."); see also Carlos Tr. 42:16-43:23; 44:9-19; 46:24-48:8.)

Since the dissolution of WCI and WNY in 1999, A&Co. (now actively run by Caesar and

his two sons) has operated all of the WESTY facilities. (Caesar Aff., ¶ 25.) From the time

13

Carlos sold his interest in A&Co., neither Carlos nor any member of his family have played a

day-to-day role in the operations of any of the WESTY facilities. (Carlos Tr. 28:19-23.) And, as

noted above, APLP has never played any role in the day-to-day operations of any WESTY

facility nor in the day-to-day use of the WESTY Trademarks. (Caesar Aff., ¶ 22.)

F.   **More Than Eleven Years After Deciding That WCI Owned The WESTY Marks, Carlos Does an About Face and Claims That APLP Owns The WESTY Marks**

In August or September of 2001, Carlos' daughter, Fabiola, asked Carlos who owned the

WESTY Trademarks. (Carlos Tr. 79:25-80:16.) When Carlos advised her that he assigned all of

the trademark rights to Caesar, Fabiola commented "wouldn't it be good" if APLP owned the

marks. (Carlos Tr. 80:10-16.) Although Carlos initially told Fabiola to "leave it alone," upon

her urging, Carlos met with Caesar to discuss assigning the WESTY Trademarks to APLP.

(Carlos Tr. 81:18-82:11.) Expressing regret at the price he received for his interest in A&Co.

and the trademarks, Carlos asked Caesar "if it were possible to put the trademarks into APLP."

(Carlos Tr. 82:13-21.) At no point in this meeting did Carlos claim that the brothers had made a

mistake in making WCI the owner of the trademarks. (Caesar Aff., ¶ 26.) Nor did Carlos claim

that APLP was the actual owner of those marks. Instead, recognizing that A&CO. owned the

WESTY Trademarks, he simply wanted Caesar to assign ownership of the marks from A&Co. to

APLP. (Carlos Tr. 82:13-21.) Caesar declined this request. (Carlos Tr. 82:13-21.)

Fabiola later raised the issue of the WESTY Trademarks with Carlos again, advising him

that she had consulted with counsel and devised a strategy to attempt to undo the decisions her

father and Caesar had made over more than a decade. (Carlos Tr. 9:3-13:5.) Her strategy was to

claim that APLP had all along owned the trademarks because APLP owned the first WESTY

facility. (Carlos Tr. 9:3-13:5.) Following that call and further meetings with counsel, on

October 30, 2002, Carlos sent a letter, ghostwritten by his counsel in this case, claiming for the

first time that the decision to make WCI the owner of the WESTY Trademarks was simply a

mistake and that APLP was the rightful owner of those marks. (Carlos Tr. 8:12-9:2; 195:24-

196:2; Caesar Aff. Ex. 17.)

### G.    Carlos Did Not File This Action Until Approximately Three Years After He Left The WESTY Business And Sold His Interest A&Co. To Caesar

Notwithstanding the undisputed evidence over 10-plus years establishing WCI's and then

A&Co.'s ownership of the WESTY Trademarks, Carlos brought this declaratory judgment action

claiming that APLP owns the WESTY Trademarks. (Amended Complaint ¶¶ 8-31.) In both his

original and amended complaints, Carlos seeks a "Declaration of Trademark Ownership." (Id. at

Count I.)[7] Defendants filed their Answer and Affirmative Defenses to the Amended Complaint

on August 5, 2003, denying that APLP owns the WESTY marks and further denying Carlos'

claimed entitlement to fees and costs.  On June 2, 2003, Defendants filed their initial Motion for

Summary Judgment as to Carlos' declaratory judgment action and a Motion to Stay Discovery

pending its resolution, which Carlos opposed. At the October 17, 2003 hearing on the Motion to

Stay, Carlos, through counsel, represented to the Court that after completing discovery "this

matter will be ripe for summary judgment." (Tr. 10/17/03 Hearing On Motion To Stay

Discovery, at 17 (Ex. E).) The Court denied the Motion to Stay Discovery and, on January 29,

2004, denied Defendants' Motion for Summary Judgment without prejudice and with leave to

file it again after the conclusion of discovery.  Now that discovery has been completed,

---

[7] The Amended Complaint added two counts.  Count II seeks a declaration that Carlos is entitled to his attorneys' fees and costs for this matter pursuant to APLP's Partnership Agreement.  Count III alternatively seeks the same fees and costs under Conn. Gen. Stat. § 34-335.

Defendants have filed this motion seeking summary judgment on all three Counts in the

Amended Complaint.[8]

## III.    LEGAL ANALYSIS

### A.    Summary Judgment Standard

Summary judgment is appropriate where, as here, there is no genuine issue of material

fact and under the undisputed facts the moving party is entitled to judgment as a matter of law in

its favor. See Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23

(1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Matsushita Elec. Indus. Co.

v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Omega Eng'g, Inc. v. Eastman Kodak Co.,

908 F. Supp. 1084, 1089 (D. Conn. 1995). The Supreme Court has emphasized the judicial

policy favoring use of summary judgment for the prompt and efficient resolution of claims that

do not have factual or legal bases. Celotex, 477 U.S. at 327.  Indeed, summary judgment is an

important judicial tool that avoids the delay and expense of trying claims for which a legally

meritorious, factually indisputable defense exists. Omega, 908 F. Supp. at 1089.

Under Rule 56, the moving party has the burden to demonstrate the non-existence of a

genuine issue of material fact. Omega, 908 F. Supp. at 1090.  The moving party may discharge

this burden by demonstrating the absence of evidence to support the non-moving party's claims.

Id.  The burden then shifts to the non-moving party, which must show the existence of a disputed

material fact by admissible evidence. Celotex, 477 U.S. at 324; see also Anderson, 477 U.S. at

248; Fed. R. Civ. P. 56(e).  Mere allegations or denials will not defeat a motion for summary

judgment. Fed. R. Civ. P. 56(e).  Rule 56 "mandates the entry of summary judgment against the

---

[8] The plaintiffs initially expressed an interest in deposing APLP's accountant, Peter Formanek, but, on information and belief, after they spoke with Mr. Formanek and reviewed his documents, they did not pursue the deposition of either Mr. Formanek or Attorney Stephens.

party who fails to make a showing sufficient to show the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at

322. A non-movant cannot create a genuine factual dispute by pointing to "some metaphysical

doubt as to the material facts." Matsushita, 475 U.S. at 586; see also Parker v. Federal Nat'l

Mortgage Ass'n, 741 F.2d 975, 980 (7th Cir. 1985) (court not required to draw every

conceivable inference from facts; only reasonable inferences need be drawn).

> **B.      The Undisputed Facts Show That Defendants Are Entitled To Summary
> Judgment In Their Favor On Count One Because A&Co. Is The Rightful
> Owner Of The WESTY Trademarks**

Summary judgment is appropriate on Carlos' claim of declaratory relief regarding

ownership of the WESTY Trademarks. As a result of Carlos' own admissions, which are also

independently documented, there is no genuine issue of material fact as to WCI's ownership of

the WESTY marks between early 1991 and December 1999, and A&Co.'s ownership of those

marks from December 1999 to the present. Moreover, as a matter of law, Caesar and Carlos had

the right to place ownership of the WESTY marks in WCI because Caesar and Carlos created the

WESTY Trademarks and business, and because Caesar and Carlos controlled use of the WESTY

marks as well as the nature and quality of all services offered under the trademarks. In contrast,

APLP's mere ownership of the first operational WESTY facility does not confer any rights in the

WESTY marks. Each of these points is addressed below.

> **1.      Caesar And Carlos Intended That WCI Own The WESTY
> Trademarks, And WCI Did So From 1991 To December 1999**

The facts indisputably demonstrate that after creating the WESTY marks, Carlos and

Caesar decided that WCI would own and register the marks. (Carlos Tr. 148:3-7; Caesar

Tr. 124:12-25.) Indeed, Carlos admitted in his deposition that Caesar and he placed ownership

of the WESTY marks in WCI in early 1991, and that WCI continued to own the trademarks until December 1999. (Carlos Tr. 148:3-7); see generally Section II, B.)

As between the various entities Caesar and Carlos controlled, WCI was the logical and appropriate choice because it was the only entity they both jointly owned and controlled. In contrast, WNY was owned solely by Caesar, and the brothers did not own APLP. (Caesar Tr. 84:22-85:9; 125:5-18.) And APLP has always been a passive real estate investment vehicle designed by Caesar and Carlos solely to generate income for their children and future Arredondo generations. (Caesar Tr. 125:11-18.) Additionally, APLP was not involved in the decision to enter the self-storage business. That decision was made in 1989 solely by Caesar and Carlos as individuals. (Caesar Tr. 166:17-20.) In fact, in 1989, *none* of Caesar and Carlos' children—the owners of APLP at that time—even knew that APLP existed. (Carlos Tr. 19:19-22; 79:4-79:17; 78:3-9.)

### 2.    A&Co. Owned The WESTY Trademarks From December 1999 To The Present

There also is no genuine dispute that WCI, as the owner of the WESTY Trademarks, assigned its rights in the trademarks to A&Co. in December 1999. Carlos' own admission in his deposition testimony, along with the unambiguous sale and assignment documents and the affidavits of Mr. Formanek and Caesar, establish Carlos' knowledge of, and consent to, the assignment of the WESTY Trademarks from WCI to A&Co. (See generally, Section II.D.)

Carlos also agrees that he sold all of his rights in A&Co.'s assets, except for a safe and an automobile, to Caesar on January 1, 2000, and that those rights specifically included all of the rights in the WESTY Trademarks that A&Co. had obtained from WCI a few days earlier with

Carlos' knowledge and consent.  As Carlos admitted in his deposition, "I believed I had given the marks to Caesar and that he put [them] in A&Co."  (Carlos Tr. 16:4-14.) [9]

### 3. As A Matter Of Law, Caesar And Carlos Had Every Right To Put Ownership Of The WESTY Trademarks In WCI

The heart of Carlos' new litigation-inspired theory of trademark ownership is the doctrine of "first use"—a principle historically used to resolve who has superior rights to a mark as between two unrelated parties who independently develop and use the same trademark.  In essence, the doctrine asks which of the competing entities first used the trademark in a manner sufficient to create trademark rights.  The first use doctrine, however, has no application in cases like this between related parties.  It cannot be used to rewrite or undo the history of business dealings between two successful and savvy brothers who knew what they wanted to accomplish and who left a remarkably clear record of their actions and intentions.  As shown below, Carlos' new minted legal claim, which is contrary to his stated intent and course of conduct for more than a decade, cannot be salvaged by an improper application of the "first use" doctrine.

### a. Carlos And Caesar, As The Creators of the WESTY Trademarks And Business And As The "Leading Lights" Of The Arredondo Family Businesses, Properly Put Ownership Of The Trademarks In WCI

The issue of trademark ownership among various family owned entities was addressed in Airport Canteen Services, Inc. v. Farmer's Daughter, Inc., 184 USPQ 622 (TTAB 1974).  That

---

[9] As discussed above, the only assets Carlos excluded from the Sale Agreement were an automobile and an office safe; no trademarks rights were excluded.  (Caesar Aff. Ex. 16 at ¶¶ 2(a) & 2(b).)  Had Carlos intended to retain any rights in the WESTY Trademarks, he could have and would have done so in the Sale Agreement, just as he did with the car and the safe, but he chose not to do so.  See Hartford Accident & Indem. Ins. v. CIGNA Reinsurance Co., No. 3:95CV2699(JCH), 1999 U.S. Dist. LEXIS 22608, at *8 (D. Conn., Nov. 23, 1999) (stating "[wh]en contract language is clear and unambiguous, the court need look no further than that language to determine the meaning of the contract") (copies of unpublished cases and TTAB cases are attached as Ex. 19); Brookridge Funding Corp. v. Northwestern Human Servs., 175 F. Supp.2d 355, 365 (2d Cir. 2001).

cancellation action before the Trademark Trial and Appeal Board ("TTAB") involved two

different parties who operated restaurants in different geographical areas under the same mark,

FARMER'S DAUGHTER. The petitioner, which had used the FARMER'S DAUGHTER mark

since 1964, sought to cancel the respondent's trademark registration of FARMER'S

DAUGHTER for restaurant services. The grounds for cancellation included the allegation that

respondent committed fraud when it applied to register a mark used by one family business but

listed a second family business as the applicant and owner of the mark.

The TTAB rejected the petitioner's argument. Finding that applicant's founder had been

the "leading light" of various family enterprises, the TTAB ruled that any use of the disputed

mark by any of the family companies was for his benefit. Specifically, the TTAB stated:

> It is clear from the record that Mr. Guagenti has been the leading
> light or owner of what can be considered to be family enterprises
> or, if you will, corporate sales, and that, for purpose of
> convenience, he, at the advice of counsel or accountant, transferred
> ownership of his various interests to one or another of his
> corporations without disturbing, and that is the important fact, the
> continuance of operation of his different activities including that of
> the "FARMER'S DAUGHTER" restaurant. It is apparent that
> there was not nor is there any claim of adverse rights in the mark
> "FARMER'S DAUGHTER" by any corporation within Mr.
> Guagenti's organization and that, in essence, any use of the mark
> by any of the corporations was for the benefit of and inured to the
> benefit of Mr. Guagenti.

184 USPQ at 627.

The Farmer's Daughter holding applies with equal force here and disposes of the case as

a matter of law. The "leading lights" of the Arredondo family, Caesar and Carlos, created the

WESTY business concept and the WESTY marks, then chose to rest trademark ownership in

WCI, not APLP. Moreover, Caesar and Carlos exercised complete control over each and every

20

WESTY facility, including those owned by APLP. The brothers' decision to make their jointly owned business the trademark owner was well-intentioned, well-informed, and legally correct. It cannot be undone or cast aside a decade later by Carlos' change of heart over selling his rights to Caesar, or by his daughter Fabiola's self-interest or dissatisfaction with the deal.

   **b.**  **Caesar And Carlos' Complete Control Over APLP And Use Of The WESTY Trademarks Makes APLP A "Related Company" Under The Lanham Act**

  Under the Lanham Act, the federal trademark law, it is not necessary that a company seeking registration of a trademark be the first user of the mark as long as the first user is a "related company" whose use of the mark is under the applicant's control.[10]  Indeed, a company can obtain and maintain a trademark registration and own proprietary trademark rights to a mark used exclusively by others provided the use is by related companies whose use of the mark is under the registrant's control.[11]  In other words, a company can file a trademark application and own the resulting trademark registration without *ever* having used the mark itself. Turner v. HMH Publishing Co., 380 F.2d 224, 229 (5th Cir. 1967), cert. denied, 389 U.S. 1006 (1967); Pneutek, Inc. v. Scherr, 211 USPQ 824, 833 (TTAB 1981).

---

[10] Section 5 of the Lanham Act, 15 U.S.C. § 1055, which governs the use of trademarks by related companies, provides: "Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public. If first use of a mark by a person is controlled by the registrant or applicant for registration of the mark with respect to the nature and quality of the goods or services, such first use shall inure to the benefit of the registrant or applicant, as the case may be."

[11] The Lanham Act defines a "related company" as "any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or services on or in connection with which the mark is used." 15 U.S.C. § 1127. And the definition of a "person" includes "a firm, corporation, union, association, or other organization capable of suing and being sued in a court of law." Id.  APLP is thus a "person" under the Lanham Act.

The Lanham Act requires only that an applicant "control" the nature and quality of the goods and services offered under the mark by the related company. This control usually occurs in one of two scenarios, or some combination of them: (1) the two entities are themselves sufficiently related through common ownership or control over the business that the necessary control over the trademark is presumed, or (2) the applicant licenses the mark to another. As shown below, APLP qualifies as a "related company" to WCI under each approach.

### (i) APLP Is A "Related Company" By Virtue Of Caesar and Carlos' Control

First, based on the undisputed facts listed below, the level of control that Caesar and Carlos exercised over APLP generally, and over use of the WESTY trademarks at APLP-owned facilities specifically, makes APLP a "related company" of WCI under the Lanham Act.

- Caesar and Carlos solely decided to enter the self-storage business and created the WESTY Trademarks.

- Caesar and Carlos solely designed the WESTY buildings and solely developed the real property for the WESTY centers.

- Caesar and Carlos solely managed the WESTY centers and solely decided how to use the WESTY marks at those centers.

- Caesar and Carlos created the idea of APLP as a passive investment vehicle to generate income for their children and future generations of Arredondos.

- Caesar and Carlos formed and initially funded APLP, and all of the members of APLP during relevant times were children of Caesar or Carlos.

- Caesar and Carlos were the sole trustees of the general partners of APLP and solely controlled APLP when they launched the WESTY business in May 1991.

- None of the members of APLP (i.e., Caesar and Carlos's children) knew anything about APLP before the first WESTY center opened in May 1991.

22

Because Caesar and Carlos were the sole creators and trustees of APLP and because none of their children (i.e., APLP's members) even knew about APLP before the first WESTY center opened in May 1991, Caesar and Carlos did not need an ownership interest in APLP to exercise their complete control over APLP and everything that it did. In short, Caesar and Carlos's positions as the "leading lights" of the Arredondo family and the various Arredondo enterprises including WCI and APLP, coupled with their complete and unfettered control over APLP as a "related company," are more than enough to justify and support their decision to vest ownership of the WESTY Trademarks first in WCI and later in A&Co. as WCI's successor.

### (ii)    APLP Is A "Related Company" Through An Implied License

Second, a "related company" relationship also exists here through a licensing arrangement and appropriate control over use of the WESTY marks at APLP-owned facilities. Although there is no express written or oral trademark license from WCI to APLP, the conduct of the parties clearly establishes an *implied* trademark license from WCI to APLP. Moreover, WCI did grant a direct, express written license to WNY as manager of the first WESTY facility in Port Chester, New York, the very same facility that APLP owns and that forms the basis for Carlos' "first use" theory.

"An implied license in fact 'arises out of the objective conduct of the parties, which a reasonable person would regard as indicating that an agreement has been reached.'" Villanova University v. Villanova Alumni Educational Foundation, Inc. 123 F. Supp. 2d 293, 307 (E.D. Pa. 2000), quoting Birthright v. Birthright, Inc., 827 F. Supp. 1114, 1134 (D.N.J. 1993). "Permission to use the trademarks coupled with the exercise of reasonable control over such use can lead to the conclusion that an implied license existed between the parties, even where no

23

contract was made." <u>Villanova</u>, 123 F. Supp. 2d at 307; <u>see also</u> <u>United States Jaycees v.</u>

<u>Philadelphia Jaycees</u>, 639 F.2d 134, 140, n.7 (3rd Cir. 1981) ("the district court found as facts

that state and local chapters affiliated with the United States Jaycees were permitted during the

term of affiliation to use the National's trade and service marks.  Thus some type of license

agreement existed.").

"It is irrelevant whether the parties thought of the arrangement at the time in terms of an

implied license.  The test for whether or not an implied license existed is based solely on the

objective conduct of the parties." <u>Villanova</u>, 123 F. Supp. 2d at 308, <u>citing</u> <u>Allen-Myland v.</u>

<u>International Business Machines Corp.</u>, 746 F. Supp. 520, 549 (E.D. Pa. 1990) and <u>Jaycees</u>, 639

F.2d at 140, n.7.

Regarding the WESTY Trademarks, the objective conduct of Caesar and Carlos acting as

owners of WCI and creators of the WESTY Trademarks and business on one hand, and as the

creators and sole trustees of the general partners of APLP and parents of APLP's members on the

other hand, unquestionably establishes an implied license.  Caesar and Carlos created and

developed the WESTY business to benefit both themselves as well as their children and future

generations of Arredondos by allowing APLP to participate as passive owners of *some* of the

WESTY properties.  (<u>See</u> Section II.D.)  Caesar and Carlos, however, fully controlled and

dictated use of the WESTY Trademarks including, but not limited to, designing the marks and

deciding how and where they would be displayed.  (<u>See</u> Sections II.C and D.)  Caesar and Carlos

also completely controlled and dictated the quality of the services offered under the WESTY

marks by developing the WESTY business model, training the WESTY employees, and by

managing all aspects of the WESTY business through management agreements. (See Section II.D.)

Moreover, the January 1, 1992 License Agreement from WCI to WNY corroborates WCI's ownership of the WESTY Trademarks. Although the January 1, 1992 License Agreement does not identify any specific marks, it clearly covers at least the Westy Logo because the wording "Miscellaneous Design" in the License Agreement corresponds exactly to the description of the Westy Logo used by the PTO in several papers it issued in connection with WCI's trademark application for that mark. Specifically, the Notice of Publication for the Westy Logo application, which was issued by the PTO before January 1, 1992, described the mark as a "Miscellaneous Design." (Caesar Aff. Ex. 22.) Accordingly, even if the License Agreement covered only the Westy Logo, it nonetheless supports WCI's ownership of all of the WESTY marks because Carlos admits that the same entity owned both the WESTY word mark and the Westy Logo. This License Agreement, executed only seven months after the first WESTY facility opened, is contemporaneous evidence confirming WCI's ownership of all of the WESTY Trademarks and its desire to license those marks to Arredondo-controlled related companies.[12]

Additionally, an implied license from WCI (and later A&Co.) to APLP is entirely logical. WCI and A&Co. have had direct, contractual operational and managerial relationships with APLP for the WESTY facilities that APLP owns, as well as with Arredondo 2000, LLC and the Caesar and Carlos-owned companies that own the other WESTY facilities. In contrast, an implied license from APLP is illogical because APLP has no contractual, operational, or

---

[12] Both Carlos and Caesar testified that they did not distinguish among the trademarks, which explains the ambiguity in the License Agreement language. (Carlos Tr. 42:24-48:2; 167:17-168:18; Caesar Tr. 10:4-23; 24:23-25:2; 130:4-131:8.)

managerial relationship with the Caesar and Carlos-owned or the Arredondo 2000, LLC-owned

WESTY facilities, and APLP has never controlled the use of WESTY Trademarks or the quality

of the services offered under those marks.

> **c.     APLP's Mere Ownership Of The First Operational WESTY
> Facility Does Not Confer Any Rights To The WESTY
> Trademarks**

As noted above, Carlos admits that both he and Caesar intended for WCI and then

A&Co. to own the WESTY Trademarks.  His position now is that their clear intent and actions

mean nothing now simply because APLP owned the first operating WESTY facility.  In essence,

Carlos now claims that mere record ownership of the physical facility by APLP absolutely and

irrevocably trumps every fact, intention, promise, and transaction under which the brothers

operated the WESTY business for over a decade.  Merely stating this proposal demonstrates its

absurdity both as a matter of fact and law.

Accordingly, even under Carlos' theory of the case, if there was a valid legal basis for the

brothers initially placing ownership of the WESTY Trademarks in WCI, Carlos must agree that

WCI and then A&Co. owned the WESTY Trademarks.  As demonstrated above, there are

perfectly valid bases for WCI's ownership of the WESTY Trademarks.  Carlos' claim that APLP

owns the WESTY marks therefore fails as a matter of law.

The cases cited by Carlos in his brief in opposition to Caesar's initial motion for

summary judgment do not change this result, Carlos argued in that brief that "the exclusive right

to a trademark belongs to one who first uses it in connection with specified goods," quoting Blue

Bell, Inc. v. Farah Mfg. Co., Inc., 508 F.2d 1260, 1265 (5th Cir. 1975).  The Blue Bell case,

however, involved two competing clothing manufacturers that both independently decided to use

the same trademark for men's clothing.  The <u>Blue Bell</u> court examined each company's use of

the mark and had to decide which had sufficiently used the disputed trademark to be declared the

"first user" and thus the trademark owner.  For the reasons discussed above, the <u>Blue Bell</u> case

involving competing and completely unrelated businesses is readily distinguishable from, and

irrelevant to, this case involving a "family" of family businesses operating under the unified

management of Caesar and Carlos.

> **d.     The Equities Compel Ownership Of The WESTY Trademarks As Caesar And Carlos Decided, i.e., By WCI And Then A&Co.**

The equities, especially when considered in light of the "related company" doctrine,

strongly favor ownership of the WESTY Trademarks in A&Co.  Professor McCarthy, author of

the leading trademark treatise, explains the rationale for permitting companies or persons to own

trademarks they create but which are used initially and/or solely by others:

> For some time, there was considerable doubt as to whether initial
> rights in a mark could be acquired and sustained through use of the
> mark only by controlled licensees when the licensor itself makes
> no use of the mark.  For example, when party Alpha creates a
> concept for a hot dog fast-food franchise system identified by the
> mark THE DOG HOUSE, and then licenses it to party Zeta, is
> Alpha the "owner" of that mark?  The argument that at one time
> appeared to be the law was that because Alpha did not use the
> words as a "mark" first, before licensing, Alpha had no "mark" to
> license to Zeta. The apparent result of accepting this argument is
> that Zeta becomes the "owner" of the mark by virtue of being the
> first to use the words as a mark to identify and distinguish the
> goods or services. This result appears grossly inequitable. If it were
> to be the law, Alpha would have to first go through the formalism
> of itself operating such a fast-food outlet before it could engage in
> licensing others.

2 J. McCarthy, <u>Trademarks and Unfair Competition</u>, § 18:36 (4th ed 2000).

The same "grossly inequitable" result would occur here if ownership of the WESTY Trademarks created and developed solely by Caesar and Carlos at their substantial expense, time, effort, and risk were found to lie in APLP merely because the brothers chose to put ownership of the first WESTY facility in APLP.  The result sought by Carlos is even more inequitable considering that APLP is a passive investment vehicle consisting of Caesar's and Carlos' heirs who had nothing to do with the creation or development of the WESTY business or trademarks and who did not even know of APLP's existence in May 1991 when the first WESTY facility opened.  Indeed, trademark ownership was not essential for the members of APLP—Caesar and Carlos' children and their descendants—to enjoy the benefits intended by Caesar and Carlos when they set up and funded APLP.  As a result of Caesar's and Carlos' efforts, APLP's members have received more than $20,000,000 in income from APLP over the last ten years, simply for being the heirs of Caesar or Carlos.  All of this has been accomplished without APLP owing the WESTY Trademarks.  Indeed, in 2003 alone, through APLP, Caesar and Carlos's heirs received income of $2,700,000.  Therefore, Caesar and Carlos' decision in 1991 to place ownership of the trademarks in WCI and then A&Co. did not interfere with the purpose of APLP of creating wealth and income for current and future Arredondo generations.  The undisputed facts make plain that Caesar and Carlos never envisioned nor intended the twisted, revisionist result that Carlos now puts forward.

**4.      Carlos' Actions Regarding The Dissolution And Reformation Of WCI
          Further Support Summary Judgment In Defendants' Favor**

Carlos asserted in his brief in opposition to Caesar's initial motion for summary judgment that even if WCI was the valid owner of the WESTY marks starting in 1991, that ownership was transferred to Carlos and Caesar equally when WCI was initially dissolved in 1992.  (Plaintiff's Response To

Defendants' Motion For Summary Judgment filed 6/23/03, pp. 11-12.) Carlos' own testimony, actions, and documents, however, completely undermine this contention.

The temporary dissolution of WCI does not disturb Caesar and Carlos' unequivocal intent to continuously place and maintain the WESTY Trademarks in WCI between 1991-1999. There is no dispute that WCI was reformed in 1996 after the original WCI was dissolved, or that WCI was reformed in 1996 with the identical 50/50 ownership.[13] There also is no dispute that Carlos intended that the reformed WCI own the WESTY Trademarks as did the first WCI. As Carlos admitted during his deposition:

Q:   . . . There was a Connecticut entity called WESTY'S that was formed in the summer of 1996, right?

A:   There was a subchapter S corporation formed in Connecticut called WESTY or WESTY'S or something Connecticut, Inc. in 1996, yes.

Q:   And in connection with that entity, was there some consideration of the trademarks?

A:   Yes.

Q:   And what was that consideration?

A:   I think it was trying to find out, A, if they existed, B, where they were, C, how could we get a hold of them.

Q:   It was your intention to have this entity that was formed on 1996 to own the trademarks, right?

A:   I think so, under the mistaken impression that 1991's corporation was correctly the owner.

---

[13] Documents signed by Carlos further evidence Caesar and Carlos' intent for WCI to continue in its original form after 1996, and to own the WESTY Trademarks. For example, a Connecticut tax registration application from July of 1997 bearing Carlos' signature, and signed after WCI's 1996 reformation, lists the date of incorporation for WCI as March 8, 1991. (Caesar Aff. Ex. 20.) Additionally, WCI's federal tax returns have the same tax identification number, and display the same incorporation year (1991) and the same Subchapter S election date (1991), both before and after WCI's 1996 reformation. (Caesar Aff. Ex. 21.)

29

(Carlos Tr. 173:3-21.) Indeed, in 1996, Carlos specifically asked A&Co.'s attorney, Jeffrey Stephens, to confirm that WCI owned the trademark WESTY'S. In a December 18, 1996 memo to Carlos, Stephens confirmed for Carlos that WCI owned the mark as shown by the PTO records. (Caesar Aff. Ex. 10.) In sum, in Caesar and Carlos' minds, nothing had changed between the original WCI and the reformed WCI.

This very issue—the effect of a "gap" in corporate status—was decided in Brewski Beer Co., Inc. v. Brewski Brothers, Inc., 47 USPQ2d 1281 (TTAB 1998), in which the applicants listed a "first use" date prior to their incorporation date and in which their corporate charter lapsed for three years after incorporation. Id. at 1286. The TTAB rejected the plaintiff's arguments that defendant was not the prior user of the mark because its "first use" date was prior to its incorporation date and the lapse in corporate registration for three years was fatal to trademark ownership. Id. According to the TTAB, the use of the BREWSKI BROTHERS mark by the individual owners of the business prior to the date of incorporation inured to the benefit of the defendant corporation after incorporation. Id. It also held that the individual owners' continuous trademark use inured to the benefit of defendant corporation upon corporate reinstatement after the lapse. Id. (citing 2 J. McCarthy § 16:36).[14]

Similar to Brewski, whether as a two-person *de facto* partnership or as equal owners of WCI I and WCI II (as Carlos now calls them), Caesar and Carlos, as the creators of the WESTY business and trademarks, and as the sole owners of both WCI companies, were one and the same. Accordingly, Carlos' own actions regarding the 1992 dissolution of WCI I and 1996 reformation of WCI II further support entry of summary judgment in Defendants' favor on Count One.

---

[14] See also Accu Personnel, Inc. v. Accustaff Inc., 38 USPQ2d 1443 (TTAB 1996) (defects in corporate form not fatal where previous entity and corporation are essentially the same); Argo & Company, Inc. v. Springer, 198 USPQ 626 (TTAB 1978) (application by entity that failed to incorporate not void because non-existent "corporation" and individual owners were same, single commercial enterprise).

**C.    As To Count Two, Defendants Are Entitled To Summary Judgment
In Their Favor Because APLP'S Partnership Agreement Does Not Allow
Carlos To Recover Attorneys' Fees And Costs For Meritless Claims**

In Count Two, Carlos seeks to recover the attorneys' fees and costs he has incurred in

this case.  His claim is based on the APLP Partnership Agreement ("APLP Agreement"), which

provides in relevant part:

> The Partnership shall promptly reimburse any General Partner for any *reasonable* out-of-
> pocket expenses incurred by such General Partner in connection with the performance of
> such General Partner's obligations to the Partnership.

(Ex. 18, Art. VII, Sec. 7.4 (emphasis added).)  Thus, Carlos may be reimbursed only for

"reasonable" expenses.   Carlos may not recover his expenses for this case, however, because his

claim that APLP owns the WESTY Trademarks is meritless, as demonstrated above.  Reasonable

expenses do *not* include expenses incurred on meritless claims.  See e.g., Lyons v. Nichols, No.

CV940312019S, Conn. Super. LEXIS 1297, at * 6 (Conn. Super. Ct., May 13, 1999) (court

refused to award punitive damages where claims were meritless).  Accordingly, Defendants are

entitled to summary judgment in their favor on Count Two.

**D.    As To Count Three, Defendants Are Entitled To Summary Judgment In
Their Favor Because Conn. Gen. Stat. Section 34-335 Does Not Apply To
Limited Partnerships Such As APLP**

In Count Three, Carlos seeks to recover the attorneys' fees and costs he incurs in

connection with this litigation, pursuant to Section 34-335 of the Connecticut General Statutes.

Section 34-335 permits recovery of expenses for limited *liability* partnerships formed under

Sections 34-300 through 34-939 of the Uniform Partnership Act ("UPA"). [15]   APLP was not

---

[15] As Section 34-314(b) of the Uniform Partnership Act specifies, "An association formed under a statute other than
sections 34-300 to 34-399, inclusive, a predecessor statute or a comparable statute of another jurisdiction is *not a
partnership under sections 34-300 to 34-399* . . . ." (emphasis added.)

31

formed under Sections 34-300 to 34-399 of the UPA, and it is not a limited *liability* partnership.

Instead, APLP was created under Section 34-10 of the Connecticut Uniform Limited Partnership

Act, and is simply a limited partnership.[16] See Conn. Gen. Stat. §§ 34-9 to 34-38u (1994).

Accordingly, Section 34-335 is inapplicable to APLP, and it cannot serve as a basis to recover

Carlos' costs of this litigation.[17]    As a result, the Defendants are entitled to summary judgment in

their favor on Count Three.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment should be

granted, and summary judgment should enter in Defendants' favor as to all three Counts in the

Plaintiff's First Amended Complaint For Declaratory Judgment.

                              DEFENDANTS,
                              CAESAR A. ARREDONDO, et al.


                        By _____
                              Craig A. Raabe (ct 04116)
                              E-mail: craabe@rc.com
                              Edward J. Heath (ct20992)
                              E-mail: eheath@rc.com
                              Robinson & Cole LLP
                              280 Trumbull Street
                              Hartford, CT 06103
                              Tel.: (860) 275-8200
                              Fax: (860) 275-8299

---

[16] As the APLP Agreement states, "As promptly as possible following the signing of this Agreement, the General Partners shall cause a Certificate of Limited Partnership . . . to be prepared and filed in accordance with Section 34-10 of the Connecticut Uniform Limited Partnership Act . . . ." (Ex. 18, Art. V, *Term*.)

[17] There is no corresponding statutory provision for recovery of limited partnership expenses.

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was mailed via federal express, postage prepaid, on this 12th day of November, 2004, to the following counsel of record:

Robert P. Dolian, Esq.
Cummings & Lockwood LLC
Four Stamford Plaza
P.O. Box 120
Stamford, CT  06904-0120

Martin J. Elgison, Esq.
David J. Stewart, Esq.
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA  30309-3424


_____
Craig A. Raabe