IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CARLOS A. ARREDONDO, in his capacity as Trustee of The 2000 Trust for the Grandchildren of Carlos A. Arredondo and Mari V. Arredondo, General Partner of Arredondo Properties Limited Partnership,<br><br>Plaintiff,<br><br>v.<br><br>CAESAR A. ARREDONDO, individually and in his capacity as Trustee of The 2000 Trust for the Grandchildren of Caesar A. Arredondo and Carolyn Abad Arredondo; THE 2000 TRUST FOR THE GRANDCHILDREN OF CAESAR A. ARREDONDO AND CAROLYN ABAD ARREDONDO, in its capacity as General Partner of Arredondo Properties Limited Partnership; and ARREDONDO & CO., LLC,<br><br>Defendants. | CIVIL ACTION NO.:<br>3:02 CV 02200 (CFD)<br><br><br><br><br><br><br><br><br><br><br><br>NOVEMBER 12, 2004 |

### **DEFENDANTS' LOCAL RULE 56(a)(1) STATEMENT**

Pursuant to L. R. Civ. P. 56 (a) (1), the defendants, Caesar A. Arredondo ("Caesar"), The 2000 Trust for the Grandchildren of Caesar A. Arredondo and Carolyn Abad Arredondo, and Arredondo & Co., LLC (collectively "defendants"), hereby submit the following undisputed material facts in support of their November 12, 2004 Motion for Summary Judgment:

1. The trademarks at issue in this case include WESTY, WESTY'S, a Terrier dog logo (the "Westy Logo"), and WESTY AT YOUR DOOR (collectively, "Westy Trademarks"). (Amended Complaint, ¶¶ 1, 9, 21; Transcript of June 23, 2004 Deposition of Carlos A. Arredondo, "Carlos Tr.," at 7:12-19 (Ex. B).)

2. In 1961, Caesar A. Arredondo ("Caesar") and Carlos A. Arredondo ("Carlos") formed C.A. Arredondo & Co. to engage in the real estate business. (Plaintiff's June 23, 2004

Local Rule 56(a)(2) Statement, "Pl. Stmt.," ¶ 1; Transcript of June 24, 2004 Deposition of Caesar A. Arredondo, "Caesar Tr.," at 69:14-24 (Ex. A).)

3.  Shortly thereafter the name C.A. Arredondo & Co. was changed to Arredondo & Co. ("A&Co."). (Affidavit of Caesar A. Arredondo, "Caesar Aff.," dated November 10, 2004, ¶ 1 (Ex. C).)

4.  From 1961 until January 1, 2000, both Caesar and Carlos owned equal shares in A&Co. (Pl. Stmt. ¶ 2.)

5.  During that time, the brothers successfully engaged in the real estate business on a national basis. (Carlos Tr. 102:12-103:12.)

6.  From 1967 until the late 1980s, Carlos and Caesar's business ownership activities were confined almost entirely to sale-leasebacks for properties that they owned as individuals. (Carlos Tr. 103:7-12.)

7.  A sale-leaseback is a transaction that involves the seller of a property immediately leasing the property from the buyer. (Caesar Aff., ¶ 5.)

8.  Caesar and Carlos' sale-leaseback transactions involved major corporations executing long-term leases. (Caesar Aff., ¶ 6.)

9.  After Caesar and Carlos formed and funded Arredondo Properties Limited Partnership ("APLP") in 1980, they decided that some but not all of the sale-leaseback properties would be owned passively by APLP so that APLP would receive the profits from those transactions that Caesar and Carlos sought out, negotiated, and concluded. (Carlos Tr. 68:2-9; Caesar Aff., ¶ 7.)

10. While the sale-leaseback properties were owned in part by either the brothers or APLP, A&Co. managed and controlled all of them. (Caesar Aff., ¶ 8.)

11. As the sale-leaseback market waned in the late 1980s, Carlos and Caesar looked elsewhere to invest their own capital as well as APLP's capital. (Caesar Aff., ¶ 9.)

12. In approximately 1989, the brothers saw an opportunity to develop high-end, self-storage facilities in southern Connecticut and suburban New York City areas. (Pl. Stmt. ¶ 4; Caesar Tr. 89:2-92:9.)

13. Their purpose of entering the self-storage business was twofold. (Caesar Aff., ¶ 10.)

14. First, it would generate income for themselves individually because the brothers would own some of the facilities and manage all of them. (Caesar Aff., ¶ 10.)

15. One of the first two WESTY projects that Caesar and Carlos tried to develop was owned by Caesar and Carlos and their wives, as individuals, who acquired in 1989 a property on Rowe Avenue in Milford, Connecticut; APLP was neither a party to that contract nor involved in the development of that project. (Carlos Tr. 162:8-24; Caesar Aff., ¶¶ 11-12; A copy of the Rowe Avenue Contract is attached to Caesar's Affidavit as Ex. 1.)

16. Although the Milford facility received municipal approval, Carlos and Caesar eventually terminated that project in July 1991, months after applying to register the WESTY trademarks in Westy's Connecticut, Inc.'s name, because a competitor sued to stop the project. (Caesar Aff., ¶ 13.)

17.   Second, just as Caesar and Carlos did with the sale-leaseback business, they would also generate income for their descendants by having APLP passively own some of the self-storage facilities. (Caesar Tr. 128:3-10; Caesar Aff., ¶ 10.)

18.   To operate and manage the WESTY self-storage facilities, the brothers formed WCI and WESTY'S New York, Inc. ("WNY") with the assistance of Attorney Alan M. Shaver of Weber, Neville & Shaver. (Carlos Tr. 140:1-141:7.)

19.   The brothers had equal ownership interests in WCI, but Caesar solely owned WNY because of Carlos' tax dispute with the New York taxing authorities. (Pl. Stmt ¶ 6; Carlos Tr. 24:1-2.)

20.   WCI and WNY were formed to, and did serve, as the operating entities for WESTY self-storage facilities in Connecticut and New York, respectively. (Carlos Tr. 140:4-141:7.)

21.   Caesar, who owned West Highland White Terriers, originated the concept of and design for the WESTY name and the Westy Logo. (Pl. Stmt. ¶ 13.)

22.   The brothers decided to place ownership of the WESTY Trademarks that they solely created in WCI. (Carlos Tr. 148:3-7; Caesar Tr. 135:1-10.)

23.   WNY was owned solely by Caesar, and APLP was a passive real estate investment vehicle that the brothers did not own. (Caesar Tr. 84:22-85:9; 125:5-18.)

24.   Carlos does not recall even considering APLP as a possible owner of the marks. (Carlos Tr. 161:24-162:4.)

4

25. Accordingly, and indisputably, in 1991 Carlos and Caesar together decided to place ownership of the WESTY Trademarks in WCI and to register them in WCI's name. (Carlos Tr. 148:3-7; Caesar Tr. 124:12-124:25.)

26. The brothers retained Attorney Shaver to assist them in registering the WESTY Trademarks in WCI's name. (Carlos Tr. 138:8-18.)

27. Carlos contacted Attorney Shaver, and Carlos concedes that he had more dealings with Attorney Shaver than Caesar did; indeed, the evidence reveals that Carlos had almost all of the interaction with Attorney Shaver. (See, e.g., Carlos Tr. 146:25-147:4.)

28. Carlos agrees that the trademark WESTY'S and the Westy Logo were filed in 1991 with the United States Patent and Trademark Office ("PTO") with WCI as the owner of both marks. (Carlos Tr. 151:10-16; 151:21-152:2.)

29. Prior to their filing, Attorney Shaver faxed draft copies of both trademark applications to Carlos with a cover letter identifying WCI as the trademark owner in both cases. (Shaver Facsimile, dated 2/22/91 at Caesar Aff. Ex. 2.)

30. In addition, both draft applications clearly identified WCI as the trademark applicant and owner. (Shaver Facsimile, dated 2/22/91 at Caesar Aff. Ex.2.)

31. Carlos approved the two draft applications for WESTY'S and the WESTY Logo, and Shaver's office then finalized and filed the applications with the PTO on March 11, 1991. (Caesar Aff. Exs. 3 and 4.)

32. In sending copies of the as-filed applications to Carlos, Shaver specifically noted that they were filed on behalf of WCI. (Caesar Aff. Exs. 3 and 4.)

33. Subsequently, on a November 6, 1991 facsimile from Shaver to Carlos advising that the Examiner at the PTO had approved WCI's application for the WESTY'S mark, Carlos scribed "GREAT!" and signed his name on the facsimile. (Caesar Aff. Ex. 5.)

34. On March 1, 1992, Carlos received the original certificate of registration of the WESTY'S trademark from Attorney Shaver. (Shaver Memo, dated 2/28/92 (Caesar Aff. Ex. 6.)

35. The certificate clearly and prominently identified WCI as the owner of the WESTY'S trademark. (Shaver Memo, dated 2/28/92 (Caesar Aff. Ex. 6).)

36. Attorney Shaver forwarded the original certificate of registration of the Westy Logo to Carlos on March 12, 1992. (Shaver Memo, dated 3/12/92 (Caesar Aff. Ex. 7).)

37. That certificate also clearly and prominently identified WCI as the trademark owner. (Shaver Memo, dated 3/12/92 (Caesar Aff. Ex. 7).)

38. Throughout the 1990s, WCI and WNY controlled use of the WESTY Trademarks and operated the WESTY facilities on a day-to-day basis. (Caesar Aff., ¶ 14.)

39. Caesar and Carlos performed the management roles of WCI and WNY in operating the WESTY facilities. (Caesar Aff., ¶ 15.)

40. Both WCI and WNY used the WESTY Trademarks in the operation of the business. (Caesar Aff., ¶ 16.)

41. In fact, WCI executed a license agreement granting to WNY a trademark license for facilities operated by WNY. Carlos signed this agreement on behalf of WCI on January 1, 1992. ("License Agreement" (Caesar Aff. Ex.8)).

42. In 1992 and 1993, respectively, WCI and WNY's corporate statuses with the States of Connecticut and New York were dissolved. (Pl. Stmt., ¶ 8; Caesar Aff. Ex. 9.)

6

43.  In July 1996, Caesar and Carlos re-formed WCI and WNY, with the identical ownership interest (i.e., 50/50 for WCI and sole ownership of WNY for Caesar) that existed before the dissolution. (Pl. Stmt ¶ 6; Carlos Tr. 24:1-2.)

44.  Carlos admits that he intended that the re-formed WCI created in 1996 would continue to operate as if "nothing had changed" from the WCI entity created in 1991 and he intended that the re-formed WCI would also own the WESTY trademarks. (Carlos Tr. 178: 11-18; 180:12-16.)

45.  To be certain that ownership of the marks remained with WCI after the corporate reformation, in 1996, Carlos specifically asked A&Co.'s attorney, Jeffrey Stephens, to confirm that WCI owned the WESTY trademarks. (Carlos Tr. 173:2-178:21.)

46.  Attorney Stephens did so and sent Carlos a memorandum dated December 18, 1996 confirming WCI's ownership of the trademarks. (Caesar Aff. Ex. 10.)

47.  Twelve WESTY self-storage centers have been opened since 1991. (Caesar Aff., ¶ 17.)

48.  Consistent with Caesar and Carlos' plan from the very beginning, both the brothers and APLP own some of the facilities. (Caesar Aff., ¶ 18.)

49.  APLP owns eight facilities. (Carlos Tr. 77:6-12.)

50.  Caesar and Carlos, as individuals, jointly own three, with each brother holding a 50% interest in the limited liability companies that own each facility. (Carlos Tr. 77:15-77:23.)

51.  The twelfth facility, which opened after the filing of this action, is owned by Arredondo 2000, LLC, which Caesar and his descendants control. (Caesar Aff., ¶ 19.)

52. Three additional WESTY facilities are in the construction and/or development stage. (Caesar Aff., ¶ 20.)

53. APLP has no connection to the facilities owned by Caesar and Carlos or Arredondo 2000 or the facilities under development. (Carlos Tr. 77:6-12.)

54. A&Co. will operate the new facilities, just as it operates all existing WESTY facilities. (Caesar Aff., ¶ 21.)

55. APLP has never been involved in the daily operation of any of the WESTY facilities. (Caesar Aff., ¶ 22.)

56. In fact, APLP has never had any day-to-day operations and meets only once per year. (Caesar Aff., ¶ 23.)

57. APLP was intended to be, and has always been operated as, a passive real estate investment vehicle created and controlled by Caesar and Carlos to generate income through real estate investment for the benefit of future Arredondo generations. (Caesar Tr. 125:11-18; Carlos Tr. 67:25-70:13.)

58. While Carlos and Caesar do not own an interest in APLP, they manage APLP as trustees of the general partners of APLP, which, in shorthand, are the Caesar Arredondo Grandchildren Trust and the Carlos Arredondo Grandchildren Trust. (Amended Complaint ¶ 9.)

59. The owners of APLP did not decide to enter the storage business; that decision was made individually by Caesar and Carlos in 1989, and it was not made at one of APLP's annual meetings. (Carlos Tr. 166:17-20.)

60.    In fact, in 1989 when the brothers developed the WESTY concept, *none* of Caesar and Carlos' children—the owners of APLP at that time—even knew that APLP existed. (Carlos Tr. 19:19-22; 79:4-79:17; 78:3-9.)

61.    This is because Caesar and Carlos had structured APLP so that each child would not learn of his or her APLP interest until he or she turned 25, which first occurred in December 1991, *after* the first WESTY facility opened. (Carlos Tr. 19:19-22; 79:4-79:17; 78:3-9.)

62.    Similarly, the decision to change the business name from WESTY'S to WESTY in 1997 was not made at an APLP annual meeting. (Caesar Aff., ¶ 24.)

63.    In fact, the brothers treated at least one member of APLP's after-the-fact objection to that change as irrelevant. (Carlos Tr. 167:2-16.)

64.    Unlike WCI, APLP has never filed an application to register any of the WESTY marks and has never licensed use of the trademarks. (Carlos Tr. 167:17-167:10.)

65.    Indeed, Carlos admits that he did not ask Attorney Shaver to register the marks in APLP's name, and he does not recall even considering placing ownership of the marks in APLP in 1991. (Carlos Tr. 161:24-162:4.)

66.    In late 1999, Carlos, who was then almost 65, advised Caesar that he intended to end his day-to-day involvement with the WESTY business. (Carlos Tr. 17:19-21:18; 22:12-22:19.)

67.    Carlos' decision appears to have been motivated by several factors: Carlos' tremendous success in the stock market during the 1990s, when his personal portfolio of stocks and mutual funds grew to over $50,000,000 (Carlos Tr. 18:4-5; 40:7-14); his interest in renovating an apartment that his wife was acquiring in her native Madrid, Spain (Carlos

Tr. 54:9-55:3); and/or his desire to spend more time at his property in the Cayman Islands (Carlos Tr. 55:4-9; 201:2-10).

68.  In late 1999, Carlos made a series of offers to sell his one-half interest in A&Co. to Caesar, culminating in an offer of $100,000 and conclusion of his daily involvement with the WESTY business by the end of 1999. (Carlos Tr. 17:19-21:18).

69.  Additionally, he agreed with Caesar's request that WCI and WNY be dissolved as part of the transaction. (Carlos Tr. 21:19-23:11.)

70.  Carlos further agreed that ownership of the WESTY Trademarks would be transferred to A&Co. (Carlos Tr. 16:4-16:23.)

71.  At his deposition, Carlos defined the WESTY Trademarks to include WESTY'S, WESTY, and the Westy Logo. (Carlos Tr. 44:12-19.)

72.  The transactions transferring Carlos' interest in A&Co., dissolving WCI and WNY, and assigning WCI's WESTY trademark rights to A&Co., were developed and memorialized through a series of meetings and an admittedly "arm's length negotiation" in December 1999 and January 2000 involving Carlos; Caesar; Accountant Peter Formanek; and Attorney Jeffrey Stephens. (Carlos Tr. 19:10-24:16, 29:12-35:25, 41:21-46:16, 111:4-15; Affidavit of Peter Formanek ("Formanek Aff.") ¶¶ 3-5 (Ex. D).)

73.  At these meetings, Carlos and Caesar, as equal owners of A&Co. and WCI, instructed Mr. Formanek to assist with the transfer of WCI's trademarks to A&Co. (Formanek Aff., ¶¶ 4, 5; Carlos Tr. 33:16-34:3; 42:24-44:19)

74.  Carlos initially understood that the WESTY Trademarks would be assigned to Caesar personally (Carlos Tr. 33:25-34:3).

10

75.    Prior to signing the transaction documents, Attorney Stephens informed Carlos that the trademarks would instead be assigned to A&Co. (Carlos Tr. 42:12-45:5.)

76.    Of course, with Carlos' departure, Caesar would solely own A&Co. (Carlos Tr. 42:24-43:23.)

77.    Fully aware of and accepting these facts and circumstances, Carlos executed the transaction documents. (Carlos Tr. 45:21-46:2.)

78.    Consistent with Carlos and Caesar's intentions and instructions, virtually all of the remaining non-cash assets and liabilities of WCI and WNY were transferred to A&Co, and WCI and WNY were dissolved. (Formanek Aff., ¶ 4, 5.)

79.    As part of this transfer, WCI specifically assigned all of its rights in its trademarks to A&Co. on December 21, 1999 for $20,000. (Trademark Assignment, dated 12/21/99 (Caesar Aff. Ex. 11); Bill of Sale, dated 12/28/99 (Caesar Aff. Ex. 12); endorsed check for $20,000, 12/28/99 (Caesar Aff. Ex. 13).)

80.    In the tax return that Mr. Formanek prepared for Carlos for 1999, Carlos declared a $10,000 capital gain for his half of the $20,000 assignment fee. (Formanek Aff., ¶ 12.)

81.    Mr. Formanek reviewed this return with Carlos, thereby reaffirming that Carlos knew and intended that A&Co. would own the WESTY Trademarks as of January 1, 2000. (Formanek Aff., ¶ 12.)

82.    Just as the brothers intended and the transaction called for, WCI recorded the assignment of the WESTY trademarks from WCI to A&Co. with the PTO on January 3, 2000. (Assignment Form, dated 1/3/00 (Caesar Aff. Ex. 14).)

83.     The PTO sent a Notice of Recordation of Assignment to Perman & Green, attorneys for A&Co., reflecting that WCI "assign[ed] the entire interest and the goodwill" of its trademarks to A&Co. (PTO Notice of Recordation of Assignment, dated 4/18/00 (Caesar Aff. Ex. 15).)

84.     After WCI executed the documents transferring the WESTY trademarks to A&Co., Carlos signed a written agreement dated January 1, 2000 selling his entire interest in A&Co. to Caesar. ("Sale Agreement" (Caesar Aff. Ex. 16).)

85.     Notably, the sale of Carlos' A&Co. interest expressly included "trademark rights." (Id.)

86.     Specifically, in addition to reciting his desire to enter into the transaction, Carlos "transfer[red] all of his right, title and ownership interest in [A&Co.] to Caesar" and further "relinquishe[d] all rights and claims to any assets of [A&Co.], tangible or intangible, now owned or to be owned in the future, including without limitation … good will, *trademark rights* and vehicles . . .." (Id.) (emphasis added).

87.     The Sale Agreement expressly excluded only two assets—an automobile and an office safe—from the assets that Carlos knowingly and deliberately relinquished and transferred to Caesar. (Id.)

88.     The Sale Agreement did not exclude any trademark assets. (Id.)

89.     As a result of the express use of the term "trademark rights" in the Sale Agreement, Carlos understood and intended that A&Co. would become the owner of all of the WESTY Trademarks, including WESTY, WESTY'S and WESTY AT YOUR DOOR. (Carlos

Tr. 16:4-14 ("I believed I had given the marks to Caesar and that he put [them] in A&Co."); see also Carlos Tr. 42:16-43:23; 44:9-19; 46:24-48:8.)

90.     Since the dissolution of WCI and WNY in 1999, A&Co. (now actively run by Caesar and his two sons) has operated all of the WESTY facilities. (Caesar Aff., ¶ 25.)

91.     From the time Carlos sold his interest in A&Co., neither Carlos nor any member of his family have played a day-to-day role in the operations of any of the WESTY facilities. (Carlos Tr. 28:19-23.)

92.     In August or September of 2001, Carlos' daughter, Fabiola, asked Carlos who owned the WESTY Trademarks. (Carlos Tr. 79:25-80:16.)

93.     When Carlos advised her that he assigned all of the trademark rights to Caesar, Fabiola commented "wouldn't it be good" if APLP owned the marks. (Carlos Tr. 80:10-16.)

94.     Although Carlos initially told Fabiola to "leave it alone," upon her urging, Carlos met with Caesar to discuss assigning the WESTY Trademarks to APLP. (Carlos Tr. 81:18-82:11.)

95.     Expressing regret at the price he received for his interest in A&Co. and the trademarks, Carlos asked Caesar "if it were possible to put the trademarks into APLP." (Carlos Tr. 82:13-21.)

96.     At no point in this meeting did Carlos claim that the brothers had made a mistake in making WCI the owner of the trademarks, nor did Carlos claim that APLP was the actual owner of those marks. (Caesar Aff., ¶ 26.)

97.     Instead, recognizing that A&CO. owned the WESTY Trademarks, he simply wanted Caesar to assign ownership of the marks from A&Co. to APLP. (Carlos Tr. 82:13-21.)

98. Caesar declined this request. (Carlos Tr. 82:13-21.)

99. Fabiola later raised the issue of the WESTY Trademarks with Carlos again, advising him that she had consulted with counsel and devised a strategy to attempt to undo the decisions her father and Caesar had made over more than a decade. (Carlos Tr. 9:3-13:5.)

100. Her strategy was to claim that APLP had all along owned the trademarks because APLP owned the first WESTY facility. (Carlos Tr. 9:3-13:5.)

101. Following that call and further meetings with counsel, on October 30, 2002, Carlos sent a letter, ghostwritten by his counsel in this case, claiming for the first time that the decision to make WCI the owner of the WESTY Trademarks was simply a mistake and that APLP was the rightful owner of those marks. (Carlos Tr. 8:12-9:2; 195:24-196:2; Caesar Aff. Ex. 17.)

102. Notwithstanding the undisputed evidence over 10-plus years establishing WCI's and then A&Co.'s ownership of the WESTY Trademarks, Carlos brought this declaratory judgment action claiming that APLP owns the WESTY Trademarks. (Amended Complaint ¶¶ 8-31.)

103. In both his original and amended complaints, Carlos seeks a "Declaration of Trademark Ownership." (Id. at Count I.)

104. Defendants filed their Answer and Affirmative Defenses to the Amended Complaint on August 5, 2003, denying that APLP owns the WESTY marks and further denying Carlos' claimed entitlement to fees and costs. (Answer and Affirmative Defenses, dated 8/5/03.)

105. On June 2, 2003, Defendants filed their initial Motion for Summary Judgment as to Carlos' declaratory judgment action and a Motion to Stay Discovery pending its resolution, which Carlos opposed. (Motion for Summary Judgment, dated 6/2/03.)

106. At the October 17, 2003 hearing on the Motion to Stay, Carlos, through counsel, represented to the Court that after completing discovery "this matter will be ripe for summary judgment." (Tr. 10/17/03 Hearing On Motion To Stay Discovery, at 17 (Ex. E).)

107. The Court denied the Motion to Stay Discovery and, on January 29, 2004, denied Defendants' Motion for Summary Judgment without prejudice and with leave to file it again after the conclusion of discovery. (Order, dated 1/29/04.)

108. Carlos purports to bring this suit to benefit APLP. (Amended Complaint, ¶ 2.)

109. Carlos's heirs represent only half of the ownership of APLP. (Caesar Aff., ¶¶ 27-32.)

110. The owners of the other half of APLP (i.e., Caesar's heirs) are opposed to this action. (See Exhibits F through J, Affidavits of Carolyn M. Arredondo, Vanessa E. Arredondo, Edward C. Arredondo, John A. Arredondo, and Colette A. Arredondo, all dated November 11, 2004, at ¶¶ 3, 5; Caesar Aff., ¶¶ 28-32.)

111. Indeed, this action was brought without their knowledge and consent. (See Affidavits of Carolyn M. Arredondo, Vanessa E. Arredondo, Edward C. Arredondo, John A. Arredondo, and Colette A. Arredondo, all dated November 11, 2004, at ¶ 4.)

112. This action was also filed without the knowledge and consent of Caesar, the trustee of a general partner of APLP (i.e., The 2000 Trust for the Grandchildren of Carlos A. Arredondo and Mari V. Arredondo) and the trustee of a limited partner of APLP (i.e., The 1987

15

Trust for the Grandchildren of Caesar A. Arredondo and Carolyn Abad Arredondo). (Caesar Aff., ¶ 33.)

113. Both individually and in his capacity as trustee of those trusts, Caesar is opposed to this action and believes that it is factually and legally baseless. (Caesar Aff., ¶ 34.)

114. The APLP Partnership Agreement ("APLP Agreement") provides:

> The Partnership shall promptly reimburse any General Partner for any *reasonable* out-of-pocket expenses incurred by such General Partner in connection with the performance of such General Partner's obligations to the Partnership.

(Caesar Aff. Ex. 18, Art. VII, Sec. 7.4 (emphasis added).)

115. The APLP Agreement states, "As promptly as possible following the signing of this Agreement, the General Partners shall cause a Certificate of Limited Partnership . . . to be prepared and filed in accordance with Section 34-10 of the Connecticut Uniform Limited Partnership Act . . . ." (Caesar Aff. Ex. 18, Art. V, *Term*.)

116. A Connecticut tax registration application from July of 1997 bearing Carlos' signature, and signed after WCI's 1996 reformation, lists the date of incorporation for WCI as March 8, 1991. (Caesar Aff. Ex. 20.)

117. WCI's federal tax returns have the same tax identification number, and display the same incorporation year (1991) and the same Subchapter S election date (1991), both before and after WCI's 1996 reformation. (Caesar Aff. Ex. 21.)

DEFENDANTS,
CAESAR A. ARREDONDO, et al.

By _____
Craig A. Raabe (ct 04116)
E-mail: craabe@rc.com
Edward J. Heath (ct20992)
E-mail: eheath@rc.com
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103
Tel.: (860) 275-8200
Fax: (860) 275-8299

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was mailed via federal express, postage prepaid, on this 12th day of November, 2004, to the following counsel of record:

Robert P. Dolian, Esq.
Cummings & Lockwood LLC
Four Stamford Plaza
P.O. Box 120
Stamford, CT 06904-0120

Martin J. Elgison, Esq.
David J. Stewart, Esq.
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424

_____
Craig A. Raabe