IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CARLOS A. ARREDONDO, in his capacity as Trustee of The 2000 Trust for the Grandchildren of Carlos A. Arredondo and Mari V. Arredondo, General Partner of Arredondo Properties Limited Partnership,<br><br>        Plaintiff,<br><br>    v.<br><br>CAESAR A. ARREDONDO, individually and in his capacity as Trustee of The 2000 Trust for the Grandchildren of Caesar A. Arredondo and Carolyn Abad Arredondo; THE 2000 TRUST FOR THE GRANDCHILDREN OF CAESAR A. ARREDONDO AND CAROLYN ABAD ARREDONDO, in its capacity as General Partner of Arredondo Properties Limited Partnership; and ARREDONDO & CO., LLC,<br><br>        Defendants. | CIVIL ACTION FILE<br><br>NO. 3:02 CV 2200 (CFD)<br><br>Filed: November 12, 2004 |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT
OF HIS MOTION FOR SUMMARY JUDGMENT**

Plaintiff Carlos A. Arredondo ("Plaintiff"), in his capacity as Trustee of The 2000 Trust for the Grandchildren of Carlos A. Arredondo and Mari V. Arredondo (the "2000 Carlos Trust"), General Partner of Arredondo Properties Limited Partnership ("APLP"), hereby files this memorandum of law in support of his Motion for Summary Judgment against defendant Caesar A. Arredondo ("Caesar"), individually and in his capacity as Trustee of The 2000 Trust for the Grandchildren of Caesar A. Arredondo and Carolyn Abad Arredondo (the "2000 Caesar Trust") and Arredondo & Co, LLC ("A&Co.") (collectively "Defendants").

## INTRODUCTION

Although Defendants attempt to mischaracterize this case as a dispute between two brothers, it is not. Instead, Plaintiff filed this case in his capacity as Trustee of the Trust that is one of the General Partners of APLP, to obtain a judicial declaration that APLP owns the service mark and trademark WESTY and related marks (the "WESTY Marks") and to prevent the Defendants from usurping, for their own benefit, valuable assets of APLP. The WESTY Marks are used to identify twelve high-end self storage facilities located in New York, Connecticut, and New Jersey (the "WESTY Business"). The parties agree that only one entity owns the WESTY Marks in connection with the WESTY business; Plaintiff contends that APLP owns the marks, and the Defendants contend that A&Co. owns the marks.

The Plaintiff's argument is simple and straightforward: APLP was the first entity to use the WESTY Mark in commerce, thereby acquiring the common law rights in the marks. The Defendants' argument, in contrast, requires the Court to ignore events like the voluntary dissolution of a corporation and to imply a series of assignments and transfers for which there is no documentary evidence.

Relying exclusively on a paper trail replete with errors, the Defendants contend that A&Co. obtained ownership of the marks by virtue of an assignment from a corporation named Westy Connecticut, Inc. However, the undisputed facts of record show that Westy Connecticut, Inc. never owned any rights in the WESTY Marks it could assign to A&Co. Thus, any purported assignment from Westy Connecticut, Inc. to A&Co. conferred no legally cognizable rights of any kind.

An examination of the history and formation of the WESTY Business reveals, as a matter of well-established principles of trademark law, that APLP is the true owner of the WESTY

- 2 -

Marks. Plaintiff is therefore entitled to summary judgment on his declaratory judgment claim and, pursuant to the terms of the APLP Partnership Agreement, to reimbursement from APLP of the attorneys' fees and costs he has incurred in litigating this matter on APLP's behalf.

## UNDISPUTED MATERIAL FACTS

### A.    APLP and the WESTY Business

Carlos and Caesar Arredondo are brothers who have engaged in various real estate oriented business ventures together since 1961. (Deposition of Caesar A. Arredondo taken June 24, 2004 ("Caesar Dep."), p. 69, lines 4-21.) Throughout their many years of doing business together, the brothers have almost always done business through corporations or limited liability partnerships to protect their personal assets. (Second Declaration of Carlos A. Arredondo, attached to Plaintiff's Motion for Summary Judgment, filed concurrently herewith, as Exhibit A ("Carlos Decl. II"), ¶ 3.)

In 1980, the brothers formed APLP for the purpose of generating income for future generations of their families. (*See* Caesar Dep., p. 72, lines 6-9; Carlos Decl. II, ¶ 4.) The current General Partners of APLP are the 2000 Carlos Trust and the 2000 Caesar Trust. (Caesar Dep., p. 86, line 8 – p.87 line 3; Caesar Dep., Ex. 7 at 5.) Carlos and Caesar Arredondo do not have any ownership interest of any kind in APLP. (*Id.* at 54.) Their only involvement in APLP is as trustees of the general partners of the limited partnership. (*Id.* at 5, 54.)

### 1.    The First Westy's Storage Center

In 1990, APLP decided that it should develop a high end self storage business under the service mark WESTY'S as a means of generating income and assets for APLP. (Carlos Decl. II, ¶ 10; *see also* Declaration of Carlos A. Arredondo, attached to Plaintiff's Response to Defendants' Motion for Summary Judgment filed June 23, 2003 as Exhibit A ("Carlos Decl. I"),

- 3 -

¶ 9.) APLP decided that the first storage center would be located in Port Chester, New York. (Carlos Decl. I, ¶ 12.)

The Westy's business was a first for APLP because it had never operated a retail business before. (Carlos Decl. II, ¶ 11; Caesar Dep., p. 89, line 21 – p. 90, line 20.) APLP was concerned about potential lawsuits from customers of the Westy's business and wanted to make certain that the assets of APLP would be insulated from these suits. (Carlos Decl. II, ¶ 12.) Accordingly, APLP formed Westy's Port Chester Limited Partnership ("WPCLP"), a Connecticut limited partnership, on March 1, 1990, to own the first store and the land on which the store was to be built. (Carlos Decl. II, ¶ 12, Ex. 1; Carlos Decl. I, ¶ 12.)

APLP owned 99% of WPCLP and was the partnership's sole limited partner. (Carlos Decl. II, ¶¶ 12-13, Ex. 1.) The remaining 1% was owned by APLP's then general partners. (*Id.*) APLP provided the capital for the land to be purchased and the store to be built, and it applied in its own name for the necessary building and zoning permits. (Carlos Decl. II, ¶ 14; Caesar Dep., Exs. 15, 16, 18.) WPCLP retained A&Co., a Connecticut limited liability corporation owned by Carlos and Caesar equally, to design and build the Port Chester store; however, WPCLP did not pay A&Co. for these services.[1] (Carlos Decl. II, ¶ 15, 16.)

On March 5, 1991, Carlos and Caesar formed Westy's New York, Inc. ("WNY I") as a Connecticut corporation. (Carlos Decl. II, ¶ 18.) The purpose of WNY I was to manage the operations of the Port Chester store and any other Westy's stores opened in New York. (*Id.*; Caesar Dep., p. 113, line 24 – p. 114, line 16.) WNY I therefore served as another layer of

---

[1]       A&Co. did not accept a fee because the funding for the facility was from APLP and was thus money intended for their children. (Carlos Decl. II, ¶ 16.) In connection with later stores, after the WESTY Business was established, A&Co. did accept a fee for site selection, design and construction services. (Carlos Decl. II, ¶ 17.)

ATL01/11697332v3

insulation to protect the assets of APLP from being able to be reached by creditors of the WESTY Business. (Carlos Decl. II, ¶ 18.)

WPCLP retained WNY I to handle the management and operations of the Port Chester store in exchange for a management fee. (Carlos Decl. II, ¶ 19.) All profits from the store are paid to APLP, the owner of the WESTY Business. (Carlos Decl. II, ¶ 22.)

WNY I was involuntarily dissolved by the Connecticut Secretary of State's Office in 1993 because of the corporation's failure to file a required organizational report. (Carlos Decl. II, ¶ 20.) The brothers were unaware of this dissolution until 1996; accordingly, they continued to operate WNY I as if it was still in existence. (Carlos Decl. II, ¶ 21.) When Carlos discovered the dissolution in 1996, Caesar and Carlos formed Westy Connecticut, Inc. ("WNY II") on July 29, 1996, and WNY II thereafter assumed management responsibility for the Port Chester store. (*Id.*)

WPCLP engaged in significant pre-opening advertising and marketing efforts in connection with the Port Chester store that began at least as early as January 1, 1991. (Caesar Dep. p. 37, lines 11-25; Carlos Decl. II, ¶ 23.) These efforts included prominent signage in front of the construction site, advertising in local yellow pages telephone directories, the distribution of printed brochures, and advertising on a delivery van. (Caesar Dep., pp. 37-57; Caesar Dep., Ex. 44, p. 5; Carlos Decl. II, ¶23, Ex. 2; Ex. B to Plaintiff's Summary Judgment Motion.) The store opened in May 1991 and remains open today. (Carlos Decl. II, ¶ 24.)

WPCLP deeded the Port Chester property and store to Port Chester Project LLC on January 2, 1996 ("PCPLLC"). APLP owns 100% of PCPLLC. (Carlos Decl. II, ¶ 25.)

As the owner of the WESTY Business, APLP was and is actively involved in the management and operation of the store. (Carlos Decl. II, ¶ 26.) APLP holds annual meetings at

- 5 -

which the operations of all of the stores are reviewed and changes to the stores are discussed and approved.  (Carlos Decl. II, ¶¶ 26-27 and Ex. 3 thereto (which is a copy of the APLP 2000 annual meeting minutes and reflects detailed review and discussion of the WESTY Business.))

**2.      The Formation of Westy's Connecticut, Inc.**

Although the first Westy's store was located in New York, APLP believed that it was possible that it could open stores in Connecticut in the future.  (Caesar Dep., p. 116, line 19 – p. 117, line 8.)  Accordingly, Carlos and Caesar formed Westy's Connecticut, Inc. ("WCI I") on March 8, 1991 as a Connecticut corporation with Carlos and Caesar as 50/50 shareholders to manage the operations of any Westy's stores that might be built in Connecticut in the future. (*Id.*; Carlos Decl. II, ¶ 28, Ex. 4)

As of August of 1992, APLP had not yet opened any stores in Connecticut, and APLP no longer envisioned that it would do so.  (Carlos Decl. I, ¶ 28; Carlos Decl. II, ¶ 29.)  WCI I therefore was not serving any business purpose and had no need to be in existence.  (*Id.*)  The shareholders voluntarily dissolved WCI I on August 13, 1992 through the filing of a Certificate of Dissolution with the Connecticut Secretary of State's Office.  (Caesar Dep., Ex. 30; Carlos Decl. II, ¶ 29.)

At the time of its dissolution, and throughout its short existence, WCI I had never had any employees, income, expenditures, or business operations of any kind.  (Carlos Decl. I, ¶ 28.)  Its only asset was $1,000 in start-up capital that Carlos and Caesar were required by Connecticut law to invest to form the corporation.  (Carlos Decl. II, ¶ 30.)  This $1,000 in cash was distributed to the shareholders on the dissolution of the corporation.  (*Id.*)

- 6 -

### 3.    The Growth of the Westy's Business

The second Westy's storage center opened in June 1995 in Tuckahoe, NY. (Carlos Decl. II, ¶¶ 31, 38.) The financing and development of this store followed the same business model as the Port Chester store. (*See* Carlos Decl. II, ¶¶ 32-37.) APLP provided all of the seed capital for the site selection and purchase, building design and construction, and initial advertising and operational expenditures. (Carlos Decl. II, ¶ 32.) APLP formed Tuckahoe Project LLC ("TPLLC"), a New York limited liability company, to own the store and the real estate on which it was built. (Carlos Decl. II, ¶ 33.) APLP owns 100 % of TPLLC. (Carlos Decl. II, ¶ 34.)

TPLLC hired A&Co. to perform site selection, building design and construction services for the store. (Carlos Decl. II, ¶ 35.) TPLLC retained WNY I, and thereafter WNY II, to manage the store. (Carlos Decl. II, ¶ 36.) TPLLC pays all profits from the store to APLP, the owner of the WESTY Business. (Carlos Decl. II, ¶ 37.)

Over the years, the business added nine more Westy stores.[2] The stores, their locations, approximate dates of opening, and owners are set forth in the table below (Carlos Decl. II, ¶ 38):

| Location | Store Owner | Owner(s) of Store Owner | Opening Date |
|---|---|---|---|
| Port Chester, NY | Port Chester Project LLC | APLP | May 1991 |
| Tuckahoe, NY | Tuckahoe Project LLC | APLP | June 1995 |
| Norwalk, CT | Norwalk Project LLC | Carlos & Caesar | May 1997 |
| Elmsford, NY | Greenburgh Project LLC | APLP | 1997 |
| Danbury, CT | Danbury Project LLC | APLP | December 1998 |
| Milford, CT | Milford Project LLC | Carlos & Caesar | January 1998 |
| Stamford, CT | Stamford Project LLC | Carlos & Caesar | January 2000 |
| Farmingdale, NY | Babylon Project LLC | APLP | February 2000 |

---

[2]    Caesar and his sons opened a twelfth store under the WESTY Marks in Upper Saddle River, NJ in June 2004. Plaintiff is uncertain about the ownership of this store. Because this store was opened after the complaint in this action was filed, its ownership and structure is properly disregarded for purposes of this case.

| Lake Success, NY | Lake Success Project LLC | APLP | February 2001 |
| Port Chester 2, NY | Port Chester Project II LLC | APLP | April 2001 |
| Hicksville, NY | Hicksville Project LLC | APLP | January 2002 |

As set forth above, APLP owns eight of the eleven LLC's that were formed to own the individual real estate, facilities and improvements, including the first two and four of the first five storage centers. Carlos and Caesar are the owners of the limited liabilities companies that own the remaining three storage centers. (Carlos Decl. II, ¶ 39.) The reason that these three stores are owned by Carlos and Caesar individually, as opposed to being owned by APLP, is that Carlos and Caesar had sold real estate that they owned together and, for tax purposes, decided to engage in like-kind exchanges within a limited period of time. (*Id.*)

Carlos and Caesar formed Westy Connecticut, Inc. ("WCI II") on July 29, 1996 with the two brothers as 50/50 shareholders as they were beginning plans to open the first storage center in Connecticut. (Carlos Decl. I, ¶ 30; Carlos Decl. II, ¶ 41.) There was no assignment, written or oral, by either of the brothers, to WCI II with respect to any trademarks or intangible assets. (Carlos Decl. II, ¶ 42.) Each of the Westy stores in Connecticut retained WCI II to handle store management and operations. (Carlos Decl. I, ¶ 31.) Similarly, each of the Westy stores in New York retained WNY II to handle store management and operations. (Caesar Dep., p. 113, line 23 – p. 114, line 16.) However, the WESTY Business continued to be owned by APLP.

**B.    The WESTY'S and WESTY Service Mark**

As stated above, the first WESTY'S store opened in May of 1991. However, the first use of the mark began at least as early as January 1, 1991 when APLP began advertising and promoting the Port Chester store.

- 8 -

In addition to the WESTY'S word mark, APLP adopted the following image of a West Highland White Terrier at least as early as January 1, 1991 as a design mark to identify the business and its services ("the Terrier Design"):



(Carlos Decl. II, ¶ 43; *see also* Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment filed June 2, 2003, Ex. 7.)

APLP's corporate attorney in 1991 was Alan Shaver. (Caesar Deposition, p. 5, lines 3-7.) APLP instructed Mr. Shaver to prepare and file service mark registration applications for the WESTY'S word mark and the Terrier Design with the U.S. Patent and Trademark Office ("USPTO"). (*Id.*; Carlos Decl. II, ¶ 44.) Mr. Shaver did so and filed the applications on March 13, 1991. (Caesar Dep., Ex. 44, 45; Carlos Decl. II, ¶ 44.)

The applications properly recited January 1, 1991 as the date of first use, but the applications mistakenly identified WCI I as the owner of the marks, since WCI I was not in existence when the marks were first used and never had any business interaction with or relationship to the Port Chester store. (*Id.*) Carlos and Caesar understood at the time – erroneously – that they could file the applications in the name of any company they wanted to; they chose to file the applications in the name of WCI I. (Carlos Decl. II, ¶ 45.) The applications matured to registration in 1992; however, both registrations were cancelled in 1998 for failure to file the necessary statements of use. (Carlos Decl. II, ¶ 46.)

- 9 -

In 1997, APLP elected to change the principal mark of the business from WESTY'S to WESTY. (Caesar Dep., p. 247, line 25 – p. 248, line 13.) This change was made to reduce the length of the mark because of new restrictions being passed by communities on the size of signage. (*Id.*) APLP also began using a smaller version of the Terrier Design that consisted of only the drawing of the head of a West Highland White Terrier ("Terrier Head design")[3]:



(*See* File History for Terrier Head Design attached to Plaintiff's Motion for Summary Judgment as Exhibit E; Carlos Decl. II, ¶ 47.)

**C.    The Separation of Carlos' and Caesar's Business Interests**

In December 1999, Carlos and Caesar decided to separate most of their business interests, including A&Co., WCI II and WNY, except that each remained the Trustee of the General Partners of APLP. (*See* Carlos A. Arredondo Deposition (hereinafter "Carlos Dep.") pp. 17-24.) Carlos agreed to sell his interests in A&Co. to Caesar effective January 1, 2000. (*See Id.*) As a part of the transactions, Caesar told Carlos that WCI II owned the WESTY Marks, and Caesar said that he wanted ownership of the marks. (*Id.* at p. 42, line 16 – p. 46 line 11.) Carlos did not recall who owned the marks, but, accepting without inquiry that this information was correct, Carlos agreed to sell his interest in WCI II to Caesar, which Carlos understood would have the effect of transferring ownership of the WESTY Marks to Caesar. (Carlos Decl. II, ¶¶ 49-50.)

---

[3]    The WESTY, WESTY'S, Terrier Design and Terrier Head design marks, and any other mark or name used by the business that includes the words "Westy," "Westy's" or a terrier design are referred to collectively as the "WESTY Marks."

- 10 -

Nevertheless, Carlos never agreed to sell his interests in the marks to A&Co. and would have opposed any such transaction. (*Id.*, ¶ 51.) On December 21, 1999, unbeknownst to Carlos, and while he was out of the country on vacation, Caesar caused WCI II to execute a bill of sale of the WESTY Marks from WCI II to A&Co. (Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment filed June 2, 2003, Ex. 11.; Carlos Decl. II, ¶ 52.)

On September 3, 2002, A&Co. filed trademark registration applications in its name with the USPTO for the marks WESTY, WESTY'S, and the Terrier Head design. (*See* Trademark applications attached as Exhibits C, D and E to Plaintiff's Motion for Summary Judgment; Carlos Decl. II, ¶ 53.) The USPTO published the applications for opposition in 2003. (Carlos Decl. II, ¶ 54.) In his capacity as Trustee of the 2000 Carlos Trust, Carlos timely filed oppositions to the applications. (Carlos Decl. II, ¶ 55, Exs. 5-7.) The Trademark Trial and Appeal Board of the USPTO consolidated all three oppositions and, on September 22, 2003, suspended the proceedings pending the resolution of this action. (TTAB Grant of Motion for Consolidation and Suspension attached to Plaintiff's Motion for Summary Judgment as Exhibit F).

ATL01/11697332v3

## ARGUMENT AND CITATION OF AUTHORITIES

This case requires the Court to apply fundamental principles of trademark law to the undisputed facts of record. Section A of Plaintiff's Argument sets out those principles, and Section B applies those principles to the undisputed facts, demonstrating as a matter of law that APLP is the owner of the WESTY marks. Sections C and D address arguments already advanced by the Defendants, and Section E sets out Plaintiff's claim for reimbursement of attorneys' fees and costs.

**A.**   **Relevant Background Law on Trademark Creation, Ownership and Use**

     **1.**   **Acquisition and Ownership of Trademark Rights**

Trademarks are symbols that serve in the minds of the consuming public to identify the goodwill of a product or service. *See, e.g., Mishawanka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203 (1942) ("[Use of a mark is] to convey through the mark, in the minds of potential customers, the desirability of the commodity upon which it appears. Once this is attained, the trademark owner has something of value."); *Berni v. Intn'l Gourmet Rests. of Am., Inc.*, 838 F.2d 642, 646 (2d Cir. 1988). Trademark rights may be acquired in the United States only through use of a mark in commerce to identify goods or services sold under the mark, not by registration of the mark with the USPTO or any other registration body. *See, e.g., Berni*, 838 F.2d at 646 ("The extent of any trademark right is defined by its actual use in the marketplace"); *Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 249 F.3d 564, 572 (6th Cir. 2001) ("Federal registration of a trademark or service mark cannot create rights and priority over others who have previously used the mark in commerce . . . "). Several federal courts have recognized that service mark rights may begin to accrue when the mark is used in pre-launch advertising or promotions. *See, e.g., Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1157-60 (9th Cir. 2001);

- 12 -

*Md. Stadium Auth. v. Becker*, 806 F. Supp. 1236, 1239-40 (D. Md. 1992), *aff'd*, 36 F.3d 1093

(4th Cir. 1994); *Marvel Comics Ltd. v. Defiant*, 837 F. Supp. 546, 548 (S.D.N.Y. 1993) (pre-

sales announcement of new comic book series held sufficient to withstand motion to dismiss).[4]

The owner of a mark is the party that first uses the mark in commerce to identify a

product or service. *See, e.g., Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 412 (1916); 15

U.S.C. § 1127. A party does not have to actually use the trademark itself to acquire and maintain

valid rights in the mark. *See Turner v. HMH Publishing Co., Inc.*, 380 F.2d 224, 334 (5th Cir.

1967) (holding that first use by licensee inures to benefit of licensor), *cert. denied,* 389 U.S. 1006

(1967). The trademark owner may license the mark to a third party to use, in which case the

goodwill generated by the third party's use of the mark inures to the benefit of the trademark

owner. *Id.*

### 2.    Trademark Assignment

Once trademark rights are established, the goodwill of the business and the trademark

that symbolizes that goodwill become inseparable. *McLean v. Fleming,* 96 U.S. 245 (1878);

*Coca-Cola Bottling Co. v. Coca-Cola Co.*, 269 F. 796 (D. Del. 1920) ("a trademark is merely

one of the visible mediums by which the good will is identified, bought and sold, and known to

the public.") Thus, a mark cannot be assigned without also assigning the goodwill of the

business associated with the mark. Any attempt to assign a mark without also assigning the

goodwill symbolized by the mark is invalid and results in a forfeiture of rights in the mark. *See,*

---

[4]    In *Buti v. Impressa Perosa, S.R.L.*, 139 F.3d 98, 105 (2d Cir. 1998), the Second Circuit held that "the mere advertising or promotion of a mark in the United States is insufficient to constitute 'use' of a mark 'in commerce' within the meaning of the Lanham Act, where that advertising is unaccompanied by any actual rendering in the United States ... of services in connection with which the mark is employed." In that case, the plaintiff owned several "Fashion Cafe" restaurants in Italy. The plaintiff planned to open restaurants in the United States and engaged in advertising in the United States to promote these planned restaurants. However, the plaintiff never actually opened any restaurants in the United States. The facts of *Buti* are therefore distinguishable from the facts of this case. *See Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 138 (2d Cir. 1999) (distinguishing *Buti* on the grounds that the *Buti* plaintiff never opened any restaurants in the U.S.).

*e.g., Berni*, 838 F.2d at 646; *Defiance Button Mach. Co. v. C&C Metal Prods. Corp.*, 759 F.2d

1053, 1060 (2d Cir. 1985); 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair*

*Competition* §18:2 (4th ed. 2004) ("Good will and its trademark are as inseparable as Siamese

Twins who cannot be separated without death to both.").

### 3.     Trademark Licensing

Trademarks may be licensed to a third party to use, but, for the license to be valid, the

trademark owner must control the nature and quality of the goods and services that its licensee

sells under the mark.  *See, e.g., Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 366-

67 (2d Cir. 1959).  If the trademark owner cannot (or does not) exercise such control, the license

is deemed to be "naked" and the owner's trademark rights are abandoned.  *Id.*; *Societe Comptoir*

*de L'Lindustrie Cotonnier Etablissements Boussac v. Alexander's Dep't Stores, Inc.*, 299 F.2d

33, 35 (2d Cir. 1962) (stating that naked licensing without quality control "is a fraud on the

public and unlawful").

Actual quality control, not the mere right to control, is the legal requirement necessary for

the license to be valid.  *See Gen. Motors Corp. v. Gibson Chem. & Oil Corp.*, 786 F.2d 105, 110

(2d Cir. 1986).  A reasonable inspection of the goods or services bearing the mark sold by the

licensee is sufficient to constitute adequate quality control where there is no showing that the

goods fall below the essential quality standards.  *See, e.g., Penta Hotels, Ltd v. Penta Tours*, 9

U.S.P.Q.2d (BNA) 1081, 1108-09 (D. Conn. 1988); *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss,*

*Jena*, 293 F. Supp, 892, 917 (S.D.N.Y. 1968), *modified on other grounds,* 433 F.2d 686 (2d Cir.

1970); 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:59 (4th

ed. 2004).

- 14 -

**B.     APLP is Proper Owner of the WESTY Marks**

The undisputed facts surrounding the development of the WESTY Business compel the conclusion that APLP owns the WESTY Marks.

**1.     Use of the Marks in Port Chester**

It is undisputed that the Port Chester store was the first Westy storage center. The only entities that had any involvement with the formation and initial operation of the store were: (1) APLP, which provided the funding for the store and secured the necessary building and zoning permits; (2) WPCLP, which owned the store; (3) A&Co., which provided site selection, design and construction services; and (4) WNY I, which operated the store for WPCLP. The original owner of the WESTY Marks therefore had to have been one of these four entities, and could not, under any circumstances, have been WCI as Defendants' contend.

First, A&Co. could not have been the original trademark owner and Defendants' have never asserted that it was. It is undisputed that A&Co. had no continuing involvement with the Port Chester store after the store was built.

Likewise, WNY I could not have been the original trademark owner because it was not in existence when trademark rights in the WESTY Marks were created through use of the marks on pre-launch advertising and promotional materials. (Advertising for the Port Chester store began at least as early as January 1, 1991, and WNY I was not incorporated until March 5, 1991.) Additionally, it is undisputed that WNY I was merely a management company and did not have any ownership interest of any kind in the tangible or intangible assets of the Port Chester store or the Westy Business. Consequently, the original owner of the WESTY Marks, based on the first use of those marks in connection with the Port Charles store, could only have been either APLP or WPCLP.

- 15 -