As between APLP and WPCLP, the undisputed facts of record demonstrate that APLP was the trademark owner. APLP: (1) owned and controlled the operations of WPCLP; (2) provided WPCLP with all of the capital necessary to buy the land and construct the Port Chester facility; (3) owned all of the profits generated by the Port Chester store; and (4) controlled the quality of the goods and services of the store. These undisputed facts establish that APLP owned the mark through ownership and control of WPCLP and therefore its control of the use of mark in connection with the Port Chester store. This conclusion becomes even more clear when the facts and circumstances surrounding the opening and operation of the second Westy store in Tuckahoe, NY are examined.

## 2.    Use of the Marks in Tuckahoe

The Tuckahoe store is owned by TPLLC, which is in turn owned by APLP. The development of the store was funded exclusively by APLP, and TPLLC distributes all profits from the store to APLP. Plaintiff and Defendants agree that the entity that owned the goodwill of the WESTY Marks used in connection with the Port Chester store also owned the goodwill established by the use of the marks in connection with the Tuckahoe store. The only entities that were involved in the creation and initial operation of both stores were APLP, WNY I (which manages the facility), and A&Co.

It is undisputed that A&Co. had no continuing involvement with the Tuckahoe store after construction was completed, and neither party contends that A&Co. owned any trademark rights related to use of the WESTY Marks in Tuckahoe.

Similarly, it is undisputed that WNY I only provided management services to the Tuckahoe store and did not own or control any tangible or intangible assets of the store. Furthermore, neither party contends that WNY I was the owner of the WESTY Marks.

ATL01/11697332v3

Thus, the only entity that could have been the owner of the WESTY Marks as related to the Tuckahoe facility was APLP, since as a matter of undisputed fact it controlled the quality of the services offered under the WESTY Marks. If there was a common trademark owner between the Port Chester and Tuckahoe facilities, as all parties contend, it had to have been an entity that could exert control over the services offered under the WESTY Marks in both Port Chester and Tuckahoe. *See, e.g., Dawn Donut Co.*, 267 F.2d at 366-67. The undisputed facts show that APLP was the only entity that had the ability to exercise control over both stores by virtue of its ownership of the entities that own the stores, and that APLP therefore owns the WESTY Marks.

3.    **Use of the Marks in Connection with the Remainder of the Westy Stores**

The third Westy store, located in Norwalk, was owned by Carlos and Caesar through NPLLC and managed by WCI II. The parties agree that the goodwill that was generated by the use of the WESTY Mark in connection with this store inured to the benefit of the entity that owned the goodwill of the first two stores. Therefore, the owner had to have been APLP, and the use of the mark by NPLLC was and is pursuant to an implied license. Were it otherwise, the trademark rights created in the Norwalk market through the use of the WESTY Marks by the store there would be owned by a third party, and there would then be competing – and likely infringing – use of the WESTY Marks in Norwalk on the one hand, and Port Chester and Tuckahoe on the other. *See Hanover Star Milling*, 240 U.S. at 415-16; *Allard Enters.*, 249 F.3d at 573-74.[5] Neither party has ever advocated this result.

Store ownership in the remainder of the stores followed the same pattern as the first three stores. The parties agree that the goodwill generated by the use of the WESTY Marks in

---

[5]    The basis for this result is that trademark rights are territorial in nature. Absent a federal registration, a trademark owner's rights in its mark are limited to the geographic territory in which the owner advertises for sale or sells its goods and services, and potentially to its natural zone of expansion. *Id.*

- 17 -

connection with each of the additional stores opened prior to January 1, 2000 (when Defendants contend that A&Co. acquired the marks by assignment) inured to the benefit of the same entity that owned the goodwill generated by the use of the WESTY Marks in connection with the first three stores.  In other words, the parties agree that one entity owned the trademark rights generated through the use of the WESTY Marks in connection with all of the stores opened before January 1, 2000.  For the reasons set forth above, that party could only have been APLP as a matter of undisputed fact and law.

C.    **Defendants' Contention that WCI I was the Original Trademark Owner is Demonstrably Incorrect**

Defendants contend that WCI I was the original owner of the WESTY'S Mark.  The undisputed facts of record show that WCI I could not have been the original trademark owner for several reasons.  First, WCI I did not exist until after the mark was first used.  To own the trademark, the party that first used the mark (which as shown above was either WPCLP or APLP) would have had to assign its trademark rights and the goodwill associated with those rights to WCI I.  There is no evidence of any assignment of rights or goodwill to WCI I, and Defendants do not contend that such an assignment occurred.

Second, it is undisputed that WCI I did not have any involvement of any kind with regard to the development, construction, opening, or operation of the Port Chester store.  WCI I could only have acquired ownership of the rights in the WESTY Marks as a matter of law if the party that first used the marks (which could only have been APLP or WPCLP for the reasons addressed above) assigned the marks and the goodwill appurtenant thereto to WCI I, and if WCI I licensed the trademark rights back to APLP or WNY to use in connection with the store.  There is no evidence in the record that APLP, WNY, or any person or entity ever assigned any trademark rights or goodwill in the WESTY Marks to WCI I, nor is there any evidence of a

- 18 -

license.  At the time of WCI I's dissolution, the only asset of the corporation was the $1,000 in

cash that Carlos and Caesar were required to put into the corporation to incorporate it under

Connecticut law.

Third, even assuming that WCI I somehow acquired ownership of the WESTY Marks, it

could not have maintained those rights.  WCI I was only in existence from May 8, 1991 to

August 26, 1992.  It is undisputed that WCI I had no relationship of any kind with the Port

Chester store, the only Westy store in existence during WCI I's brief lifespan.  WCI I therefore

had no legal right to control or influence the store's operation.  It is also undisputed that WCI I

had no employees and engaged in no business operations or actions of any kind.  Indeed, the

corporation was voluntarily dissolved in 1992 by its shareholders because it served no purpose

and its shareholders did not envision any future need for the corporation.  WCI I therefore not

only did not exercise any quality control over the services offered by the Port Chester store, it

could not have exercised such control either legally or practically.  And even if WCI I could

somehow have exercised control despite the fact that it had no employees to exercise the control,

it certainly could not have exercised control after it was dissolved.  Any purported rights WCI I

owned would therefore have been abandoned long ago, leaving nothing to pass to WCI II or

A&Co. as a matter of law.  *See, e.g., Dawn Donut*, 267 F.2d at 366-67.

## D.    The 1991 and 1998 Trademark Applications are Erroneous

In an attempt to divert the court's attention from the factual and legal realities of this

case, the Defendants contend that the identification of WCI I, and later WCI II, as the owner of

the WESTY Marks in applications filed with the Trademark Office evidences that WCI I, and

then WCI II, owned the marks.  The Defendants' argument is a classic attempt to have the tail

wag the dog.  The information in a trademark application does not dictate, or even alter, the

factual and legal reality of the identity of the owner of the mark. If Carlos had instructed Mr.

Shaver to fill in "Carlos Arredondo" as the owner on the applications that Mr. Shaver filed with

the Trademark Office in 1991, that would not make Carlos the owner of the WESTY Marks.

The owner of the WESTY Marks is and was the party that first used and thereafter controlled the

use of the WESTY Marks, and that party was plainly APLP. *See, e.g., Hanover Star Milling,*

240 U.S. at 415; *Allard Enters., Inc.,* 249 F.3d at 572.

When the trademark applications were filed in 1991, Carlos and Caesar apparently

understood that they could identify any entity they wanted to as the trademark owner. This

understanding is plainly incorrect as a matter of well-established trademark law. Indeed, the

identification of WCI I on the applications renders the applications, and the registrations that

issued thereon, void *ab initio. See, e.g., Chien Ming Huang v. Tzu Wei Chen Food Co. Ltd.,* 849

F.2d 1458, 1460 (Fed. Cir. 1988) (holding that application filed in the name of the wrong

applicant is void); *In re Tong Yang Cement Corp.,* 19 U.S.P.Q.2d (BNA) 1689, 1691 (T.T.A.B.

1991) (holding that application's application is "void *ab initio* because the applicant entity . . .

never owned either the mark or the Korean application upon which the U.S. application is

based"); *see also Smith v. Coahoma Chem. Co.,* 121 U.S.P.Q. (BNA) 215, 217 (C.C.P.A. 1959)

(canceling federal registration on the grounds that, since the registrant never used the registered

mark on his own but only through a corporation he owned, the corporation was the true

trademark owner and the registration was invalid). The identification of WCI I as trademark

owner was plainly a mistake, and it is the recognition of this mistake that caused Carlos, as

trustee of one of the General Partners of APLP, to bring this lawsuit.[6]

---

[6]    To the extent Defendants' argument is that Carlos and Caesar owned or controlled the mark individually and therefore had the right to assign the mark to any entity they wanted, the argument would be meritless. Neither Carlos nor Caesar have, in their individual capacities, ever engaged in any Westy business. All of their actions have been through corporations and limited partnerships designed to shield them from liability. The entities they formed

- 20 -

The trademark application for WESTY AT YOUR DOOR that the brothers filed in the name of WCI II in 1998 reflects a continuation of the same mistake.[7] It may be, as Defendants have contended previously in this case, that the shareholders intended WCI II to be a reincarnation of WCI I. Nevertheless, raising WCI I from the dead would make no difference in the outcome of this case since WCI I never owned any rights in the WESTY Marks.[8] Therefore, even if WCI I was reincarnated as WCI II, it still would own no rights in the WESTY Marks.

Additionally, Defendants' contention that the court should treat WCI II as a continuation of WCI I is a request that the court ignore well established principals of common law trademark use. If WCI I owned the WESTY Marks at the time it was dissolved, someone had to own and control those rights in the intervening four years before WCI II was formed. The Defendants glaringly avoid taking a stand on this issue, instead asking this court to leap frog over those four years as if they do not exist. By law, the court cannot do so. Once a party stops using a mark without an intent to resume use, the trademark rights that the party owned are abandoned to the public domain. *See, e.g., Stetson v. Howard D. Wolf & Assoc.*, 955 F.2d 847, 850 (2d Cir. 1992); *P. Daussa Corp. v. Sutton Cosmetics (P.R.), Inc.*, 462 F.2d 134, 136 (2d Cir. 1972). Three years non-use by a party constitutes *prima facie* evidence that the mark has been abandoned. 15

---

served this purpose well. They also prevent Caesar from being able to make any argument that he ever had any personal ownership in the WESTY Marks. *See, e.g., Smith v. Tobacco By-Products & Chem. Corp.*, 243 F.2d 188, 191 (C.C.P.A. 1957) (holding that the executives and shareholders of a business do not own the marks that the business uses).

[7]     The corporate documents of the WESTY Business related to trademark ownership contain so many errors and misstatements that none of them can be credibly relied upon by the court. A list of these errors is set forth in Exhibit G hereto. This list makes clear that the managers and attorneys of the WESTY Business did not understand trademark law and how trademark ownership is affected by the corporate structure they had implemented.

[8]     Significantly, there was no assignment of any kind of any rights in the WESTY Marks to WCI II at the time WCI II was formed or thereafter, and Defendants do not contend that there was. Thus, unless WCI I owned the marks, there is no theory under which WCI II could own the marks.

- 21 -

ATL01/11697332v3

U.S.C. § 1127; *see also Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044-45 (2d Cir. 1980).

If WCI I owned the WESTY Marks, it abandoned them by not using the marks for four years. Moreover, if WCI I owned the marks, it intended not to resume use of the marks. WCI I's shareholders dissolved the corporation because it served no present *or* anticipated future business purpose. Because WCI I had no anticipated future purpose, it could not have had a present intent to resume use of the marks in the future at the time the corporation was dissolved. Thus, even assuming arguendo that WCI owned the WESTY Marks originally, it abandoned those rights as an undisputed matter of fact and law, and WCI II's formation and alleged resumption of use of the marks would not cure this abandonment.. *See, e.g.*, 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 17:3 (4th ed. 2004) ("Once a period of non-use results in abandonment, a resumption of use thereafter cannot cure the preceding abandonment.").

Arguing abandonment does not help the Defendants here. Even if WCI I owned the marks from March 1991 to the time WCI I was dissolved, WCI I stopped using the marks. APLP did not. APLP has continuously used the marks in commerce since Port Chester opened in 1991, making APLP the trademark owner upon WCI I's dissolution, assuming for purposes of argument that WCI I owned the marks at all. *See, e.g.*, *Stetson*, 955 F.2d at 850. Thus, even if Defendants' theory is correct that WCI I owned the marks initially, the result in this case is the same: APLP owns the marks today.[9]

### E.    Plaintiff is Entitled to Recover His Attorneys' Fees

---

[9]    Defendants have also pointed previously to a written license of an unidentified design from WCI I to WNY dated January 1, 1992 as evidence of WCI I's ownership of the WESTY Marks. This document is not competent evidence regarding this point because the document does not identify what mark was licensed. Even assuming that the license purported to license one of the WESTY Marks, the license has no legal effect for the reasons discussed above.

- 22 -

The APLP partnership agreement requires the partnership to reimburse actions taken by the general partners of APLP on behalf of the partnership. *See* Agreement of Limited Partnership of Arredondo Properties Limited Partnership (January 1, 1980), Amended and Restated as of March 13, 2000, §§ 7.3.3-7.4. Reimbursement is further endorsed by Connecticut state law. *See, e.g.*, Conn. Gen. Stat. § 34-335 ("[a] partnership shall reimburse a partner for payments made . . . for the preservation of its business or property").

Plaintiff brought this action to preserve valuable assets of APLP. Indeed, he had a fiduciary duty to do so. *Cent. States, Southeast & Southwest Areas Pension Fund v. Cent. Trans., Inc.*, 472 U.S. 559, 572 (1985) ("One of the fundamental common-law duties of a trustee is to preserve and maintain trust assets."); Restatement (Second) of Trusts, § 170 (1957). Plainitff is therefore entitled to reimbursement from the partnership of the fees and costs he has incurred in connection with this litigation, regardless of whether he wins or loses this case.

At APLP's annual partnership meeting held on March 8, 2003, Plaintiff submitted to APLP for reimbursement the invoices for legal services he had paid to date in connection with this case. Caesar, in his role as trustee for the other General Partner of APLP (the 2000 Caesar Trust), blocked APLP from granting Carlos' reimbursement request. Plaintiff therefore requests that the court find that he is entitled to the reimbursement of his legal fees from APLP, order Caesar, as trustee of the 2000 Caesar Trust, to withdraw his opposition to the reimbursement request, and order APLP to promptly reimburse Carlos for his litigation related expenses.

## CONCLUSION

For the reasons set forth above, APLP was the true owner of the WESTY Marks in December 1999 when the brothers purported to transfer trademark ownership from WCI II to A&Co. Because WCI II never owned any rights in the marks, it had nothing to assign to A&Co.,

- 23 -

rendering the purported assignment of trademark rights to A&Co. void *ab initio*.  APLP was and is the true trademark owner, and Plaintiff asks that the court declare the same.  Plaintiff further requests:  (1) that the court order APLP to reimburse Carlos for the fees and expenses he has incurred, and will incur, in connection with this litigation; and (2) that the Court order the Commissioner of the U.S. Patent and Trademark to refuse registration to Application Serial Nos. 74/445,815; 76/446,777, and 76/446,778 and any other applications filed by A&Co. that contain the words "Westy," "Westy's," or any confusingly similar term, or any design of a terrier.

Respectfully submitted this 12th day of November, 2004.

ROBERT P. DOLIAN (ct04278)
M. JULIET BONAZZOLI (ct21394)
CUMMINGS & LOCKWOOD LLC
Four Stamford Plaza, P.O. Box 120
Stamford, Connecticut 06904-0120
Ph  (203)327-1700
Fx  (203) 708-5647


OF COUNSEL:

MARTIN J. ELGISON  ct24759
DAVID J. STEWART  ct24757
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Ph (404) 881-7000
Fx (404) 881-7777

Counsel for Plaintiff

- 24 -

ATL01/11697332v3

## CERTIFICATE OF SERVICE

I certify that on this 12ᵗʰ day of November, 2004, a true and correct copy of the

foregoing **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** was served

upon counsel for Defendants, by the manner indicated, addressed as follows:

> Craig A. Raabe (First Class Mail)
> ROBINSON & COLE LLP
> 280 Trumbull Street
> Hartford, CT 06103

M. Juliet Bonazzoli

2063296_1.doc 11/12/2004

ATL01/11697332v3