IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CARLOS A. ARREDONDO, in his capacity as Trustee of The 2000 Trust for the Grandchildren of Carlos A. Arredondo and Mari V. Arredondo, General Partner of Arredondo Properties Limited Partnership,<br><br>    Plaintiff,<br><br>v.<br><br>CAESAR A. ARREDONDO, individually and in his capacity as Trustee of The 2000 Trust for the Grandchildren of Caesar A. Arredondo and Carolyn Abad Arredondo; THE 2000 TRUST FOR THE GRANDCHILDREN OF CAESAR A. ARREDONDO AND CAROLYN ABAD ARREDONDO, in its capacity as General Partner of Arredondo Properties Limited Partnership; and ARREDONDO & CO., LLC,<br><br>    Defendants. | CIVIL ACTION FILE<br><br>NO. 3:02 CV 2200 (CFD)<br><br>Filed: November 12, 2004 |

## LOCAL RULE 56(A)(1) STATEMENT

Pursuant to L.R.Civ.P. 56(a)(1), Plaintiff Carlos A. Arredondo ("Plaintiff"), in his capacity as Trustee of The 2000 Trust for the Grandchildren of Carlos A. Arredondo and Mari V. Arredondo (the "2000 Carlos Trust"), General Partner of Arredondo Properties Limited Partnership ("APLP"), hereby submits the following undisputed material facts in support of his Motion for Summary Judgment:

1. Carlos and Caesar Arredondo are brothers who have engaged in various real estate oriented business ventures together since 1961. (Deposition of Caesar A. Arredondo taken June 24, 2004 ("Caesar Dep."), p. 69, lines 4-21.)

2. Throughout Carlos and Caesar's many years of doing business together, the brothers have almost always done business through corporations or limited liability partnerships to protect their personal assets. (Second Declaration of Carlos A. Arredondo, attached to Plaintiff's Motion for Summary Judgment, filed concurrently herewith, as Exhibit A ("Carlos Decl. II"), ¶ 3.)

3. In 1980, Carlos and Caesar formed APLP for the purpose of generating income for future generations of their families. (*See* Caesar Dep., p. 72, lines 6-9; Carlos Decl. II, ¶ 4.)

4. The current General Partners of APLP are the 2000 Carlos Trust and The 2000 Trust for the Grandchildren of Caesar A. Arredondo and Carolyn Abad Arredondo (the "2000 Caesar Trust"). (Caesar Dep., p. 86, line 8 – p.87 line 3; Caesar Dep., Ex. 7 at 5.)

5. Carlos and Caesar Arredondo do not have any ownership interest of any kind in APLP and have not since 1987. (*Id.* at 54; Carlos Decl. II, ¶ 8.) Their only involvement in APLP is as trustees of the general partners of the limited partnership. (*Id.* at 5, 54.)

6. In 1990, APLP decided that it should develop a high end self storage business under the service mark WESTY'S as a means of generating income and assets for APLP. (Carlos Decl. II, ¶ 10; *see also* Declaration of Carlos A. Arredondo, attached to Plaintiff's Response to Defendants' Motion for Summary Judgment filed June 23, 2003 as Exhibit A ("Carlos Decl. I"), ¶ 9.)

7. APLP decided that the first storage center would be located in Port Chester, New York. (Carlos Decl. I, ¶ 12.)

8. The Westy's business was a first for APLP because it had never operated a retail business before. (Carlos Decl. II, ¶ 11; Caesar Dep., p. 89, line 21 – p. 90, line 20.)

9. APLP was concerned about potential lawsuits from customers of the Westy's business and wanted to make certain that the assets of APLP would be insulated from these suits. (Carlos Decl. II, ¶ 12.)

10. APLP formed Westy's Port Chester Limited Partnership ("WPCLP"), a Connecticut limited partnership, on March 1, 1990, to own the first store and the land on which the store was to be built. (Carlos Decl. II, ¶ 12, Ex. 1; Carlos Decl. I, ¶ 12.)

11. APLP owned 99% of WPCLP and was the partnership's sole limited partner. (Carlos Decl. II, ¶¶ 12-13, Ex. 1.) The remaining 1% was owned by APLP's then general partners. (*Id.*)

12. APLP provided the capital for the land to be purchased and the store to be built, and it applied in its own name for the necessary building and zoning permits. (Carlos Decl. II, ¶ 14; Caesar Dep., Exs. 15, 16, 18.)

13. WPCLP retained A&Co., a Connecticut limited liability corporation owned by Carlos and Caesar equally, to design and build the Port Chester store; however, WPCLP did not pay A&Co. for these services. (Carlos Decl. II, ¶ 15, 16.)

14. A&Co. did not accept a fee from WPCLP to design and build the Port Chester store because the funding for the facility was from APLP and was thus money intended for Carlos and Caesar's children. (Carlos Decl. II, ¶ 16.)

15. After the Westy business was established, A&Co. did accept fees for site selection, design and construction services for new stores. (Carlos Decl. II, ¶ 17.)

16. On March 5, 1991, Carlos and Caesar formed Westy's New York, Inc. ("WNY I") as a Connecticut corporation. (Carlos Decl. II, ¶ 18.)

17. The purpose of WNY I was to manage the operations of the Port Chester store and any other Westy's stores opened in New York. (*Id.*; Caesar Dep., p. 113, line 24 – p. 114, line 16.)

18. WNY I served as another layer of insulation to protect the assets of APLP from being able to be reached by customers of the Westy business. (Carlos Decl. II, ¶ 18.)

19. WPCLP retained WNY I to handle the management and operations of the Port Chester store in exchange for a management fee. (Carlos Decl. II, ¶ 19.)

20. All profits from the Port Chester store are paid to APLP, the owner of the Westy business. (Carlos Decl. II, ¶ 22.)

21. WNY I was involuntarily dissolved by the Connecticut Secretary of State's Office in 1993 because of the corporation's failure to file a required organizational report. (Carlos Decl. II, ¶ 20).

22. Carlos and Caesar were unaware of the dissolution of WCI I until 1996; accordingly, they continued to operate WNY I as if it was still in existence. (Carlos Decl. II, ¶ 21).

23. When Carlos discovered the dissolution in 1996, Caesar and Carlos formed Westy Connecticut, Inc. ("WNY II") on July 29, 1996, and WNY II thereafter assumed management responsibility for the Port Chester store. (*Id.*)

24. WPCLP engaged in significant pre-opening advertising and marketing efforts in connection with the Port Chester store that began at least as early as January 1, 1991. (Caesar Dep. p. 37, lines 11-25; Carlos Decl. II, ¶ 23.)

25. WPCLP's pre-opening advertising included prominent signage in front of the construction site, advertising in local yellow pages telephone directories, the distribution of printed brochures, and advertising on a delivery van. (Caesar Dep., pp. 37-57; Caesar Dep., Ex. 44, p. 5; Carlos Decl. II, ¶23, Ex. 2; Ex. B to Plaintiff's Summary Judgment Motion.)

26. The Port Chester store opened in May 1991 and remains open today. (Carlos Decl. II, ¶ 24.)

27. WPCLP deeded the Port Chester property and store to Port Chester Project LLC on January 2, 1996 ("PCPLLC").

28. APLP owns 100% of PCPLLC. (Carlos Decl. II, ¶ 25.)

29. As the owner of the Westy business, APLP was and is actively involved in the management and operation of the store. (Carlos Decl. II, ¶ 26.)

30. APLP holds annual meetings at which the operations of all of the stores are reviewed and changes to the stores are discussed and approved. (Carlos Decl. II, ¶¶ 26-27 and Ex. 3 thereto (which is a copy of the APLP 2000 annual meeting minutes and reflects detailed review and discussion of the Westy business.))

31. Although the Westy's Port Chester store was located in New York, APLP believed that it was possible that it could open stores in Connecticut in the future. (Caesar Dep., p. 116, line 19 – p. 117, line 8.)

32. Carlos and Caesar formed Westy's Connecticut, Inc. ("WCI I") on March 8, 1991 as a Connecticut corporation with Carlos and Caesar as 50/50 shareholders to manage the operations of any Westy's stores that might be built in Connecticut in the future. (*Id.*; Carlos Decl. II, ¶ 28, Ex. 4)

ATL01/11790412v1

33. As of August of 1992, APLP had not yet opened any stores in Connecticut, and APLP no longer envisioned that it would do so. (Carlos Decl. I, ¶ 28; Carlos Decl. II, ¶ 29.)

34. Because APLP had not yet opened any stores in Connecticut, WCI I was not serving any business purpose and had no need to be in existence. (*Id.*)

35. The shareholders voluntarily dissolved WCI I on August 13, 1992 through the filing of a Certificate of Dissolution with the Connecticut Secretary of State's Office. (Caesar Dep., Ex. 30; Carlos Decl. II, ¶ 29.)

36. At the time of its dissolution, and throughout its existence, WCI I had never had any employees, income, expenditures, or business operations of any kind. (Carlos Decl. I, ¶ 28.)

37. WCI I's only asset was $1,000 in start-up capital that Carlos and Caesar were required by Connecticut law to invest to form the corporation. (Carlos Decl. II, ¶ 30.)

38. The $1,000 in start-up capital of WCI I was distributed to the shareholders on the dissolution of the corporation. (*Id.*)

39. The second Westy's storage center opened in June 1995 in Tuckahoe, NY. (Carlos Decl. II, ¶¶ 31, 38.)

40. The financing and development of the Tuckahoe store followed the same business model as the Port Chester store. (*See* Carlos Decl. II, ¶¶ 32-37.)

41. APLP provided all of the seed capital for the site selection and purchase, building design and construction, and initial advertising and operational expenditures. (Carlos Decl. II, ¶ 32.)

42. APLP formed Tuckahoe Project LLC ("TPLLC"), a New York limited liability company, to own the store and the real estate on which it was built. (Carlos Decl. II, ¶ 33.)

43. APLP owns 100 % of TPLLC. (Carlos Decl. II, ¶ 34.)

44. TPLLC hired A&Co. to perform site selection, building design and construction services for the store. (Carlos Decl. II, ¶ 35.)

45. TPLLC retained WNY I, and thereafter WNY II, to manage the store. (Carlos Decl. II, ¶ 36.)

46. TPLLC pays all profits from the store to APLP, the owner of the Westy business. (Carlos Decl. II, ¶ 37.)

47. The current WESTY stores, their locations, approximate dates of opening, and owners are set forth in the table below (Carlos Decl. II, ¶ 38):

| Location | Store Owner | Owner(s) of Store Owner | Opening Date |
| --- | --- | --- | --- |
| Port Chester, NY | Port Chester Project LLC | APLP | May 1991 |
| Tuckahoe, NY | Tuckahoe Project LLC | APLP | June 1995 |
| Norwalk, CT | Norwalk Project LLC | Carlos & Caesar | May 1997 |
| Elmsford, NY | Greenburgh Project LLC | APLP | 1997 |
| Danbury, CT | Danbury Project LLC | APLP | December 1998 |
| Milford, CT | Milford Project LLC | Carlos & Caesar | January 1998 |
| Stamford, CT | Stamford Project LLC | Carlos & Caesar | January 2000 |
| Farmingdale, NY | Babylon Project LLC | APLP | February 2000 |
| Lake Success, NY | Lake Success Project LLC | APLP | February 2001 |
| Port Chester 2, NY | Port Chester Project II LLC | APLP | April 2001 |
| Hicksville, NY | Hicksville Project LLC | APLP | January 2002 |

48. APLP owns eight of the eleven LLC's that were formed to own the individual real estate, facilities and improvements, including the first two and four of the first five storage centers. (Carlos Decl. II, ¶ 38.)

49. Carlos and Caesar are the owners of the limited liabilities companies that own the three storage centers that are not owned by APLP. (Carlos Decl. II, ¶ 39.)

ATL01/11790412v1

50. The reason that Carlos and Caesar individually own three stores, as opposed to being owned by APLP, is that Carlos and Caesar had sold real estate that they owned together and, for tax purposes, decided to engage in like-kind exchanges within a limited period of time. (*Id.*)

51. Carlos and Caesar formed Westy Connecticut, Inc. ("WCI II") on July 29, 1996 with the two brothers as 50/50 shareholders as they were beginning plans to open the first storage center in Connecticut. (Carlos Decl. I, ¶ 30; Carlos Decl. II, ¶ 41.)

52. There was no assignment, written or oral, by either of the brothers, to WCI II with respect to any trademarks or intangible assets. (Carlos Decl. II, ¶ 42.)

53. Each of the Westy stores in Connecticut retained WCI II to handle store management and operations. (Carlos Decl. I, ¶ 31.)

54. Each of the Westy stores in New York retained WNY II to handle store management and operations. (Caesar Dep., p. 113, line 23 – p. 114, line 16.)

55. In addition to the WESTY'S word mark, APLP adopted the following image of a West Highland White Terrier at least as early as January 1, 1991 as a design mark to identify the business and its services ("the Terrier Design"):



(Carlos Decl. II, ¶ 43; *see also* Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment filed June 2, 2003, Ex. 7.)

ATL01/11790412v1

56. APLP's attorney in 1991 was Alan Shaver. (Caesar Deposition, p. 5, lines 3-7.)

57. APLP instructed Mr. Shaver to prepare and file service mark registration applications for the WESTY'S word mark and the Terrier Design with the U.S. Patent and Trademark Office ("USPTO"). (*Id.*; Carlos Decl. II, ¶ 44.)

58. Mr. Shaver prepared and then filed the service mark registration applications for the WESTY'S word mark and the Terrier Design with the USPTO on March 13, 1991. (Caesar Dep., Ex. 44, 45; Carlos Decl. II, ¶ 44.)

59. The WESTY'S and Terrier Design applications properly recited January 1, 1991 as the date of first use, but the applications mistakenly identified WCI I as the owner of the marks, since WCI I was not in existence when the marks were first used and never had any business interaction with or relationship to the Port Chester store. (*Id.*)

60. Carlos and Caesar understood at the time – erroneously – that they could file the WESTY'S and Terrier Design applications in the name of any company they wanted to; they chose to file the applications in the name of WCI I. (Carlos Decl. II, ¶ 45.)

61. The WESTY'S and Terrier Design applications matured to registration in 1992; however, both registrations were cancelled in 1998 for failure to file the necessary statements of use. (Carlos Decl. II, ¶ 46.)

62. In 1997, APLP elected to change the principal mark of the business from WESTY'S to WESTY. (Caesar Dep., p. 247, line 25 – p. 248, line 13.)

63. The change from the WESTY'S to WESTY was made to reduce the length of the mark because of new restrictions being passed by communities on the size of signage. (*Id.*)

64. APLP also began using a smaller version of the Terrier Design that consisted of only the drawing of the head of a West Highland White Terrier ("Terrier Head design"):



(*See* File History for Terrier Head Design attached to Plaintiff's Motion for Summary Judgment as Exhibit E; Carlos Decl. II, ¶ 47.)

65. In December 1999, Carlos and Caesar decided to separate most of their business interests, including A&Co., WCI II and WNY, except that each remained the Trustee of the General Partners of APLP. (*See* Carlos A. Arredondo Deposition (hereinafter "Carlos Dep.") pp. 17-24.)

66. Carlos agreed to sell his interests in A&Co. to Caesar effective January 1, 2000. (*See Id.*)

67. As a part of the transactions, Caesar told Carlos that WCI II owned the WESTY Marks, and Caesar said that he wanted ownership of the marks. (*Id.* at p. 42, line 16 – p. 46 line 11.)

68. Carlos did not recall who owned the marks, but, accepting without inquiry that this information was correct, Carlos agreed to sell his interest in WCI II to Caesar, which Carlos understood would have the effect of transferring ownership of the WESTY Marks to Caesar. (Carlos Decl. II, ¶¶ 49-50.)

69. Carlos never agreed to sell his interests in the marks to A&Co. and would have opposed any such transaction. (*Id.*, ¶ 51.)

70. On December 21, 1999, unbeknownst to Carlos, and while he was out of the country on vacation, Caesar caused WCI II to execute a bill of sale of the WESTY Marks from WCI

ATL01/11790412v1

II to A&Co. (Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment filed June 2, 2003, Ex. 11.; Carlos Decl. II, ¶ 52.)

71. On September 3, 2002, A&Co. filed trademark registration applications in its name with the USPTO for the marks WESTY, WESTY'S, and the Terrier Head design. (*See* Trademark applications attached as Exhibits C, D and E to Plaintiff's Motion for Summary Judgment; Carlos Decl. II, ¶ 53.)

72. The USPTO published the applications for opposition in 2003. (Carlos Decl. II, ¶ 54.)

73. In his capacity as Trustee of the 2000 Carlos Trust, Carlos timely filed oppositions to the applications. (Carlos Decl. II, ¶ 55, Exs. 5-7.)

74. The Trademark Trial and Appeal Board of the USPTO consolidated all three oppositions and, on September 22, 2003, suspended the proceedings pending the resolution of this action. (TTAB Grant of Motion for Consolidation and Suspension attached to Plaintiff's Motion for Summary Judgment as Exhibit F).

Respectfully submitted this 12th day of November, 2004.


ROBERT P. DOLIAN (ct04278)
M. JULIET BONAZZOLI (ct21394)
CUMMINGS & LOCKWOOD LLC
Four Stamford Plaza, P.O. Box 120
Stamford, Connecticut 06904-0120
Ph (203)327-1700
Fx (203) 708-5647


OF COUNSEL:

MARTIN J. ELGISON  ct24759
DAVID J. STEWART  ct24757
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Ph (404) 881-7000
Fx (404) 881-7777

Counsel for Plaintiff

ATL01/11790412v1

## CERTIFICATE OF SERVICE

I certify that on this 12th day of November, 2004, a true and correct copy of the foregoing **LOCAL RULE 56(A)(1) STATEMENT** was served upon counsel for Defendants, by the manner indicated, addressed as follows:

        Craig A. Raabe (First Class Mail)
        ROBINSON & COLE LLP
        280 Trumbull Street
        Hartford, CT 06103

        */s/ M. Juliet Bonazzoli*
        M. Juliet Bonazzoli

2063307_1.doc 11/12/2004

ATL01/11790412v1