words, a company can file a trademark application and own the resulting trademark registration without ever having used the mark itself.  Turner v. HMH Publishing Co., 380 F.2d 224, 229 (5th Cir. 1967), cert. denied, 389 U.S. 1006 (1967); Pneutek, Inc. v. Scherr, 211 USPQ 824, 833 (TTAB 1981).

The Lanham Act requires only that an applicant "control" the nature and quality of the goods and services offered under the mark by the related company.  This control usually occurs in one of two scenarios, or some combination of them:  (1) the two entities are themselves sufficiently related through common ownership or control over the business that the necessary control over the trademark is presumed, or (2) the applicant licenses the mark to another.  As shown below, APLP qualifies as a "related company" to WCI under each approach.

        **(a)     APLP Is A "Related Company" By Virtue Of Caesar and Carlos' Control**

First, based on the undisputed facts listed below, the level of control that Caesar and Carlos exercised over APLP generally, and over use of the WESTY trademarks at APLP-owned facilities specifically, makes APLP a "related company" of WCI under the Lanham Act.

- Caesar and Carlos solely decided to enter the self-storage business and created the WESTY Trademarks.
- Caesar and Carlos solely designed the WESTY buildings and solely developed the real property for the WESTY centers.

---

And the definition of a "person" includes "a firm, corporation, union, association, or other organization capable of suing and being sued in a court of law."  Id.  APLP is thus a "person" under the Lanham Act.

- Caesar and Carlos solely managed the WESTY centers and solely decided how to use the WESTY marks at those centers.

- Caesar and Carlos created the idea of APLP as a passive investment vehicle to generate income for their children and future generations of Arredondos.

- Caesar and Carlos formed and initially funded APLP, and all of the members of APLP during relevant times were children of Caesar or Carlos.

- Caesar and Carlos were the sole trustees of the general partners of APLP and solely controlled APLP when they launched the WESTY business in May 1991.

- None of the members of APLP (i.e., Caesar and Carlos's children) knew anything about APLP before the first WESTY center opened in May 1991.

Because Caesar and Carlos were the sole creators and trustees of APLP and because none of their children (i.e., APLP's members) even knew about APLP before the first WESTY center opened in May 1991, Caesar and Carlos did not need an ownership interest in APLP to exercise their complete control over APLP and everything that it did. In short, Caesar and Carlos's positions as the "leading lights" of the Arredondo family and the various Arredondo enterprises including WCI and APLP, coupled with their complete and unfettered control over APLP as a "related company," are more than enough to justify and support their decision to vest ownership of the WESTY Trademarks first in WCI and later in A&Co. as WCI's successor.

### (b)    APLP Is A "Related Company" Through An Implied License

Second, a "related company" relationship also exists here through a licensing arrangement and appropriate control over use of the WESTY marks at APLP-owned facilities. Although there is no express written or oral trademark license from WCI to

APLP, the conduct of the parties clearly establishes an implied trademark license from WCI to APLP. Moreover, WCI did grant a direct, express written license to WNY as manager of the first WESTY facility in Port Chester, New York, the very same facility that APLP owns and that forms the basis for Carlos' "first use" theory.

"An implied license in fact 'arises out of the objective conduct of the parties, which a reasonable person would regard as indicating that an agreement has been reached.'" Villanova University v. Villanova Alumni Educational Foundation, Inc. 123 F. Supp. 2d 293, 307 (E.D. Pa. 2000), quoting Birthright v. Birthright, Inc., 827 F. Supp. 1114, 1134 (D.N.J. 1993). "Permission to use the trademarks coupled with the exercise of reasonable control over such use can lead to the conclusion that an implied license existed between the parties, even where no contract was made." Villanova, 123 F. Supp. 2d at 307; see also United States Jaycees v. Philadelphia Jaycees, 639 F.2d 134, 140, n.7 (3rd Cir. 1981) ("the district court found as facts that state and local chapters affiliated with the United States Jaycees were permitted during the term of affiliation to use the National's trade and service marks. Thus some type of license agreement existed.").

"It is irrelevant whether the parties thought of the arrangement at the time in terms of an implied license. The test for whether or not an implied license existed is based solely on the objective conduct of the parties." Villanova, 123 F. Supp. 2d at 308, citing Allen-Myland v. International Business Machines Corp., 746 F. Supp. 520, 549 (E.D. Pa. 1990) and Jaycees, 639 F.2d at 140, n.7.

Regarding the WESTY Trademarks, the objective conduct of Caesar and Carlos acting as owners of WCI and creators of the WESTY Trademarks and business on one hand, and as the creators and sole trustees of the general partners of APLP and parents of APLP's members on the other hand, unquestionably establishes an implied license. Caesar and Carlos created and developed the WESTY business to benefit both themselves as well as their children and future generations of Arredondos by allowing APLP to participate as passive owners of some of the WESTY properties. (See Section II.D.) Caesar and Carlos, however, fully controlled and dictated use of the WESTY Trademarks including, but not limited to, designing the marks and deciding how and where they would be displayed. (See Sections II.C and D.) Caesar and Carlos also completely controlled and dictated the quality of the services offered under the WESTY marks by developing the WESTY business model, training the WESTY employees, and by managing all aspects of the WESTY business through management agreements. (See Section II.D.)

Moreover, the January 1, 1992 License Agreement from WCI to WNY corroborates WCI's ownership of the WESTY Trademarks. Although the January 1, 1992 License Agreement does not identify any specific marks, it clearly covers at least the Westy Logo because the wording "Miscellaneous Design" in the License Agreement corresponds exactly to the description of the Westy Logo used by the PTO in several papers it issued in connection with WCI's trademark application for that mark. Specifically, the Notice of Publication for the Westy Logo application, which was issued by the PTO before January 1, 1992, described the mark as a "Miscellaneous Design."

-22-

(Caesar Aff. Ex. 22.) Accordingly, even if the License Agreement covered only the Westy Logo, it nonetheless supports WCI's ownership of all of the WESTY marks because Carlos admits that the same entity owned both the WESTY word mark and the Westy Logo. This License Agreement, executed only seven months after the first WESTY facility opened, is contemporaneous evidence confirming WCI's ownership of all of the WESTY Trademarks and its desire to license those marks to Arredondo-controlled related companies.[10]

Additionally, an implied license from WCI (and later A&Co.) to APLP is entirely logical. WCI and A&Co. have had direct, contractual operational and managerial relationships with APLP for the WESTY facilities that APLP owns, as well as with Arredondo 2000, LLC and the Caesar and Carlos-owned companies that own the other WESTY facilities. In contrast, an implied license from APLP is illogical because APLP has no contractual, operational, or managerial relationship with the Caesar and Carlos-owned or the Arredondo 2000, LLC-owned WESTY facilities, and APLP has never controlled the use of WESTY Trademarks or the quality of the services offered under those marks.

3.   **APLP's Mere Ownership Of The First Operational WESTY Facility Does Not Confer Any Rights To The WESTY Trademarks**

---

[10] Both Carlos and Caesar testified that they did not distinguish among the trademarks, which explains the ambiguity in the License Agreement language. (Carlos Tr. 42:24-48:2; 167:17-168:18; Caesar Tr. 10:4-23; 24:23-25:2; 130:4-131:8.)

As noted above, Carlos admits that both he and Caesar intended for WCI and then A&Co. to own the WESTY Trademarks. His position now is that their clear intent and actions mean nothing now simply because APLP owned the first operating WESTY facility. In essence, Carlos now claims that mere record ownership of the physical facility by APLP absolutely and irrevocably trumps every fact, intention, promise, and transaction under which the brothers operated the WESTY business for over a decade. Merely stating this proposal demonstrates its absurdity both as a matter of fact and law.

Accordingly, even under Carlos' theory of the case, if there was a valid legal basis for the brothers initially placing ownership of the WESTY Trademarks in WCI, Carlos must agree that WCI and then A&Co. owned the WESTY Trademarks. As demonstrated above, there are perfectly valid bases for WCI's ownership of the WESTY Trademarks. Carlos' claim that APLP owns the WESTY marks therefore fails as a matter of law.

The cases cited by Carlos in his brief in opposition to Caesar's initial motion for summary judgment do not change this result, Carlos argued in that brief that "the exclusive right to a trademark belongs to one who first uses it in connection with specified goods," quoting Blue Bell, Inc. v. Farah Mfg. Co., Inc., 508 F.2d 1260, 1265 (5th Cir. 1975). The Blue Bell case, however, involved two competing clothing manufacturers that both independently decided to use the same trademark for men's clothing. The Blue Bell court examined each company's use of the mark and had to decide which had sufficiently used the disputed trademark to be declared the "first user" and thus the trademark owner. For the reasons discussed above, the Blue Bell case

involving competing and completely unrelated businesses is readily distinguishable from, and irrelevant to, this case involving a "family" of family businesses operating under the unified management of Caesar and Carlos.

### 4.    The Equities Compel Ownership Of The WESTY Trademarks As Caesar And Carlos Decided, i.e., By WCI And Then A&Co.

The equities, especially when considered in light of the "related company" doctrine, strongly favor ownership of the WESTY Trademarks in A&Co.  Professor McCarthy, author of the leading trademark treatise, explains the rationale for permitting companies or persons to own trademarks they create but which are used initially and/or solely by others:

> For some time, there was considerable doubt as to whether initial rights in a mark could be acquired and sustained through use of the mark only by controlled licensees when the licensor itself makes no use of the mark. For example, when party Alpha creates a concept for a hot dog fast-food franchise system identified by the mark THE DOG HOUSE, and then licenses it to party Zeta, is Alpha the "owner" of that mark?  The argument that at one time appeared to be the law was that because Alpha did not use the words as a "mark" first, before licensing, Alpha had no "mark" to license to Zeta. The apparent result of accepting this argument is that Zeta becomes the "owner" of the mark by virtue of being the first to use the words as a mark to identify and distinguish the goods or services. This result appears grossly inequitable. If it were to be the law, Alpha would have to first go through the formalism of itself operating such a fast-food outlet before it could engage in licensing others.

2 J. McCarthy, Trademarks and Unfair Competition, § 18:36 (4th ed 2000).

The same "grossly inequitable" result would occur here if ownership of the WESTY Trademarks created and developed solely by Caesar and Carlos at their substantial expense, time, effort, and risk were found to lie in APLP merely because the

brothers chose to put ownership of the first WESTY facility in APLP.  The result sought

by Carlos is even more inequitable considering that APLP is a passive investment

vehicle consisting of Caesar's and Carlos' heirs  who had nothing to do with the creation

or development of the WESTY business or trademarks and who did not even know of

APLP's existence in May 1991 when the first WESTY facility opened.  Indeed,

trademark ownership was not essential for the members of APLP—Caesar and Carlos'

children and their descendants—to enjoy the benefits intended by Caesar and Carlos

when they set up and funded APLP.  As a result of Caesar's and Carlos' efforts, APLP's

members have received more than $20,000,000 in income from APLP over the last ten

years, simply for being the heirs of Caesar or Carlos.  All of this has been accomplished

without APLP owing the WESTY Trademarks.  Indeed, in 2003 alone, through APLP,

Caesar and Carlos's heirs received income of $2,700,000.  Therefore, Caesar and

Carlos' decision in 1991 to place ownership of the trademarks in WCI and then A&Co.

did not interfere with the purpose of APLP of creating wealth and income for current and

future Arredondo generations.  The undisputed facts make plain that Caesar and Carlos

never envisioned nor intended the twisted, revisionist result that Carlos now puts

forward.

    **5.**  **Neither Carlos' "Legal" Arguments Nor The Cases He Cites**
       **Supports His Position That Caesar And Carlos' Decision To**
       **Place Trademark Ownership In WCI Was "Erroneous."**

  Carlos cites several cases for the proposition that the identification of WCI as the

owner of the trademark applications filed in 1991 renders those applications void ab

initio. (Pl. Mem., pp. 19-21.) Those cases, however, are readily distinguishable from this case.

In <u>Chien Ming Huang v. Tzu Wei Chen Food Co. Ltd.</u>, 849 F.2d 1458, 1460 (Fed. Cir. 1988), Mr. Huang signed a trademark application listing himself as the trademark owner and he mailed it to the PTO on April 27, 1982. Mr. Huang earlier had filed an application to incorporate a company, which was granted and made effective on May 1, 1982. Both parties to the proceeding agreed that ownership of the trademark passed to the newly formed corporation on May 1, 1982. The trademark application in the individual's name was not received by the PTO, and thus not filed, until May 3, 1982, two days after Mr. Huang's company was incorporated and ownership of the trademark was transferred to the corporation. Because ownership of the trademark was transferred to the corporation before the application was filed, the court held that the application was void because it was not applied for in the name of the owner of the mark at the time of filing. In this case, however, both Carlos and Caesar agree that they decided to and in fact placed ownership of the WESTY Trademarks in the name of WCI before filing the application for the WESTY marks in March 1991. Accordingly, because the first WESTY application was filed by its rightful owner, the <u>Chien Ming Huang</u> case has no relevance here.

Similarly irrelevant is the case of <u>In re Tong Yang Cement Corp.</u>, 19 U.S.P.Q.2d 1689 (TTAB 1991). In that case, a Korean corporation applied to register a trademark in the United States claiming priority from an application previously filed in Korea. The

-27-

Korean application, however, was not filed in the name of the applicant for the U.S. application. Rather, the Korean application was filed in the name of a joint venture consisting of the applicant for the U.S. application and two other Korean corporations. The PTO Examining Attorney refused registration on the ground that at the time the U.S. application was filed, the owner of the U.S. application was not identical to the owner of the foreign application on which it was based, and the TTAB affirmed that decision. In re Tong Yang Cement Corp. thus has no relevance where the applications to register the WESTY marks were not based on a foreign application, and no disparity between the applicant and owner existed at the time of filing or thereafter.

Carlos also cites several cases for the proposition that executives or shareholders of a business can never own trademarks used by the business. Carlos' position, however, is contrary to well-settled law. Carlos cites Smith v. Coahoma Chem. Co., 121 U.S.P.Q. 215, 217 (C.C.P.A. 1959), for the proposition that a corporation is the true owner of a trademark used only by the corporation and that any registrations for the mark obtained by an officer and stockholder of the corporation in his own name are invalid. Numerous distinctions exist between Smith v. Coahoma and this case. Among them, the officer/shareholder at issue Smith v. Coahoma had an employment contract with the corporation so that the officer/shareholder's efforts were done for the benefit of the corporation. In this case, however, there is no such employment contract between

Caesar and Carlos and WCI or any of the other companies they controlled.[11]  Indeed, in Pneutek, Inc. v. Scherr, 211 U.S.P.Q. 824 (TTAB 1981), the TTAB rejected an argument similar to that advanced by Carlos here and in doing so characterized the officer/shareholder's employment contract with the corporation in Smith v. Coahoma as the "critical difference." Id. at 831.

Finally, Carlos cites Smith v. Tobacco By-Products & Chem. Corp, 243 F.2d 188 (C.C.P.A. 1957), for the proposition that "executives and shareholders of a business do not own the marks that the business uses." (Pl. Mem., p. 21 n.6.)  Contrary to Carlos' position, there is no per se rule against executives or shareholders of a business owning marks that the business uses. Indeed, in ABC Moving Co. v. Brown, 218 U.S.P.Q. 336 (TTAB 1983), the TTAB rejected the petitioner's argument that an individual who is a controlling stockholder and principal officer of a corporation cannot establish individual rights when the only use of the mark has been by the corporation. In support of its argument, the petitioner had cited the two Smith cases also cited by Carlos here. In rejecting the petitioner's argument, the TTAB stated:

> Accordingly we disagree with petitioner's conclusion that use of a mark only through a licensee corporation where the licensor is an officer and controlling stockholder in that corporation is inherently defective and cannot support an application for registration by the licensor. While the fact that an individual is the controlling stockholder and officer of a corporation is not sufficient, in and of itself, to establish ownership in a mark which was only used by the corporation, such an individual may be the owner of a mark used by a corporation under the

---

[11] Further, unlike the present situation, Smith v. Coahoma involved an arms-length trademark validity challenge brought by a rival company, not an internal family dispute over ownership.

individual's control.  The question of whether the individual is, in fact, the owner
of the mark must be resolved on a case-by-case basis dependent upon the
particular facts adduced in the case. (citation omitted)  In the present case, the
facts of record are insufficient to support a holding that respondent was not the
owner of the mark when it applied for registration.  (emphasis added)

218 U.S.P.Q. at 339.

In this case, the facts of record, including Carlos' own deposition testimony and

countless documents spanning more than a decade, demonstrate beyond question

that Caesar and Carlos controlled the WESTY trademarks and business and properly

placed ownership of the WESTY marks they created in their jointly owned company

WCI.

### 6.    WCI Never Abandoned the WESTY Trademarks.

As another example of the legal deficiencies in his position, Carlos' argues that

even if WCI were the owner of the WESTY marks in 1991, the marks were abandoned

when WCI was voluntarily dissolved in 1992. (Pl. Mem., pp. 21-22.)  Again, Carlos's

argument fails.  He concedes that abandonment requires proof that the trademark

owner discontinued use of it mark with the intent not to resume use.  (Pl. Mem., p. 21.)

Here, of course, the WESTY marks remained in continuous use from 1991 to the

present, a fact that Carlos does not dispute.

Nor do the "abandonment" cases cited by Carlos support his position.  In fact,

they support Caesar's position.  For example, in Stetson v. Howard D. Wolf & Assoc.,

955 F.2d 847 (2d Cir. 1992), the court rejected the plaintiff's claim of abandonment

because the mark at issue was continuously used without interruption.  This is exactly

the case here where Caesar and Carlos have operated the Westy business and used the WESTY Trademarks continuously from 1991 to the present. Indeed, Carlos testified in his deposition that when WCI was reformed, it was his intention that WCI still owned the WESTY marks and it was his intention that the reformed WCI operate as if nothing had changed. (Carlos Tr. 173: 16-21; 174: 4-49; 180: 12-16)

The <u>Stetson</u> case supports Caesar's position in yet another way. The dispute in <u>Stetson</u> pitted a band against its manager, who owned the trademark for the band's name and who had the band under contract to perform under his auspices. The band refused to honor the contract and performed on its own. Because the band was not performing under the direction of its manager—the trademark owner—the band argued that the mark was abandoned because the manager himself did not use the mark. Here, there is no dispute that WCI used the marks after it was reformed and there is no dispute that Carlos intended WCI to own the marks after it was reformed. The court's rejection of the hyper-technical argument in <u>Stetson,</u> placing form over substance, applies with equal force here to Carlos' hyper-technical argument that the WESTY Trademarks were abandoned simply because WCI did not formally exist for a period of time.[12]

---

[12] Carlos' reliance on <u>P. Daussa Corp. v. Sutton Cosmetics (P.R.) Inc.</u>, 462 F.2d 134 (2d Cir. 1972), is similarly misplaced. The question of abandonment was not even at issue in that case. Rather, the case involved several companies' competing uses of a trademark that a third-party had abandoned by discontinuing use of the mark, expressly abandoning its trademark registration, and selling its inventory. None of those facts are present here.

7.     **The Dissolution and Reformation of WCI Supports Summary Judgment in Defendants' Favor.**

Moreover, as noted above and in Caesar's pending summary judgment motion (Defs. Mem., pp. 8. n.5 and 28-30), WCI's dissolution and subsequent re-formation were routine and rational corporate events that in no way extinguished the WESTY marks or caused them to be transferred to APLP by default. Not surprisingly, Carlos cited no authority compelling this absurd and incongruous result. And indeed, the Defendants have twice addressed the legal flaw in Carlos' argument concerning WCI's dissolution.[13]

The effect of a very similar "gap" in corporate status was decided in Brewski Beer Co., Inc. v. Brewski Brothers, Inc., 47 USPQ2d 1281 (TTAB 1998). In that case, the TTAB, held that the use of BREWSKI BROTHERS by the individual owners of the business prior to the date of incorporation inured to the corporation's benefit. The TTAB further held that a three year lapse in corporate status did not doom the corporation's trademark rights because the individual owners' continuous trademark use inured to the corporation's benefit upon corporate reinstatement after the lapse. Id. (citing 2 J. McCarthy § 16:36).[14]

As in Brewski, whether as a two-person de facto partnership or as equal owners of WCI I and WCI II (as Carlos now calls them), Caesar and Carlos maintained use of the WESTY marks between 1993 and 1996 as they continued to look for sites in Connecticut to

---

[13]   See Defs. Mem., pp. 28-30 and Defendants' July 18, 2003 Reply Memorandum, pp. 8-10.

[14]   See also Accu Personnel, Inc. v. Accustaff Inc., 38 USPQ2d 1443 (TTAB 1996) (defects in corporate form not fatal where previous entity and corporation are essentially the same); Argo & Company, Inc. v. Springer, 198 USPQ 626 (TTAB 1978) (application by entity that failed to incorporate not void because non-existent "corporation" and individual owners were same, single commercial enterprise).

-32-

build additional WESTY facilities and as WNY continued to exercise its trademark rights

under the January 1, 1992 license from WCI.  (See License Agreement at Exhibit 8 to Exhibit

B of Defs. Mem.)  This use inured to the benefit of WCI when the brothers re-formed that

company.  Again, even if Carlos' is correct that WCI became dormant for a period of years,

this technical flaw in corporate status has no effect on the continuity or ownership of the

WESTY marks.

> **C.     Carlos' Self-Serving Factual Assertions That Flatly Contradict His
> Deposition Testimony And/Or Have No Evidentiary Support Do Not
> Create A Genuine Issue of Material Fact.**

>> **1.     Self-serving Declarations Are Properly Disregarded For
>> Summary Judgment Purposes.**

Carlos' Memorandum relies predominantly on his Declaration.  The factual

assertions in that self-serving Declaration, however, as well as in his Memorandum,

largely lack evidentiary citation or support.  The case law is clear—a party may not

create a genuine issue of material fact by presenting contradictory or unsupported

statements.  See, e.g., Anderson v. Liberty Lobby, 477 U.S. 242, 256 (1986); Securities

& Exchange Comm'n v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir.1978).

Moreover, "[i]t is well settled in this circuit that a party's affidavit which contradicts his

own prior deposition testimony should be disregarded on a motion for summary

judgment." Mack v. United States, 814 F.2d 120, 124 (2d Cir. 1987) (in granting

defendant's motion for summary judgment, district court properly disregarded plaintiff's

affidavit that contradicted his earlier deposition testimony to find no genuine factual

dispute); see also Stolow v. Greg Manning Auctions Inc., No. 03-7259, 80 Fed.Appx.

722, 724 (2d Cir. Nov. 17, 2003) (given prior sworn statements to the contrary, plaintiff

could not rely on self-serving statement made in opposition to summary judgment);

Palazzo ex rel Delmage v. Corio, 232 F.3d 38, 43 (2d Cir.2000) ("[I]n opposing

summary judgment, a party who has testified to a given fact in his deposition cannot

create a triable issue merely by submitting an affidavit denying the fact"); Duncan v.

Town of Brookfield, No. 3:98CV01919(AWT), 2003 U.S. Dist. LEXIS 15953 (D.Conn.

Aug. 22, 2003) (Thompson, U.S.D.J.) (court concluded that no material issue of fact

existed where plaintiff testified in his deposition that he was "fully recovered" and later

filed an affidavit stating that he "suffered from a number of serious physical

impairments" which substantially limited his abilities) (attached as Exhibit A); Mrosek v.

Kraatz, 178 F. Supp. 2d 104, 107 n.1 (D.Conn. Sept. 30, 2001) (Chatigny, U.S.D.J.)

(citing Mack, supra, court "ignores…allegation of earlier retaliatory conduct because a

party may not create an issue of fact by contradicting earlier sworn testimony.")

(attached as Exhibit B); Spelios v. Aetna Life Ins. Co., No. 3:97CV1482(WWE), 1999

U.S. Dist. LEXIS 10254, *11 (D.Conn. June 25, 1999) (Eginton, S.U.S.D.J.) (plaintiff's

"self-serving affidavit that he did not tell any subordinate to falsify data on their back-log

reports or to understate the number of backlogged claims…is completely undermined

by the more thorough investigation by Aetna….[and] strikingly at odds with the

statements given by supervisors who were directed to alter the numbers) (attached as

Exhibit C).

   Carlos' declaration contains a litany of naked factual assertions that elevate form

over substance in seeking to avoid the result dictated by well-established trademark and

contract law. As explained in Caesar's motion, when the "leading lights" of closely-held

-34-

family businesses decide to place trademarks in a certain entity, that ownership decision is valid. (See Sections IV.A.2. and IV.B above.) Ignoring the fact that Caesar and Carlos individually controlled and operated every entity involved in this case—WCI, WNY, A&Co., APLP—he claims that APLP made all WESTY trademark- and business-related decisions. In support of these assertions, he either refers to his own self-serving conclusory Declaration or offers no legitimate evidentiary citation at all. Stripped of his Declaration, Carlos' motion has no foundation in fact or in law.

The following chart exposes Carlos' naked assertions by not only showing the lack of any credible evidence supporting them but by also providing direct evidence to the contrary, including Carlos' sworn deposition testimony.

| Assertion in Carlos' Memorandum | Evidentiary Citation in Carlos' Memorandum | Contrary Evidentiary Record |
|---|---|---|
| "Neither Carlos nor Caesar have, in their individual capacities, ever engaged in any Westy business." (Pl. Mem., p. 20.n.6.) | None. | The land for one of the first two initially-considered Westy sites in Milford, Connecticut was owned by Caesar, Carlos and their wives individually. (Carlos Tr. 162:8-24; Caesar Aff., ¶¶ 11-12; a copy of the Rowe Avenue Contract is attached to Caesar's Affidavit as Ex.1.)<br><br>Caesar and Carlos, as individuals, jointly own three WESTY facilities, with each brother holding a 50% interest in the limited liability companies that own each facility. (Carlos Tr. 77:15-77:23; Pl. Mem., p. 8.) |

| | | |
|---|---|---|
| "In 1990, APLP decided that it should develop a high end self-storage business under the service mark WESTY'S as a means of generating income and assets for APLP." (Pl. Mem., p. 3.) | Carlos' Second Declaration, ¶ 10; Carlos' First Declaration, ¶ 9.<br><br>Carlos' Declaration cites to no documents corroborating this allegation. | "Q. Is it fair to say that Caesar came up with the idea of entering the self-storage business? A. Yes." (Carlos Tr. 96:22-97:25).<br><br>"Caesar came up with the name WESTY." (Carlos Tr. 97:3)<br><br>As to self-storage being a mechanism solely to generate income and assets for APLP, again, the land for one of the first two planned WESTY facilities was owned by Caesar and Carlos and their wives individually, and Carlos and Caesar currently jointly own and individually profit from three WESTY facilties. (See prior entry.) |
| "APLP decided that the first storage center would be located in Port Chester, New York." (Pl. Mem., p. 4.) | Carlos' First Declaration, ¶ 12.<br><br>Carlos' Declaration cites to no documents corroborating this allegation. | "The general partners [i.e., Caesar and Carlos] basically rule APLP." (Carlos Tr. 90:5-6.)<br><br>All of APLP's decisions are made by Carlos and Caesar. (Carlos Tr. 90:20-91:5.)<br><br>Caesar and Carlos made the decision to build in Port Chester, and the decision to use the WESTY marks in Port Chester was made by Caesar and not during an |

| | | |
|---|---|---|
| | | APLP annual meeting. (Carlos Tr. 166:3-24.) |
| "APLP was and is actively involved in the management and operation of the [Port Chester] store." (Pl. Mem., p. 5.) | Carlos' Second Declaration, ¶ 26.<br><br>Carlos' Declaration cites to no documents corroborating this allegation. | "APLP has no employees." (Carlos Tr. 90:2-3, 91:22-23.)<br><br>"Q.  How does [APLP] conduct its business?  A. The general partners [i.e., Caesar and Carlos] basically rule APLP." (Carlos Tr.  90:4-6.)<br><br>"Q. How often do the general partners of APLP meet to conduct business? A. Probably once a year, twice a year.  One preannual meeting, two annual meetings.  Q. Do those meetings always occur within a matter of days of each other? A.Typically."  (Carlos Tr. 91:20-92:1) |

| | | |
|---|---|---|
| "APLP holds annual meetings at which the operations of all of the stores are reviewed and changes to the stores are discussed and approved." (Pl. Mem., p. 6 (emphasis added).) | Carlos' Second Declaration, ¶ 26-27; the only document cited by Carlos is Exhibit 3 thereto, which is the APLP 2000 annual meeting minutes.<br><br>Carlos' Declaration cites to no documents corroborating this allegation. | APLP has no connection to the three facilities owned by Caesar and Carlos or the new facilities under development by Caesar's family. (Carlos Tr. 77:6-12; Pl. Mem., p. 7 and n.2)<br><br>"Q. How does [APLP] conduct its business? A. The general partners [i.e., Caesar and Carlos] basically rule APLP." (Carlos Tr. 90:4-6.)<br><br>The decision to change the business name from WESTY'S to WESTY in 1997 was not made at an APLP annual meeting. (Carlos Tr. 167:2-167:9) In fact, Caesar and Carlos advised the limited partners at an annual meeting that Caesar and Carlos had already changed the name. Indeed, one of the limited partners raised an objection to that change, but Caesar and Carlos treated that objection as irrelevant. (Carlos Tr. 167:2-16.) |
| "APLP elected to change the principal mark of the business from WESTY'S to WESTY." (Pl. Mem., p 10.) | Caesar's Deposition, 247:25-248:13.<br><br>Carlos' Declaration cites to no documents corroborating this allegation. | Carlos mischaracterizes Caesar's testimony. In the cited portion of Caesar's deposition, he simply testified that the name was changed. The cited portion of the transcript makes no reference to APLP.<br><br>Additionally, as cited above, Caesar and Carlos made |

|  |  | the decision to change the name and ignored one of APLP's limited partner's after-the-fact objection to that change. |
|---|---|---|
| "APLP instructed [Attorney] Shaver to perpare and file service mark registration applications for the WESTY'S word mark and the Terrier Design with the [PTO]."  (Pl. Mem., p. 9.) | Carlos' Second Declaration, ¶ 44; Caesar's Deposition, 5:3-7.<br><br>Carlos' Declaration cites to no documents corroborating this allegation. | Carlos agrees that he intended to have Attorney Shaver file the trademark registrations in the name of WCI, and Attorney Shaver did so.  (Carlos Tr. 146:25 - 148:7)  There is no basis or support to claim that Carlos was issuing that instruction in his role as general partner of APLP.<br><br>Attorney Shaver's correspondence, referencing registration in the name of WCI, was addressed either to Carlos individually (Defs. Mem., Exs. 6, 7) or to Carlos at A&Co. (Defs. Mem. , Exs. 2, 5), but never to Carlos at APLP.<br><br>In the cited portion of his deposition, Caesar states only that he assumes the WESTY'S trademark application was prepared by he and Carlos' trademark attorney, Alan Shaver.  (Caesar Tr. 5:3-7.) |
| "APLP adopted the [Terrier Design] at least as early as January 1, 1991 as a design mark to identify the business and its services." (Pl. Mem., p. 9.) | Carlos' Second Declaration, ¶ 43; Exhibit 7 to Defendant's June 2, 2003 Memorandum of Law in Support of Motion for Summary Judgment. | Carlos admitted that Caesar, assisted by a graphic artist, created the Terrier Design and the other designs associated with the business.  (Id. |

| | | | |
|---|---|---|---|
| | Carlos' Declaration cites to no documents corroborating this allegation. | | 97:11-17.)<br><br>The exhibit that Carlos cites —Exhibit 7—is a March 12, 1992 memorandum from Attorney Shaver enclosing the Terrier Design's certificate of registration listing the owner as WCI. This document in no way supports the assertion that APLP adopted the Terrier Design. |
| "[T]he WESTY Business continued to be owned by APLP." (Pl. Mem., p. 8.) | None. | | There is no support in the record for the assertion that APLP owned a "WESTY Business." Carlos' Memorandum does not define what he means by the "WESTY Business." The evdientiary record establishes that while APLP owned the limited liability companies that owned some WESTY facilities, the WESTY marks were originally owned by WCI and are now owned by A&Co. |

Carlos' reliance on these unsubstantiated, self-serving statements is unfounded.

Such statements cannot create genuine issues of fact. His Declaration, therefore,

should be disregarded and his motion for summary judgment should be denied.

**D.    Carlos Is Not Entitled To Recover His Attorneys' Fees.**

In Sections III.C and D of their Summary Judgment Memorandum, the

Defendants demonstrated that Carlos is not entitled to recover his attorneys' fees and

costs for this litigation.  The Defendants incorporate those Sections herein by reference.

**V.    CONCLUSION**

For the foregoing reasons, the Court should deny Carlos' November 12, 2004

Motion for Summary Judgment and grant the Defendants' Motion for Summary

Judgment of the same date, entering judgment in favor of the Defendants on all three

counts in the Amended Complaint.

                                        DEFENDANTS,
                                        CAESAR A. ARREDONDO, et al.

                                        By _____
                                           Craig A. Raabe (ct 04116)
                                           E-mail: craabe@rc.com
                                           Edward J. Heath (ct20992)
                                           E-mail: eheath@rc.com
                                           Robinson & Cole LLP
                                           280 Trumbull Street
                                           Hartford, CT 06103
                                           Tel.: (860) 275-8200
                                           Fax: (860) 275-8299

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was mailed via mail, postage prepaid, on this 3rd day of December, 2004, to the following counsel of record:

Robert P. Dolian, Esq.
Cummings & Lockwood LLC
Four Stamford Plaza
P.O. Box 120
Stamford, CT  06904-0120

Martin J. Elgison, Esq.
David J. Stewart, Esq.
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA  30309-3424

_____
Edward J. Heath