IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CARLOS A. ARREDONDO, in his capacity as Trustee of The 2000 Trust for the Grandchildren of Carlos A. Arredondo and Mari V. Arredondo, General Partner of Arredondo Properties Limited Partnership,<br><br>            Plaintiff,<br><br>     v.<br><br>CAESAR A. ARREDONDO, individually and in his capacity as Trustee of The 2000 Trust for the Grandchildren of Caesar A. Arredondo and Carolyn Abad Arredondo; THE 2000 TRUST FOR THE GRANDCHILDREN OF CAESAR A. ARREDONDO, in its capacity as General Partner of Arredondo Properties Limited Partnership; and ARREDONDO & CO., LLC,<br><br>            Defendants. | NO. 3:02 CV 2200 (CFD)<br><br><br><br><br><br><br><br><br><br><br><br>DECEMBER 3, 2004 |

## DEFENDANTS' LOCAL RULE 56(a)(2) STATEMENT

Pursuant to L.R.Civ.P. 56(a)(2), the defendants hereby submit the following responses to the plaintiff's Local Rule 56(a)(1) Statement:

1.    Carlos and Caesar Arredondo are brothers who have engaged in various real estate oriented business ventures together since 1961. (Deposition of Caesar A. Arredondo taken June 24, 2004 ("Caesar Dep."), p. 69, lines 4-21).

**RESPONSE:** Admitted.

2.    Throughout Carlos and Caesar's many years of doing business together, the

brothers have almost always done business through corporations or limited

liability partnerships to protect their personal assets. (Second Declaration of

Carlos A. Arredondo, attached to Plaintiff Motion for Summary Judgment, filed

concurrently herewith, as Exhibit A ("Carlos Decl. II"), ¶ 3).

**RESPONSE:** Denied.  (Carlos Tr. 162: 8-24; Caesar Aff. ¶¶ 11-12, Ex. 1 (attached to
              Caesar's Motion for Summary Judgment.))

3.    In 1980, Carlos and Caesar formed APLP for the purpose of generating income for

.    future generations of their families. (*See* Caesar Dep., p. 72, lines 6-9; Carlos

Decl. II, ¶ 4).

**RESPONSE:** Admitted only to the extent it alleges generation of income through
              passive, real estate investment.  (Carlos Tr.; 91:6-92:4).

4.    The current General Partners of APLP are the 2000 Carlos Trust and The 2000

Trust for the Grandchildren of Caesar A. Arredondo and Carolyn Abad Arredondo

(the "2000 Caesar Trust"). (Caesar Dep., p. 86, line 8 — p.87 line 3; Caesar Dep.,

Ex. 7 at 5).

**RESPONSE:** Admitted.

5.    Carlos and Caesar Arredondo do not have any ownership interest of any kind in

APLP and have not since 1987. (*Id*. at 54; Carlos Decl. II, ¶ 8).  Their only

involvement in APLP is as trustees of the general partners of the limited

partnership. (*Id*. at 5, 54).

**RESPONSE:**  Caesar Arredondo ("Caesar") admits that he and Carlos do not have an ownership interest in APLP and have not since 1987. Caesar denies that the "only" involvement with APLP is as trustees for the general partners. (Carlos Tr., 90: 4-25).

6.    In 1990, APLP decided that it should develop a high end self storage business

under the service mark WESTY'S as a means of generating income and assets for

APLP. (Carlos Decl. II, ¶ 10; *see also* Declaration of Carlos A. Arredondo,

attached to Plaintiff's Response to Defendants' Motion for Summary Judgment

filed June 23, 2003 as Exhibit A ("Carlos Decl. I"), ¶ 9).

**RESPONSE:**  Denied. (Carlos Tr. 96: 22- 97: 25).

7.    APLP decided that the first storage center would be located in Port Chester, New

York. (Carlos Decl. I, ¶ 12).

**RESPONSE:**  Denied. (Carlos Tr. 90: 5-6)

8.    The WESTY's business was a first for APLP because it had never operated a retail

business before. (Carlos Decl. II, ¶ 11; Caesar Dep., p. 89, line 21 — p. 90,

line 20).

**RESPONSE:**  Caesar denies that APLP ever has "operate[d]" the WESTY business. APLP passive real estate investment vehicle and its "business" is only to own passively "real estate, facilities and improvements" on which some, but not all, WESTY facilities are located. (Carlos Tr. 91: 6-15; Pl. Mem., p. 8).

9.    APLP was concerned about potential lawsuits from customers of the WESTY' s

business and wanted to make certain that the assets of APLP would be insulated

from these suits. (Carlos Decl. II, ¶ 12).

**RESPONSE:**    Caesar admits that he and Carlos wanted to insulate APLP from lawsuits
related to APLP's ownership of the real estate at the eight WESTY
facilities that operate on that real estate.

10.    APLP formed WESTY's Port Chester Limited Partnership ("WPCLP"), a

Connecticut limited partnership, on March 1, 1990, to own the first store and the

land on which the store was to be built. (Carlos Decl. II, ¶ 12, Ex. 1; Carlos

Decl. I, ¶ 12).

**RESPONSE:**    Caesar admits that he and Carlos, not APLP, formed WPCLP and placed
ownership of the building and land on which the first WESTY facility
was to be built in WPCLP.

11.    APLP owned 99% of WPCLP and was the partnership's sole limited partner.

(Carlos Decl. II, ¶ ¶ 12-13, Ex. 1).  The remaining 1% was owned by APLP's then

general partners. (*Id.*)

**RESPONSE:**  Admitted.

12.    APLP provided the capital for the land to be purchased and the store to be built,

and it applied in its own name for the necessary building and zoning permits.

(Carlos Decl. II, ¶ l4;Caesar Dep., Exs. 15, 16, 18).

**RESPONSE:**  Admitted.

13.     WPCLP retained A&Co., a Connecticut limited liability corporation owned by

        Carlos and Caesar equally, to design and build the Port Chester store; however,

        WPCLP did not pay A&Co. for these services. (Carlos Decl. II, ¶ 15, 16).

**RESPONSE:**  Caesar admits that he and Carlos caused WPCLP to enter into a contract
                with A&Co. to design and build the Port Chester WESTY facility and
                that WPCLP did not pay A&Co. for those services.

14.     A&Co. did not accept a fee from WPCLP to design and build the Port Chester

        store because the funding for the facility was from APLP and was thus money

        intended for Carlos and Caesar's children. (Carlos Decl. II, ¶ 16.)

**RESPONSE:**  Caesar has insufficient information to admit or deny.

15.     After the WESTY business was established, A&Co. did accept fees for site

        selection, design and construction services for new stores. (Carlos Decl. II, ¶ 17).

**RESPONSE:**  Caesar admits that A&Co. accepted fees for site selection, design and
                construction services for WESTY facilities.

16.     On March 5, 1991, Carlos and Caesar formed WESTY's New York, Inc. ("WNY

        I") as a Connecticut corporation. (Carlos Decl. II, ¶ 18).

**RESPONSE:**  Admitted.

17.     The purpose of WNY I was to manage the operations of the Port Chester store and

        any other WESTY's stores opened in New York. (*Id.*; Caesar Dep., p. 113, line 24

        — p. 114, line 16).

**RESPONSE:**  Admitted.

18.   WNY I served as another layer of insulation to protect the assets of APLP from

being able to be reached by customers of the WESTY business. (Carlos Decl.

II, 18).

**RESPONSE:**   Caesar admits that one purpose of WNY was to insulate the assets of
APLP from suits in relation to APLP's ownership of the buildings and
real estate upon which WESTY facilities were located.

19.   WPCLP retained WNY I to handle the management and operations of the Port

Chester store in exchange for a management fee. (Carlos Decl. II, ¶ 19).

**RESPONSE:**   Caesar admits that he and Carlos caused WPCLP to contract with WNY in
order to have WNY manage and operate the Port Chester WESTY facility
in exchange for a fee.

20.   All profits from the Port Chester store are paid to APLP, the owner of the WESTY

business. (Carlos Decl. II, ¶ 22).

**RESPONSE:**   Caesar denies that APLP owns the WESTY business.  APLP owns the
"real estate, facilities and improvements," as a passive real estate
investment vehicle, at which some, but not all, WESTY facilities are
located.  (Pl. Mem. p. 8).  Additionally, some of the Port Chester profits
are paid to A&Co.

21.   WNY I was involuntarily dissolved by the Connecticut Secretary of State's Office

in 1993 because of the corporation's failure to file a required organizational report.

(Carlos Decl. II, ¶ 20).

**RESPONSE:**   Admitted.

22.    Carlos and Caesar were unaware of the dissolution of WCI I until 1996;

      accordingly, they continued to operate WNY I as if it was still in existence.

      (Carlos Decl. II, ¶ 21).

**RESPONSE:**    Caesar has insufficient knowledge concerning this assertion. There
                appear to be typographical errors that render the assertion confusing and
                ambiguous.

23.    When Carlos discovered the dissolution in 1996, Caesar and Carlos formed

      WESTY Connecticut, Inc. ("WNY II") on July 29, 1996, and WNY II thereafter

      assumed management responsibility for the Port Chester store. (*Id.*)

**RESPONSE:**    Caesar has insufficient knowledge concerning this assertion. There
                appear to be typographical errors that render the assertion confusing and
                ambiguous.

24.    WPCLP engaged in significant pre-opening advertising and marketing efforts in

      connection with the Port Chester store that began at least as early as January 1,

      1991. (Caesar Dep. p. 37, lines 11-25; Carlos Decl. II, ¶ 23).

**RESPONSE:**    Caesar admits that he and Carlos engaged in pre-opening advertising and
                marketing efforts in connection with the Port Chester WESTY facility but
                Caesar has insufficient knowledge as to the remainder of the assertion.

25.    WPCLP's pre-opening advertising included prominent signage in front of the

      construction site, advertising in local yellow pages telephone directories, the

      distribution of printed brochures, and advertising on a delivery van. (Caesar Dep.,

      pp. 37-57; Caesar Dep., Ex. 44, p. 5; Carlos Decl. II, ¶23, Ex. 2; Ex. B to Plaintiffs

      Summary Judgment Motion).

**RESPONSE:**   Caesar admits that he and Carlos engaged in pre-opening advertising including permanent signage in front of the construction site, advertising in local Yellow Page telephone directories, distribution of printed brochures and advertising on a delivery van but he has insufficient knowledge as to the remainder of the assertion.

26.   The Port Chester store opened in May 1991 and remains open today. (Carlos Decl. II, ¶ ¶ 24).

**RESPONSE:**  Admitted.

27.   WPCLP deeded the Port Chester property and store to Port Chester Project LLC on January 2, 1996 ("PCPLLC").

**RESPONSE:**  Admitted.

28.   APLP owns 100% of PCPLLC. (Carlos Decl. II, ¶ 25).

**RESPONSE:**  Admitted.

29.   As the owner of the WESTY business, APLP was and is actively involved in the management and operation of the store. (Carlos Decl. II, ¶ 26).

**RESPONSE:**  Denied.  (See, e.g., Carlos Tr. 77: 6-12; 90: 4-5; 167: 2-16; Pl. Mem., p. 7 and n. 2).

30.   APLP holds annual meetings at which the operations of all of the stores are reviewed and changes to the stores are discussed and approved. (Carlos Decl. II, ¶ 26-27 and Ex. 3 thereto (which is a copy of the APLP 2000 annual meeting minutes and reflects detailed review and discussion of the WESTY business)).

**RESPONSE:**  Denied.  (Carlos Tr. 77: 6-23; 90: 4-6; 167: 2-16; Pl. Mem., p. 7 and n. 2)

31.    Although the WESTY' s Port Chester store was located in New York, APLP

believed that it was possible that it could open stores in Connecticut in the future.

(Caesar Dep., p. 116, line 19—p. 117, line 8).

**RESPONSE:**    Caesar admits that while the first WESTY facility was located in Port
Chester, he and Carlos believed that it was possible to open WESTY
facilities in Connecticut. Caesar denies that APLP had such a belief, in
part, because (1) APLP did not open stores and (2) APLP's members did
not even know of the existence of APLP and were unaware of the details
of the WESTY business. (Carlos Tr. 19: 19-22; 74: 4-17; 78: 3-9; Pl.
Mem., p. 8.)

32.    Carlos and Caesar formed WESTY's Connecticut, Inc. ("WCI I") on March 8,

1991 as a Connecticut corporation with Carlos and Caesar as 50/50 shareholders to

manage the operations of any WESTY' s stores that might be built in Connecticut

in the future. (*Id.*; Carlos Decl. II, ¶ 28, Ex. 4).

**RESPONSE:**    Admitted.

33.    As of August of 1992, APLP had not yet opened any stores in Connecticut, and

APLP no longer envisioned that it would do so. (Carlos Decl. I, ¶ 28; Carlos Decl.

II, ¶ 29).

**RESPONSE:**    Caesar denies that APLP ever "opened any stores in Connecticut" and he
states that he always envisioned creating WESTY facilities in
Connecticut. APLP has not "opened" stores – it simply owns "real estate,
facilities and improvements" at which some, but not all, WESTY
facilities are located. (Pl. Mem., p. 8). Caesar further denies that "APLP
no longer envisioned" that it would own real estate at which future
WESTY facilities would be located, in part, because most of APLP's
members did not even know it existed in 1992. (Carlos Tr. 19: 19-22;
74: 4-17; 78: 3-9).

34.     Because APLP had not yet opened any stores in Connecticut, WCI I was not

serving any business purpose and had no need to be in existence. (*Id.*)

**RESPONSE:** Caesar denies that APLP ever "opened any stores." APLP simply owns
"real estate, facilities and improvements" at which some, but not all,
WESTY facilities are located. (Pl. Mem., p. 8). Further, WCI conducted
business, even though its corporate status lapsed, through its trademark
license to WNY. (Caesar Aff. Ex. 8).

35.     The shareholders voluntarily dissolved WCI on August 13, 1992 through the filing

of a Certificate of Dissolution with the Connecticut Secretary of State's Office.

(Caesar Dep., Ex. 30; Carlos Decl. II, ¶ 29).

**RESPONSE:** Admitted.

36.     At the time of its dissolution, and throughout its existence, WCI I had never had

any employees, income, expenditures, or business operations of any kind. (Carlos

Decl. I, ¶ ¶ 28).

**RESPONSE:** Denied. (<u>See</u>, <u>e.g.</u>, Caesar Aff. Ex. 8).

37.     WCI's only asset was $1,000 in start-up capital that Carlos and Caesar were

required by Connecticut law to invest to form the corporation. (Carlos Decl. II,

¶ 30).

**RESPONSE:** Denied. WCI owned the trademarks at issue in this case. (Carlos Tr. 148:
3-7).

38.     The $1,000 in start-up capital of WCI I was distributed to the shareholders on the

dissolution of the corporation. (*Id.*)

**RESPONSE:** Caesar has insufficient knowledge concerning this assertion.

39.    The second WESTY's storage center opened in June 1995 in Tuckahoe, NY.

       (Carlos Decl. II, ¶ 31, 38).

**RESPONSE:**  Caesar admits that the Tuckahoe WESTY opened in November 1996.

40.    The financing and development of the Tuckahoe store followed the same business

       model as the Port Chester store. (*See* Carlos Decl. II, ¶ ¶ 32-37).

**RESPONSE:**  Caesar admits that the Tuckahoe WESTY facility generally followed the
                 same business model as the Port Chester WESTY facility.

41.    APLP provided all of the seed capital for the site selection and purchase, building

       design and construction, and initial advertising and operational expenditures.

       (Carlos Decl. II, ¶ 32).

**RESPONSE:**  Caesar has insufficient knowledge concerning this assertion.

42.    APLP formed Tuckahoe Project LLC ("TPLLC"), a New York limited liability

       company, to own the store and the real estate on which it was built. (Carlos

       Decl. II, ¶ 33).

**RESPONSE:**  Caesar admits that he and Carlos, not APLP, formed the Tuckahoe Project
                 LLC and they structured the LLC so that it was owned 100% by APLP.
                 Caesar admits that TPLLC owned the building and the real estate upon
                 which the Tuckahoe WESTY facility was located.

43.    APLP owns 100 % of TPLLC. (Carlos Decl. II, ¶ 34).

**RESPONSE:**  Admitted.

44.     TPLLC hired A&Co. to perform site selection, building design and construction

services for the store. (Carlos Decl. II, ¶ 35).

**RESPONSE:**  Caesar admits that he and Carlos caused TPLLC to contract with A&Co.
to perform site selection, building design and construction services for the
Tuckahoe WESTY facility.

45.     TPLLC retained WNY I, and thereafter WNY II, to manage the store. (Carlos

Decl. II, ¶ ¶ 36).

**RESPONSE:**  Caesar admits that he and Carlos caused TPLLC to contract with WNY to
manage the WESTY facility in Tuckahoe.

46.     TPLLC pays all profits from the store to APLP, the owner of the WESTY

business. (Carlos Decl. II, ¶ 37).

**RESPONSE:**  Caesar denies that APLP is "the owner of the WESTY business." APLP
owns "real estate, facilities and improvements" at which some, but not all,
WESTY facilities are located. (Pl. Mem., p. 8). TPLLC also pays profits
to A&Co.

47.     The current WESTY stores, their locations, approximate dates of opening, and

owners are set forth in the table below (Carlos Decl. II, ¶ 38):

| Location | Store Owner | Owner(s) of Store Owner | Opening Date |
|---|---|---|---|
| Port Chester, NY | Port Chester Project LLC | APLP | May 1991 |
| Tuckahoe, NY | Tuckahoe Project LLC | APLP | June 1995 |
| Norwalk, CT | Norwalk Project LLC | Carlos & Caesar | May 1997 |
| Elmsford, NY | Greenburgh Project LLC | APLP | 1997 |
| Danbury, CT | Danbury Project LLC | APLP | December 1998 |
| Milford, CT | Milford Project LLC | Carlos & Caesar | January 1998 |
| Stamford, CT | Stamford Project LLC | Carlos & Caesar | January 2000 |
| Farmingdale, NY | Babylon Project LLC | APLP | February 2000 |
| Lake Success, NY | Lake Success Project LLC | APLP | February 2001 |
| Port Chester 2, NY | Port Chester Project II LLC | APLP | April 2001 |
| Hicksville, NY | Hicksville Project LLC | APLP | January 2002 |

**RESPONSE:**    Caesar denies that APLP owns the WESTY stores to the extent that means APLP owns the WESTY business.  APLP owns real estate and improvements.  (Pl. Mem., p. 8).  Caesar admits the opening dates with the following corrections: Norwalk (9-97); Elmsford (6-98); Stamford (5-99); Milford (7-99); Upper Saddle River (6-04).

48.    APLP owns eight of the eleven LLC's that were formed to own the individual real estate, facilities and improvements, including the first two and four of the first five storage centers. (Carlos Decl. II, ¶ 38).

- 13 -

**RESPONSE:**   Admitted with the following correction: APLP owns eight of the twelve
WESTY facilities.

49.    Carlos and Caesar are the owners of the limited liabilities companies that own the

three storage centers that are not owned by APLP. (Carlos Decl. II, ¶ 39).

**RESPONSE:**   Caesar admits that he and Carlos are the owners of the limited liability
companies that own the building and real estate at three WESTY
facilities.  APLP does not own these building and real estate.

50.    The reason that Carlos and Caesar individually own three stores, as opposed to

being owned by APLP, is that Carlos and Caesar had sold real estate that they

owned together and, for tax purposes, decided to engage in like-kind exchanges

within a limited period of time. (*Id.*)

**RESPONSE:**   Denied.

51.    Carlos and Caesar formed WESTY Connecticut, Inc. ("WCI II") on July 29, 1996

with the two brothers as 50/50 shareholders as they were beginning plans to open

the first storage center in Connecticut. (Carlos Decl. I, ¶ 30; Carlos Decl. II, ¶ 41).

**RESPONSE:**   Caesar admits that he and Carlos reformed WESTY Connecticut, Inc. on
July 29, 1996 with the two brothers as 50/50 shareholders prior to
opening the first WESTY storage facility in Connecticut.

52.    There was no assignment, written or oral, by either of the brothers, to WCI II with

respect to any trademarks or intangible assets. (Carlos Decl. II, ¶ 42).

**RESPONSE:**   Denied.  The brothers placed ownership in WCI and continued in that
belief after WCI's reformation.  (Carlos Tr. 173: 2- 178 -21; 180: 12-16;
Caesar Aff. Ex. 10).

53.     Each of the WESTY stores in Connecticut retained WCI II to handle store

management and operations. (Carlos Decl. I, ¶ 31).

**RESPONSE:**  Caesar admits that WCI managed and operated each of the WESTY stores
in Connecticut until A&Co. took over those responsibilities in 2000.

54.     Each of the WESTY stores in New York retained WNY II to handle store

management and operations. (Caesar Dep., p. 113, line 23 — p. 114, line 16).

**RESPONSE:**  Caesar admits that WNY managed and operated each of the WESTY
facilities in New York until A&Co. took over those responsibilities in
2000.

55.     In addition to the WESTY'S word mark, APLP adopted the following image of a

West Highland White Terrier at least as early as January 1, 1991 as a design mark

to identify the business and its services ("the Terrier Design"):



(Carlos Decl. II, ¶ 43; *see also* Defendants' Memorandum of Law in Support of Their

Motion for Summary Judgment filed June 2, 2003, Ex. 7).

**RESPONSE:**  Denied.  (Carlos Tr. 97: 1-17).

56.     APLP's attorney in 1991 was Alan Shaver. (Caesar Deposition, p. 5, lines 3-7).

**RESPONSE:**  Denied.  (See Defs. Mem. Exs. 2, 5, 6, 7 (correspondence addressed to
Carlos individually or at A&Co.)).

57.     APLP instructed Mr. Shaver to prepare and file service mark registration

applications for the WESTY'S word mark and the Terrier Design with the U.S.

Patent and Trademark Office ("USPTO"). (*Id.*; Carlos Decl. II, ¶ 44).

**RESPONSE:**  Denied.  (Id.; Carlos Tr. 146: 25 – 148: 7).

58.     Mr. Shaver prepared and then filed the service mark registration applications for

the WESTY'S word mark and the Terrier Design with the USPTO on March 13,

1991. (Caesar Dep., Ex. 44, 45; Carlos Decl. II, ¶ 44).

**RESPONSE:**  Admitted.

59.     The WESTY'S and Terrier Design applications properly recited January 1, 1991

as the date of first use, but the applications mistakenly identified WCI I as the

owner of the marks, since WCI I was not in existence when the marks were first

used and never had any business interaction with or relationship to the Port

Chester store. (*Id.*)

**RESPONSE:**  Denied.  (See, e.g., Caesar Aff. Ex. 8 (license from WCI to WNY))

60.     Carlos and Caesar understood at the time — erroneously — that they could file the

WESTY'S and Terrier Design applications in the name of any company they

wanted to; they chose to file the applications in the name of WCI I. (Carlos Decl.

II, ¶ 45).

**RESPONSE:**  Caesar admits that they filed in the name of WCI but denies it was a legal
mistake.  See generally Answer to the Amended Complaint.

61.    The WESTY'S and Terrier Design applications matured to registration in 1992;
       however, both registrations were cancelled in 1998 for failure to file the necessary
       statements of use. (Carlos Decl. II, ¶ 46).

**RESPONSE:** Admitted.

62.    In 1997, APLP elected to change the principal mark of the business from
       WESTY'S to WESTY. (Caesar Dep., p. 247, line 25 — p. 248, line 13).

**RESPONSE:** Denied. (Carlos Tr. 167: 2-16; Caesar Aff. ¶ 24).

63.    The change from the WESTY'S to WESTY was made to reduce the length of the
       mark because of new restrictions being passed by communities on the size of
       signage. (*Id.*)

**RESPONSE:** Admitted.

64.    APLP also began using a smaller version of the Terrier Design that consisted of
       only the drawing of the head of a West Highland White Terrier ("Terrier Head
       design"):



(*See* File History for Terrier Head Design attached to Plaintiff's Motion for Summary
Judgment as Exhibit E; Carlos Decl. II, ¶ 47).

**RESPONSE:**  Denied.  (Carlos Tr. 77: 6-23; Pl. Mem. p. 7 and n. 2 (APLP has no relation to four WESTY facilities that use the Terrier design))

65.    In December 1999, Carlos and Caesar decided to separate most of their business interests, including A&Co., WCI II and WNY, except that each remained the Trustee of the General Partners of APLP. (*See* Carlos A. Arredondo Deposition (hereinafter "Carlos Dep.") pp. 17-24).

**RESPONSE:**  Denied.  (Carlos Tr. 77: 15-23 (Carlos and Caesar own real estate on which three WESTY facilities are located)).

66.    Carlos agreed to sell his interests in A&Co. to Caesar effective January 1, 2000. (*See Id.*)

**RESPONSE:**  Admitted.

67.    As a part of the transactions, Caesar told Carlos that WCI II owned the WESTY Marks, and Caesar said that he wanted ownership of the marks. (*Id.* at p. 42, line 16 — p. 46 line 11).

**RESPONSE:**  Caesar admits that he discussed with Carlos during the negotiations for Carlos' exit from the WESTY business that WCI, at that time, owned the WESTY marks and Caesar told Carlos that he (Caesar) wanted ownership of the marks.  Attorney Jeffrey Stephens then told Carlos, prior to the consummation of the transactions, that the transactions relating to Carlos' exit from the WESTY business placed full ownership in A&Co.  (Carlos Tr. 42: 12 – 43:17).

68.    Carlos did not recall who owned the marks, but, accepting without inquiry that this information was correct, Carlos agreed to sell his interest in WCI II to Caesar,

which Carlos understood would have the effect of transferring ownership of the

WESTY Marks to Caesar. (Carlos Decl. II, ¶ 49-50).

**RESPONSE:**   Caesar does not have knowledge of Carlos' mindset but Caesar admits
that Jeffrey Stephens told Carlos prior to the consummation of the
transactions relating to Carlos' exit from the WESTY business that the
completion of those transactions would result in placing full ownership of
the WESTY trademarks in A&Co.  (Carlos Tr. 42: 12 – 43:17).

69.   Carlos never agreed to sell his interests in the marks to A&Co. and would have

opposed any such transaction. (*Id.*, ¶ 51).

**RESPONSE:**  Denied.  (Carlos Tr. 42: 12 - 43: 17).

70.   On December 21, 1999, unbeknownst to Carlos, and while he was out of the

country on vacation, Caesar caused WCI II to execute a bill of sale of the WESTY

Marks from WCI II to A&Co. (Defendants' Memorandum of Law in Support of

Their Motion for Summary Judgment filed June 2, 2003, Ex. 11.; Carlos Decl. II,

¶ 52).

**RESPONSE:**   Caesar does not have knowledge of Carlos' mindset but Caesar admits
that Jeffrey Stephens told Carlos prior to the consummation of the
transactions relating to Carlos' exit from the WESTY business that the
completion of those transactions would result in placing full ownership of
the WESTY trademarks in A&Co.  (Carlos Tr. 42: 12 – 43: 17).

71.   On September 3, 2002, A&Co. filed trademark registration applications in its

name with the USPTO for the marks WESTY, WESTY'S, and the Terrier Head

design. (*See* Trademark applications attached as Exhibits C, D and E to Plaintiff's

Motion for Summary Judgment; Carlos Decl. II, ¶ 53).

**RESPONSE:** Admitted.

72.    The USPTO published the applications for opposition in 2003. (Carlos Decl. II, ¶ 54).

**RESPONSE:** Admitted.

73.    In his capacity as Trustee of the 2000 Carlos Trust, Carlos timely filed oppositions to the applications. (Carlos Decl. II, ¶ 55, Exs. 5-7).

**RESPONSE:** Admitted.

74.    The Trademark Trial and Appeal Board of the USPTO consolidated all three oppositions and, on September 22, 2003, suspended the proceedings pending the resolution of this action. (TTAB Grant of Motion for Consolidation and Suspension attached to Plaintiffs Motion for Summary Judgment as Exhibit F).

**RESPONSE:** Admitted.

## DISPUTED ISSUES OF MATERIAL FACT

The defendants maintain that there are no material facts in dispute that would prevent entry of summary judgment in the plaintiff's favor. As discussed in the defendants' Motion for Summary Judgment and in their Opposition to the plaintiff's Motion, the plaintiff's "facts" are either (1) contradicted by his own deposition testimony and/or undisputed, admissible documents or (2) the assertions are not supported by any admissible evidence. All other factual disputes are immaterial.

DEFENDANTS,
CAESAR A. ARREDONDO, et al.

By _____
Craig A. Raabe (ct 04116)
E-mail: craabe@rc.com
Edward J. Heath (ct20992)
E-mail: eheath@rc.com
Robin P. Keller (ct23564)
E-mail : rkeller@rc.com
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103
Tel.: (860) 275-8200
Fax: (860) 275-8299

## CERTIFICATION OF SERVICE

I certify that on this 3rd day of December, 2004, a true and correct copy of the

foregoing **LOCAL RULE 56(a)(2) STATEMENT** was served upon counsel for

Plaintiff, by regular mail, postage prepaid, addressed as follows:

ROBERT P. DOLIAN, ESQ.
CUMMINGS & LOCKWOOD LLC
107 Elm Street
Stamford, Connecticut 06902

MARTIN J. ELGISON, ESQ.
DAVID J. STEWART, ESQ.
DANA MARTY HAAS, ESQ.
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424

Edward J. Heath