IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CARLOS A. ARREDONDO, in his capacity as Trustee of The 2000 Trust for the Grandchildren of Carlos A. Arredondo and Mari V. Arredondo, General Partner of Arredondo Properties Limited Partnership,<br><br>Plaintiff,<br><br>v.<br><br>CAESAR A. ARREDONDO, individually and in his capacity as Trustee of The 2000 Trust for the Grandchildren of Caesar A. Arredondo and Carolyn Abad Arredondo; THE 2000 TRUST FOR THE GRANDCHILDREN OF CAESAR A. ARREDONDO AND CAROLYN ABAD ARREDONDO, in its capacity as General Partner of Arredondo Properties Limited Partnership; and ARREDONDO & CO., LLC,<br><br>Defendants. | CIVIL ACTION NO.:<br>3:02 CV 02200 (CFD)<br><br><br><br><br><br><br><br><br><br>DECEMBER 21, 2004 |

**DEFENDANTS' REPLY MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

**I. INTRODUCTION**

Carlos' effort to avoid summary judgment rests on an unsupported declaration that seeks to unravel and dismiss over a decade's worth of decisions and actions. Carlos' self-serving submission contradicts the evidence of record, including Carlos' own testimony, carries no weight and, under well-established law, cannot defeat summary judgment against him. Carlos, however, does admit the following facts: Carlos and Caesar successfully engaged in the real estate business together from 1961 to 2000 (Plaintiff's Local Rule 56(a)(2) Statement, "Pl. Stmt.," ¶¶ 4-5); from 1967 until the late 1980s they owned sale-leaseback properties individually or through partnerships (Pl. Stmt. at ¶ 6); they formed and funded APLP as a real estate investment vehicle in 1980 to generate income for their descendants (Pl. Stmt. ¶ 9;

Deposition of Carlos A. Arredondo, dated 6/23/04, "Carlos Tr.," at p. 91 (copy attached as Exhibit B to Defendants' Summary Judgment Memorandum)); they decided that APLP should own some sale-leasebacks to generate income (Pl. Stmt. at ¶ 9); "as the sale-leaseback market waned in the late 1980's, Carlos and Caesar looked elsewhere to invest their own capital as well as APLP's capital" (Pl. Stmt. at ¶ 11); before the first WESTY facility opened in 1991, the brothers pursued building a WESTY facility on land they personally owned (Pl. Stmt. at ¶ 15); the brothers made all of the decisions for APLP (Carlos Tr. at pp. 90-92); the brothers intended for WCI, not APLP, to own the WESTY Trademarks and they operated with that understanding for more than a decade (Pl. Stmt. at ¶¶ 22, 44); and Carlos exited the day-to-day operations of the WESTY business believing that he had sold his interest in the WESTY Trademarks to Caesar (Pl. Stmt. at ¶ 70; Carlos Tr. 33-34, 42-45). These undisputed facts are sufficient by themselves to support summary judgment in Caesar's favor.

Despite these admissions, to support his new claim that APLP, not WCI, has always owned the trademarks, Carlos now would like the Court to believe that Caesar and Carlos—ages 57 and 54 respectively in 1989 and admittedly looking to invest their *own capital*—retired as real estate entrepreneurs at the peak of their careers and went to work solely as unpaid trustees for their children. Carlos also asks the Court to believe that the brothers inexplicably abandoned their plans to invest their *own capital* and reap profits as owners of the WESTY facilities and instead chose only to receive nominal management fees for operating the WESTY facilities.

Not only is Carlos' version of the "facts" illogical, undocumented, and lacking credibility on its face, it is contrary to Carlos' deposition testimony and countless documents generated over a decade, virtually all of which Carlos himself initiated, reviewed, and/or signed. His

claims are supported only by his Declaration and its naked allegations. In short, Carlos offers no corroboration for his claim that the brothers acted purely and exclusively in their capacity as "trustees of two trusts that serve as the general partners of APLP." (Carlos' Memorandum of Law In Opposition To Summary Judgment, "Carlos Opp. Br.," at p. 3.)

Carlos bases his revisionist claim entirely on the doctrine of "first use"—essentially arguing that the doctrine can be used as a legal eraser to wipe out more than a decade of undisputed actions. As presented by Carlos in support of his revisionist ends, "first use" is an unbending rule, that looks only to the "who and when" of the first facility that opened for business while ignoring the complete picture of "who, what, where, when, *and why*" surrounding the birth of a trademark. Carlos' view of the law is as deeply flawed as his efforts to rewrite the past. Carlos and Caesar's control over the nature and quality of WESTY services, and their stature as the "leading lights" of the Arredondo family, entitled them under well-established principles of trademark law to determine ownership status for the WESTY marks. Far from being "irrelevant," as Carlos now insists, (Carlos Opp. Br. at pp. 24-25), Carlos and Caesar's intent was, and remains, controlling.

The most glaring error in Carlos' revisionist theory is his refusal to recognize that Congress, in enacting the Lanham Act, included the "related company" rule to make clear that the first entity to technically "use" a mark need not necessarily be its owner. Applying this rule in contexts indistinguishable from the present case, courts have respected trademark ownership decisions made by the "leading lights" of family businesses. Carlos cites *no case* to the contrary in which a family enterprise's rational decision to place trademark ownership in one of several candidate companies has been second guessed, much less undone, based on a supposed "mistake of law" regarding the first use doctrine, the related company rule, or any

other provision. In short, Carlos' present litigation-inspired position that "intent is irrelevant" and that a mistake of law has occurred is wrong on the facts and wrong on the law.

## II.     DISCUSSION

### A.     Carlos' Self-Serving, Unsupported Claims Cannot Defeat Summary Judgment.

As Caesar demonstrated in his opposition to Carlos' motion for summary judgment, Carlos can neither defeat nor obtain summary judgment based on self-serving statements that contradict his deposition and/or have no evidentiary support. (Caesar's Opp. Br. at pp. 33-40). Carlos' opposition to Caesar's motion further exposes this flaw. The Court need look no further than Carlos' Rule 56(a)(2) statement. Even a cursory review of that statement reveals that virtually every fact—and every material fact—has no support beyond the words on the paper. Carlos' failure to cite to independent, admissible evidence, particularly in contrast to Caesar's reliance on Carlos' own words and deeds, shows the futility of Carlos' claim.

Unable to substantiate his position, Carlos simply makes facts up. For example, Carlos contends that the brothers could not own the WESTY marks because "none of [Caesar and Carlos'] personal capital was ever at risk." (Carlos Opp. Br. at p. 24.) But Caesar and Carlos put *millions of dollars* of their *personal assets* at risk in guaranteeing APLP's loans for WESTY facilities. For example:

- Caesar and Carlos *personally* guaranteed a $15,000,000 unsecured line of credit from Union Trust to APLP and to Carlos and Caesar starting at least as early as 1990. (Ex. 1 to Affidavit of Caesar Arredondo dated December 20, 2004 (affidavit attached hereto as Ex. A)("Aff. Ex.") - Line of Credit documents from Union Trust signed by Carlos and Caesar.)

- Caesar and Carlos *personally* gave People's Bank certificates of deposit in the amounts of $1,000,000 and $400,000 as cash collateral for APLP's loans for the Tuckahoe and Elmsford WESTY facilities. (Aff. Ex. 2 - March 10, 1998 and September 11, 1998 letters from People's Bank to Carlos.)

- Caesar and Carlos *personally* entered into guaranty agreements with People's Bank to guarantee the "top 10%" of APLP's loans for the Tuckahoe ($10,500,000 loan), Elmsford ($13,500,000 loan), and Danbury ($9,000,000 loan) WESTY facilities, thus creating personal exposure of more than $3,000,000. (Aff. Ex. 3 - Limited Guaranty agreements with People's Bank personally signed by Carlos and Caesar.)

Clearly, Caesar and Carlos had no fiduciary duty, as trustees of APLP, to put millions of their own money at risk to guarantee APLP's loans. Contrary to Carlos' claim that they acted solely as fiduciaries of APLP, these guarantees illustrate that Caesar and Carlos had a substantial personal stake in the WESTY business consistent with ownership, and that they were not acting solely as trustees for APLP as they developed and managed the business on a day-to-day basis, including controlling the trademarks. Indeed, contrary to Carlos' current claim that APLP controlled the trademarks, when asked in his deposition what efforts APLP made to control the trademarks, Carlos answered: "None, to my understanding. The only way APLP could do anything is through Caesar and I. And we had mistakenly put it in the wrong place." (Carlos Tr., p. 95.)

Further, to support his "first use" argument, and in his attempt to undermine the brothers' undisputed intent for WCI to own the WESTY marks, Carlos also states that at the time the Port Chester land was purchased in late 1989, "the brothers did not consider the [WESTY self-storage] concept to be a program that would include multiple facilities." (Pl. Stmt. ¶12) Carlos also contends that "the brothers did not consider any development of a self-storage facility in Southern Connecticut until late 1990, when they considered building a . . . WESTY facility . . . in Milford, Connecticut." (Id.)

Again, Carlos is indisputably wrong on both accounts. On May 10, 1989, about a month *before* Carlos and Caesar contracted to acquire a property in Milford and *before* the June 19, 1989 contract to purchase the Port Chester property, Carlos authored a memo detailing his

-5-

investigations into the self-storage market in Milford. (Aff. Ex. 4)  On August 9, 1989, Carlos wrote about a zoning lawyer who could advise on a possible Milford self-storage facility. (Aff. Ex. 5)  Further, as early as June 1989, Caesar was sketching designs for self-storage facilities in Connecticut, namely, in Milford (June and September 1989) and in Trumbull (June 1989).[1]  (Aff. Exs. 6, 7, 8.)

In addition, in late 1989, Carlos and Caesar pursued a property in Norwalk, Connecticut for a possible WESTY facility.  (Aff. Ex. 9 - Nov. 9, 1989 letter from Chase Manhattan to Carlos and Dec. 20, 1989 proposal from A&Co. to Chase Manhattan.)  Moreover, the brothers sought out a law firm in 1989 to assist them with their ambitious plans for multiple WESTY facilities.  In a letter dated December 21, 1989, Day, Berry & Howard, the largest law firm in Connecticut, told Caesar: "We would be pleased to represent your company in your real estate activities, and specifically *your plans for development of high quality self-storage facilities in the Northeast.*"  (Aff. Ex. 10.)  The firm also agreed to strictly limit their representation of other self-storage companies (*Id.*), hardly the position a major law firm would take if it were representing the brothers only on a single, out-of-state WESTY facility.

### B. The First Use Doctrine Does Not Support Stripping Ownership Of The WESTY Marks From Caesar.

After reciting certain "black letter" trademark fundamentals that neither party disputes (Carlos Opp. Br. at p. 8), Carlos contends "the only way to resolve [issues of trademark ownership] is to trace the history of the mark backwards to its first use in commerce." (*Id.* at 9).  But as fully explained in Caesar's opening brief, the "first use" doctrine neither negates nor trumps the Lanham Act's "related company" rule, which provides in relevant part:

---

[1] These 1989 sketches as well as Carlos' 1989 memos discussed above also refute Carlos' contention that the brothers did not consider the Milford property for a WESTY facility until "late 1990."

> If the first use of a mark by a person is controlled by the registrant or applicant for registration of the mark with respect to the nature and quality of the goods or services, such first use shall inure to the benefit of the registrant or applicant, as the case may be.

15 U.S.C. § 1055. The Lanham Act could not be clearer: companies such as WCI, or individuals such as Carlos and Caesar, can own a mark even though they did not own the first WESTY facility, provided they control the nature and quality of the goods or services identified by the mark.

Carlos' discussion of trademark law is as selectively self-serving as his presentation of the facts. APLP's ownership of the first WESTY facility cannot and does not defeat Carlos and Caesar's decision that WCI owned the WESTY Trademarks. WCI not only had the opportunity and right to control the first use of the WESTY mark, but in fact exercised control over the first use, as extensively documented in Caesar's opening brief, and, more importantly, as Carlos admitted at his deposition. (Carlos Tr., at pp. 95, 97, 137, 142, 143, 158-59.)

Unable to evade the dispositive impact of the related company doctrine, Carlos attempts to dismiss or distinguish the cases cited in Caesar's brief. For example, Carlos claims that the "leading light" rule of *Airport Canteen Services, Inc. v. Farmers Daughter, Inc.*, 184 U.S.P.Q. 622 (TTAB 1974), applies only where common ownership of various family businesses exists. (Carlos Opp. Br. at 10). But "control," not "common ownership," is all Section 5 of the Lanham Act requires. Indeed, a fair reading of *Airport Canteen* reveals that "common ownership" per se was not the deciding factor. Rather, the ability of the owner to ensure "continuance of operations of his different activities"—to *control* the trademark in question—ultimately supported the conclusion that *all* uses inured to the leading light's benefit. *Id.* at 627. Carlos also attaches undue significance to a statement in *Airport Canteen* noting the absence of "any claim of adverse rights in the mark . . . by any corporation within" the family organization. *Id.*

Here, however, Carlos' about face after eleven years of unified trademark ownership hardly amounts to a "claim of adverse right" that distinguishes this case from *Airport Canteen.* Carlos' after-the-fact repudiation of his own decisions do not skew the obvious parallels between the actions of the leading light of the family business in *Airport Canteen* and the leading lights of the Arredondo family.

Unlike the cases Carlos cites, like *In re Raven Marine, Inc.*, 217 U.S.P.Q. 62 (TTAB 1983), the brothers' control over the WESTY marks and business is neither "highly ambiguous" nor based on "meager information." Rather, Carlos admits that he and Caesar fully controlled all use of the WESTY marks from their inception until Carlos voluntarily transferred his ownership interest to Caesar. (Carlos Tr., at pp. 95, 97, 137, 142, 143, 158-59, 167, 208.) Carlos also admits that he and Caesar were the "principal actors" for WCI, APLP, and other family enterprises. (Carlos Opp. Br. at p. 10). These admissions negate Carlos' efforts to deny the brothers' "control" over the WESTY marks. Nor does Caesar base his position on corporate formalities such as stock ownership or corporate titles, as Carlos wrongly implies. (Carlos Opp. Br. at p. 16). Rather, Carlos' own sworn testimony conclusively establishes the brothers' hands-on control over every facet of the WESTY business, and confirms the applicability of the "related company" doctrine to the WESTY Trademarks.

Equally significant, Carlos' testimony shows his complete agreement that WCI and later A&Co. owned the WESTY marks.[2] For this reason, cases cited by Carlos such as *Malibu, Inc. v. Reasonover*, 246 F.Supp. 2d 1008 (N.D. Ind. 2003), are inapplicable. There, the court

---

[2] Carlos confirms his deposition testimony in his Rule 56(a)(2) statement, wherein he acknowledges that "because [Caesar] owned the marks as a part of the dissolution of WCI II, he had the right to transfer them where he chose." (Pl. Stmt. at ¶ 75) Caesar chose to transfer the marks to A&Co. and Carlos admitted in his deposition that he knew of that transfer before he completed the sale of his interest in A&Co. to Caesar. (See Discussion in Defendants' Opening Memo., pp. 11-14.)

rejected a corporation's former officer claim of ownership of the corporation's mark *after* the corporation dismissed him. As in *Malibu*, Carlos' after-the-fact efforts to wrest control of a mark from its rightful owner should be rejected.

### C. The WESTY Marks Were Never Abandoned.

After insisting that APLP is the original, sole, and continuous trademark owner, Carlos shifts to the paradoxical position that APLP acquired the marks by default through "abandonment" by WCI. (Carlos Opp. Br. at 17-18.) Abandonment occurs when a trademark owner ceases all use of its mark with an intent not to resume use. 15 U.S.C. § 1127. Here, however, the WESTY marks remained in continuous use from their inception. Carlos utterly fails to explain how abandonment can occur under these circumstances where the mark and its valuable goodwill remain in use and under the continuous control of those who founded the very business the mark identifies. The cases cited by Carlos neither support such an absurd result nor do they bear any relationship to the facts and issues here. In fact, *Stetson v. Howard D. Wolf & Associates,* 955 F. 2d 847 (2d Cir. 1992) (Carlos. Opp. Br. at 17), supports Caesar's position. *Stetson* involved competing claims of trademark rights between members of THE DIAMONDS singing group and its manager, who owned the band name. The court resolved that dispute in the manager's favor despite alleged non-use by the manager himself. *Id.* at 852. The manager of the band owned the trademark even though he personally never used it because he controlled use of the mark by the band. Similarly, Caesar and Carlos own the WESTY marks because they controlled their use.[3]

---

[3] Similarly, *P. Daussa Corp. v. Sutton Cosmetics (P.R.) Inc.,* 462 F.2d 134, (2d Cir. 1972), involved a rare situation in which the original trademark owner stopped using its mark, rejected competitors' offers to buy it, and "formally . . . abandon[ed] the mark by making the appropriate filing at the Patent Office." *Id. at 135.*

Lacking support for his incongruous abandonment theory, Carlos is left trying to distinguish *Brewski Beer Co., v. Brewski Brothers, Inc.,* 47 U.S.P.Q. 1281 (TTAB 1998) (cited at page 30 of Defendants' Opening Memo). But Carlos' supposed distinction actually highlights *Brewski's* relevance. As Carlos notes, the TTAB refused to elevate corporate form over substance, finding that continuous use of the BREWSKI mark by its originators overcame lapses in the status of their company. All uses of the mark, whether by their corporation, by the founders individually, or otherwise, inured to the benefit of the company in which they ultimately placed ownership of the mark. *Id.* at 1286.[4] The result should be no different here, where Carlos and Caesar clearly controlled the WESTY marks from the first use onward, and clearly intended that a company they likewise controlled should own the marks. Carlos' arguments present a textbook example of form over substance and should be rejected. For the reasons set forth here and in Caesar's other memoranda, and consistent with Carlos' view that this matter should be resolved through summary judgment, (see Defendants' Opening Memo., Ex. E at p. 17), this Court should enter summary judgment for the Defendants.

### III.   CONCLUSION

For the foregoing reasons, the defendant's Motion for Summary Judgment should be granted.

---

[4] Nowhere is Carlos' penchant for exaggeration more apparent than in his supposed expose' of WCI's chronology as it relates to the first WESTY application. It is irrelevant that the first use of WESTY identified in the application occurred before WCI's incorporation, because Carlos and Caesar controlled the first use as well as WCI, the trademark applicant. *See Airport Canteen,* 184 U.S.P.Q. at 927 (prior use of mark inured to the benefit of a related company).

DEFENDANTS,
CAESAR A. ARREDONDO, et al.

By _____
Craig A. Raabe (ct 04116)
E-mail: craabe@rc.com
Edward J. Heath (ct20992)
E-mail: eheath@rc.com
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103
Tel.: (860) 275-8200
Fax: (860) 275-8299

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was mailed via mail, postage prepaid, on this 21st day of December, 2004, to the following counsel of record:

Robert P. Dolian, Esq.
Cummings & Lockwood LLC
Four Stamford Plaza
P.O. Box 120
Stamford, CT 06904-0120

Martin J. Elgison, Esq.
David J. Stewart, Esq.
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424

Craig A. Raabe