IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

CARLOS A. ARREDONDO, in his capacity as
Trustee of The 2000 Trust for the Grandchildren of
Carlos A. Arredondo and Mari V. Arredondo,
General Partner of Arredondo Properties Limited
Partnership,

        Plaintiff,

    v.

CAESAR A. ARREDONDO, individually and in
his capacity as Trustee of The 2000 Trust for the
Grandchildren of Caesar A. Arredondo and Carolyn
Abad Arredondo; THE 2000 TRUST FOR THE
GRANDCHILDREN OF CAESAR A.
ARREDONDO AND CAROLYN ABAD
ARREDONDO, in its capacity as General Partner
of Arredondo Properties Limited Partnership; and
ARREDONDO & CO., LLC,

        Defendants.

CIVIL ACTION FILE

NO. 3:02 CV 2200 (CFD)

Filed: December 16, 2005

## JOINT TRIAL MEMORANDUM

**1.    Trial Counsel.**

For Plaintiff:        Martin J. Elgison
                    David J. Stewart
                    Alston & Bird LLP
                    1201 West Peachtree Street
                    Atlanta, Georgia 30309-2424
                    Ph  (404) 881-7000; Fx  (404) 881-7777

                    Robert P. Dolian (ct04278)
                    Cummings & Lockwood LLC
                    Four Stamford Plaza, P.O. Box 120
                    Stamford, Connecticut 06904-0120
                    Ph  (203)327-1700; Fx  (203) 708-5647

**For Defendants:**       Hubert J. Santos, Esq.
                          Santos & Seeley, P.C.
                          51 Russ Street
                          Hartford, CT 06106
                          Phone: (860) 249-6548

                          Craig A. Raabe, Esq.
                          Edward J. Heath, Esq.
                          Robinson & Cole, LLP
                          280 Trumbull Street
                          Hartford, CT 06103
                          Phone: (860) 275-8200

                          David M. Kelly, Esq.
                          Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
                          1300 I Street, NW
                          Washington, DC 20005-3315
                          Phone: (202) 408-4000

**2.    Jurisdiction.**

This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

§§ 1331, 1338, 2201, and 2202 because this case arises under the Federal Declaratory Judgment

Act, 28 U.S.C. § 2201 and the Trademark Act of 1946, 15 U.S.C. § 1051, et seq. Personal

jurisdiction is not contested.

**3.    Jury/Non-jury.**

This is a non-jury case.

**4.    Nature of the Case.**

**A.    Plaintiff's Position:**

Plaintiff's First Amended Complaint sets forth three causes of action, each of which are

addressed below.

Count I:  Declaration of Trademark Ownership.

Plaintiff requests that the court declare pursuant to 28 U.S.C. § 2201 that Arredondo

Properties Limited Partnership ("APLP") owns the trademarks and service marks WESTY,

WESTY'S, and related design marks (collectively the "WESTY Marks"). For relief, Plaintiff requests that the court:

(1)     Declare that APLP is the true and exclusive owner of the WESTY Marks;

(2)     Order Arredondo & Co. to expressly abandon its pending applications for registration of the WESTY Marks;

(3)     Order the Director of the Trademark Office of the PTO to deny registration to Defendant Arredondo & Co.'s pending applications for registration of the WESTY Marks;

(4)     Enjoin the Defendants, individually and collectively, from taking any action or doing any thing that is inconsistent with APLP's true and exclusive ownership of the WESTY Marks;

(5)     Enjoin the Defendants, individually and collectively, from using, registering or seeking to register any trademark, service mark, trade name, domain name, meta tag, or search engine keyword that consists in whole or in part of the term "Westy" or the Terrier Design, or that is likely to cause confusion with any of the WESTY Marks.

(6)     Find that this case is exceptional pursuant to 15 U.S.C. § 1117 and award Plaintiff recovery of its reasonable attorneys' fees incurred in connection herewith; and

(7)     Award plaintiff recovery of its costs.

Count II:  Declaration of Entitlement to Attorneys' Fees and Costs Pursuant to the APLP Partnership Agreement.

Plaintiff requests that the court declare, pursuant to Section 7.3.3. – 7.4 of the APLP partnership agreement, that Plaintiff is entitled to reimbursement for attorneys' fees and costs he

- 3 -

incurs in connection with this litigation, which is brought on behalf of APLP to preserve the partnership's assets, regardless of whether he prevails on Count I. Plaintiff further requests that the court order APLP to reimburse him for such fees and costs.

Count III: Declaration of Entitlement to Attorneys' Fees and Costs Pursuant to Connecticut Law.

Plaintiff requests that the court declare, pursuant to Conn. Gen. Stat. § 34-335 and the common law of Connecticut, that Plaintiff is entitled to reimbursement for attorneys' fees and costs he incurs in connection with this litigation, which is brought on behalf of APLP to preserve the partnership's assets, regardless of whether he prevails on Count I, and order APLP to reimburse him for such fees and costs.

**B.    Defendant's Position:**

    **1.    General Denial Of The Plaintiff's Claims**

The Defendants deny each and every claim that Carlos has asserted. Carlos' claims are a recent construct, designed solely for this litigation. Carlos' claims, founded on an assertion that Arredondo Properties Limited Partnership ("APLP"), an entity of which his children are among the shareholders, owns the WESTY trademarks, are completely inconsistent with Carlos' words and actions for more than ten years. It was not until this lawsuit, filed more than a decade after Carlos and his brother created the WESTY self-storage business and almost three years after Carlos retired and sold his rights to the WESTY trademark and left the daily operations of the WESTY business, that Carlos first claimed that APLP owned the WESTY trademarks. Contrary to Carlos' current claim that APLP owns the WESTY trademarks, the defendant will introduce evidence establishing that Carlos, based on a joint decision with his brother Caesar, purposefully and knowingly placed ownership of the WESTY marks in an entity owned wholly by the two brothers known as WESTY Connecticut, Inc. ("WCI") in 1991 and transferred the marks to

- 4 -

Arredondo & Co. LLC ("A&Co."), another of the brothers' jointly owned companies, when

Carlos exited the brothers' business in January of 2000.

The brothers formed WCI in 1991 at about the same time they registered the WESTY

trademarks in the name of WCI with the United States Patent & Trademark Office ("USPTO").

The brothers created WCI to operate the WESTY facilities that were to be located in

Connecticut. Carlos' knowledge of WCI's ownership of the WESTY marks will be proven, in

part, by the fact that it was Carlos who had the primary dealings with their trademark attorney,

Alan Shaver, in registering the WESTY trademarks in the name of WCI in 1991. Carlos

reviewed and approved the draft trademark applications identifying WCI as the trademark

owner. Indeed, Carlos expressed in writing his pleasure when Attorney Shaver confirmed for

him that the USPTO had approved the registration in WCI.

Together, the brothers created, operated, and successfully grew the WESTY self-storage

business for a decade based on the fact that they had placed ownership of the marks in WCI.

During that decade, when the brothers realized that they were operating WCI as though it existed

even though they previously had dissolved the corporate form, they reformed WCI and,

according to Carlos, continued operating WCI "as if nothing had changed," as evidenced by the

fact that they continued to use the same tax identification number. True to their original intent to

have WCI own and control the WESTY marks, in 1996, Carlos asked to have their attorney at

the time, Jeffrey Stephens, confirm with the USPTO that WCI owned the WESTY marks.

Attorney Stephens did so and advised Carlos in writing that the registration records at the

USPTO listed WCI as the owner of the WESTY marks. During that decade, the brothers also

caused WCI to grant a written trademark license to an entity that they formed called WESTY

New York, Inc. ("WNY"), which the brothers created to operate the WESTY facilities located in

New York. Carlos signed the license agreement on behalf of WCI, again confirming his intention and understanding that WCI owned and controlled the WESTY marks.

Throughout the 1990s, the two brothers controlled the development of the WESTY brand and business model. They did so through their active management of operating entities, including WCI and WNY, which they intentionally had own and license the WESTY marks. In stark contrast, APLP, the 200-year generational investment vehicle that Carlos now claims always owned the marks, was a passive, real-estate partnership that, by Carlos' own admission, only met to conduct its business one or two days per year. While APLP owned the real estate on which some, but not all, of the WESTY facilities were located, it did not have a role in the day-to-day operation or management of the WESTY business or any of the individual WESTY facilities. Moreover, APLP has absolutely no relation to five existing WESTY facilities and two WESTY facilities that are under construction that Caesar and Carlos own as individuals or that Caesar's children own. This fact alone in conclusive proof that APLP does not own the WESTY marks because it has not, and cannot, control the use of the marks on those properties. In contrast, the actual and intended trademark owner, WCI, and now A&Co. as the successor to WCI, actively manages those properties and has controlled the use of the trademarks consistent with its ownership.

At the end of the 1990s, buoyed by magnificent personal wealth from the high technology stock boom (including growth of $37,000,000 in 1999 alone), Carlos decided to exit his role in the day-to-day operations of the WESTY business and focus on interests other than managing the WESTY business. To that end, Carlos decided to sell to Caesar all of his interest in the WESTY operating entities, specifically including any interest that Carlos had in the WESTY trademarks. The defendants will prove that Carlos specifically directed an accountant,

Peter Formanek, and an attorney, Jeffrey Stephens, to prepare a transaction through which Carlos would transfer his interest in the WESTY operating entities to his brother, Caesar.

After an admitted "arms length negotiation," Carlos himself dictated to Messrs. Formanek and Stephens the terms and timing of the transfer, and they prepared the transaction in accordance with Carlos' instructions while he was traveling out of the country. Carlos wanted to review and sign the transaction papers upon his return, and upon returning, he did in fact review and execute those papers. Carlos insisted that the transaction be completed by the end of 1999. The transaction also specifically included the transfer of the WESTY trademarks from WCI to A&Co., the dissolution of WCI and the transfer of virtually all of Carlos' share of the assets of A&Co. (specifically including the WESTY trademarks) to Caesar. WNY was also dissolved, but Carlos had no ownership interest in WNY because of a dispute that he had with the New York tax authorities.

As mentioned, the closing agreement specifically enumerated the WESTY trademarks as one of the assets being transferred and Mr. Formanek assigned a specific value of $20,000 to the trademarks. In his 2000 tax return, Carlos declared his share of the proceeds from the trademark sale as a capital gain, thus declaring under penalties of perjury that he had sold his interest in the trademarks.

In his deposition in this case, Carlos eliminated any dispute as to his knowledge and intention with respect to ownership of the trademarks, and he killed his claim of trademark ownership in APLP, when, in summarizing the result of the 1999 transactions through which he exited the WESTY business, he stated, "I believed I had given the marks to Caesar and that he put [the marks] in A&Co." Carlos was correct in his sworn testimony and to this day, A&Co. has remained the owner of the WESTY trademarks.

In the closing agreement, in addition to specifically transferring his interest in the WESTY trademarks, Carlos also specifically released Caesar and A&Co. from all claims, known and unknown. In violation of that release, Carlos brought this action, apparently at the behest of at least one of his children.

In that connection, almost three years after dissolving WCI and selling his interest in A&Co. and the trademarks to his brother in 1999, one of Carlos' daughters, Fabiola, asked Carlos "who owned the trademarks?" Consistent with his actions over a decade and with his sworn deposition testimony, Carlos correctly told Fabiola that he had transferred the WESTY trademarks to his brother, Caesar, and Fabiola responded, "wouldn't it be good" if APLP owned the marks. Fabiola then asked her father if he would mind if she spoke with Caesar about obtaining the trademarks and Carlos told Fabiola to "leave it alone." Fabiola, however, persisted, finally convincing Carlos to meet with Caesar. During the meeting between Carlos and Caesar, Carlos did not claim that APLP owned the trademarks. Instead, he asked Caesar "to put the trademarks into APLP," thus again expressly acknowledging ownership of the WESTY trademarks in A&Co. as WCI's successor. Having at that time spent almost two years building the infrastructure and goodwill of the WESTY business without Carlos and in reliance on Carlos' transfer of his interest in the trademarks, Caesar declined to transfer the trademarks from A&Co. to APLP.

Undaunted, Fabiola then contacted a lawyer and devised a scheme to try to undo the words and actions of her father and uncle. Her theory was simple, but factually and legally baseless: she would have her father claim that the decade-long ownership of the WESTY trademarks in WCI and then A&Co., upon which the brothers and Caesar's sons had relied, was a "mistake" and should be undone. Fabiola had her counsel draft a demand letter claiming

trademark ownership in APLP and when Caesar did not acquiesce to the demand, Carlos filed

this suit claiming that APLP owned the trademarks because it was the "first user" of the WESTY

marks, notwithstanding the fact that APLP is a passive, real-estate investment trust.

Carlos' claim to ownership through "first use" is baseless. First, Carlos has no right to

bring this lawsuit and claim "first use" on behalf of APLP because he does not control APLP

and, by agreement with Caesar, Carlos cannot make unilateral decisions for APLP, including a

decision to claim trademark ownership.

Both Carlos and Caesar each serve as trustees of the general partners of APLP. In short,

they each serve as trustees over a 50% interest in APLP—with each half representing the

brothers' respective families and descendants. Importantly, Caesar and the beneficiaries of the

trust that is comprised of his side of the Arredondo family and that is one 50% general partner in

APLP, do not support this lawsuit and do not believe that there is any factual or legal basis for

the lawsuit. Moreover, the APLP partnership agreement and the APLP mission statement each

require the support of both Caesar and Carlos to take any action on behalf of the partnership,

including the filing of a lawsuit. Therefore, this lawsuit, and Carlos' newly constructed claim of

"first use" on behalf of APLP, are in breach of that agreement.

Second, even if Carlos had authority to bring this lawsuit, Carlos' attempt to use the "first

use" doctrine to erase more than twelve years of unambiguous history elevates form over

substance and has no merit. To begin with, Caesar and Carlos were the first to use the WESTY

marks and they did so in connection with a proposed WESTY facility in Milford that they were

to own. APLP had no connection to this proposed facility.

Significantly, the "first use" doctrine does not apply to uses of a trademark by related

entities, such as APLP, A&Co., WCI and Caesar and Carlos as individuals. Rather, the "first

use" doctrine is a doctrine to determine trademark priority as between unrelated entities that do not share decision-making authority with each other. In other words, the "first use" doctrine is used to prioritize trademark ownership between entities that independently develop the same or a similar trademark and then compete against each other, which could confuse the consumers. The doctrine is not used to determine ownership priority between related entities controlled by the same person or persons that are fully aware of the others' development or use of the trademark.

Moreover, when the related entities are controlled by "leading lights" (i.e., the founders of the entities), the "first use" doctrine cannot be used as a device to contradict the clear intent of the "leading lights" and it cannot be used to undo their course of conduct for more than a decade—especially against the will of one of the "leading lights" who has relied to his detriment on the conduct of the other. Simply put, there is no legal basis for Carlos' twisted "first use" construct. Indeed, it would be grossly inequitable to apply the "first use" doctrine here where the brothers unequivocally placed ownership of an asset they created and developed into their jointly owned company.

In summary, APLP has never owned the WESTY trademarks. The founders of the WESTY business knowingly and intentionally placed ownership in WCI and, when Carlos exited the WESTY business, they transferred ownership of the trademarks to A&Co with Carlos' agreement. The defendants have relied on that transfer of ownership and it cannot be undone because Carlos' daughter thinks it would be "good."

## 2. **Affirmative Defenses To The Plaintiff's Claim**

### a. **Estoppel**

Carlos is estopped from taking his current position that APLP has always owned the WESTY trademarks, especially after he confirmed through words and actions for more than a

decade that WCI and then A&Co. owned the WESTY marks. In his deposition, Carlos testified unequivocally that he intended WCI to own the marks. In that same deposition, Carlos also testified that he knew and intended to transfer his interest in the marks to Caesar, who was, with Carlos' knowledge, then putting ownership of the marks in A&Co. The defendants, through Caesar and his sons, both of who have now been partners in A&Co. for four years, will testify that they relied on Carlos' words and actions as they relied on A&Co.'s ownership of the WESTY marks to continue to build the WESTY business and goodwill after Carlos left the business. If, as Carlos claims, APLP owned the trademarks, APLP could then potentially prohibit use of the marks by Caesar and his sons, especially on facilities that APLP does not own. Had they known of the alleged "mistake" that could prohibit their use of the WESTY trademarks, the defendants would not have followed the business course that they have followed for the last five years.

For instance, the defendants, and the principals of A&Co. (Caesar, John and Edward Arredondo), would not have:

1.      Designed, developed, and built four WESTY facilities that APLP does not own and with which APLP has no relationship whatsoever;

2.      Built new WESTY facilities on property that APLP owned;

3.      Entered into twenty-year management agreements with APLP; and

4.      Restricted themselves from developing a self-storage facility within four miles of an APLP facility.

Additionally, if there were any notion that APLP owned the WESTY trademarks:

1.  Caesar would not have agreed to sell to Carlos a portion of his controlling interest in APLP, thereby equalizing ownership interests of the brothers' respective families (and lose control of the trademarks);

2.  Caesar would not have bought from Carlos the Upper Saddle River, New Jersey property and developed it as a WESTY facility (with no assurance that he could use the WESTY trademarks for that facility); and

3.  John and Edward would not have spent five years developing the WESTY business and the goodwill that accompanies the WESTY trademarks.

4.  Caesar would not have developed the WESTY business as he did at the outset in 1989 if he and Carlos did not own the trademarks through one of their jointly owned companies. Because Caesar does not own APLP, he will testify that he would have never placed ownership of the WESTY trademarks in that entity. Caesar will also testify that he relied on Carlos' intention and affirmation that WCI and then A&Co. owned the trademarks.

This is a classic example of estoppel. The Connecticut Supreme Court has "recognized that estoppel always requires proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury." Union Carbide Corp. v. Danbury, 257 Conn. 865, 873 (2001)(internal quotation marks omitted). Here, Carlos led the defendants to believe that A&Co. owned the WESTY marks and the defendants relied on that belief to their detriment in continuing to build the WESTY business, rather than, for instance, changing the name after Carlos exited the business. Indeed, in his deposition, Carlos admitted that he "assumed" that his brother relied on the transaction through which Carlos transferred his interest

in the WESTY trademarks.  Accordingly, Carlos is now estopped from claiming that APLP owns the WESTY marks.

      **b.**     **Waiver**

      Carlos has also waived his claim that APLP owns the WESTY trademarks through his unequivocal sale of the marks and his release of any claims in relation thereto.  "Waiver is the intentional relinquishment of a known right. . . .  To constitute waiver there must be both knowledge of the existence of the right and intention to relinquish it. . . .  Waiver involves the idea of assent, and assent is an act of understanding."  Novella v. Hartford Accident & Indem. Co., 163 Conn. 552, 561-62 (1972).  As shown above, in the transaction through which Carlos exited the WESTY business, he "relinquishe[d] all rights and claims to any assets of the LLC [A&Co.], tangible or intangible, now owned or to be owned in the future, including without limitation office furniture, equipment, contract rights, good will, *trademark rights* and vehicles."  Carlos further "release[d] CAESAR and the LLC from any claim, known or unknown, that he may have against either or both of them arising from his ownership of an interest in the LLC or any actions relating to the operation of the LLC."   In his deposition, Carlos testified without question that (1) he understood this transaction, (2) he intended its consequences and (3) he knew specifically at the time of executing the sale agreement that ownership of the WESTY trademarks was in A&Co.

      He certainly cannot now claim that he is allowed to bring this suit despite the clear language of the Sale Agreement because the provisions of that contract apply to him only in his individual capacity and not to him in his capacity as a trustee.  Such a reading of the Sale Agreement would render its release language meaningless.  A contract must be construed in a way that gives full meaning and effect to all of its provisions.  Levine v. Advest, Inc., 244 Conn.

732, 753 (1998). "Parties generally do not insert meaningless provisions in their agreements and therefore every provision must be given effect if reasonably possible." O'Bryan v. O'Bryan, 67 Conn.App. 51, 57 (2001), certification granted in part, 259 Conn. 911, affirmed, 262 Conn. 355 (2003). Accordingly, Carlos has waived any claim to ownership of the marks in the name of APLP.

### c.    Laches

For twelve years, by his own admission, Carlos believed that WCI and then A&Co. owned the WESTY trademarks. Throughout that period, Carlos conducted himself based on that belief, including managing the WESTY facilities with Caesar. Carlos also admitted in his deposition that he assumed that his brother, Caesar, likewise believed that WCI and then A&Co., not APLP, owned the WESTY trademarks during this time. It is inexcusable and unjust for Carlos to claim after those twelve years, and the defendants' reliance on Carlos' words and actions, that APLP has always owned the WESTY trademarks. Carlos' claims are barred by the doctrine of laches. "Laches consists of an inexcusable delay which prejudices the defendant." Cummings v. Tripp, 204 Conn. 67, 88 (1987)(citations; internal quotation marks omitted). In this case, there can be no doubt that the defendants were prejudiced. The defendants spent years building the WESTY business and its goodwill without any notice that Carlos might claim ownership in APLP. The defendants would have had an entirely different business plan if they had notice of Carlos' newly fabricated claim and they certainly would not have spent years and great sums of money developing the goodwill behind a trademark that they did not own.

### d.    Breach Of Partnership Agreement

Carlos' claims also are barred because they are in breach of the APLP partnership agreement. "The elements of a breach of contract action are the formation of an agreement,

- 14 -

performance by one party, breach of the agreement by the other party and damages." <u>Rosato v.</u> <u>Mascardo</u>, 82 Conn. App. 396, 411 (2004). The APLP partnership agreement states plainly that "[a]ny action required or permitted to be taken by the General Partners hereunder for a period of twenty (20) years from the Second Amendment Date [March 13, 2000], ***shall require the*** ***consent of both General Partners***." (emphasis added) Additionally, in the APLP mission statement that the brothers drafted and APLP approved in March of 2000, the brothers, as trustees of the general partners, declared that through 2020, "all decisions must be made unanimously by both general partners." These mutual consent provisions were intended to prevent exactly the type of unilateral activity that Carlos has engaged in by bringing this lawsuit. Accordingly, these provisions bar Carlos' claims.

**5.     Stipulations of Fact and Law.**

The parties are unable to agree to any stipulations on any issues of fact or law.

**6.     Plaintiff's Contentions.**

a.     <u>Declaration of Trademark Ownership</u>

Plaintiff filed this case in his capacity as Trustee of the Trust that is one of the General Partners of APLP to obtain a judicial declaration that APLP owns the WESTY Marks and to prevent the Defendants from usurping, for their own benefit, valuable assets or APLP.

APLP is a limited partnership that was formed by Carlos and Caesar Arredondo as a vehicle to generate income for future generations of their respective families. The owners and beneficiaries of APLP are thus the children and grandchildren of both sides of the Arredondo family. Neither Carlos nor Caesar has or has ever had any ownership interest in APLP.

Through a wholly-owned subsidiary, APLP (not Carlos and Caesar, as defendants contend) in 1990 funded the design, construction, launch, and operation of a high-end self

storage facility in Port Chester, New York under the service mark WESTY'S (later changed to WESTY). Consistent with the general purpose of APLP, the purpose of the Port Chester facility was to generate income for future generations of both sides of the Arredondo family. As the original and exclusive owner of the first WESTY facility, APLP was the original owner of the WESTY Marks as a matter of well-established trademark law. APLP has never assigned its rights in the marks to any third party; therefore, it continues to own the marks today.

Notwithstanding APLP's clear ownership of the WESTY Marks, Defendants contend that Arredondo & Co., LLC ("A&Co."), a limited liability company owned by Caesar and his sons, owns the marks. In other words, despite the fact that a trust owned by both sides of the family solely funded and built the business for the benefit of *both* sides of the Arredondo family, Defendant Caesar Arredondo and his sons now seek to usurp the mark for their own benefit and to the detriment of the rest of the family.

Defendants base their legal position on the allegations that a company named Westy's Connecticut, Inc. ("WCI I") was the original owner of the WESTY Marks, that WCI I's rights in the marks passed to a later incorporated company named Westy Connecticut, Inc. ("WCI II"), and that WCI II assigned the marks to A&Co. in 2000 through an agreement signed by Plaintiff. In support of their contentions, Defendants point in part to a trademark registration application for the WESTY'S mark that was filed with the U.S. Patent and Trademark Office in 1991, which recites that the date on which the WESTY Mark was first used was January 1, 1991. Defendants contend that this application evidences that WCI I was the original trademark owner. Plaintiff's contend that regardless of what this application stated, WCI I could not have been the original owner of the WESTY Marks for a number of reasons, including that (1) WCI I did not exist when the WESTY business was formed and the WESTY Marks were first used; (2) WCI I never

itself used the marks; and (3) WCI I never had any business operations of any kind before Carlos and Caesar intentionally dissolved the company in 1992.

Plaintiff signed the WESTY'S trademark registration application in WCI I's name under the mistaken belief that he and his brother could place ownership of the WESTY Marks in any company they wished. Under black letter trademark law, they could not. The party that first used and controlled use of the mark was the party that owned that mark, and this party was APLP alone. Because Carlos and Caesar have no ownership interest in APLP, they could not unilaterally decide to take one of the partnership's most valuable assets away from it and give it to a company that they owned personally. Any attempt by them to do so was void *ab initio*.

This initial mistake has been perpetuated for ten (10) years, and did not surface until the purported transfer was questioned by one of the limited partners of APLP. At that time, the mistake was identified and this lawsuit was brought to correct it.

Because WCI I never owned any rights in the WESTY Marks, WCI II could never have owned any rights in the marks. Thus, the purported sale by the brothers of the WESTY Marks from WCI II to A&Co. in 2000 conveyed no legally cognizable rights in the marks. Recognizing this mistake, Plaintiff filed this lawsuit in his capacity as trustee of the trust that is one of the general partners of APLP to preserve the assets of the partnership for the benefit of both sides of the family.

       b.     <u>Declaration of Entitlement to Attorneys' Fees</u>

The APLP partnership agreement requires the partnership to reimburse actions taken by the general partners of APLP on behalf of the partnership. Reimbursement is further endorsed by Connecticut state law. *See, e.g.*, Conn. Gen. Stat. § 34-335 ("[a] partnership shall reimburse a partner for payments made . . . for the preservation of its business or property").

- 17 -

Plaintiff brought this action to preserve valuable assets of APLP. Indeed, he had a fiduciary duty to do so. Plaintiff is therefore entitled to reimbursement from the partnership of the fees and costs he has incurred in connection with this litigation, regardless of whether he wins or loses this case.

At APLP's annual partnership meeting held on March 8, 2003, Plaintiff submitted to APLP for reimbursement the invoices for legal services he had paid to date in connection with this case. Defendant Caesar Arredondo, in his role as trustee for the other General Partner of APLP (the 2000 Caesar Trust), blocked APLP from granting Plaintiff's reimbursement request. Plaintiff therefore requests that the court declare that he is entitled to the reimbursement of his legal fees from APLP.

**7.    Defendants' Contentions.**

**A.    Two Brothers, Caesar And Carlos, Formed A&Co. And APLP**

In January 1961, Caesar Arredondo ("Caesar") formed C.A. Arredondo & Co. to engage in the real estate business and Carlos Arredondo ("Carlos") joined the business as an equal partner in August 1961. Thereafter, the name was changed to Arredondo & Co. ("A&Co."). From 1961 until January 1, 2000, both Caesar and Carlos owned equal shares in A&Co. During that time, the brothers successfully engaged in the real estate business on a national basis.

From 1967 until the late 1980s, Carlos and Caesar's business activities involved mortgage brokering and sale-leasebacks for properties that they owned as individuals. A sale-leaseback is a transaction that involves the seller of a property immediately leasing the property from the buyer. Caesar and Carlos' sale-leaseback transactions involved mostly major corporations executing long-term leases.

- 18 -

In 1980, Caesar and Carlos formed and funded Arredondo Properties Limited Partnership ("APLP"), as a passive real estate vehicle to generate income for 200 years for their children and future generations of Arredondos.  While Carlos and Caesar do not own an interest in APLP, they manage it as trustees of the general partners of APLP, which, in shorthand, are the Caesar Arredondo Grandchildren Trust and the Carlos Arredondo Grandchildren Trust.  Simply put, each side of the family has a 50% interest in APLP, which was the result of Caesar selling to Carlos at original cost, after Carlos left the WESTY business, a sufficient interest in APLP to equalize each family's share.  A fundamental principle underlying APLP is that neither side of the family can take action with regard to APLP without the consent of the other.  To that end, the partnership agreement contains the following provision:  "[a]ny action required or permitted to be taken by the General Partners hereunder for a period of twenty (20) years from the Second Amendment Date [March 13, 2000], *shall* require the consent of both General Partners."  Additionally, the APLP mission statement provides:  "all decisions must be made unanimously by both general partners."

After forming APLP, the brothers decided that some but not all of the sale-leaseback properties that they were involved with would be owned passively by APLP so that APLP would receive the profits from those transactions that Caesar and Carlos sought out, negotiated, and concluded.  While the sale-leaseback properties were owned in part by either the brothers personally or APLP, A&Co. managed and controlled all of them.

**B.     Caesar And Carlos Created the WESTY Self-Storage Business And The WESTY Trademarks**

As the sale-leaseback market waned in the late 1980s, Caesar and Carlos looked elsewhere to invest their own capital as well as APLP's capital.  In approximately 1989, the

brothers saw an opportunity to develop high-end, self-storage facilities in southern Connecticut and suburban New York City areas.

Caesar and Carlos had two purposes of entering the self-storage business. The first purpose was to generate income for themselves individually because the brothers would own some of the facilities and manage all of them. Second, the self-storage business was to also generate income for their descendants by having APLP passively own some of the self-storage facilities, as they had done did with the sale-leaseback business.

In the spring of 1989, the brothers began exploring this business opportunity. On May 10, 1989, Carlos authored a memo detailing his investigations into the self-storage market in Milford, Connecticut. This was about a month before Carlos and Caesar contracted to acquire a property on Rowe Avenue in Milford and before the June 19, 1989 contract to purchase the Port Chester property. The Milford property was owned by Caesar and Carlos and their wives, as individuals; APLP was neither a party to that contract nor involved in the development of that project. On August 9, 1989, Carlos wrote about a zoning lawyer who could advise on a possible Milford self-storage facility. Further, as early as June 1989, Caesar was sketching designs for self-storage facilities in Connecticut, namely, in Milford (June and September 1989) and in Trumbull, Connecticut (June 1989). In addition, in late 1989, Carlos and Caesar pursued a property in Norwalk, Connecticut for a possible WESTY facility. During that year, the brothers sought out a law firm to assist them with their ambitious plans for multiple WESTY facilities. In a letter dated December 21, 1989, Day, Berry & Howard, one of the largest law firms in Connecticut, told Caesar: "We would be pleased to represent your company in your real estate activities, and specifically your plans for development of high quality self-storage facilities in the Northeast." The firm also agreed to strictly limit their representation of other self-storage

companies. This is hardly the position a major law firm would take if it were representing the brothers only on a single, out-of-state WESTY facility.

To operate and manage the WESTY self-storage facilities, the brothers formed WESTY's Connecticut, Inc. ("WCI") and WESTY'S New York, Inc. ("WNY") with the assistance of Attorney Alan M. Shaver of the law firm of Weber, Neville & Shaver. The brothers had equal ownership interests in WCI, but Caesar solely owned WNY because of Carlos' tax dispute with the New York taxing authorities. WCI and WNY were formed to, and did serve, as the operating entities for WESTY self-storage facilities in Connecticut and New York, respectively.

**C.    Caesar And Carlos Decided in 1991 That WCI Should Own The WESTY Marks**

Caesar, who owned West Highland White Terriers, originated the concept of and design for the WESTY Trademark and the WESTY terrier dog logo ("WESTY Logo"). The brothers decided to place ownership of the WESTY Trademarks that they solely created in WCI. WCI was the logical option to place assets they jointly created because the brothers jointly owned WCI. In contrast, WNY was owned solely by Caesar, and APLP was a passive real estate investment vehicle that the brothers did not own. Carlos does not recall even considering APLP as a possible owner of the marks. Accordingly, and indisputably, in 1991, Carlos and Caesar, as founders and creators of the WESTY Trademarks and the WESTY self-storage business, together decided to place ownership of the WESTY Trademarks in WCI and to register them in WCI's name.

The brothers retained Attorney Shaver to assist them in registering the WESTY Trademarks in WCI's name. Carlos contacted Attorney Shaver, and Carlos concedes that he had more dealings with Attorney Shaver than Caesar did; indeed, the evidence reveals that Carlos

had almost all of the interaction with Attorney Shaver.  Caesar ultimately signed the final trademark applications.

Carlos agrees that applications for the trademark WESTY'S and the WESTY'S Logo were filed in 1991 with the United States Patent and Trademark Office ("USPTO") with WCI as the owner of both marks and applications.  Prior to their filing, Attorney Shaver faxed draft copies of both trademark applications to Carlos with a cover letter identifying WCI as the trademark owner in both cases.  In addition, both draft applications clearly identified WCI as the trademark applicant and owner.  Carlos approved the two draft applications for WESTY'S and the WESTY Logo, and Attorney Shaver's office then finalized and filed the applications with the USPTO on March 11, 1991.  In sending copies of the two as-filed applications to Carlos, Attorney Shaver specifically noted that they were filed in WCI's name.  Months after this mutual decision to place ownership of the WESTY Trademarks in WCI's name, Caesar and Carlos terminated the WESTY project on Rowe Avenue in Milford in July 1991, despite having obtained municipal approval, because a competitor sued to stop the project.

On November 6, 1991, Attorney Shaver sent Carlos a facsimile advising that the Examiner at the PTO had approved WCI's application for the WESTY'S mark.  Carlos scribed "GREAT!" and signed his name on the facsimile.

On March 1, 1992, Carlos received the original certificate of registration of the WESTY'S trademark from Attorney Shaver.  The certificate clearly and prominently identified WCI as the owner of the WESTY'S trademark.  Attorney Shaver forwarded the original certificate of registration of the WESTY Logo to Carlos on March 12, 1992.  That certificate also clearly and prominently identified WCI as the trademark owner.

In 1992 and 1993, respectively, WCI and WNY's corporate statuses with the States of Connecticut and New York were dissolved.  In July 1996, Caesar and Carlos re-formed WCI and WNY, with the identical ownership interest (i.e., 50/50 for WCI and sole ownership of WNY for Caesar) that existed before the dissolution.  Carlos admits that he intended that the re-formed WCI created in 1996 would continue to operate as if "nothing had changed" from the WCI entity created in 1991 and he intended that the re-formed WCI would also own the WESTY Trademarks.  In fact, the brothers used the same Internal Revenue Service tax identification number for the re-formed WCI as they used for the WCI created in 1991 and they listed the incorporation year for the re-formed WCI to be 1991, not 1996.  To be certain that ownership of the marks remained with WCI after the corporate reformation, in 1996, Carlos specifically asked A&Co.'s attorney, Jeffrey Stephens, to confirm that WCI owned the WESTY Trademarks.  Attorney Stephens did so and sent Carlos a memorandum dated December 18, 1996 confirming WCI's ownership of the trademarks.

**D.    WCI, Not APLP, Controlled Use Of WESTY Marks and the WESTY Trademarks And The WESTY Business**

Throughout the 1990s, WCI and WNY controlled use of the WESTY Trademarks and operated the WESTY facilities on a day-to-day basis.  Caesar and Carlos performed the management roles of WCI and WNY in operating the WESTY facilities.  Both WCI and WNY used the WESTY Trademarks in the operation of the business.  In fact, WCI executed a license agreement granting to WNY a trademark license for facilities operated by WNY.  Carlos signed this agreement on behalf of WCI on January 1, 1992 ("License Agreement").  Therefore, Caesar and Carlos fully controlled and dictated use of the WESTY Trademarks, including, but not limited to, designing the marks and deciding how and where they would be displayed.  Moreover, Caesar and Carlos completely controlled and dictated the quality of services offered

under the WESTY marks by developing the WESTY business model, training the WESTY employees, and by managing all aspects of the WESTY business through management agreements.

Thirteen WESTY self-storage centers have been opened since 1991, and six of those opened after Carlos left the WESTY business. Consistent with Caesar and Carlos' plan from the very beginning, both the brothers and APLP own some of the WESTY facilities. APLP owns eight facilities. Caesar and Carlos, as individuals, jointly own three, with each brother holding a 50% interest in the limited liability companies that own each facility. The twelfth and thirteenth facilities, which opened after the filing of this action, are owned by Arredondo 2000, LLC, which Caesar and his descendants' control. Two additional WESTY facilities are in the construction stage and these two facilities are scheduled to open in February and April 2006. APLP has no connection to the facilities owned by Caesar and Carlos or Arredondo 2000 or the facilities under development. A&Co. will operate all of the new facilities, just as it operates all existing WESTY facilities regardless of whether APLP owns the facility.

APLP has never been involved in the daily operation of any of the WESTY facilities. In fact, APLP has never had any day-to-day operations and meets only once per year. This lack of involvement is no surprise given APLP's purpose. APLP was intended to be, and has always been operated as, a passive real-estate investment vehicle created and controlled by Caesar and Carlos to generate income through real estate investment for the benefit of future Arredondo generations. Indeed, Caesar and Carlos put millions of dollars of their personal assets at risk in guaranteeing APLP's loans for WESTY facilities. For example:

- Caesar and Carlos personally guaranteed a $15,000,000 unsecured line of credit from Union Trust to APLP and to Carlos and Caesar starting at least as early as 1990.

- Caesar and Carlos personally gave People's Bank certificates of deposit in the amounts of $1,000,000 and $400,000 as cash collateral for APLP's loans for the Tuckahoe and Elmsford WESTY facilities.

- Caesar and Carlos personally entered into guaranty agreements with People's Bank to guarantee the "top 10%" of APLP's loans for the Tuckahoe ($10,500,000 loan), Elmsford ($13,500,000 loan), and Danbury ($9,000,000 loan) WESTY facilities, thus creating personal exposure of more than $3,000,000.

Clearly, Caesar and Carlos had no fiduciary duty, as trustees of APLP, to put millions of their own money at risk to guarantee APLP's loans. These guarantees illustrate that Caesar and Carlos had a substantial personal stake in the WESTY business consistent with ownership, and that they were not acting solely as trustees for APLP as they developed and managed the business on a day-to-day basis, including controlling the trademarks.

The owners of APLP did not decide to enter the storage business. As noted above, that decision was made individually by Caesar and Carlos in 1989, and it was not made at one of APLP's annual meetings. In fact, in 1989 when the brothers developed the WESTY concept, *none* of Caesar and Carlos' children—the owners of APLP at that time—even knew that APLP existed. This is because Caesar and Carlos had structured APLP so that each child would not learn of his or her APLP interest until he or she turned 25, which first occurred in December 1991, after the first WESTY facility opened. Similarly, the brothers' decision to change the business name from WESTY'S to WESTY in 1997 was not made at an APLP annual meeting. In fact, the brothers treated at least one member of APLP's after-the-fact objection to that change as irrelevant.

APLP's complete lack of involvement in deciding to enter the self-storage business, in selecting the WESTY marks, in developing the WESTY business model, and in operating the WESTY facilities on a daily basis, is consistent with APLP never claiming ownership of the WESTY marks until just before it filed this suit. As important examples, unlike WCI, APLP has

- 25 -

never filed an application to register any of the WESTY marks and has never licensed use of the

trademarks. Indeed, Carlos admits that he did not ask Attorney Shaver to register the marks in

APLP's name, and he does not recall even considering placing ownership of the marks in APLP

in 1991.

> **E.    Carlos Left The WESTY Business In 1999 When WCI Assigned The WESTY Marks To A&Co., And Carlos Sold His Interest In A&Co. To Caesar**

In 1999, Carlos, who was then almost 65, advised Caesar that he intended to end his day-

to-day involvement with the WESTY business. This decision appears to have been motivated by

several factors: Carlos' tremendous success in the high-tech stock market boom during the late

1990s, when his personal portfolio of stocks and mutual funds grew to over $50,000,000; his

interest in renovating an apartment that his wife was acquiring in her native Madrid, Spain;

and/or his desire to spend more time at his property in the Cayman Islands. Regardless, Carlos

made a series of offers to sell his one-half interest in A&Co. to Caesar, starting in August and

culminating in December in an offer to sell his interest for $100,000 and to conclude his daily

involvement with the WESTY business by the end of 1999. Additionally, he agreed with

Caesar's request that WCI and WNY be dissolved as part of the transaction. Carlos further

agreed that ownership of the WESTY Trademarks would be transferred to A&Co. At his

deposition, Carlos defined the WESTY Trademarks to include WESTY'S, WESTY, and the

WESTY Logo.

The transactions transferring Carlos' interest in A&Co., dissolving WCI and WNY, and

assigning WCI's WESTY trademark rights to A&Co., were developed and memorialized

through a series of meetings and an admittedly "arm's length negotiation" in December 1999 and

January 2000. These transactions involved Carlos; Caesar; Accountant Peter Formanek; and

Attorney Jeffrey Stephens.  The record of these transactions—and Carlos' intent—is clear and undisputed.

### i.    WCI Assigned The WESTY Trademarks To A&Co. in December 1999

At these meetings in late 1999, Carlos and Caesar, as equal owners of A&Co. and WCI, instructed Mr. Formanek to assist with the transfer of WCI's trademarks to A&Co.  Carlos initially understood that the WESTY Trademarks would be assigned to Caesar personally, but prior to signing the transaction documents, Attorney Stephens informed Carlos that the trademarks would instead be assigned to A&Co.  Of course, with Carlos' departure, Caesar would solely own A&Co.  Fully aware of and accepting these facts and circumstances, Carlos executed the transaction documents.

Consistent with Carlos and Caesar's intentions and instructions, virtually all of the remaining non-cash assets and liabilities of WCI and WNY were transferred to A&Co, and WCI and WNY were dissolved.  As part of this transfer, WCI specifically assigned all of its rights in its trademarks to A&Co. on December 21, 1999 for $20,000.  In the tax return that Mr. Formanek prepared for Carlos for 1999, Carlos declared a $10,000 capital gain for his half of the $20,000 assignment fee.  Mr. Formanek reviewed this return with Carlos, thereby reaffirming that Carlos knew and intended that A&Co. would own the WESTY Trademarks as of January 1, 2000.

Just as the brothers intended and the transaction called for, WCI recorded the assignment of the WESTY trademarks from WCI to A&Co. with the PTO on January 3, 2000.  The PTO sent a Notice of Recordation of Assignment to Perman & Green, attorneys for A&Co., reflecting that WCI "assign[ed] the entire interest and the goodwill" of its trademarks to A&Co.

### ii.     Carlos Sold His Interest In A&Co. And The WESTY Marks To Caesar In January 2000

After WCI executed the documents transferring the WESTY trademarks to A&Co., Carlos signed a written agreement dated January 1, 2000 selling his entire interest in A&Co. to Caesar ("Sale Agreement"). Notably, the sale of Carlos' A&Co. interest expressly included "trademark rights." Specifically, in addition to reciting his desire to enter into the transaction, Carlos "transfer[red] all of his right, title and ownership interest in [A&Co.] to Caesar" and further "relinquishe[d] all rights and claims to any assets of [A&Co.], tangible or intangible, now owned or to be owned in the future, including without limitation … good will, *trademark rights and vehicles . . ..*" (Emphasis added.) The Sale Agreement expressly excluded only two assets—an automobile and an office safe—from the assets that Carlos knowingly and deliberately relinquished and transferred to Caesar. The Sale Agreement did not exclude any trademark assets. As a result of the express use of the term "trademark rights" in the Sale Agreement, Carlos understood and intended that A&Co. would become the owner of all of the WESTY Trademarks, including WESTY, WESTY'S and WESTY AT YOUR DOOR.

Since the dissolution of WCI and WNY in 1999, A&Co. (now actively run by Caesar and his two sons) has operated all of the WESTY facilities. From the time Carlos sold his interest in A&Co., neither Carlos nor any member of his family have played a day-to-day role in the operations of any of the WESTY facilities. And, as noted above, APLP has never played any role in the day-to-day operations of any WESTY facility nor in the day-to-day use of the WESTY Trademarks. Caesar and his sons have relied on Carlos' sale and have built both the facilities and the good will of the WESTY business since that time.

**F.     More Than Eleven Years After Deciding That WCI Owned The WESTY Marks, Carlos Does an About Face and Claims That APLP Owns The WESTY Marks**

In August or September of 2001, Carlos' daughter, Fabiola, asked Carlos who owned the WESTY Trademarks.  When Carlos advised her that he assigned all of the trademark rights to Caesar, Fabiola commented "wouldn't it be good" if APLP owned the marks.  Although Carlos initially told Fabiola to "leave it alone," upon her urging, Carlos met with Caesar to discuss assigning the WESTY Trademarks to APLP.  Expressing regret at the price he received for his interest in A&Co. and the trademarks, Carlos asked Caesar "if it were possible to put the trademarks into APLP."  At no point in this meeting did Carlos claim that the brothers had made a mistake in making WCI the owner of the trademarks.  Nor did Carlos claim that APLP was the actual owner of those marks.  Instead, recognizing that A&Co. owned the WESTY Trademarks, he simply wanted Caesar to assign ownership of the marks from A&Co. to APLP.  Caesar declined this request.   Caesar also had a separate conversation with Fabiola, in which Fabiola suggested that if the trademarks were transferred to APLP, Caesar would not have to pay royalties to use the trademarks for new WESTY facilities, but his sons would pay royalties. Fabiola also told Caesar that if he did not agree to transfer the trademarks to APLP, Fabiola would never speak to him again.

Because Caesar reaffirmed that A&Co. owned the trademarks and because he reaffirmed that A&Co. would not transfer the marks to APLP, Fabiola again raised the issue of the WESTY Trademarks with Carlos, advising him that she had consulted with counsel and devised a strategy to attempt to undo the decisions her father and Caesar had made over more than a decade.  Her strategy was to claim that APLP had all along owned the trademarks because APLP owned the first WESTY facility.  Following that call and further consultations with counsel, on October 30,

- 29 -

2002, Carlos sent a letter, ghostwritten by his counsel in this case, claiming for the first time that the decision to make WCI the owner of the WESTY Trademarks was simply a mistake and that APLP was the rightful owner of those marks.

It appears that at least one of the motives for this lawsuit is to create leverage to dissolve the 200-year partnership (APLP) that Caesar and Carlos formed. Based on the comments of Carlos and at least one of his daughters, it appears that Carlos no longer supports the 200-year passive, real-estate investment vehicle, perhaps because the high technology stock boom, through which Carlos gained enormous "paper" wealth, went bust and Carlos' personal financial situation changed dramatically. By attempting to transfer ownership of the trademarks into APLP, Carlos and his daughters are attempting to increase the value of APLP for either a private sale of Carlos' family's interest or a public offering of the WESTY business.

**8.    Legal Issues.**

1.    Whether the plaintiff has proven that the Court should find and declare that APLP is the owner of the WESTY trademarks?

2.    Whether the defendants have proven that the plaintiff is estopped from taking the position that APLP is the owner of the WESTY trademarks?

3.    Whether the defendants have proven that the plaintiff's claim that APLP is the owner of the WESTY trademarks is barred by waiver.

4.    Whether the defendants have proven that the plaintiff's claim that APLP is the owner of the WESTY trademarks is barred by the doctrine of laches?

5.    Whether the defendants have proven that the plaintiff's claim that APLP is the owner of the WESTY trademarks is barred because plaintiff is in breach of the APLP Partnership Agreement?

6.    Whether either party has proven that it is entitled to an award for recovery of its reasonable attorney's fees?

7.    Whether the plaintiff has proven that the Court should enter a declaration that he is entitled to recover the fees and costs of this litigation pursuant to APLP's Partnership Agreement?

8.    Whether the plaintiff has proven that the Court should enter a declaration that he is entitled to recover the fees and costs of this litigation pursuant to Connecticut General Statutes Section 34-335 and the common law of Connecticut?

**9.    List of Witnesses.**

a.    Plaintiff's Witness List:

Carlos A. Arredondo
Carlos A. Arredondo will testify concerning the following:

1.    The creation, structure and operation of APLP, WCI, WNY and other legal entities related to the WESTY self – storage business.

2.    The use of the WESTY Trademarks in connection with the WESTY self-storage business.

Caesar A. Arredondo
Caesar A. Arredondo will testify concerning the following:

1.    The creation, structure and operation of APLP, WCI, WNY and other legal entities related to the WESTY self – storage business.

2.    The use of the WESTY Trademarks in connection with the WESTY self-storage business.

Any witness listed in Defendants' Witness List

b.    Defendants' Witness List:

The Defendants propose to call the following witnesses and reserve the right to call these witnesses in an order that is different from what is set forth below.

1.    **Witness Summary Of Caesar Arredondo**

Caesar Arredondo will testify concerning all aspects of this case, including the topics discussed at his deposition, and including without limitation:

1.    The rationale behind, and formation and operation of, A&Co., WCI, WNY, APLP and other entities that he created with his brother, Carlos.

2.    The financial condition and value of A&Co., APLP, WCI, WNY, and other entities that he created with Carlos, as well as the financial conditions of Caesar and Carlos.

3.    His relationship with his brother and other family members.

4.    The origin and development of the WESTY business.

5.    The creation, registration and ownership of the WESTY trademarks.

6.    The respective roles of Caesar and Carlos in the WESTY business.

7.    His reliance on the words and actions of his brother in relation to A&Co., APLP, the WESTY business and the WESTY trademarks.

8.    His interactions with Attorneys Alan Shaver and Jeffrey Stephens and Accountant Peter Formanek.

9.    Carlos' exit from the WESTY business and the sale of his interests, including the trademarks.

10.    The operations of the WESTY business since Carlos' exit.

11.    Carlos' words and deeds since his exit from the WESTY business.

2.    **Witness Summary Of Carlos Arredondo**

Carlos Arredondo will testify concerning all aspects of this case, including the topics discussed at his deposition, and including without limitation:

1.    The rationale behind, and formation and operation of, A&Co., WCI, WNY, APLP and other entities that he created with his brother, Carlos.

2.    His relationship with his brother and other family members.

3.    The origin and development of the WESTY business.

4.  The creation, registration and ownership of the WESTY trademarks.

5.  The respective roles of Caesar and Carlos in the WESTY business.

6.  His interactions with Attorneys Alan Shaver and Jeffrey Stephens and Accountant Peter Formanek.

7.  His finances.

8.  His motivation for exiting the WESTY business.

9.  His exit from the WESTY business and the sale of his interests, including the trademarks.

10. His words and deeds since his exit from the WESTY business.

11. The motivation for initiating this action, including his interaction with his family members regarding the action.

12. Any non-privileged communications with his counsel regarding this action.

### 3.    Witness Summary of Mari V. Arredondo

1.  Relationships between various family members.

2.  Discussions with Carlos concerning his sale of his interest in A&Co. and the WESTY trademarks.

3.  Her plans in 1999 with regard to Carlos' exit from the daily operations of the WESTY business for 1999 through the present.

4.  Her involvement in the purchase of the initial Milford property.

5.  Her and Carlos' finances.

### 4.    Witness Summary Of Edward Arredondo

Edward Arredondo will testify as to:

1.  His involvement in the WESTY business.

2.  The words and actions of Carlos.

- 33 -

3.    His reliance on Carlos' words and actions and on A&Co.'s ownership of the WESTY marks

4.    His interaction with his family members.

### 5.    Witness Summary Of John Arredondo

John Arredondo will testify as to:

1.    His involvement in the WESTY business.

2.    The words and actions of Carlos.

3.    His reliance on Carlos' words and actions and on A&Co.'s ownership of the WESTY marks.

4.    His interaction with his family members.

### 6.    Witness Summary Of Fabiola Arredondo

Fabiola Arredondo will testify as to:

1.    Her knowledge of and lack of involvement in the WESTY business.

2.    The words and actions of Carlos.

3.    Her involvement with, and intentions with respect to, APLP.

4.    Her involvement in and motivation for the initiation of this action, including her conversations with family members.

5.    Her conversations with Carlos' counsel.

6.    Her interactions with family members.

7.    Her finances.

### 7.    Witness Summary of Elena Arredondo

Elena Arredondo will testify as to:

1.    Her involvement with, and intentions with respect to, APLP.

### 8.    Witness Summary Of Peter Formanek

Peter Formanek will testify as to:

- 34 -

1.    His role as an accountant in the WESTY business.

2.    His interactions with members of the Arredondo family.

3.    The words and actions of Carlos.

4.    Carlos' exit from the WESTY business and the related transactions.

5.    Carlos' tax returns and personal finances.

### 9.    Witness Summary Of Jeffrey Stephens

Jeffrey Stephens will testify as to:

1.    His role as an attorney with the WESTY business.

2.    His interactions with members of the Arredondo family.

3.    The words and actions of Carlos, including but not limited to Carlos' words and deeds confirming WCI and A&Co.'s ownership of the WESTY marks.

4.    Carlos' exit from the WESTY business and the related transactions.

## 10.    Exhibits.

Plaintiffs' exhibit list is attached as Exhibit A.  Defendants' exhibit list is attached as Exhibit B.

## 11.    Deposition Testimony.

No witnesses are expected to testify by deposition.

## 12.    Anticipated Evidentiary Problems.

A.    Attached as Exhibit C is Plaintiff's Motion in Limine and Memorandum of Law concerning anticipated evidentiary problems.

B.    The Defendants do not anticipate any evidentiary problems at this time but reserve the right to object to evidence based on the presentation of evidence.

13.    **Trial Time.**

Plaintiff estimates that two days will be needed for the trial of this case.  Defendants

estimate that eight days will be needed for the trial of this case.

14.    **Further Proceedings.**

The parties do not anticipate that any further proceedings are necessary prior to trial.

15.    **Election for Trial by Magistrate.**

The parties do not consent to trial by a United States Magistrate.

Respectfully submitted, this 16th day of December, 2005.

ROBERT P. DOLIAN (ct04278)
CUMMINGS & LOCKWOOD LLC
Four Stamford Plaza, P.O. Box 120
Stamford, Connecticut 06904-0120
Ph  (203)327-1700; Fx  (203) 708-5647

MARTIN J. ELGISON (ct24759)
DAVID J. STEWART (ct24757)
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Ph (404) 881-7000; Fx (404) 881-7777

Counsel for Plaintiff

CRAIG A. RAABE, ESQ. (CT04116)
EDWARD J. HEATH, ESQ. (CT20292)
Robinson & Cole, LLP
280 Trumbull Street
Hartford, CT 06103
Phone:  (860) 275-8200

HUBERT J. SANTOS, ESQ. (CT00069)
Santos & Seeley, P.C.
51 Russ Street
Hartford, CT 06106
Phone:  (860) 249-6548

DAVID M. KELLY, ESQ., *pro hac vice*
Finnegan, Henderson, Farabow, Garrett &
Dunner, LLP
1300 I Street, NW
Washington, DC 20005-3315
Phone:  (202) 408-4000

Counsel for Defendants

Respectfully submitted, this 16th day of December, 2005.

MARTIN J. ELGISON (ct24759)
DAVID J. STEWART (ct24757)
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Ph (404) 881-7000; Fx (404) 881-7777

ROBERT P. DOLIAN (ct04278)
CUMMINGS & LOCKWOOD LLC
Four Stamford Plaza, P.O. Box 120
Stamford, Connecticut 06904-0120
Ph (203)327-1700; Fx (203) 708-5647

Counsel for Plaintiff

CRAIG A. RAABE, ESQ. (CT04116)
EDWARD J. HEATH, ESQ. (CT20292)
Robinson & Cole, LLP
280 Trumbull Street
Hartford, CT 06103
Phone: (860) 275-8200

HUBERT J. SANTOS, ESQ. (CT00069)
Santos & Seeley, P.C.
51 Russ Street
Hartford, CT 06106
Phone: (860) 249-6548

DAVID M. KELLY, ESQ., *pro hac vice*
Finnegan, Henderson, Farabow, Garrett &
Dunner, LLP
1300 I Street, NW
Washington, DC 20005-3315
Phone: (202) 408-4000

Counsel for Defendants