**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **CARLOS A. ARREDONDO, in his capacity as Trustee of The 2000 Trust for the Grandchildren of Carlos A. Arredondo and Mari V. Arredondo, General Partner of Arredondo Properties Limited Partnership,**<br><br>      **Plaintiff,**<br><br>**v.**<br><br>**CAESAR A. ARREDONDO, et al.**<br><br>      **Defendants.** | **CIVIL ACTION NO.:**<br>**3:02 CV 02200 (CFD)**<br><br><br><br><br>**JUNE 22, 2007** |

**DEFENDANTS' MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFF'S AMENDED MOTION IN LIMINE**

The Defendants hereby oppose the Amended Motion in Limine ("Motion"), filed by the Plaintiff, Carlos A. Arredondo ("Carlos"), on May 25, 2007. Carlos offers eight separate lines of arguments on which to exclude the Defendants from offering certain testimonial and documentary evidence. All of his arguments are closely tied to the lengthy facts of this case, and none of them provides a valid basis to enter an *in limine* order excluding any of the Defendants' exhibits. testimony or exhibits. In particular, Carlos surprisingly relies on the "first use" theory as a basis to exclude evidence. Having failed to prevail on summary judgment on the same "first use" theory, Carlos should not be able to avoid facing the same facts that created the genuine issues precluding summary judgment.

**A.    Evidence Regarding Caesar And Carlos' Initial Plans And Efforts To Develop A**
<u>**WESTY Facility in Milford, Connecticut Is Relevant.**</u>

**1.    The "First Use" Doctrine Is Inapposite.**

Carlos seeks to exclude evidence regarding Caesar and Carlos' plans to build the first
WESTY storage center in Milford, Connecticut in 1991, in connection with which development
project they initially used the WESTY marks.  (Motion, pp. 3-4.)  Carlos argues that the Court
should apply a "first use" theory to determine ownership of the WESTY marks, and that
evidence of the brothers' plans for the "Milford Project" is irrelevant to that analysis.  (Motion,
pp. 3-4.)

Carlos' "first use" theory is the wrong legal theory, as the Defendants demonstrated in
their summary judgment filings.  The applicable standards to determine trademark ownership in
this case are the "leading lights," "licensing," and "quality control" theories.  Evidence of the
brothers' plans and efforts to develop a WESTY facility in Milford in 1991 and 1992 as part of
the WESTY chain they created and controlled is directly relevant to those theories.

In short, in a case such as this in which there is a dispute between related companies
controlled by the same "leading lights," the law requires an analysis of the intent of the "leading
lights" and the control they exercise over the trademark and the quality of the services offered
under the mark to determine which related company has rights in the trademark.  The "first use"
doctrine asserted by Carlos instead applies only to a trademark dispute between ***unrelated***
companies to determine which company used the mark first, and thereby obtained superior rights
to the trademark.

2

**2.    For "Related Companies," Trademark Ownership Is Determined By The Intent Of The "Leading Lights" Of The Companies, And The Leading Lights Here—Caesar and Carlos—Intended That They Would Own The WESTY Marks That They Alone Created.**

The issue of trademark ownership among various family-owned entities, as is the case here, was addressed in <u>Airport Canteen Services, Inc. v. Farmer's Daughter, Inc.</u>, 184 USPQ 622 (TTAB 1974). That cancellation action before the Trademark Trial and Appeal Board ("TTAB") involved two different parties who operated restaurants in different geographical areas under the same mark, FARMER'S DAUGHTER. The petitioner, which had used the FARMER'S DAUGHTER mark since 1964, sought to cancel the respondent's trademark registration of FARMER'S DAUGHTER for restaurant services. The grounds for cancellation included the allegation that respondent committed fraud when it applied to register a mark used by one family business but listed a second family business as the applicant and owner of the mark. The TTAB rejected the petitioner's argument. Finding that applicant's founder had been the "leading light" of various family enterprises, the TTAB ruled that any use of the disputed mark by any of the family companies was for his benefit. Specifically, the TTAB stated:

> It is clear from the record that Mr. Guagenti has been the leading light or owner of what can be considered to be family enterprises or, if you will, corporate sales, and that, for purpose of convenience, he, at the advice of counsel or accountant, transferred ownership of his various interests to one or another of his corporations without disturbing, and that is the important fact, the continuance of operation of his different activities including that of the "FARMER'S DAUGHTER" restaurant. It is apparent that there was not nor is there any claim of adverse rights in the mark "FARMER'S DAUGHTER" by any corporation within Mr. Guagenti's organization and that, in essence, any use of the mark by any of the corporations was for the benefit of and inured to the benefit of Mr. Guagenti.

184 USPQ at 627.

Similarly, as the Defendants demonstrated at length in their summary judgment filings, the "leading lights" of the Arredondo family, Caesar and Carlos, created the WESTY business concept and the WESTY marks, then chose to rest trademark ownership in WCI, not APLP. Moreover, Caesar and Carlos exercised complete control over each and every WESTY facility, including those owned by APLP. The level of control that Caesar and Carlos exercised over APLP generally, and over use of the WESTY trademarks at APLP-owned facilities specifically, makes APLP a "related company" of WCI under the Lanham Act. This is because: (1) Caesar and Carlos solely decided to enter the self-storage business and created the WESTY Trademarks; (2) Caesar and Carlos solely designed the WESTY buildings and solely developed the real property for the WESTY centers; (3) Caesar and Carlos solely managed the WESTY centers, completely controlling and dictating the quality of the services offered under the WESTY marks by developing the WESTY business model, training the WESTY employees, and by managing all aspects of the WESTY business through management agreements; (4) Caesar and Carlos created the idea of APLP as a passive investment vehicle to generate income for their children and future generations of Arredondos; (5) Caesar and Carlos formed and initially funded APLP, and all of the members of APLP during relevant times were children of Caesar or Carlos; (6) Caesar and Carlos were the sole trustees of the general partners of APLP and solely controlled APLP when they launched the WESTY business in May 1991; and, (7) none of the members of APLP (i.e., Caesar and Carlos's children) knew anything about APLP before the first WESTY center opened in May 1991.

3.    **The Lanham Act Specifically Addresses Trademark Ownership By Related Companies, And All Use Of The WESTY Marks By Related Company APLP Was For The Benefit Of Caesar and Carlos.**

Under the Lanham Act, the federal trademark law, it is not necessary that a company seeking registration of a trademark be the first user of the mark as long as the first user is a "related company" whose use of the mark is under the applicant's control. Indeed, a company can obtain and maintain a trademark registration and own proprietary trademark rights to a mark used exclusively by others provided the use is by related companies whose use of the mark is under the registrant's control. In other words, a related company can file a trademark application and own the resulting trademark registration without ever having used the mark itself. Turner v. HMH Publishing Co., 380 F.2d 224, 229 (5th Cir. 1967), cert. denied, 389 U.S. 1006 (1967); Pneutek, Inc. v. Scherr, 211 USPQ 824, 833 (TTAB 1981).

The plain language of the Lanham Act provides the basis for the related company and "leading light" doctrines. Section 5 of the Lanham Act, 15 U.S.C. § 1055, which governs the use of trademarks by related companies, provides:

> Where a registered mark or a mark sought to be registered is or may be used legitimately by related companies, such use shall inure to the benefit of the registrant or applicant for registration, and such use shall not affect the validity of such mark or of its registration, provided such mark is not used in such manner as to deceive the public. If first use of a mark by a person is controlled by the registrant or applicant for registration of the mark with respect to the nature and quality of the goods or services, such first use shall inure to the benefit of the registrant or applicant, as the case may be.

The Lanham Act defines a "related company" as "any person whose use of a mark is controlled by the owner of the mark with respect to the nature and quality of the goods or

5

services on or in connection with which the mark is used." 15 U.S.C. § 1127.  The

Lanham Act's definition of a "person" includes "a firm, corporation, union, association,

or other organization capable of suing and being sued in a court of law." 15 U.S.C. §

1127.

 In this case, APLP is clearly a related company of Caesar and Carlos and their

companies, and all use of the WESTY marks by related company APLP inured to the

benefit of Caesar and Carlos, owners of the WESTY marks.[1]

 **4.** **Caesar And Carlos's Complete Control Over The Creation and Design Of The WESTY Business Model And The Quality Of All WESTY Services And Facilities Further Establishes Their Ownership Of The WESTY Marks.**

 Another line of "control" cases involving disputes over trademark ownership in the

names of musical performing groups complements the "leading-lights" and implied license

theories and further reinforces Caesar and Carlos's ownership of the WESTY Marks.  These

cases recognize that where several claimants contest trademark ownership, the controlling legal

standard looks to who controls the nature and quality of the goods marketed under the mark in

question.

 In <u>Bell v. Streetwise Records Ltd.</u>, 640 F. Supp 575 (D. Mass. 1986), a popular

performing group and their producer disputed ownership of trademark rights in the group's name

---

[1] A "related company" relationship also exists here through a licensing arrangement and appropriate control over use of the WESTY marks at APLP-owned facilities.  Although there is no express written or oral trademark license from WCI to APLP, the conduct of the parties clearly establishes an *implied* trademark license from WCI to APLP. Moreover, WCI did grant a direct, express written license, signed by Carlos, to WNY as manager of the first WESTY facility in Port Chester, New York, the very same facility that APLP owns and that forms the basis for Carlos' "first use" theory.  See Defendants' Memorandum Of Law In Support Of Motion For Summary Judgment, dated November 12, 2005, pp. 23-26.

"NEW EDITION."  The court held that the group's members, not the producer, were the mark's lawful owners because they developed the group's "distinctive personality and style as performers."  The producer did not make the type of contribution essential to trademark ownership, namely, he did not conceive of or form the group and he did not exercise control over the nature and quality of the services rendered under the mark.  The group "and no one else controlled the quality of [the musical] services" that the mark identified.  Therefore, they were the mark's lawful owners.  In contrast, in this case Caesar and Carlos alone conceived of the WESTY marks and business model and alone controlled the quality of all WESTY facilities and services.

In Rick v. Buchansky, 609 F. Supp 1522 (S.D.N.Y. 1985), the court upheld ownership of the group name "VITO AND THE SALUTATIONS" by the group's manager because he, not a revolving cast of group members, established and controlled the nature and quality of the musical services at issue.  The court found that the manager instigated the group's formation, conceived its name, and managed the group through frequent personnel changes.  Id. at 1531. Significantly, the court rejected the group members' argument that they owned the mark because they alone made the first actual use of the mark in commerce by performing under the name, the very same argument advanced by Carlos in this case.  As in Bell v. Streetwise, the court concluded that control over the nature and quality of the services, not technical first use, determines trademark ownership.  Similarly, Caesar and Carlos's complete control over the nature and quality of all WESTY facilities and services determines trademark ownership in Caesar and Carlos.

Similarly, in <u>Robi v. Reed</u>, 173 F.3d 736 (9th Cir. 1999), the Ninth Circuit considered conflicting claims over the rights to use the name of the once-popular musical group "The Platters," and likewise held that control over the nature and quality of the group's services determines trademark ownership. Herb Reed founded The Platters in 1953; he was also the manager and one of the group's original singers. In 1954, Paul Robi began performing with The Platters, and left the group in 1965. The district court ruled that Robi's membership and long tenure in the band did not give him an ownership interest in The Platters name. Nor did he have any right to use the name on his own. In affirming the lower court, the Ninth Circuit concluded that Reed alone owned the mark because he not only had maintained continuity with the group, but had controlled the quality of its services. <u>Id</u>. at 740. He founded the group, gave the group its name, managed the group, and was the only member who had continuously performed with the group. <u>Id</u>. This case is directly on point as Caesar and Carlos founded the WESTY business, gave the business its name, managed the business and controlled the quality of its services, and were the only persons who were with the WESTY business from its inception until Carlos left.

In sum, the principles set forth and applied by the courts in these three cases further demonstrate the relevance of the evidence Carlos seeks to exclude. In particular, this evidence will show that it was Caesar/Carlos who: (1) conceived of and founded the WESTY business concept, (2) gave the business the WESTY name, (3) determined and controlled the nature and quality of the services offered under the WESTY marks (regardless of who owned the location), and (4) are the *only* persons who were "continuously involved" with the WESTY business from the beginning until Carlos left the business.

8

5.      **Evidence Regarding The "Milford Project" Shows The Intent Of And Quality Control Exercised By The "Leading Lights."**

Evidence of Caesar and Carlos' plans and efforts to develop the first WESTY in Milford, Connecticut is relevant to the "leading lights" and "control" theories because it is probative of their creation and control over the WESTY marks, and services, and APLP's complete lack of involvement in the project.  As articulated in the Defendants' summary judgment filings, and reflected in the exhibits that Carlos challenges, the "Milford Project," as it is known, was the first WESTY facility that the brothers sought to develop.  This WESTY facility was to be constructed on land in Milford, Connecticut that Caesar and Carlos, and their wives, had acquired in their individual capacities in 1989, and it was to be owned, controlled and operated by Caesar and Carlos, not APLP.  APLP was neither a party to that contract nor involved in any way in the development of the "Milford Project."  Although the Milford facility received municipal approval, Carlos and Caesar eventually terminated that project in July 1991, months after applying to register the WESTY trademarks in WCI's name, because a competitor sued to stop the project.  Even though the project was not completed, Caesar and Carlos' intent with respect to the ownership and control is clear from the "Milford Project" evidence.  While Carlos no doubt recognizes this evidence as fatal to his case, that is no basis to exclude it.

6.      **Carlos' Motion Improperly Seeks To Have The Court Decide Core Legal Issues And To Exclude Whole Categories Of Evidence.**

The foregoing analysis also reveals Carlos' motion for what it really is:  a thinly-veiled second bite at summary judgment.  By asking the Court to exclude evidence related to the Defendants' "leading lights" theory, Carlos actually asks the Court to decide one of the core

9

legal issues in this case, namely whether the "first use" or "leading lights" doctrine governs

trademark ownership among Caesar and Carlos' related companies.

Carlos' tactic "reflect[s] an inappropriate use" of a motion in limine. TVT Records v.

Island Def Jam Music Group, 250 F. Supp. 2d 341, 344. (SDNY 2003). The purpose of an in

limine motion is to enable the trial court to rule on disputes over the admissibility of *discrete*

items of evidence." Id. (emphasis added). In TVT Records, for example, the court was faced

with motions in limine seeking to exclude "whole topics and sources of prospective evidence,

out of context and before any specific objection against its proper backdrop [was] raised." Id.

The court noted that "in the guise of addressing limited evidentiary issues, the parties' motions in

limine would effectively serve as a form of advance trial of substantive portions of the case, or

indeed as a substitute for the trial itself." Id. at 346-351. The court denied much of the

requested relief, reasoning that such a tactical broadening of the scope of a motion in limine was

"inappropriate" and "impermissible." Id. at 344-45.

Furthermore, the TVT Records court held that it could not "categorically conclude,

absent context that [the subject] evidence is not relevant to issues presented by the current

litigation, nor can the Court assess the probative value of such evidence at this stage." Id. at 346.

The need for factual context often leads courts to deny motions in limine that seek to "exclude

broad categories of evidence." Sperberg v. Goodyear Tire & Rubber Co., 519 F.2d 708, 711 (6th

Cir. 1975) (motion sought to exclude all references "to the pendency of other related cases" and

evidence about parties' prior stipulation); see also Home Depot U.S.A. v. G & S

Investors/Willow Park, L.P., 2005 WL 3018701, *9-*10 (EDNY 2005) (copies of unpublished

cases are attached at **Exhibit 1**.)  This is particularly true where, as here, the motion goes beyond

targeting certain exhibits and asks the court to prohibit all evidence about whole topics.  National

Union v. L.E. Myers Co. Group, 937 F. Supp. 276, 287 (SDNY 1996) (finding motion in limine

to exclude "any extrinsic evidence as to the meaning of . . . various [written] insurance policy

provisions" too imprecise and "too sweeping in scope to be decided in limine").  In that situation,

the "better practice is to deal with questions of admissibility of evidence as they arise" during

trial.  Sperberg, 519 F.2d at 711; see also Home Depot, 2004 WL 3078701 at *9-10 (noting that

"many Courts" have found the same).

**B.    Evidence Regarding Carlos' Reasons For Selling His Interest in Arredondo & Co.,
       LLC, Which Included The WESTY Marks, Is Relevant.**

Carlos seeks to exclude evidence concerning the "events, circumstances, and reasons that

**caused**" him to sell his interest in A&Co. and the WESTY marks in 1999. (Motion, p. 5

(emphasis added).)  Carlos claims that his motivations for selling are not relevant.[2]  Not so.

Carlos' sale of his interest in A&Co. included an express sale of the WESTY trademarks.  Those

circumstances and his reasons therefore are central to this case.  Carlos' claim that his motivation

in expressly selling the WESTY trademark is not probative is preposterous.  In addition to other

reasons discussed below, this aspect of Carlos' motion in limine can be denied because his sale

of A&Co. and the WESTY Trademark completely contradicts his current position that  APLP

always owned the WESTY trademarks.

---

[2] Carlos also claims that this evidence would cause "more damage" to the families involved, although he fails to
specify how introduction of this evidence would do so.

First, as to the context of the transactions and their price, in late 1999, Carlos, who was then almost 65, advised Caesar that he intended to end his day-to-day involvement with the WESTY business.  He made a series of unilateral offers to sell his one-half interest in A&Co. to Caesar, each time reducing the price for that interest and shortening the date of his final departure from the company.  This culminated in a $100,000 payment for the transfer of his interest in A&Co. to Caesar, thereby concluding his daily involvement with the WESTY business by the end of 1999, as well his $10,000 share of WCI's fee for the assignment of the WESTY marks to A&Co.  Specifically, as set forth more fully in the Defendants' summary judgment filings, Carlos signed a Sale Agreement dated January 1, 2000 selling his entire interest in A&Co. to Caesar.  Notably, the sale of Carlos' A&Co. interest expressly included "trademark rights."  Specifically, in addition to reciting his desire to enter into the transaction, Carlos "transfer[red] all of his right, title and ownership interest in [A&Co.] to Caesar" and further "relinquishe[d] all rights and claims to any assets of [A&Co.], tangible or intangible, now owned or to be owned in the future, including without limitation … good will, *trademark rights* and vehicles . . . ."  (Id.) (emphasis added).  The Sale Agreement expressly excluded only two assets—an automobile and an office safe—from the assets that Carlos knowingly and deliberately relinquished and transferred to Caesar.   The Sale Agreement did not exclude any trademark assets.  As a result of the express use of the term "trademark rights" in the Sale Agreement, Carlos understood and intended that A&Co. would become the owner of all of the WESTY Trademarks, including WESTY, WESTY'S and WESTY AT YOUR DOOR.

12

Carlos' decision appears to have been motivated by several factors: Carlos' approaching the typical retirement age of 65; his tremendous success in the stock market during the 1990s, when his personal portfolio of stocks and mutual funds grew to over $50,000,000; his interest in renovating an apartment that his wife was acquiring in her native Madrid, Spain; and/or his desire to spend more time at his property in the Cayman Islands.  These motivations explain why in late 1999 Carlos would sell his interest in, and completely end his involvement with, the WESTY business, including the WESTY marks, in exchange for $110,000.

Second, as to this evidence undermining Carlos' about-face claim that APLP, not Caesar, WCI or A&Co., has always owned the WESTY marks, certain relevant events occurred in the years following the December 1999 transactions.  In August or September of 2001, more than a year and a half after Carlos agreed to transfer the WESTY marks, Carlos' daughter, Fabiola, asked Carlos who owned the WESTY Trademarks.  When Carlos advised her that he assigned all of the trademark rights to Caesar, Fabiola commented "wouldn't it be good" if APLP owned the marks.  Although Carlos initially told Fabiola to "leave it alone," upon her urging, Carlos met with Caesar to discuss assigning the WESTY Trademarks to APLP.  Expressing regret at the transaction in which he transferred his interest in A&Co. and the trademarks, Carlos asked Caesar "if it were possible to put the trademarks into APLP."  Caesar declined this request.[3]

---

[3] Of course, at no point in this meeting did Carlos claim that the brothers had made a mistake in making WCI the owner of the trademarks.  Nor did Carlos claim that APLP was the actual owner of those marks.  Instead, recognizing that A&CO. owned the WESTY Trademarks, he simply wanted Caesar to assign ownership of the marks from A&Co. to APLP.

Fabiola later raised the issue of the WESTY Trademarks with Carlos again, advising him that she had consulted with counsel and devised a strategy to attempt to undo the decisions her father and Caesar had made over more than a decade.  Her strategy was to claim that APLP had all along owned the trademarks because APLP owned the first WESTY facility.  By this same time, Carlos had suffered what he characterized as a "very dramatic decline" in his personal stock and mutual fund investment portfolio, reducing it to approximately twenty percent of what it had been.  (See, e.g., Exhibits 333, 371 and 391).  The prospect of regaining control over the trademarks central to this very profitable business was becoming attractive to him.  Thereafter, and following further meetings with counsel, on October 30, 2002, Carlos sent a letter, ghostwritten by his counsel in this case, claiming for the first time that the decision to make WCI the owner of the WESTY Trademarks was simply a mistake and that APLP was the rightful owner of those marks.

This evidence of the dramatic decline in Carlos' personal finances and the prodding and legal machinations of his daughter together reveal that Carlos' after-the-fact challenging of his original, clear intent concerning ownership of the WESTY marks is not credible.  The circumstances and motivations prove the logic and rationale for Carlos' express sale of the WESTY trademark and his prior understanding that APLP did not own the trademark.

14

**C.    The Defendants Should Not Be Precluded From Asserting A Defense That Carlos Is Barred From Bringing Count One For Failure To Comply With The APLP Partnership Agreement.**

Carlos correctly notes that the Defendants asserted in the December 2005 Joint Trial Memorandum that all of Carlos' claims are barred because they are in breach of the APLP Partnership Agreement.  The APLP Partnership Agreement states plainly that "[a]ny action required or permitted to be taken by the General Partners hereunder for a period of twenty (20) years from the Second Amendment Date [March 13, 2000], *shall require the consent of both General Partners*." (emphasis added)  Additionally, in the APLP mission statement that the brothers drafted and APLP approved in March of 2000, the brothers, as trustees of the general partners, declared that through 2020, "all decisions must be made unanimously by both general partners."  These mutual consent provisions were intended to prevent exactly the type of unilateral activity that Carlos has engaged in by bringing this lawsuit without the consent of the other general partner.  Accordingly, these provisions bar Carlos' claims.

The Defendants do not dispute that this defense is reflected in the Sixth Affirmative Defense, which is directed only at the Second and Third Count, not Carlos' First Count for breach of contract.   The Defendants nonetheless maintain that the omission of a reference to the First Count in the Sixth Affirmative Defense was an oversight and have filed contemporaneously with this Memorandum a Motion for Leave to Amend their August 2003 Answer to direct the Sixth Affirmative Defense at all counts.

Under Rule 15(a) of the Federal Rules of Civil Procedure, a party may move to amend the pleadings with leave of court "and leave shall be freely given when justice so requires."

Even if the leave is sought during trial, it can be given unless "it would cause prejudice to the other party by requiring discovery to be reopened, delaying the proceedings or creating additional litigation expenses." <u>The Cadle Co. v. Jones</u>, Nos. 3:00CV316 (WWE), 3:00CV317 (WWE), 2004 WL 2049321, *4 (D.Conn. August 20, 2004). "Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend." <u>Callahan v. Unisource Worldwide, Inc.</u>, No. 3:01CV1205 (CFD), 2004 WL 413268. *1 (D.Conn. Feb. 24, 2004.) (citing <u>State Teachers Ret. Bd. v. Fluor Corp.</u>, 654 F.2d 843, 856 (2d Cir.1981)).  "[T]he lenient standard under Rule 15, which provides that leave to amend 'shall be freely given,' must be balanced against the requirement under Rule 16(b) [ ] ] that the Court's scheduling order 'shall not be modified except upon a showing of good cause.' . . . A finding of good cause depends on the diligence of the moving party." <u>Id</u>. (citations omitted).

As set forth in the Defendants' Motion for Leave to Amend, Carlos would not be prejudiced by this amendment.  Carlos cannot dispute that he has known since at least the inception of this litigation that the other general partner has never consented to the action.  For example, in a March 20, 2003 letter from the Defendants' counsel, Attorney Craig Raabe, to Carlos' counsel, Carlos was so advised.  That letter is designated as Exhibit 410.  Carlos also fails to cite any additional factual discovery that he needs to conduct, any delay in the proceedings, or any additional litigation expenses as a result of this proposed amendment.  He has had the Joint Trial Memorandum, which addresses the Sixth Affirmative Defense as though it were directed as to all counts, since December 2005, and thus has had more than ample time to

consider any factual or legal defenses to a broader version of that defense than the Defendants

had set out in August 2003.

**D.      Exhibits 14, 396, 397 Are Not Inadmissible Settlement Documents.**

     **1.      Exhibit 14**

Exhibit 14 is a note that Carlos handwrote and faxed in December 2002 to both his legal

counsel and Caesar.  In part of that note, Carlos states facts concerning his understanding of

A&Co.'s role with respect to the WESTY business operations as of December 31, 1999.  The

Defendants intend to offer this exhibit to place those statements into evidence.  The exhibit will

not be offered as evidence of a proposal to compromise Carlos' claims.  Consequently, Federal

Rule of Evidence 408 is inapplicable to Exhibit 14.

     **2.      Exhibit 396**

Exhibit 396 is a letter from Carlos to Caesar, dated October 30, 2002.  This letter,

apparently ghostwritten by Carlos' counsel, represents the first time that Carlos suggested that

the decision to make WCI the owner of the WESTY Trademarks was simply a mistake and that

APLP has always been the rightful owner of those marks.  (The significance of this letter is also

discussed in Section A, above.)  The Defendants intend to introduce this letter for that purpose,

rather than as an offer to compromise indicative of the weakness of Carlos' claims or his

calculations regarding the amount he is seeking.  Federal Rule of Evidence 408 is, therefore,

inapplicable to Exhibit 396.

### 3.    Exhibit 397

The Defendants do not anticipate that they will introduce this exhibit as an offer to compromise or for the truth of the matters asserted in it.  The Defendants reserve the right to offer the document based on the plaintiff's case-in-chief, and, if they attempt to do so, they will demonstrate that admission of the document is not barred by the Federal Rules of Evidence.

### E.    <u>Hearsay Issues Do Not Bar Admission Of Any Of The Defendants' Exhibits.</u>

### 1.    Exhibit 15.

Exhibit 15 consists of Carlos' handwritten notes regarding expenditures relating to a WESTY development in Milford.  This exhibits is not hearsay because it as an admission by a party-opponent.  F.R.E. 801(d)(2).

### 2.    Exhibit 16.

Exhibit 16 consists of handwritten notes regarding status of corporations and bank account information.  Upon information and belief, the notes were written by Carlos and thus are not hearsay because they are an admission of a party opponent.  The Defendants reserve the right to offer the document for purposes other than the truth of its contents based on the plaintiff's case-in-chief, and, if they attempt to do so, the Defendants will demonstrate that admission of the document is not barred by the Federal Rules of Evidence regarding hearsay.

### 3.    Exhibit 219.

Exhibit 219 is an account statement as of November 29, 1991 sent by Union Trust bank to "Westy's Milford Limited Partnership."  The Defendants presently do not anticipate offering this document at trial for the truth of the amounts reflected in the statement; instead, the

Defendants intend to offer this document to demonstrate that Union Trust was communicating with Carlos and Caesar with respect to a WESTY project in Milford, Connecticut in 1991. The Defendants reserve the right to offer this exhibit for the truth of the amounts it references in response to Carlos' case-in-chief, and, if they do so, they will demonstrate that admission of the document is not barred by the Federal Rules of Evidence regarding hearsay.

      **4.**      **Exhibits 307, 333, 366 and 391.**

Exhibits 307, 333, 366, and 391 are documents reflecting financial information regarding Carlos. These exhibits are not hearsay because they qualify as an admission by a party-opponent. F.R.E. 801(d)(2). The Defendants understand that Carlos, or someone acting at his direction, drafted these documents, thereby satisfying one or more of the requirements set forth in Rule 801(d)(2)(A),(C), and (D). Additionally, the Defendants understand that as to each document Carlos has "manifested an adoption or belief in its truth," thereby satisfying the standard for admission of these documents that is set forth in Rule 801(d)(2)(B).

      **5.**      **Exhibit 351.**

Exhibit 351 is a document consisting of a handwritten outline made by Caesar in connection with his negotiations with Carlos to end Carlos' involvement in the brothers' business operations. Specifically, it lists the reasons that Caesar has determined support Carlos maintaining an office in the brothers' office space. Caesar created this outline in the course of his negotiations with Carlos. Caesar regularly engaged in negotiations as a part of his business, and it was his regular practice to handwrite outlines in connection with his negotiations.

Accordingly, Exhibit 351 satisfies the hearsay exception for business records set forth in Federal Rule of Evidence 803(6).

**6.      Exhibits 372-374.**

Exhibits 372, 373 and 374 are correspondence from counsel regarding trademark applications. Caesar and Carlos retained counsel to oversee the WESTY trademark applications, the information contained in the documents reflects that the correspondence was created at or around the time of the events at issue in the correspondence by counsel with knowledge of those events, and it was the regular practice of counsel to correspond with the brothers in connection with the handling of these trademark matters.  As a result, Exhibits 372-374 satisfy the hearsay exception for business records set forth in Federal Rule of Evidence 803(6).

**7.      Exhibit 389.**

Exhibit 389 is a memorandum reflecting an agreement.  Because Carlos signed the memorandum, it is a statement of a party-opponent that falls outside the scope of hearsay under Federal Rule of Evidence 801(d)(2).

**8.      Exhibit 398.**

Exhibit 398 is a memorandum from Peter Formanek, the accountant for WCI, A&Co., APLP, Caesar, and Carlos, concerning the trademark assignment from WCI to A&Co.  The Defendants anticipate that this document will not be offered for the truth of the matters asserted in it; however, if the Defendants seek to offer the document for the truth of its contents based on the plaintiff's case-in-chief, the Defendants will demonstrate that admission of the document is not barred by the Federal Rules of Evidence regarding hearsay.

**9.    Exhibit 410.**

Exhibit 410 is a letter from Caesar's legal counsel to Carlos' legal counsel concerning Carlos' demand that APLP pay his legal fees incurred in this action.  In the letter, defense counsel reiterates Caesar's lack of consent to Carlos' prosecution of this action, which consent is necessary for Carlos to recover his fees under the APLP partnership agreement.  Carlos is attempting to recover his legal fees through the second and third counts in this case, and thus this document reiterating Caesar's lack of consent has independent legal significance placing it beyond the hearsay rule.  New Era Publications Intern., ApS v. Henry Holt and Co., Inc., 873 F.2d 576, 592 (2nd Cir. 1989) (concurring opinion).  Moreover, the document is an exception to the hearsay rule because it is a business record.  F.R.E. 803(6).

**10.    Exhibit 437.**

Exhibit 437 is a transcript of the APLP Annual Meeting held on March 13, 2004.  The Defendants will demonstrate at trial that this record was made at or near the time of that annual meeting by a court reporter who attended the meeting, that the transcript was kept in the regular course of APLP's business, and that it is the regular course of APLP's business to make this record.  Accordingly, Exhibit 437 satisfies the business record exception to the hearsay rule. F.R.E. 803(6).

**11.    Exhibits 438 and 459.**

Exhibit 438 is a memorandum from Caesar to Carlos transmitting the APLP annual meeting minutes/report relating to the meeting held on March 13, 2004.  Included in this report is the 2003 APLP Annual Meeting package.  The cover memorandum, meeting package, and

21

documents contained therein all satisfy the business records exception to the hearsay rule.  F.R.E 803(6).  Additionally, a number of these documents contain statements of Carlos.  Those statements are admissions of a party opponent and thus they are not considered hearsay.  F.R.E. 801(d)(2).

Exhibit 459 is a transcript of the APLP Annual Meeting held on March 2005.  The Defendants will demonstrate at trial that this record was made at or near the time of that annual meeting by a court reporter who attended the meeting, that the transcript was kept in the regular course of APLP's business, and that it is the regular course of APLP's business to make this record.  Accordingly, Exhibit 437 satisfies the business record exception to the hearsay rule. F.R.E. 803(6).   Moreover, to the extent that it includes statements of Carlos and his legal counsel, those statements are admissions of a party opponent and thus they are not considered hearsay.  F.R.E. 801(d)(2).

**12.     Exhibits 418, 420-423, 425, 428, 434-436, and 442-457.**

Exhibits 418, 420-423, 425, 428, 434-436, and 442-457 are previous filings and deposition testimony in this case.  Insofar as the pleading was submitted by Carlos or his counsel, the document is a statement of a party opponent and not hearsay.  F.R.E. 801(d)(2).  As to the remainder of these exhibits that constitute pleadings or deposition testimony, at this time the Defendants do not anticipate offering those particular documents for the truth of the matters asserted therein.  The Defendants reserve the right to do so, in which case the Defendants will demonstrate that admission of the proffered exhibit is not barred by Federal Rules of Evidence regarding hearsay.

**F.    The Defendants Should Not Be Precluded Under Rules 16(f) or 37(b)(2)(B) From Introducing Exhibits.**

Carlos asks the Court to sanction the Defendants by precluding them, under Rules 16(f) or 37(b)(2)(B) of the Federal Rules of Civil Procedure, from offering into evidence twenty six exhibits that are documents produced after the close of discovery. The circumstances surrounding the provision of these documents to Carlos do not warrant the sanction of preclusion.

Rule 37(b)(2) lists possible, but not exclusive, remedies that the Court may consider for documents produced after the close of discovery. "There is no doubt that exclusion of evidence is a harsh sanction and should be imposed only in rare situations." Softel v. Dragon Medical & Scientific Communications, Inc., 1990 WL 164859, *6 (S.D.N.Y. October 24, 1990). In a subsequent decision in Softel, the Second Circuit enumerated four factors that must be considered before a court orders the rare and harsh remedy of evidence preclusion: (1) the party's explanation for the failure to comply with the discovery order, (2) the importance of the precluded evidence, (3) the prejudice suffered by the opposing party, and (4) the possibility of a continuance. Softel, 118 F.3d 955, 961 (2d Cir. 1997). The prejudice factor is essential. Where the party seeking preclusion under Rule 37 cannot demonstrate prejudice, a court should not exclude the evidence. Land Ocean Logistics, Inc. v. Aqua Gulf Corp., 181 F.R.D. 229, 234 (W.D.N.Y. Sep. 2, 1998). As another court within this District held in a case where the failure to timely comply with a discovery order was "an unintentional error":

> Clearly, the imposition of the harshest sanctions under Rule 37(b)-(d), such as the preclusion of evidence or the dismissal of an action, requires willful misconduct

> or bad faith. Considerations of fair play dictate that courts eschew the harshest
> sanctions where failure to comply is due to a mere oversight of counsel amounting
> to no more than simple negligence.

Messier v. Southbury Trng. Sch., 1998 WL 841641, * 4 (D.Conn. Dec. 2, 1998).

The majority of the documents that Carlos is attempting to exclude under Rule 37(b) were produced to him in December 2004 in the course of summary judgment briefing. Most of these documents were submitted to refute issues that Carlos first introduced into this case as a part of his summary judgment briefing. Of those documents, many were exhibits to, or were produced through formal discovery contemporaneously with, the Defendants' December 21, 2004 summary judgment Reply. These documents have now been designated as Exhibits 50, 71, 73, 74, 89, 90, 92, 115, 220, 230, 233, 311 and 389. Carlos responded by filing a motion seeking to strike those exhibits or leave to file a sur-reply to address them. The Defendants opposed Carlos' motion, explaining how these documents related to issues Carlos raised in summary judgment and that the law pertaining to Rule 37(b)(2) does not warrant a sanction of preclusion (Defendants' Memorandum Of Law In Response To Plaintiff's Motion To Strike Or, In The Alternative, Motion For Leave To File A Sur-Reply Brief, dated January 28, 2005, ("Defendants' Response"), pp. 13-15.). Indeed, Carlos was aware of many of these documents through his role in A&Co. As a result, on September 7, 2005, the Court denied Carlos' motion to strike but permitted him to file his sur-reply.

The Defendants' Response also addressed other documents now designated as trial exhibits. With respect to the document now designated as trial Exhibit 62, the Response explained that while this document was produced in October 2004 after the close of discovery,

the timing of the production was by agreement of counsel; Carlos cannot now object to that timing. (See Response, pp. 12-13.)  With respect to trial Exhibit 58, the Response explained that defense counsel believed this document had been produced in the course of the Defendants 23,000 page discovery production, but realized while preparing the Defendants' summary judgment Reply that it had not; the simple, excusable inadvertence of counsel is not a basis to award a sanction of preclusion.  (See Response, pp. 10-12, 16-17.)  Lastly, with respect to the document now designated as trial Exhibit 51, the Response explained that the Defendants discovered this document at the time of preparing their summary judgment Reply, despite diligent efforts to initially locate responsive documents.  (See Response, p. 17.)  The documents now designated as Exhibits 28, 55, 56, 57, 64, 65, 119 and 151 were discovered contemporaneously with Exhibit 51, and were produced to Carlos at that time.

Exhibit 371 is a memorandum from Carlos to Caesar, dated October 1, 2001, in which Carlos notes "the very dramatic decline" in his personal financial portfolio.  Carlos is the author of this document and has known for the last several years that his financial circumstances during the 1999-2003 timeframe are at issue in this case, but he nonetheless did not produce this document to Caesar in discovery.  Also, even if Carlos were to claim that he had forgotten about or misplaced this document during the early part of this action, the parties exchanged their exhibits in late 2005 and he has had since that time to prepare a response to this document, if any, and to seek leave to conduct additional discovery.

Finally, Exhibit 458 discusses APLP's annual cash flow from building leases between 1999 and 2004.  This exhibit is not responsive to the plaintiff's discovery.  Regardless, it is a business record of APLP, and Carlos has had access to this information since it was generated.

Carlos has failed to make a showing of bad faith, willful misconduct, or even recklessness concerning these exhibits.  This failure, coupled with the fact that he has been in possession of these documents since late 2004, demonstrate that there are no grounds to impose the rare, harsh, and in these circumstances, unnecessary, remedy of preclusion under Rule 37(b).

**G.    Authentication Issues Do Not Bar Admission Of Any Of The Defendants' Exhibits.**

**1.    Exhibits 44, 45, 50, 51, 62, 65, 119, 129-131, 160-162, 195-209.**

Exhibits 44, 45, 50, 51, 62, 65, 119, 129-131, 160-162, 195-209 are sketches of various buildings and building sites.  The sketches were either prepared by Caesar or used in connection with a development project in which he participated such that he can provide testimony that the document "is what it is claimed to be," thus meeting the illustrative example for demonstrating the authenticity of the document under Federal Rule of Evidence 901(b)(1).

**2.    Exhibits 5, 15, 74, 94, 97, 99, 102, 104, 108, 114, 123-126, 132-135, 137, 144, 151, 222, 307, 333, 366, 367, 372-374, 391, 398, 418, 421, 425, 428, 434, and 447-457.**

The documents designated as Exhibits 5, 15, 74, 94, 97, 99, 102, 104, 108, 114, 123-126, 132-135, 137, 144, 151, 222, 367, 372-374, 398, 418, 425, 428, and 447-457 were all prepared by Caesar or by someone acting in connection with his business affairs.  Accordingly, Caesar can provide testimony that the document "is what it is claimed to be," in satisfaction of Federal Rule of Evidence 901.

Upon information and belief, the documents designated as Exhibits 307, 333, 366, 391, and 421 were prepared by Carlos or someone acting at his direction. Accordingly, Carlos can authenticate those exhibits. Exhibit 421, for example, is an affidavit that Carlos submitted to this Court.

Finally, Exhibit 434 is a transcript of a proceeding before this Court. Under Federal Rule of Evidence 201, the Court may take judicial notice of the authenticity of this transcript.

**3.    Exhibit 46.**

Exhibit 46 is a copy of a quitclaim deed regarding the property on Rowe Avenue in Milford, Connecticut where the brothers initially intended to build the first WESTY facility. Given Carlos' intimate involvement in that transaction, the Defendants did not expect Carlos to dispute the authenticity of this document. Indeed, he has not made any specific challenge to its authenticity. Nonetheless, if Carlos intends to stand on this objection, the Defendants will obtain a certified copy from the City of Milford and replace the existing uncertified exhibit copy.

**4.    Exhibits 179 and 180.**

Exhibits 179 and 180 patently relate to business matters in which Caesar was involved. Exhibit 179 is a quote for product to be delivered to A&Co. Exhibit 180 is a bid proposal submitted to the brothers. Consequently, Caesar is able to authenticate these exhibits

**5.    Exhibit 189.**

Exhibit 189 is "Testwell Craig Laboratories Field Test Boring Logs of Westy's in Milford, CT." This exhibit related to WESTY business operations. Caesar is, therefore, able to authenticate these exhibits.

**6.    Exhibit 219.**

Exhibit 219 is a Union Trust bank statement regarding Westy's Milford Limited Partnership.  Caesar is able to authenticate this document because the bank statement concerns WESTY business operations.  The exhibit also contains handwritten notes.  Upon information and belief, the handwriting is Carlos', and he should thus be able to authenticate them.

**7.    Exhibit 351.**

Exhibit 351 is a handwritten note.  The handwriting is Caesar's, and, thus, he is able to authenticate this exhibit.

**8.    Exhibit 437.**

Exhibit 437 is the transcript of APLP's 2004 Annual Meeting.  "The testimony of either the stenographer (transcriber) or a participant in the actual conversation that the transcript is correct is sufficient to authenticate."  United States v. Devous, 764 F.2d 1349, 1355 (10th Cir. 1985).  Caesar attended the Annual Meeting, and he is thus able to authenticate the transcript at trial.

**9.    Exhibits 34-40, 42, 47, 59, 81, 91, 150, 223, 231, 234, 235, 365 and 438.**

Carlos' sole authenticity challenge to these exhibits is the manner in which they are described on the Defendants' Amended Exhibit List.  While Carlos claims the descriptions are "inaccurate," he fails to explain how.  The Defendants believe the descriptions are accurate.

10.    **Exhibits 222, 254, 279, 349, 367, 450, 454 and 457.**

Carlos seeks to bar the admission of Exhibits 222, 254, 279, 349, 367, 450, 454 and 457 by claiming, without explanation, that these are incomplete documents. Carlos has provided no valid basis to exclude these documents on grounds of incompleteness.

Exhibit 222 is a license agreement in which WCI granted to WNY a trademark license for the WESTY facilities operated by WNY. Carlos signed this agreement on behalf of WCI on January 1, 1992. Carlos claims the document is incomplete, likely because the document suggests that there was an attachment that is not included. This goes to the weight of the evidence, not its admissibility. Caesar and Carlos can testify as to whether there ever was an attachment, and if so, what it was.

Exhibit 254 is a December 1996 facsimile from Attorney Jeffrey Stephens to Carlos referencing letters received from the USPTO confirming that WCI is the owner of the WESTY trademarks. Although the attachments are not included with this exhibit, the Defendants are not offering this exhibit to introduce the attachments into evidence. The Defendants will offer this exhibit to demonstrate Carlos' understanding and intention in 1996 that WCI was then, and had previously been, the owner of the WESTY trademarks.

Exhibit 279 is the same type of correspondence from Attorney Stephens, except that it was issued in January 1998, and will be offered to show Carlos' state of mind as of that time. The Defendants do not intend to offer the attachments.

Exhibit 349 is a reconciliation report from December 1999. It reflects the $20,000 payment made by A&Co. to WCI for the assignment of the WESTY trademarks. Although this

exhibit contains only one page of the report, that is the only page of the report that is relevant to this case. The other pages have no bearing on the WCI trademark assignment transaction, and Carlos does not suggest otherwise.

Finally, Exhibits 450, 454 and 457 are affidavits submitted in this case. Ostensibly, Carlos objects to these documents because the affidavits are listed without their exhibits. For the sake of keeping an already extensive set of exhibits as brief as possible, the Defendants listed these affidavits without their lengthy exhibits, many of which exhibits are already otherwise designated as exhibits. That said, if the Defendants use Exhibits 450, 454 and 457 at trial, they will include the affidavit exhibits, if necessary.

**H.    Exhibits 326, 333, 371, and 391 Contain Relevant Evidence And Should Be Admitted.**

The Plaintiff seeks to exclude Exhibits 326, 333, 371 and 391 because they contain personal financial details about Carlos. As explained in Section B above, Carlos' personal financial circumstances are relevant to this dispute.

In 1999, when Carlos' stock and mutual fund investment portfolio exceeded $54 million, he was anxious to sell off his interest in A&Co., including the WESTY marks, to Caesar and leave the company quickly. Only years later, after his net worth underwent a "very dramatic decline" in which his personal stock and mutual fund investment portfolio was reduced to approximately twenty percent of what it had been in 1999, and after prompting by his daughter, did Carlos seek to regain some control of the profitable WESTY marks by asserting the preposterous claim that he always intended for APLP own the WESTY marks. Exhibit 333 sets

out Carlos' $54 million personal stock and mutual fund investment portfolio as of December 13, 1999.  Exhibits 371 and 391 reflect the subsequent "very dramatic decline" in Carlos' personal fortune (in investments other than real estate) as of October 2001 and March 2002 to approximately $12 million.

Exhibit 326 is a December 1999 document that reflects, among other things, Carlos' and Caesar's financing with personal responsibility related to WESTY locations.  As discussed above in Section F, Carlos made the brothers' personal responsibility for WESTY locations an issue in his Opposition to the Defendants' summary judgment motion.

If the plaintiff will stipulate to all of the figures contained in these exhibits and will not challenge their relevance, the Defendants will agree that the exhibits themselves need not be introduced at trial so long as the Plaintiff does not oppose the Defendants' reference to those figures during the trial and in post-trial briefing.  Alternatively, the Defendants will also not oppose an appropriately-drafted motion by the Plaintiff to have the courtroom closed during the use of these exhibits and to have these exhibits, related portions of the trial transcript, and related post-trial briefing placed under seal.

**I.      There Is No Basis To Exclude Exhibit 410 Merely Because It Contains Some Legal Conclusions.**

The Defendants do not dispute that Exhibit 410 contains some legal conclusions about this case.  This will, however, be a bench trial.  The parties have submitted pleadings containing similar legal conclusions to the Court already, and will continue to assert similar legal conclusions to the Court throughout the trial and in post-trial briefing.  To adopt Carlos'

argument that Exhibit 410 should be excluded merely because it contains some legal conclusions

is to adopt a position that the Court will be unable to evaluate the validity of those conclusions,

and appropriately agree or disagree with them, because they are included in an exhibit.

**J.    The Attorney-Client Privilege Does Not Preclude Admission Of The E-Mail Included In Exhibit 459, Or, In The Alternative, The Plaintiff's Position With Respect To Exhibit 459 Permits The Defendants To Examine All Communication Between The Plaintiff And The Law Firm Of Alston & Bird Concerning This Case.**

Exhibit 459 is a transcript of APLP's annual meeting for 2005, and attached to it is an e-

mail from David Stewart, of Alston & Bird, to Carlos.  The e-mail forwards Carlos' final

response to Paragraph 67 of the Defendants' Local Rule summary judgment statement, which

final response was provided to the Court as a part of his summary judgment opposition.  As

Exhibit 459 reveals, Carlos intentionally submitted this e-mail to the attendees of that meeting

and directed that it be included with the transcript.  Carlos contends that the attorney-client

privilege precludes the Defendants from admitting this e-mail because it is an e-mail "to APLP

from its legal counsel."  By disclosing this e-mail to Caesar in the course of that meeting,

however, Carlos waived any privilege with respect to it.

To argue otherwise, Carlos must contend that the Defendants—at least Caesar in his role

as the trustee of The 2000 Trust For The Grandchildren Of Caesar A. Arredondo and Carolyn

Abad Arredondo (which is a General Partner of APLP)—are also represented by Alston & Bird.

If that is the case, then Caesar and his children, who are members of APLP, have a right to

access the files of Alston & Bird concerning this case.  Accordingly, if the Court determines that

the e-mail attached to Exhibit 459 should be excluded under the attorney-client privilege, then

Caesar intends to request that Alston & Bird provide him with a complete copy of its files,

including all communications, concerning this matter.

DEFENDANTS,
CAESAR A. ARREDONDO, et al.


By ____/s/Edward J. Heath_____
       Craig A. Raabe (ct 04116)
       E-mail: craabe@rc.com
       Edward J. Heath (ct20992)
       E-mail: eheath@rc.com
       Robinson & Cole LLP
       280 Trumbull Street
       Hartford, CT 06103
       Tel.:  (860) 275-8200
       Fax:  (860) 275-8299

       Hubert J. Santos (ct00069)
       E-mail: hsantos@santos-seeley.net
       Santos & Seeley, P.C.
       51 Russ St.
       Hartford, CT 06106
       Tel.:  (860) 249-6548
       Fax:  (860) 725-5533

       David M. Kelly, Esq. (ct26060)
       E-mail: david.kelly@finnegan.com
       Finnegan, Henderson, Farabow, Garrett
          & Dunner, LLP
       901 New York Avenue, N.W.
       Washington, D.C. 20001-4413
       Tel.: (202) 408-4050
       Fax: (202) 408-4400

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was served electronically, on this 22nd day

of June, 2007, to the following counsel of record:

Robert P. Dolian, Esq.
Cummings & Lockwood LLC
Four Stamford Plaza
P.O. Box 120
Stamford, CT  06904-0120

Martin J. Elgison, Esq.
David J. Stewart, Esq.
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA  30309-3424

/s/Edward J. Heath_____
Edward J. Heath