IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CARLOS A. ARREDONDO, in his capacity as Trustee of The 2000 Trust for the Grandchildren of Carlos A. Arredondo and Mari V. Arredondo, general partner of Arredondo Properties Limited Partnership, <br><br>        Plaintiff, <br><br>        v. <br><br> CAESAR A. ARREDONDO, individually and in his capacity as Trustee of The 2000 Trust for the Grandchildren of Caesar A. Arredondo and Carolyn Abad Arredondo; THE 2000 TRUST FOR THE GRANDCHILDREN OF CAESAR A. ARREDONDO AND CAROLYN ABAD ARREDONDO, in its capacity as general partner of Arredondo Properties Limited Partnership; and ARREDONDO & CO., LLC, <br><br>        Defendants. | CIVIL ACTION FILE <br><br> NO. 3:02 CV 2200 (CFD) <br><br> Filed: December 18, 2009 |

**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................... 3

II.     FINDINGS OF FACT ............................................................................................ 3

A.     The Parties. ........................................................................................................... 4

B.     The History, Background and Structure of APLP. ................................................. 5

C.     The Origin of the WESTY'S Self-Storage Business ............................................. 6

D.     Construction of the Facility in Port Chester and First Use of the WESTY Marks in
       Commerce .............................................................................................................. 9

E.     Formation of Westy's Connecticut, Inc. and Westy's New York, Inc. ................. 11

F.     The Original Registrations of the WESTY Marks................................................ 12

G.     Dissolution of WCI I and WNY I ....................................................................... 15

H.     The Tuckahoe WESTY'S and the Growth of the WESTY'S Business................ 16

I.     The Incorporation of Westy Connecticut, Inc. in 1996 ....................................... 16

J.     The Change from WESTY'S to WESTY ............................................................. 17

K.     The Carlos and Caesar 2000 Agreement ............................................................. 17

L.     Plaintiff's Decision to Bring This Case ............................................................... 18

M.     The New Applications to Register the WESTY Marks ........................................ 20

III.    CONCLUSIONS OF LAW ................................................................................. 20

A.     Relevant Background Law on Service Mark Creation, Ownership and Use........ 20

B.     APLP First Used the WESTY Marks in Commerce and Is Therefore The Owner
       of Those Marks .................................................................................................... 23

C.     Defendants' Theories .......................................................................................... 25

       1.    The Leading Lights Theory ....................................................................... 27

       2.    The Related Company Theory.................................................................... 29

       3.    The Control Theory ................................................................................... 30

D.     Defendant's Affirmative Defenses ...................................................................... 34

       1.    Estoppel..................................................................................................... 34

       2.    Waiver........................................................................................................ 37

       3.    Laches........................................................................................................ 37

       4.    Breach of APLP Charter............................................................................ 39

E.     Plaintiff is Entitled to Recover His Attorneys' Fees............................................ 40

IV.     CONCLUSION ................................................................................................... 41

APPENDIX A – WESTY STORE LOCATIONS

## I.    <u>INTRODUCTION</u>

Plaintiff CARLOS A. ARREDONDO ("Plaintiff"), in his capacity as Trustee of the 2000

Trust for the Grandchildren of Carlos A. Arredondo and Mari V. Arredondo (the"2000 Carlos

Trust"), general partner of Arredondo Properties Limited Partnership ("APLP"), filed this

declaratory judgment action pursuant to 28 U.S.C. § 2201 against Defendants seeking a

declaration, among other things, that APLP is the owner of all right, title and interest in and to

the service mark WESTY and related marks (collectively referred to herein as the "WESTY

Marks") that are  used to identify high-end self storage facilities in the northeastern United

States.  Plaintiff also seeks reimbursement of his legal fees pursuant to the partnership agreement

of APLP and Connecticut law.  Defendants have asserted the affirmative defenses of waiver,

laches and estoppel, as well as the defense that Plaintiff is barred from bringing this action by the

APLP partnership agreement.  The parties mutually agreed that there was no issue in the case

triable by a jury, and a bench trial was held on October 19, 20 and 22, 2009.

Based on the evidence admitted at trial and fundamental principles of the law regarding

the ownership of trademarks and service marks, the Court finds that:  (1) APLP is the owner of

the WESTY Marks; (2) Plaintiff's oppositions to Arredondo & Co., LLC's ("A&Co.") pending

applications to register the WESTY Marks should be granted; and (3) Plaintiff is entitled to

reimbursement of his attorney fees and costs.

## II.    <u>FINDINGS OF FACT</u>

Having considered the evidence and the parties' submissions and arguments, and

pursuant to Federal Rule of Civil Procedure 52(a), the Court finds by a preponderance of the

evidence the following facts:

A.    **The Parties.**

The Plaintiff in this case is Carlos A. Arredondo, who has brought this case solely in his capacity as Trustee of The 2000 Trust for the Grandchildren of Carlos A. Arredondo and Mari V. Arredondo, which is one of two general partners of Arredondo Properties Limited Partnership ("APLP").

The defendants are Caesar A. Arredondo, individually ("Caesar"); the 2000 Trust for the Grandchildren of Caesar A. Arredondo and Carolyn Abad Arredondo (the "Caesar 2000 Trust"), which is the other general partner of APLP: Caesar A. Arredondo in his capacity as Trustee of the Caesar 2000 Trust; and Arredondo & Co. ("A&Co."), a company owned by Caesar and his two sons Edward and John, and previously owned equally by Carlos and Caesar.

The limited partners and owners of APLP are the children, grandchildren and various trusts that benefit the lineal descendants of Carlos and Caesar.  The limited partners are not parties to this action.

Defendants have, throughout the course of this case, attempted to cast this as a personal dispute between two brothers (and their families) and to paint Carlos as a man who has not lived up to his word.[1]  The Defendants have consistently asked this Court to disregard the fact that Plaintiff has not brought this action in his personal or individual capacity or sought any relief that would benefit him personally.  The evidence showed, however, that Plaintiff has no ownership interest in APLP and can gain nothing personally from the outcome of the case.  Moreover, the Plaintiff's actions here will benefit <u>all</u> the limited partners of APLP, not just his family, so there is no basis to question his motives for bringing this case.  Accordingly, the Court finds that

---

[1] For example, in his opening statement, counsel for Defendants stated:  "This is a case…about a relationship…between Carlos and Caesar Arredondo who…were guided by two principles: they would live by their word and a deal is a deal…Carlos broke his word and the relationship between the two brothers has been destroyed." (R. at 41:17-42:5).

Plaintiff has brought this action solely in his capacity as Trustee of the Carlos 2000 Trust and not in his individual capacity.

**B.**      **The History, Background and Structure of APLP.**

Carlos and Caesar Arredondo are brothers who engaged in various real estate business ventures together since 1961.  (Testimony of Caesar Arredondo ("Caesar Test."), R. at 321:8-9). In 1980, Carlos and Caesar formed APLP for the purpose of generating income through real estate investments for future generations of their families.  (Testimony of Carlos Arredondo ("Carlos Test."), R. at 56:19-57:3).[2]

When APLP was formed, Carlos and Caesar collectively owned approximately 50% of the partnership interests and were the general partners of APLP.  (Carlos Test., R. at 57:4-7).  In 1987, the Partnership Agreement for APLP was amended, and the ownership was restructured because Carlos and Caesar had been advised by their counsel that they should separate themselves personally from APLP. (Carlos Test., R. at 57:8-17).  Following that advice, Carlos and Caesar sold their interest in APLP to the limited partners of APLP at fair market value. (*Id.*). After the transaction in 1987, Carlos and Caesar no longer had any ownership interest in APLP. (Carlos Test., R. at 59, 7-9).

As part of the restructuring, two trusts became the general partners of APLP: The 1987 Trust for the Grandchildren of Caesar A. Arredondo and Carolyn Abad Arredondo (the "1987 Trust") and Trust "A" for the Grandchildren of Carlos A. Arredondo and Mari V. Arredondo

---

[2] The transcripts in this proceeding have been filed by the court reporter at Dkt. 161 (Vol. 1, Oct. 19, 2009 proceedings), Dkt. 158 (Vol. 2, Oct. 20, 2009 proceedings), and Dkt. 166 (Vol. 3,Oct. 22, 2009 proceedings). Because the page numbers of each Volume run consecutively, all citations herein are to the record "R." with the specific page:line numbers identified.  Citations to Plaintiff's exhibits and Defendants' exhibits are to "P's Ex." and "D's Ex.," respectively.

LEGAL01/13126411v15

("Trust A").  (P's Ex. 1, 2)  Carlos and Caesar became the Trustees of the two trusts that were

the general partners of APLP.  (*Id.*).[3]

During the 1980's, APLP engaged in a series of real estate transactions known as "sale

leasebacks" with major corporations, in which APLP would acquire a building owned by a major

corporation and lease it back to the company.  (Carlos Test., R. at 59:10-20).  During this same

time period, Carlos and Caesar were also engaged in the sale leaseback business individually.

(Carlos Test., R. at 59:21-60:1).  However, Carlos and Caesar were careful to maintain separate

and segregated accounts for their own affairs and for the businesses of APLP, and there is no

evidence to suggest they operated differently throughout the relevant time period in this case.

(Carlos Test., R. at 60:2-6).  Contrary to Defendants' contentions, Carlos and Caesar did not act

as if they were just "two guys in a room."  Instead, they understood that when they spent APLP's

money they were acting in a fiduciary capacity.  (Caesar Test. R. at 551:17-25; 552:1-2).

## C.    **The Origin of the WESTY'S Self-Storage Business**

By the late 1980's, APLP was generating a positive cash flow for the limited partners and

had a substantial amount of cash reserves.  (Carlos Test., R. at 60:7-11).  As a result of a number

of factors, including lease disputes, corporate mergers and multiple tax filings, Carlos and

Caesar, in their roles as trustees of the trusts that were the general partners of APLP, began to

consider doing real estate transactions that were closer to their place of business in Connecticut.

(Carlos Test., R. at 60:7-25; 61:1-17).  Caesar suggested to Carlos that APLP should consider

building high end self storage facilities in and around New York and Connecticut, and Carlos

agreed.  (Carlos Test., R. at 62:8-20).  Carlos and Caesar decided to use the name WESTY'S to

---

[3] The APLP Partnership Agreement was amended again in 2000.  The current general partners of
APLP are The 2000 Carlos Trust and The 2000 Trust for the Grandchildren of Caesar A.
Arredondo and Carolyn Abad Arredondo (the "2000 Caesar Trust").  Carlos and Caesar are
trustees of the two trusts.

identify the self storage center that was to be built in Port Chester.  (Caesar Test., R. at 440:20-441:11)

Neither Carlos nor Caesar had any experience in the self-storage business, or any other retail business.  (*Id.*).  They also were unsure whether the novel high-end self-storage concept would be successful.  (*Id.*).  Accordingly, there was a considerable financial risk involved to APLP in moving forward with developing a high-end self-storage business.  (Caesar Test., R. at 428:12-15).

Carlos and Caesar concluded that the best choice for the initial facility would be Port Chester, New York, so they began to investigate whether any properties were available in Port Chester that would fit the needs of the project.  (Carlos Test., R. at 62:23-63:15).  They located  a site in Port Chester that they believed would work and that was owned by a man named Michael Nieto, with whom Carlos had previously done business.  (*Id.*; Caesar Test., R. at 274:8-19; P's Ex. 52).

From January through June 1989, Carlos negotiated with Mr. Nieto to acquire the Port Chester property for APLP and sketches were drawn up of what eventually became the Port Chester facility. (Carlos Test., R. at 63:7-24).  On June 29, 1989, APLP entered into an agreement to acquire Mr. Nieto's property in Port Chester for the price of $2.7 million.  (Carlos Test., R. at 65:23-66:20; P's Ex. 8).  APLP paid Mr. Nieto a good faith deposit of ten percent (10%) of the purchase price, or $270,000. (*Id.*).

On September 26, 1989, APLP applied to the Department of Building in the Village of Port Chester for a permit to build a self storage facility at 351 North Main Street in Port Chester. (P's Ex. 11). Carlos signed the application on behalf of APLP.  (*Id.*).  During the course of 1989,

- 7 -

APLP spent approximately $386,000 on various costs associated with the Port Chester facility. (P's Ex. 14).

Based on the advice of counsel, Westy's Port Chester Limited Partnership ("WPCLP") was formed on January 11, 1990 to insulate APLP from potential liability arising out of the planned self storage facility in Port Chester.  (Carlos Test., R. at 73:15-22; P's Ex. 15).  WPCLP was owned 99% by APLP, the sole limited partner.[4]  (Carlos Test., R. at 74:17-75:14; P's Ex. 17).  On January 12, 1990, WPCLP closed on the property in Port Chester.  (P's Ex. 16).  APLP, through WPCLP, paid the purchase price of $2.7 million (less the $270,000 good faith deposit) in cash at closing.  (Carlos Test., R. at 66:11-20).

On January 1, 1991, an Amended and Restated Agreement of Limited Partnership of Westy's Port Chester Limited Partnership was executed. (P's Ex. 33).  Westy's Self-Storage Campus, Inc. was replaced as the general partner of WPCLP with the 1987 Trust and Trust A, which were the general partners of APLP  (Carlos Test., R. at 89:16-20) in order to eliminate an entity – Westy's Self-Storage Campus, Inc. – that had no function. (*Id.*).  APLP remained the owner of ninety nine percent (99%) of the partnership interest in WPCLP.

Importantly, although Carlos and Caesar are the only individuals whose signatures appear on the Amended and Restated Agreement, they were careful not to sign in their individual capacities.  For example, Caesar signed the document twice:  Once on behalf of the General Partners as "Caesar A. Arredondo, <u>not individually</u> but solely as trustee…" and once on behalf of

---

[4] On March 1, 1990, an Agreement of Limited Partnership of Westy's Port Chester Limited Partnership was executed (P's Ex. 17).  The general partner of WPCLP was Westy's Self-Storage Campus Inc., a newly-created New York corporation.  (Carlos Test., R. at 76:16-77:7). APLP was the sole limited partner of WPCLP, with a 99% ownership share.  (*Id.*).  At trial, Carlos testified that Westy's Self-Storage Campus, Inc. had been formed and designated to be the general partner of WPCLP with a one percent (1%) ownership interest based on the advice of counsel.

the Limited Partners as "Caesar A. Arredondo, <u>not individually</u> but solely as trustee…" (P's Ex. 33) (emphasis added).[5]

**D.    Construction of the Facility in Port Chester and First Use of the WESTY Marks in Commerce**

Following acquisition of the land in Port Chester in January 1990, construction began on the facility[6] almost immediately.  Although Carlos and Caesar, through A&Co., provided management services to APLP during the construction phase of the building, the building permit was issued to APLP. (P's Ex. 19).  WPCLP, owned 99% by APLP, entered into the construction contract (P's Ex. 21).  APLP through WPCLP paid the cost of the construction in cash.  (Carlos Test., R. at 79:5-8).

As is customary when a new business is launched, advertising and promotional efforts for the Port Chester facility began before it opened.  On March 6, 1990, A&Co. requested permission from the building inspector of the Village of Port Chester to install a temporary sign at the Port Chester facility.  (P's Ex. 18).  Permission was granted, and in the fall of 1990, a ten foot by ten foot sign displaying the WESTY Marks and Logo made out of precast concrete similar to the concrete that was used in the construction of the facility was placed at the construction site.  (Carlos Test., R. at 76:1-15).  The sign was visible to the public and was intended to inform the public of the upcoming opening of the Westy's Port Chester self-storage facility.  Carlos testified that about 9000 cars per day drove by the construction site.  (*Id.*). (Caesar Test., R. at 253:6-25; 254:1-2).

---

[5] There were numerous other documents admitted into evidence and substantial testimony from Caesar showing that Carlos and Caesar were not acting in their individual capacities in connection with the activities associated with the development of the WESTY's center in Port Chester.  (*See*, e.g., D's Exs. 142 and 143; Caesar Test. R. at 308:16-25; 309:1-25; 310:0-25; 311:1-25; 312:1-25; 313:1-4).

[6] The Court uses the terms "facility," "center" and "store" interchangeably to describe the physical structure and surrounding area of a WESTY's self storage business.

In August of 1990, steps were taken to place ads in the local Yellow Pages to advertise the Westy's Port Chester facility.  (Carlos Test., R. at 81:23-83:11; P's Ex. 24, 25).  In addition, a flyer, or brochure, was prepared and distributed prior to the opening of the facility.  (Caesar Test. R. at 255:2-20).  On February 11, 1991, Beverly Symonds, an assistant to Caesar and Carlos, prepared a memorandum indicating that a potential customer had called the Westy's telephone number inquiring about self-storage services.  (Carlos Test., R. at 90:7-10; P's Ex. 34).

In addition to the cost of the land and construction, all of the start-up expenses for the Westy's Port Chester facility were paid by APLP, and APLP bore all of the risk of loss associated with the Westy's Port Chester facility.  (Carlos Test., R. at 84:17-85:2).  By the end of 1990, APLP had paid approximately $7.5 million in cash for the construction of the Westy's Port Chester facility.  (Carlos Test., R. at 88:20-23; P's Ex. 32, p.6).  The evidence in the case showed that APLP paid <u>all</u> costs associated with the building of the facility.  (Carlos Test., R. at 87:2-89:10; P's Ex. 30-32).  Although Carlos had initially arranged for financing that would be guaranteed by Carlos and Caesar to fund the construction of the facility, no permanent financing was arranged prior to completion of construction and APLP paid approximately $11 million in cash for the purchase of the land and the construction of the facility. (Carlos Test., R. at 118:1-120:21).  APLP also paid for the advertising that took place before the center opened and all of the operational expenses, including management fees to companies controlled by Carlos and Caesar.  (Caesar Test. R. at 252:5-7; 254:12-13; 255:20-21).  APLP was not, as Defendants contend, merely a passive investment vehicle.  It submitted building permits, it entered into construction contracts, it paid for advertising and promotional activities, and it used the WESTY Marks.

Defendants argued that Carlos and Caesar were at substantial financial risk with respect to the plans to open a high-end storage facility; however, the evidence showed that Carlos and Caesar never had any of their own money at risk in connection with the venture.  (Carlos Test. R. at 690:21-695:2).  In fact, over time Carlos and Caesar were paid millions of dollars to provide management services to the WESTY'S center in Port Chester.  (Caesar Test., R. at 498:24-499:16)

E.  **Formation of Westy's Connecticut, Inc. and Westy's New York, Inc.**

A&Co. provided general management and administrative services for APLP during the construction phase of the Westy's facility in Port Chester.  (*See, e.g.,* Caesar Test., R. at 320:17-21; P's Exs. 18 and 31).  In early 1991, however, Carlos and Caesar decided that they wanted to establish a new company to provide management services to APLP once the WESTY'S Port Chester facility was open for business.  (Carlos Test., R. at 90:25-91:25).  Because of a tax issue that Carlos had previously with the State of New York, Carlos and Caesar decided to create two new Connecticut corporations, one to handle management of Westy's facilities that would be built in New York, including Port Chester, and one to manage any facilities that might be built in Connecticut.  (*Id.*).

Carlos and Caesar engaged the services of an attorney, Alan Shaver, to set up the two new corporations.  (*Id.*).  Carlos and Caesar met with Mr. Shaver in February 1991, and instructed Mr. Shaver to form two Connecticut corporations:  Westy's New York, Inc. ("WNY I"), and Westy's Connecticut, Inc. ("WCI I").  (*Id.*).  Carlos and Caesar planned for WNY I to provide management services to the Port Chester facility, and for WCI I to provide management services to any facilities that might be opened in Connecticut.  (*Id.*).  At the time, Carlos and Caesar did not know whether or not the idea for a high end self storage business would work,

and whether or not any additional facilities would be built in Connecticut, but if they were, they intended for WCI I to provide management services to them. (Carlos Test., R. at 91:11-15).

**F.      The Original Registrations of the WESTY Marks.**

During the meeting with Mr. Shaver discussed above, Carlos and Caesar also had conversations with Mr. Shaver with respect to registering the WESTY name and logo.[7]  (Carlos Test., R. at 92:6-9).  Prior to this time, neither Carlos nor Caesar had any experience in the adoption or protection of service marks or trademarks.  (Carlos Test., R. at 92:22-24)  Carlos testified at trial that it was his recollection that Caesar informed Carlos that they could place ownership of the WESTY Marks in any entity in which they wished. (Carlos Test., R. at 92:10-16).  Caesar testified that he believed he and Carlos owned the WESTY Marks and could "place" ownership of the WESTY Marks in any entity that they wanted.  (Caesar Test., R. at 287:24-288:11; 545:17-23; 548:16-549:8).  Carlos or Caesar instructed Mr. Shaver to file applications to register the WESTY Marks with the United States Patent and Trademark Office ("USPTO") in the name of WCI I.  (Caesar Test., R. at 315:5-11).

Mr. Shaver apparently suggested to Carlos and Caesar that he should perform a search to confirm that the WESTY Marks were available for use and adoption, and Mr. Shaver did so.  On February 21, 1991, Mr. Shaver sent a memorandum to Carlos indicating, among other things, that the WESTY Marks were available for use and registration, and that Mr. Shaver's firm was prepared to prepare and prosecute applications to register the WESTY Marks in the USPTO (P's Ex. 37).

Mr. Shaver did not, however, conduct any independent investigation of his own as to whether or not WCI I was the proper company to file the application to register the WESTY

---

[7] In addition to the WESTY word mark, APLP also used a logo comprised of a West Highland terrier standing on a box (the "WESTY Logo").

Marks.  (Carlos Test., R. at 94:21-95:18).  He did not have any conversations with or ask any questions of either Carlos or Caesar with respect to facts that would have been important to determine the proper applicant: what company paid for the land and construction of the building, what company owned the land and building; what advertising had been done in connection with the planned opening of the facility, whether WCI I had any employees, or, perhaps the most important question, what was the relationship between WCI I and APLP, the owner of the land and the building.  (*Id.*).  In other words, Mr. Shaver accepted without any investigation that WCI I was the proper applicant.

On February 22, 1991, Mr. Shaver transmitted to Carlos's attention two draft applications to be filed in the USPTO.  (Carlos Test., R. at 95:19-96:17; P's Ex. 38).  One was for the word mark WESTY'S, and one was for the WESTY'S Logo.  (*Id.*).  Mr. Shaver noted that "in both applications the owner (Westy's Connecticut, Inc., a Connecticut corporation) the class (int'l cl 39) and the description of the services are identical." (P's Ex. 38).  In the transmittal coversheet, Mr. Shaver also confirmed the details for the incorporation of WNY I and WCI I.  (*Id.*).

Importantly, both draft applications indicated that the marks covered by the applications had been used in commerce "at least as early as January 1, 1991." (*Id.*).  Caesar testified at trial that he believed that statement was correct.  (Caesar Test., R. at 248:20-25).  Moreover, the evidence produced at trial showed that the WESTY Marks had been used in pre-opening advertising prior to January 1, 1991, both in the form of the sign that had been erected outside the construction site and in fliers that had been distributed to the public.  (Caesar Test., R. at 249:21-255:21).

Other evidence admitted at trial, including documents prepared at the direction of Caesar, support the conclusion that the date of first use of the WESTY Marks in commerce was at least

as early as January 1, 1991.  For example, a document that was created after the lawsuit was filed

at the direction of Caesar that purported to set out the chronology of events indicates a first use

of the WESTY'S trademark as of January 1, 1991.  (P's Ex 97)  Similarly, in 2002 A&Co. filed

applications to register the WESTY Marks because, as discussed more fully below, the original

registrations for the marks were cancelled.  (Caesar Test. R. at 260:1-25; 261:1-25; 262:1-25).

These applications all claimed a date of first use of January 1, 1991.  Based on the foregoing

evidence, the Court finds that the WESTY Marks were in use in commerce at least as early as

January 1, 1991.[8]

On March 8, 1991, Carlos and Caesar formed WNY I and WCI I as Connecticut

corporations.  (Carlos Test., R. at 90:25-91:25).  WNY I was formed to provide management

services to the Port Chester facility, and WCI I was formed to provide management services to

any Westy's stores that might be built in Connecticut in the future.  (*Id.*; P's Ex. 44).  The

evidence was undisputed at trial that WCI I was not intended to have, and did not have, anything

to do with the WESTY'S facility in Port Chester.  (Carlos Test., R. at 91:7-16; 103:2-8; Caesar

Test., R. at 520:21-25).

On March 11, 1991, Mr. Shaver filed an application to register the mark WESTY'S on

behalf of WCI I.  (P's Ex. 47).  The application recites a date of first use of the mark in

commerce of January 1, 1991, and was signed by Caesar.  (Carlos Test., R. at 101:14-19; P's Ex.

47).  On the same date, as evidenced by the registration which later issued, Mr. Shaver filed an

application to register the WESTY'S Logo.  (P's Ex. 52).  This application also indicated a date

---

[8] This finding is not necessary for the Court to rule in favor of Plaintiff.  As set out in the Court's
Conclusions of Law below, the Court finds that APLP owns the marks because it was the first
entity to use the WESTY Marks in commerce, regardless of whether the date of first use is May
2, 1991, as asserted by Defendants, or at least as early as January 1, 1991, as asserted by
Plaintiff.

of first use of January 1, 1991.  (*Id.*).  The two applications are hereinafter referred to as the "Original Applications."

On February 18, 1992, the USPTO issued Reg. No. 1,676,139 for the service mark WESTY'S in the name of WCI I.  (P's Ex. 51).  The registration certificate recites a date of first use in commerce of January 1, 1991.  (*Id.*).  On March 3, 1992, the USPTO issued certificate of Reg. No. 1,677,899 for the WESTY'S logo, also in the name of WCI I.  (P's Ex. 52).  This registration certificate also recites the date of first in commerce of January 1, 1991.  (*Id.*).  The two registrations are referred to herein as the "Original Registrations."  The Original Registrations for the WESTY Mark and WESTY'S Logo were cancelled in 1998 for failure to file the necessary statements of use.  (Caesar Test., R. at 259:15-25; 260:1-20).

## G.   Dissolution of WCI I and WNY I

Although the Westy's Port Chester store was located in New York, Carlos and Caesar thought that APLP might open stores in Connecticut in the future if the concept was successful. As of April of 1992, APLP had not yet opened any stores in Connecticut, and Carlos and Caesar no longer envisioned that it would do so.  (Carlos Test., R. at 106:1-18).  WCI I was therefore not serving any purpose.  (*Id.*).  Accordingly, Carlos and Caesar voluntarily dissolved WCI I on April 22, 1992.  (*Id.*; P's Ex. 53). Carlos and Caesar, as the sole shareholders, directors and officers of WCI I, submitted a Certificate of Dissolution By Directors and Shareholders with the Connecticut Secretary of State's Office (P's Ex. 53).  At the time of its dissolution, and throughout its existence, WCI I had never had any employees, income, expenditures, or business operations of any kind – it was simply an inactive company that did not conduct any business. (P's Ex. 54).

**H.**  **The Tuckahoe WESTY'S and the Growth of the WESTY'S Business**

The second WESTY'S self-storage center opened in November 1996 in Tuckahoe, NY and was, like the Port Chester facility, owned by APLP.  (Carlos Test., R. at 113:8-18; P's Ex. 100).  The financing and development of the Tuckahoe store followed the same business model as the Port Chester store.  (*Id.*).  APLP provided all of the seed capital for the site selection and purchase, building design and construction, and initial advertising and operational expenditures.  (*Id.*).  APLP retained WNY I, and thereafter WNY II, to manage the store.  (Carlos Test., R. at 113:19-24).

During the remainder of the 1990's, five additional WESTY'S self-storage facilities were built:  Norwalk, Connecticut; Elmsford, New York; Danbury, Connecticut; Milford, Connecticut; and Stamford, Connecticut.  (Carlos Test., R. at 113:25-114:12; P's Ex. 100).  The WESTY'S facilities in Elmsford and Danbury were owned by APLP, and the WESTY'S locations in Norwalk, Milford, and Stamford were owned by Carlos and Caesar through LLCs jointly and equally owned by them.  (*Id.*).

The current WESTY stores, their locations, approximate dates of opening, and owners are set forth in Appendix A to this Opinion.  As shown in Appendix A, from 1991 to September, 1997, when the third WESTY'S facility owned by Carlos and Caesar was opened, the only entity that owned and operated any WESTY'S self-storage centers was APLP.

**I.**  **The Incorporation of Westy Connecticut, Inc. in 1996**

On July 26, 1996, a Certificate of Incorporation was prepared and filed with the Connecticut Secretary of State in the name of Westy's Connecticut, Inc. ("WCI II").  (P's Ex. 59).  Neither Carlos nor Caesar could testify as to why WCI II was formed.  The name of the

corporation was later changed to Westy Connecticut, Inc.  (Carlos Test., R. at 394:18-395:6; D's Ex. 263, 264).

**J.**      **The Change from WESTY'S to WESTY**

In 1997, APLP elected to change the principal mark of the business from WESTY'S to WESTY to reduce the length of the mark because of new restrictions being passed by communities on the size of signage.  (Carlos Test., R. at 205:16-19; Caesar Test., R. at 565:24-566:6).  APLP also began using a different logo that consisted of only the drawing of the head of a West Highland White Terrier as depicted below:



(P's Ex. 96).

**K.**      **The Carlos and Caesar 2000 Agreement**

In December 1999, Carlos and Caesar decided to separate most of their business interests, including A&Co., WCI II and WNY II. [9]  On December 13, 1999, Carlos agreed to sell his interests in A&Co., WCI II and  WNY II to Caesar.  (Carlos Test., R. at 178:15-25).  Carlos instructed an attorney named Jeff Stephens to prepare an agreement reflecting his deal with Caesar, and provided Mr. Stephens with the material terms. (Carlos Test., R. at 154:4-24; Caesar Test., R. at 338:19-340:4).

---

[9] The Defendants devoted much of their efforts during trial on Carlos' motives for leaving A&Co. and the associated real estate businesses he had with Caesar.  The Court allowed the evidence to be introduced but finds for the reasons set out in this opinion that it has no probative value in resolving the critical issue in this case: ownership of the WESTY Marks.

Carlos then left the country.  (Carlos Test., R. at 180:8-18).  While he was gone, Caesar

arranged to have the Original Registrations (which, unbeknownst to Caesar, had already been

cancelled) assigned from WCI II to A&Co.  (Carlos Test., R. at 154:4-24).  Mr. Stephens drafted

an assignment, which contained numerous errors.[10] (Caesar Test., R. at 266:14-269:11; P's Ex.

91).  When Carlos returned on January 1, 2000, Stephens provided him with an agreement that

was to be effective January 1, 2000 (the "Carlos and Caesar 2000 Agreement"). (Carlos Test., R.

at 154:4-24; D's Ex. 337).  Carlos noticed that the Carlos and Caesar 2000 Agreement contained

a reference to trademarks, and asked Mr. Stephens why it was included.  (*Id.*).  Mr. Stephens told

Carlos that Caesar had arranged for the WESTY Marks to be assigned to A&Co. while Carlos

was gone.  (*Id.*).

APLP was not a party to the Carlos and Caesar 2000 Agreement.  (D's Ex. 337).[11]  Carlos

was acting solely in his individual capacity and was not acting in his capacity as Trustee of the

general partner of APLP with respect to the Carlos and Caesar 2000 Agreement.  There is no

evidence to suggest or support a finding that Carlos or Caesar intended by signing the Carlos and

Caesar 2000 Agreement to release any claims Carlos might bring in his capacity as trustee of one

of the general partners of APLP.

L.      **Plaintiff's Decision to Bring This Case**

In September, 2002, Carlos had a conversation with his daughter Fabiola Arredondo, who

was in the process of setting up a new business and selecting a new service mark for that

---

[10] For example, the WESTY Mark was not listed in the assignment even though it was the
principal mark used by the business.  (Caesar Test. R. at 269:1-7)  Mr. Stephens also prepared a
Bill of Sale to reflect that consideration had been paid, which was not consistent with the
assignment. (Caesar Test., R. at 272:1-19; P's Ex. 92).

[11] Mr. Stephens, who was counsel for both A&Co. and APLP at the time, testified at trial that the
Carlos and Caesar 2000 Agreement had nothing to do with APLP.  (Stephens Test. R. at 678:17-
25; 679:1-10).

business.  (Carlos Test. R. at 121:5-21).  Fabiola told him that during the course of setting up her new business she had learned of the doctrine of first use, which she understood to mean that the party that first used a trademark or service mark in commerce owned the mark.  (*Id.*).  She told her father she assumed that under the doctrine of first use, APLP was the proper owner of the WESTY Marks and encouraged her father to contact the law firm with which she was dealing in order to gain a better understanding of the legal doctrine.  (*Id.*).  Carlos contacted the firm and upon being informed of the doctrine of first use, concluded that APLP was, in fact, the proper owner of the WESTY Marks.  (*Id.*).  He concluded that he had a duty, as trustee of the general partner of APLP, to correct the mistake he and Caesar had made in 1991 and had perpetuated throughout the years. (*Id.*).

On October 30, 2002, Plaintiff, in his capacity as Trustee of the Carlos 2000 Trust, wrote a letter to Caesar in his capacity as Trustee of the Caesar 2000 Trust, in which Plaintiff advised Caesar that APLP, as the first user of the mark, was the owner of the marks and that the New Applications (defined below) should be withdrawn.  (P. Ex. 69)  In that letter, Plaintiff set out a proposal pursuant to which APLP, as the owner of the WESTY Marks would:  (1) grant the present and future limited partners of APLP a royalty-free license to use the WESTY Marks to build and operate WESTY'S self-storage centers; and (2) grant Carlos and Caesar, as the owners of the facilities in Norwalk, Milford and Stamford, a royalty-free license to use the WESTY Marks on those centers.  Caesar rejected that offer, and insisted that A&Co. was the owner of the rights in the WESTY Marks.

On December 12, 2002, Plaintiff filed this action in his capacity as trustee of the trust that is one of the general partners of APLP, pursuant to the Declaratory Judgment Act, seeking a declaration that APLP owns the WESTY Marks. (Dkt. 1, Compl.).  Carlos has personally paid all

- 19 -

legal fees and expenses incurred as Plaintiff in this litigation.  (Carlos Test., R. at 123:22-124:5;

P's Ex. 70).  Carlos therefore seeks reimbursement of these fees pursuant to both the APLP

partnership agreement and Connecticut law.

**M.    The New Applications to Register the WESTY Marks**

On September 3, 2002, A&Co. filed applications in its name with the USPTO for the

marks WESTY, WESTY'S, and the Terrier Head design (the "New Applications").  (Caesar

Test., R. at 260:12-20; P's Exs. 94, 95).  The USPTO published the New Applications for

opposition in 2003.  (P's Exs. 71, 72, 73).  In his capacity as Trustee of the 2000 Carlos Trust,

Carlos timely filed oppositions to the applications on April 16, 2003 with the Trademark Trial

and Appeal Board ("TTAB") of the USPTO.  (*Id.*).  The TTAB consolidated all three oppositions

and, on September 22, 2003, suspended the proceedings pending the resolution of this action.[12]

### III.    CONCLUSIONS OF LAW

**A.    Relevant Background Law on Service Mark Creation, Ownership and Use**

It is a bedrock principle of American trademark jurisprudence that rights in a service

mark are acquired in the United States only through use of a mark "in commerce" to identify

goods or services sold under the mark, not by creation or invention of a mark or registration of a

mark with the USPTO.  *See Berni v. Int'l Gourmet Rests. of Am., Inc.*, 838 F.2d 642, 646 (2d Cir.

1988) ("The extent of any trademark right is defined by its actual use in the marketplace");

*Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 249 F.3d 564, 572 (6th Cir. 2001)

("Federal registration of a trademark or service mark cannot create rights and priority over others

who have previously used the mark in commerce . . . ").  The owner of a mark is the party that

---

[12] *See Arredondo v. Arredondo & Co.,* Opp. No. 91-156,040 (TTAB Sept. 22, 2003) (granting
Motion for Consolidation and Suspension of Opposition Nos. 91-156,040, 91-156,192 and 91-
157,195).

first uses the mark in commerce to identify a product or service.  *See, e.g., Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 412 (1916); 15 U.S.C. § 1127.  As stated by the court in *Sengoku Works Ltd. v. RMC International, Ltd.*:

> It is axiomatic in trademark law that the standard test of ownership is priority of use.  To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services.

*Sengoku Works Ltd. v. RMC International, Ltd.,*96 F.3d 1217, 1219 (9th Cir. 1996) (citing J. Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair Competition* § 16.03 (3d ed. 1996)).

Indeed, in one of the key cases relied upon by Defendants, *Rick v. Buchansky,* 609 F. Supp. 1522 (S.D.N.Y 1985), the Court said:

> It goes without saying that rights in a trademark or service mark are acquired through appropriation and use of the mark in commerce.  Thus, the mere conception of a mark, without its subsequent use in commerce, would be insufficient to confer rights on the conceiver of the mark under federal trademark law.

609 F. Supp. at 1531.  The Federal Circuit has held accordingly:

> For service marks, the 'use in commerce' requirement is met when (1) a mark is 'used or displayed in the sale or advertising of services' and (2) either (i) the services are 'rendered in commerce' or (ii) the services are 'rendered in more than one State or in the United States and a foreign country and the person rendering those services is engaged in commerce in connection with the services.'

*Aycock Eng'g, Inc. v. Airflite, Inc.*, 560 F.3d 1350, 1357 (Fed. Cir. 2009).

Federal courts have recognized that service mark rights may begin to accrue when the mark is used in pre-launch advertising or promotions.  *See, e.g., Chance v. Pac-Tel Teletrac Inc.,* 242 F.3d 1151, 1157-60 (9th Cir. 2001); *Md. Stadium Auth. v. Becker*, 806 F. Supp. 1236, 1239-40 (D. Md. 1992), *aff'd*, 36 F.3d 1093 (4th Cir. 1994); *Marvel Comics Ltd. v. Defiant*, 837 F.

- 21 -

Supp. 546, 548 (S.D.N.Y. 1993) (pre-sales announcement of new comic book series held

sufficient to withstand motion to dismiss).[13]

It is also important in this case to recognize that the function and purpose of a service

mark is to identify the source of services to the public.  As the Supreme Court has noted,

trademarks are symbols that serve in the minds of the consuming public to identify the "source"

and goodwill of a product or service.  *See, e.g., Mishawanka Rubber & Woolen Mfg. Co. v. S.S.*

*Kresge Co.,* 316 U.S. 203, 205 (1942) ("[Use of a mark is] to convey through the mark, in the

minds of potential customers, the desirability of the commodity upon which it appears.  Once

this is attained, the trade-mark owner has something of value.").  The Lanham Act defines a

service mark as "a mark used in the sale or advertising of services to identify and distinguish the

services of one person, including a unique service, from the services of others and to indicate the

source of the services, even if that source is unknown." *See* Lanham Act, 15 U.S.C. § 1127.

Once service mark rights are established, the goodwill of the business and the service

mark that symbolizes that goodwill become inseparable.  *McLean v. Fleming,* 96 U.S. 245

(1877); *Coca-Cola Bottling Co. v. Coca-Cola Co.,* 269 F. 796 (D. Del. 1920) ("a [service mark]

is merely one of the visible mediums by which the good will is identified, bought and sold, and

known to the public.")  Thus, a mark cannot be assigned without also assigning the goodwill of

---

[13] In *Buti v. Impressa Perosa, S.R.L.*, 139 F.3d 98, 105 (2d Cir. 1998), the Second Circuit held that "the mere advertising or promotion of a mark in the United States is insufficient to constitute 'use' of the mark 'in commerce,' within the meaning of the Lanham Act, where that advertising or promotion is unaccompanied by any actual rendering in the United States … of the services 'in connection with which the mark is employed.'"  In that case, the plaintiff owned several "Fashion Cafe" restaurants in Italy.  The plaintiff planned to open restaurants in the United States and engaged in advertising in the United States to promote these planned restaurants.  However, the plaintiff never actually opened any restaurants in the United States.  The facts of *Buti* are therefore distinguishable from the facts of this case.  *See Morningside Group Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 138 (2d Cir. 1999) (distinguishing *Buti* on the grounds that the *Buti* plaintiff never opened any restaurants in the U.S.).

the business associated with the mark.  Any attempt to assign a mark without also assigning the goodwill symbolized by the mark is invalid and results in a forfeiture of rights in the mark.  *See, e.g., Berni*, 838 F.2d at 646; *Defiance Button Mach. Co. v. C&C Metal Prods. Corp.*, 759 F.2d 1053, 1060 (2d Cir. 1985); 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §18:2 (4th ed. 1994) ("Good will and its trademark symbol are as inseparable as Siamese Twins who cannot be separated without death to both.").

**B.**      **APLP First Used the WESTY Marks in Commerce and Is Therefore The Owner of Those Marks**

Defendants contend that the "first use doctrine" should not apply here because that doctrine only applies in cases where the dispute is between unrelated companies, and the companies here are related.  The Court rejects Defendants' contention that the first use doctrine does not apply in this case.  It is black letter trademark law that "use in commerce" is the *sina qua non* of trademark ownership in the United States, and courts often apply the concept of "first use in commerce" in order to determine ownership of a mark even among parties that are related.  Indeed, Defendants' contention that the first use doctrine does not apply here because the parties are "related" is disingenuous at best in light of their own reliance on *Rick*, *supra*, in which the court stated:  "The critical issue for purposes of determining ownership of the mark, however, is whether plaintiff–or some other person or persons – first appropriated and used the mark in commerce."  603 F. Supp. at 1531 (emphasis added).  Accordingly, as stated above, the first use doctrine is not only applicable here, it is dispositive.

In this case, there is no dispute that the WESTY Marks have been "used in commerce."  Instead, the dispute is over which person or entity acquired the common law rights in the marks when those rights arose from use of the WESTY Marks in commerce.

The following summarizes the Court's relevant factual findings regarding the first use of the WESTY Marks in commerce:

     (1)    the WESTY Marks were first used to identify self-storage services in connection with the Port Chester facility;

     (2)    APLP owned the WESTY'S facility in Port Chester:  APLP, either directly or indirectly, paid for the land on which the Port Chester facility was built, paid for the construction of the facility, paid for all of the capital improvements for the facility, and paid all expenses associated with the operation of the facility including salaries, rents and management services fees and was entitled to the profits (and bore the risk of losses) from operation of the facility;

     (3)    APLP bore all of the financial risk in association with the project;

     (4)    Neither Carlos nor Caesar, nor any entity controlled by Carlos and Caesar, had any ownership interest in APLP or the WESTY'S facility in Port Chester;

     (5)    Carlos and Caesar never acted in their individual capacities in connection with the creation and development of the WESTY'S business:  they acted in a fiduciary capacity as the trustees of the general partners of APLP, an entity in which they had no ownership interest, and they acted as the owners, directors and officers of various companies they owned jointly, including A&Co., WCI I and WCI II;

     (6)    APLP owned the WESTY'S self-storage facility in Tuckahoe;

     (7)    From 1991-1997, the services that were offered to the public under the WESTY Mark were offered through facilities owned exclusively by APLP; and

     (8)    WCI I was an inactive corporation that had no connection to the WESTY'S facility in Port Chester and did not control the use of the WESTY Marks.

Based on these factual findings, APLP was the first entity to offer services to the public under the WESTY Marks, first used the WESTY Marks in commerce, and is, under well established principles of trademark law, the owner of the common law rights in and to the WESTY Marks.

There is no evidence that APLP has at any time assigned its ownership of the WESTY

Marks to any third party.  Accordingly, APLP was the original owner of the WESTY Marks and

remains the owner of the marks today.  Any purported assignment of rights from WCI II to

Arredondo & Co. in 1999 was *void ab initio* because WCI II had no rights to assign.

## C.    **Defendants' Theories**

The Defendants have advanced various theories throughout this case regarding ownership

of the WESTY Marks, and their current theory is ambiguous at best.  However, Defendants

appear to trace ownership of the marks as follows:  (1) Carlos and Caesar had the legal right and

authority to "place" original ownership of the WESTY Marks in WCI I in 1991, [14] (2) WCI II

became the owner of the WESTY Marks when it was formed in 1996 because formation of WCI

II somehow represented a "reinstatement" of WCI I, despite the fact that they were plainly two

different corporations formed at different times.  (*See* Caesar Test., R. at 532:16-25; 533:1-10;

*see, also,* Testimony of Jeffrey Stephens ("Stephens Test."). R. at 666:9-14), and (3) WCI II

assigned the WESTY Marks to A&Co. in 1999.  During oral argument on Plaintiff's Motion in

Limine, Defendants' counsel articulated three theories pursuant to which Defendants contend

Carlos and Caesar owned the WESTY Marks personally and had the legal right and authority to

"place ownership" of (i.e., assign) the WESTY Marks in WCI I.  These three theories were

described by counsel in argument as: (i) the leading lights theory; (ii) the related company

theory; and (iii) the control theory.  (R. at 17-22).  All three theories are supported by the same

basic set of alleged facts asserted by the Defendants:

---

[14] Throughout this case, Defendants have gone to great lengths to avoid characterizing the
alleged transaction in which Carlos and Caesar supposedly "placed" ownership of the WESTY
Marks in WCI I as an "assignment," which is the correct term for the transfer of ownership rights
in a service mark.

(1) Caesar and Carlos solely decided to enter the self-storage business and created the WESTY Marks; (2) Caesar and Carlos solely designed the WESTY centers and solely developed the real property for the WESTY centers; (3) Caesar and Carlos solely managed the WESTY centers, completely controlling and dictating the quality of the services offered under the WESTY marks by developing the WESTY business model, training the WESTY employees, and managing all aspects of the WESTY business through management agreements; (4) Caesar and Carlos created the idea of APLP as a passive investment vehicle to generate income for their children and future generations of Arredondos; (5) Caesar and Carlos formed and initially funded APLP, and all of the members of APLP during relevant times were children of Caesar or Carlos; (6) Caesar and Carlos were the sole trustees of the general partners of APLP and solely controlled APLP when they launched the WESTY business in May 1991; and, (7) none of the members of APLP (i.e., Caesar and Carlos's children) knew anything about APLP before the first WESTY center opened in May 1991.

(Dkt. 112, Defs.' Resp. in Opp. to Pl.'s Mot. Limine, p.4)

Caesar asks the Court to ignore the partnership structure of APLP in order to rule that he and Carlos personally owned the common law rights in the WESTY Marks when they were first used in commerce, even though APLP paid all of the money for the use of the marks and the creation of the goodwill associated with those marks. [15]  Caesar admitted at trial that when he and Carlos spent APLP's money, they were acting in their fiduciary capacity and were not acting as just two guys in a room.  (Caesar Test., R. at 551:14-552:2).  Caesar (and Carlos) did nothing more than provide services for which they were paid.  As Caesar admitted, they were vendors of services to APLP.  (Caesar Test., R. at 524:2-6).  The Court concludes that Carlos and Caesar were not acting in their individual capacities as just "two guys in a room" when the WESTY Marks were first used in Port Chester.  Instead, they were acting in their capacity as trustees of the general partners of APLP, with a fiduciary duty to the limited partners to act in their best

---

[15] While Defendants have made much of the fact that Carlos and Caesar made all of the business decisions for APLP and that the limited partners were, in some cases, not even aware of APLP's existence, that fact is not relevant here.  General partners typically manage the affairs of a limited partnership the same way that CEO's manage corporations, but do so in a fiduciary capacity for the benefit of the limited partners. *See* Conn. Gen. Stat. Ann. § 34-388.

interests.  To the extent they were not acting as the general partners, they were acting as directors and officers of the companies that provided management services to APLP for a fee.  *See, e.g., Smith v. Tobacco By-Products & Chem. Corp.*, 243 F.2d 188, 191 (C.C.P.A. 1957) (holding that the executives and shareholders of a business do not own the marks that the business uses).

In effect, Caesar asks this Court to ignore the fact that APLP incurred all of the financial burden and risk to build the goodwill of the WESTY'S business in Port Chester, which is represented and symbolized by the WESTY Marks, while Caesar incurred no financial burden or risk, and find that Caesar, personally, owned the service marks that symbolize the goodwill of the business.  The Court concludes this would be inconsistent with the evidence in the case and inconsistent with Caesar's fiduciary duties to APLP.

With these factual findings and legal conclusions as background, the Court examines each of Defendants' theories below.

### 1.      The Leading Lights Theory

Defendants contend that Carlos and Caesar were the "leading lights" of a group of related companies and as the leading lights had the right to place ownership of the WESTY Mark in any entity they wished.  Defendants contend that the evidence shows that Carlos and Caesar intended to place ownership of the WESTY Mark in WCI I.  Thus, Defendants contend the application filed in WCI I's name was appropriate because Carlos and Caesar had the right to place ownership in WCI I and WCI was, as of the date of the filing of the application, the owner of the WESTY Marks.

In support of this leading lights theory, Defendants rely on a single decision of the Trademark Trial and Appeal Board, a unit of the Trademark Office ("TTAB"): *Airport Canteen*

*Services, Inc. v. Farmer's Daughter, Inc.,* 184 U.S.P.Q. (BNA) 622 (T.T.A.B. 1974).[16]  That

cancellation action before the TTAB involved two different parties who operated restaurants in

different geographical areas under the same mark, FARMER'S DAUGHTER.  The petitioner,

which had used the FARMER'S DAUGHTER mark since 1964, sought to cancel the

respondent's trademark registration of FARMER'S DAUGHTER for restaurant services.  The

grounds for cancellation included the allegation that respondent committed fraud when it applied

to register a mark used by one family business but listed a second family business as the

applicant and owner of the mark.  The TTAB rejected the petitioner's argument.  Finding that

applicant's founder had been the "leading light" of businesses that he owned and controlled, the

TTAB ruled that any use of the disputed mark by any of the companies that he owned and

controlled was for his benefit.  Specifically, the TTAB stated:

> It is clear from the record that Mr. Guagenti has been the leading light or owner of
> what can be considered to be family enterprises or, if you will, corporate sales,
> and that, for purpose of convenience, he, at the advice of counsel or accountant,
> transferred ownership of his various interests to <u>one or another of his corporations</u>
> without disturbing, and that is the important fact, the continuance of operation of
> his different activities including that of the "FARMER'S DAUGHTER"
> restaurant.  It is apparent that there was not nor is there any claim of adverse
> rights in the mark "FARMER'S DAUGHTER" by any corporation within Mr.
> Guagenti's organization and that, in essence, any use of the mark by any of the
> corporations was for the benefit of and inured to the benefit of Mr. Guagenti.
> (emphasis added)

184 U.S.P.Q. at 627.

Therefore, in order for the *Airport Canteen Services* case to apply, Defendants must show

that APLP was part of a group of companies controlled, both in fact and in law, by Carlos and

---

[16] Although Defendants characterize the holding in *Airport Canteen* as the "leading lights
theory," it can hardly be considered an established principle of trademark law like the first use
doctrine.  It has been mentioned in only a single case decided by the TTAB, not by any federal
court, and its characterization of the holding from that proceeding as a "theory" in trademark law
is pure hyperbole.

Caesar.  The evidence shows, however, that Carlos and Caesar did not have any ownership interest in APLP.  Although it is true that Carlos and Caesar managed the affairs of APLP on a day-to-day basis as trustees of the general partners, they did so in a fiduciary capacity, the same as a board of directors or the executive officers of a company manage the affairs of those business.  Unlike Mr. Guagenti in the *Airport Canteen* case, who <u>owned</u> all of the family enterprises, Carlos and Caesar did not own any part of APLP.  Therefore the *Airport Canteen* case is inapplicable to the facts of this case.

2.    **The Related Company Theory**

Defendants next contend that the related company doctrine is applicable here.  Under the related company theory, Defendants contend that someone other than APLP can be the owner of the WESTY Mark even if that person was not the first user if two conditions are met: (1) the first user is a related company; and (2) the person asserting ownership of the mark controls the use of the mark by the related company.  Defendants next contend that "APLP and Carlos and Caesar and their companies are clearly related[,]" and further, "Caesar and Carlos clearly controlled the use of the mark by APLP . . . ."

Defendants are wrong on both counts.  First, APLP is not a "related company" *vis a vis* Carlos and Caesar in fact or in law.  Carlos and Caesar had no ownership interest in APLP and their sole relationship to APLP was that of fiduciaries.  Carlos and Caesar had no financial interest in the Port Chester facility except to provide management services for which they were paid.  As Caesar admitted during trial, Carlos and Caesar, whether the services were rendered by them individually or through companies controlled by them, were merely vendors to APLP.

Carlos and Caesar had no ownership interest in APLP and did not control the partnership legally or factually.  Because Defendants contend that WCI I was the owner of the WESTY

Marks, Defendants must attempt to fill a gap in their theory by contending the evidence establishes an "implied license" from WCI I to APLP.[17]  However, the evidence was undisputed that WCI I never did anything – it had no employees, no revenues, no operations, never conducted any business, and was voluntarily dissolved by Carlos and Caesar in April of 1992, an act wholly inconsistent with Defendants' implied license theory.  Therefore, WCI I did not exercise control of the use of any of the WESTY Marks during the time it was in existence and could not have exercised control of the use after it was dissolved by virtue of an "implied license" or otherwise.  The Court concludes that the related company doctrine does not apply here.

3.      The Control Theory

Lastly, the Defendants argue that ownership of the WESTY Mark is controlled by a line of cases involving musical groups including *Bell v. Streetwide Records, Ltd*, 640 F. Supp. 575 (D. Mass. 1986), *Rick v. Buchansky,* 609 F. Supp. 1522 (S.D.N.Y. 1985), and *Robi v. Reed,* 173 F.3d 736 (9th Cir. 1999).  The Court has reviewed those cases and finds that they do not support the Defendants' contention that A&Co. owns the WESTY Marks.

In *Bell v. Streetwise Records, Ltd.*, a popular performing group and their producer disputed ownership of trademark rights in the group's name "NEW EDITION."  The court held that the group's members, not the producer, were the mark's lawful owners because they were

---

[17] In support of their "implied license theory," Defendants' attempt to rely on a license agreement between WCI I and WNY I dated January 1, 1992.  (D's Ex. 222; P's Ex. 55).  It is clear, however, that like most of the documents in this case that relate to service marks, that license agreement provides no probative evidence of ownership.  Although Defendants attempt to characterize it as an agreement between WCI I and WNY I with respect to the WESTY Marks, it does not identify the WESTY Marks with particularity or even refer to the mark "WESTY'S" at all, does not contain quality control provisions, and has no term. (*Id.*).  In fact, neither Carlos nor Caesar could testify who created the document, or why. (Carlos Test., R. at 107:19-108:15; 168:25-169:7; Caesar Test., R. at 519:18-25).

the first to use the mark in commerce, just as APLP was the first to use the WESTY Marks in commerce here.

The *Bell* case actually supports the Plaintiff's position in this case, not the Defendants'. Specifically, the court in the *Bell* case confirmed that priority of use is controlling, even when the parties are related: "It is settled law that ownership of a mark is established by priority of appropriation. . .  Priority is established not by conception, but by *bona fide* usage." *Id.* (citations omitted).  The court in *Bell* further found that as of the release of the initial record of the group in February, 1983, which was the first use in commerce, the plaintiffs had publicly performed in the local entertainment market on at least twenty occasions.  Therefore, the court "conclude[d] that plaintiffs [had] acquired legal rights to the mark NEW EDITION through their prior use in intrastate commerce."  *Id.* at 580.

In *Rick v. Buchansky*, the court upheld ownership of the group name "VITO AND THE SALUTATIONS" by David Rick, the group's manager because he paid many, if not most of the group's recording, travel and clothing expenses, instigated the group's formation, conceived its name, and managed the group through frequent personnel changes.  *Id.* at 1531.  The *Rick* case is, however, easily distinguishable from the facts of this case.  Unlike Carlos and Caesar, Rick was held to be the owner of the mark at issue there because he appropriated and used the mark in commerce, not the band members.  As the court in *Rick* noted, "it goes without saying that rights in a trademark or service mark are acquired through appropriation and use of the mark in commerce…the critical issue for purposes of determining ownership of the mark…is whether plaintiff – or some other person or persons – first appropriated and used the mark in commerce." *Id.*  In reaching its conclusion, the court in *Rick* also noted that the defendants theory of trademark ownership could "succeed only if defendants' characterization of the relationship

between the musical group's members and plaintiff – as one of employer and employee – is supported by the facts of the case." *Id.* at 1532.  The court concluded, however, that the preponderance of the evidence supported no such characterization.  *Id.*  The court further found that it was the plaintiff, in his role as the group's manager, who directly promoted the mark at issue through the solicitation of live bookings and recording contracts and through advertising the groups' concert appearances and recordings. *Id.* at 1533.

Here, in contrast to *Rick*, APLP paid all of the expenses associated with the promotion, marketing and advertising of the WESTY Marks in connection with the Port Chester facility. Although Carlos and Caesar, through WNY I and A&Co., provided management services to APLP, it is undisputed that they did so as vendors and, unlike *Rick,* did not pay for any of the promotion or marketing.  Accordingly, Carlos and Caesar do not stand in the same position as Rick, rendering that case inapplicable.

In *Robi v. Reed*, the Ninth Circuit considered conflicting claims over the rights to use the name of the once-popular musical group "The Platters."  Herb Reed founded The Platters in 1953; he was also the manager and one of the group's original singers.  In 1954, Paul Robi began performing with The Platters, and left the group in 1965.  In 1988, Paul Robi executed a written "assignment of trademark" ostensibly transferring the band's name to his wife, Martha Robi. Thereafter, Martha Robi managed, booked and presented a singing group known as "The Platters," but the group did not include any original member of The Platters.  Martha Robi sued Herb Reed claiming exclusive right to the name, and the district court granted summary judgment in favor of Reed.

In affirming the lower court, the Ninth Circuit focused on the fact that Reed owned the mark because he had maintained continuity with the group, founded the group, gave the group its

name, managed the group, and was the only member who had continuously performed with the group.  *Id.*  In contrast, Paul Robi left the group and never returned to it.  Martha Robi never performed with the group and claimed rights to the name solely on the basis of performances by musicians who never had any connection with the group. *Id.*

It is apparent that the court's holding in *Robi* is based on the finding that Reed had been continuously involved with the group and that Paul Robi and Martha Robi had not.  Here, in contrast, APLP has maintained ownership of the WESTY'S facility in Port Chester for almost twenty years, during which time it continuously used the WESTY Marks.  The *Robi* case is not applicable here.

Defendants' assertion that Carlos and Caesar personally owned the WESTY Marks is inconsistent with the overwhelming evidence in the case that they never owned any assets related to the WESTY'S business in their individual capacity.  Neither Carlos nor Caesar have, in their individual capacities, ever engaged in any activities related to the WESTY business.  (Caesar Test., R. at 305:22-307:15).  All of their actions have been through corporations and limited partnerships designed to shield them from liability. (*Id.*).  The Defendants in general and Caesar in particular ask the Court to disregard the various corporate forms and other legal entities established by Carlos and Caesar to shield themselves from potential liability and to treat Carlos and Caesar as just "two guys in a room."  The Court declines to do so.  Having availed himself of the protections afforded by corporate and partnership formation, Caesar cannot now ignore the careful steps he took to protect himself from liability through the use of corporate or other limited liability forms.

**D.**     **Defendant's Affirmative Defenses**

Defendants assert four separate affirmative defenses: waiver, estoppel, laches, and breach of the APLP Partnership Agreement.  The first three defenses, waiver, estoppel and laches, are all based upon the same set of operative facts: that Carlos, by his words and actions, agreed to the assignment of the WESTY Marks from WCI II to A&Co. and in the Carlos and Caesar 2000 Agreement released all claims he may have had to the assets of A&Co., including the WESTY Marks.  Defendants further contend that Caesar, as well as his sons Edward and John, who were shareholders of A&Co. but are not parties here, relied to their detriment on Carlos' words and actions and on the release set out in the Carlos and Caesar 2000 Agreement and were justified in doing so.  Defendants' fourth affirmative defense is that Carlos is barred from bringing this case by APLP partnership agreement and that Carlos does not have the authority to claim ownership of the WESTY Mark on behalf of APLP or to bring suit on APLP's behalf.  The Court addresses each of the defenses below.

**1.**     **Estoppel.**

Under Connecticut law, estoppel requires proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts.  *Shell Oil Co. v. Wentworth*, 822 F. Supp. 878, 883-84 (D. Conn. 1993); *McCulloch v. Hartford Life & Accident Ins. Co.*, 363 F. Supp. 2d 169, 188 (D. Conn. 2005).  The Defendants cannot meet any of those elements here.

For the doctrine of estoppel to apply, the action that formed the basis of the estoppel defense must be undertaken by the party against whom the defense is asserted.  *Shell Oil Co.,* 822 F. Supp. at 883-884 (stating that to prove estoppel *the party against whom estoppel is*

*claimed* must cause the other party to rely) (emphasis added).  Here, the words and actions upon which Defendants base the estoppel defense were made by Carlos in his individual capacity, not in his capacity as Trustee of the Carlos 2000 Trust, the general partner of APLP and the "party" in this case.  The evidence showed that Carlos was not acting on behalf of APLP in agreeing to transfer the WESTY Marks to A&Co. and that the Carlos and Caesar 2000 Agreement had nothing to do with APLP.  Accordingly, the first element of the estoppel defense is not met.

Even if Carlos' actions taken in his individual capacity could be attributed to him in his capacity as Plaintiff in this case, the evidence does not support Caesar's contentions that Caesar or his sons relied on Carlos' release with respect to A&Co.'s ownership of the WESTY Marks.  There was no reason for Caesar to think or be concerned that A&Co. did not own the marks.  Caesar specifically arranged for the alleged assignment from WCI II to A&Co., and there was no evidence introduced to suggest that APLP or anyone else would challenge that assignment.  Moreover, Caesar testified that he always believed that he and Carlos owned the WESTY Marks and could do with them whatever they wanted:

> "The way I look at it, it's more than that.  It's that, but it's more than that.  Again, you asked my opinion, my opinion is Carlos and I are the only two people in the room.  We created it, we put all this effort into it.  We can put it where we want.  And if there's a legal technicality that says oh, no, after all this work and effort, technically you don't own it because of this, that, and the other thing, those are legal matters that I don't understand.  But as a lay person, and as one of the creators of the trademark, and all the work we put into it, we own that trademark and where we put it, that entity owns it.  If we put it into the wrong place, that entity is both of us, it's still us, it's still Caesar and Carlos, and we can decide where it goes, and we did."

(Caesar Test., R. at 548:16-549:8).

Therefore, Defendants' argument that they based their decision to expand the WESTY business after January, 2000 on Carlos' release is nothing more than an *post hoc* rationalization developed for the purposes of this case.  Its clear from the evidence that in January of 2000,

Caesar believed, and had no reason to doubt, that A&Co. was the owner of the marks by virtue of an assignment from WCI II.  In fact, Caesar's belief that A&Co. owned the marks was not only based on the assignment from WCI II, but also on his unquestioned belief that he and Carlos owned the marks and could do with them whatever they wanted.

Furthermore, the evidence shows that Caesar's, Edward's and John's reliance was not justified or reasonable after October 30, 2002, when Carlos wrote to Caesar and asserted that APLP was the proper owner of the WESTY Mark.  Carlos also set out a proposal that would have allowed A&Co., as well as the limited partners of APLP, to continue to use the WESTY Marks on a royalty free basis to build new self-storage facilities.  Caesar rejected that offer.

Accordingly, from at least as early as October, 2002, the Defendants were aware that Carlos, in his capacity as Trustee of a general partner of APLP, had asserted that APLP owned the WESTY Marks.  The Defendants were aware from that time forward there was a risk they could lose this case and lose ownership of the WESTY Marks, and they elected to proceed with expansion plans anyway.  (Caesar Test., R. at 514:14-16).  They were also aware APLP had made a proposal that would have allowed them to expand the WESTY business as they eventually had.

It is clear from the evidence that the Defendants' decision to expand the WESTY business was based on Caesar's belief that A&Co. owned the WESTY Marks under any circumstances, not on the release by Carlos in the Carlos and Caesar 2000 Agreement.  Moreover, the evidence shows that the Defendants' reliance was not reasonable or justified after October 30, 2002 and that the second element of their estoppel defense is not met.

LEGAL01/13126411v15

## 2.    Waiver.

Under Connecticut law, waiver is the intentional relinquishment of a known right in which the <u>party</u> has both knowledge of the existence of the right and the intention to relinquish it. *JEM, Inc.* v. *Seneca Ins. Co.*, 309 F.Appx. 491 (2d Cir. 2009); *see also, McCulloch,* 363 F. Supp. 2d at 188.  For the same reasons set forth above, the Plaintiff has not waived any claims in this case.  The Defendants' affirmative defensive of waiver is based solely on actions taken by Carlos in his individual capacity, not as the trustee of the general partner of APLP, and that Carlos' individual actions cannot be imputed to Carlos in his capacity as Plaintiff in this case. Accordingly, Defendants have not met their burden of proof with respect to the waiver defense.

## 3.    Laches.

Under Connecticut law, "in order to prevail on the affirmative defense of laches, a defendant must prove that it has been prejudiced by the plaintiff's unreasonable delay in bringing the action. A defendant has been prejudiced by a delay when the assertion of a claim available some time ago would be 'inequitable' in light of the delay in bringing that claim." *Conopco, Inc.* v. *Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir. 1996); *see also, Conn. Cmty. Bank v. Bank of Greenwich*, 578 F. Supp. 2d 405, 423 (D. Conn. 2008).

Laches is an equitable defense used instead of a statute of limitations. *Conn. Cmty. Bank,* 578 F. Supp. 2d at 423 (citing *Conop,* 95 F. 3d at 191).  The Lanham Act does not include a statute of limitations, so courts look to the most analogous state statute of limitations for the appropriate time period.  *Id.*  The most analogous statute of limitations in Connecticut is the three year limitations period for all actions founded upon a tort. *Id.* (citing Conn. Gen. Stat. § 52-577). Prior to the running of the statute of limitations, there is a presumption that laches does not

apply; after the limitations period has run the presumption lies in favor of the laches defense. *Conopco,* 95 F.3d at 191.

Here, the Defendants cannot establish the elements of a laches defense. First, the evidence showed that Carlos was unaware that APLP was, under the theories advanced by the Plaintiff in this case, the owner of the WESTY Mark until his conversation with his daughter in September, 2002. The evidence shows that Carlos acted promptly once he became aware that there were legal grounds to support the position that APLP owned the WESTY Marks, and certainly within the three year limitation period. Moreover, any delay by Carlos individually cannot be attributed to him in his capacity as the Plaintiff in this case for the reasons set out above. Finally, for the same reasons as set forth above with respect to the estoppel defense, the Defendants did not reasonably rely on any delay, even if it could be imputed to the Plaintiff in this case. Defendants were aware as of October 2, 2002, that a claim was being made to ownership of the WESTY Mark. From that point on, Defendants acted at their peril. Even if there was some delay in bringing this case – and there was none – such delay has no bearing on Defendants' actions after October 2, 2002. *ProFitness Physical Therapy Center v. Pro-Fit Orthopedic and Sports Physical Therapy P.C.*, 314 F.3d 62, 68 (2d Cir. 2002) (holding that "any acts after receiving a cease and desist letter are at the defendant's own risk because it is on notice of plaintiff's objection to such acts.") (quotation omitted); *Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.,* 841 F. Supp. 1339, 1357 (E.D.N.Y. 1994) (holding that defendants' could not reasonably rely upon the plaintiff's delay after the receipt of warning letters from the plaintiff).

4.     **Breach of APLP Charter.**

Defendants assert that Carlos has no right to bring this case because it is barred by the APLP Partnership Agreement.  That argument, however, completely misses the mark.

Plaintiff has brought this action under the Declaratory Judgment Act, 28 U.S.C. § 2201, in his capacity as Trustee of the Carlos 2000 Trust, one of the general partners of APLP.  He is not bringing this action pursuant to the APLP Partnership Agreement.  The Defendants have never raised the defense that Plaintiff does not have standing to bring this action.  Defendants' contention that the Plaintiff's claim is barred by the APLP Partnership Agreement is simply inapplicable here.

The APLP Partnership Agreement states that "(a) any action required or permitted to be taken by the General Partners *hereunder* for a period of twenty (20) years from the Second Amendment Date [March 13, 2000], shall require the consent of both General Partners." (emphasis added).  This case is not being brought, however, under the partnership agreement.  It is not an "action required or permitted to be taken by the General Partners" under the partnership agreement – it is an independent action taken by one of the general partners under the Declaratory Judgment Act.

Moreover, Defendants' assertion that Plaintiff cannot bring this suit to protect the assets of APLP because Caesar – who stands to gain personally by an outcome in his favor – has not consented, defies reason and common sense.  Were that position to be upheld, a general partner would be free to loot his partnership's assets, safe in the knowledge that he will never be subject to an action against it as long as it withholds consent.  *See, e.g., Wilf v. Halpern*, 194 A.D.2d 508, 599 N.Y.S.2d 579 (N.Y. App. Div. 1993) ("The provision in the partnership agreement requiring unanimity does not, as defendant asserts, give him an absolute right, at his sole whim

and discretion, to impede significant functions of the partnership solely for personal gain, but must be construed in light of defendant's fiduciary obligation of undivided loyalty to his fellow partners….").  Applying the Defendants reasoning here would leave APLP, which as Caesar strenuously argues, acts only through its general partners, helpless against breaches by the general partners of their duty to the limited partners.

**E.**      **Plaintiff is Entitled to Recover His Attorneys' Fees**

The APLP partnership agreement requires the partnership to reimburse actions taken by the general partners of APLP for the benefit of the partnership.[18]  *See* P's Ex. 2, §§ 7.3.3-7.4. Reimbursement is further endorsed by Connecticut state law.  *See, e.g.*, Conn. Gen. Stat. Ann. § 34-335 (West 2009) ("[a] partnership shall reimburse a partner for payments made . . . for the preservation of its business or property").

Plaintiff brought this action to preserve valuable assets of APLP.  Indeed, he had a fiduciary duty to do so.  *Konover Development Corp. v. Zeller*, 228 Conn. 206, 218-219, 635 A.2d 798, 805 (Conn. Sup. Ct. 1994) (discussing the fiduciary duty a general partner owes to his limited partners and holding that "[i]n general, partners act as trustees toward each other and toward the partnership."); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 572 (1985) ("One of the fundamental common-law duties of a trustee is to preserve and maintain trust assets."); Restatement (Second) of Trusts § 170 (1957).  Plaintiff is therefore entitled to reimbursement from the partnership of the fees and costs he has incurred in connection with this litigation, regardless of whether he wins or loses this case.

---

[18] As discussed in Section D.4., Plaintiff is not bringing this action under the APLP Partnership Agreement.  Nevertheless, Plaintiff should be reimbursed because this action is brought to benefit the partnership.

- 40 -

In fact, Caesar's defense of this case in order to benefit A&Co. to the detriment of the partners of APLP constitutes a breach of his fiduciary duty to the partners of APLP. *See* Conn. Gen. Stat. Ann., § 34-338(b)(2) (West 2009) ("A partner's duty of loyalty to the partnership and the other partners [includes refraining] from dealing with the partnership…on behalf of a party having an interest adverse to the partnership…"); *Konover Develop. Corp.*, 228 Conn. at 218-219, 635 A.2d at 805. Caesar is in breach of this statutory by taking the position that A&Co., a company he controls, has an interest in the WESTY Marks that is adverse to APLP. Caesar's actions are particularly egregious since, as discussed above, the valuable assets he seeks to obtain for himself and keep from APLP – the WESTY Marks – were created using APLP's money, not his.

At APLP's annual partnership meeting held on March 8, 2003, Plaintiff submitted to APLP for reimbursement the invoices for legal services he had paid to date in connection with this case. Caesar, in his role as trustee for the other general partner of APLP (the 2000 Caesar Trust), blocked APLP from granting Carlos' reimbursement request. The Court finds that Plaintiff is entitled to the reimbursement of his legal fees from APLP and orders Caesar, as trustee of the 2000 Caesar Trust, to withdraw his opposition to the reimbursement request, and order APLP to promptly reimburse Carlos for his litigation related expenses.

## IV.   CONCLUSION

For the reasons set forth above, APLP was the owner of the WESTY Marks in December 1999 when the brothers purported to transfer trademark ownership from WCI II to A&Co. Because WCI II never owned any rights in the marks, it had nothing to assign to A&Co., rendering the purported assignment of trademark rights to A&Co. void *ab initio*. APLP was and is the owner of the WESTY Marks.

Respectfully submitted this 18th day of December 2009.


/s/ Jason D. Rosenberg

MARTIN J. ELGISON  ct24759
DAVID J. STEWART  ct24757
JASON ROSENBERG  phv01770
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424
Ph (404) 881-7000
Fx (404) 881-7777

MICHAEL KAELIN
CUMMINGS & LOCKWOOD LLC
Four Stamford Plaza, P.O. Box 120
Stamford, Connecticut 06904-0120
Ph  (203)327-1700
Fx  (203) 708-5647


Counsel for Plaintiff

## APPENDIX A -- WESTY STORE LOCATIONS

| Location | Store Owner | Opening Date |
|---|---|---|
| Port Chester, NY | APLP | May 1991 |
| Tuckahoe, NY | APLP | Nov. 1996 |
| Norwalk, CT | Carlos and Caesar Arredondo, through Norwalk Project, LLC[19] | Sept. 1997 |
| Elmsford, NY | APLP | June 1998 |
| Danbury, NY | APLP | Dec. 1998 |
| Milford, CT | Carlos and Caesar Arredondo, through Milford Project, LLC | July 1999 |
| Stamford, CT | Carlos and Caesar Arredondo, through Stamford Project, LLC | May 1999 |
| Farmingdale, NY | APLP | Feb. 2000 |
| Lake Success, NY | APLP | Feb. 2001 |
| Port Chester 2, NY | APLP | April 2001 |
| Hicksville, NY | APLP | Jan. 2002 |
| Upper Saddle River, NJ | Arredondo 2000, LLC[20] ("A2000") | 2004 |
| Fairfield, CT | A2000 | 2005 |
| Wilton, CT | A2000 | 2007 |
| Chatham, NJ | A2000 | 2006 |
| Norwood, NJ | A3[21] | 2006 |

[19] See Pl's Ex. 100; Vol. I, 113:25-114:12 regarding ownership of the Norwalk, Milford, and Stamford locations.

[20] A2000 is owned by the children, grandchildren, and great-grandchildren of Caesar Arredondo, individually and through related trusts. Neither Carlos Arredondo nor his descendants have any ownership interest in A2000. (Vol. III, 507:5-508:20).

[21] A3 is jointly owned by John and Edward Arredondo, sons of Defendant Caesar Arredondo. (Vol. III, 508:20-509:5). Neither Carlos Arredondo nor his descendants have any ownership interest in A2000.

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on this 18th day of December, 2009, a true and correct copy of the

foregoing **PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF**

**LAW** was served upon the following counsel for Defendants through the CM/ECF system:

> CRAIG A. RAABE
> EDWARD HEATH
> Robinson & Cole LLP
> 280 Trumbull Street
> Hartford, CT 06103
>
> HUBERT J. SANTOS
> Santos & Steeley, P.C.
> 51 Russ Street
> Hartford, CT 06106
> Phone: (860) 249-6548
> hsantos@santos-seeley.net
>
> DAVID M. KELLY, *pro hac vice*
> Finnegan, Henderson, Farabow, Garrett & Dunner, LLP
> 1300 I Street, NW
> Washington, DC 20005-3315
> Phone: (202) 408-4000
> David.kelly@finnegan.com

/s/ Jason D. Rosenberg
_____
Jason D. Rosenberg