UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CARLOS A. ARREDONDO, in his capacity as Trustee of The 2000 Trust for the Grandchildren of Carlos A. Arredondo and Mari V. Arredondo, General Partner of Arredondo Properties Limited Partnership,<br>    Plaintiff,<br><br>v.<br><br>CAESAR A. ARREDONDO, individually and in his capacity as Trustee of The 2000 Trust for the Grandchildren of Caesar A. Arredondo and Carolyn Abad Arredondo; THE 2000 TRUST FOR THE GRANDCHILDREN OF CAESAR A. ARREDONDO AND CAROLYN ABAD ARREDONDO, in its capacity as a General Partner Of Arredondo Properties Limited Partnership; and ARREDONDO & CO., LLC, :<br>    Defendants. | CIVIL ACTION NO.<br>3:02-cv-2200 (CFD) |

**MEMORANDUM OF DECISION**

I.  **Introduction**

Plaintiff Carlos Arredondo ("Carlos") brought this suit in his capacity as trustee of The 2000 Trust for the Grandchildren of Carlos A. Arredondo and Mari V. Arredondo ("the Carlos Trust") against the defendants, Arredondo & Co., LLC ("A&Co.") and Caesar A. Arredondo, individually and in his capacity as trustee of The 2000 Trust for the Grandchildren of Caesar A. Arredondo and Carolyn Abad Arredondo ("the Caesar Trust").[1] Carlos is seeking a declaratory judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and the Trademark Act of 1946, 15 U.S.C. §1051 et seq., that Arredondo Properties Limited Partnership ("APLP") is the true and exclusive owner of what is

---
[1] The Carlos Trust and the Caesar Trust are the two general partners of Arredondo Properties Limited Partnership ("APLP").

collectively referred to as the "Westy trademarks."[2] Carlos contends that APLP was the "first user" of the Westy trademarks and, as such, is the true owner of the marks. The defendants deny these claims and assert a number of affirmative defenses.[3]

The following are the Court's findings of fact and conclusions of law following a bench trial.

## II. Findings of Fact

The Court finds the following facts:

Carlos and Caesar Arredondo are brothers who engaged in various real estate business ventures together since 1961. The brothers achieved great success in real estate development and, in 1980, Caesar and Carlos created APLP as a vehicle to generate income for future generations of their families. APLP was created a number of years prior to the development of the Westy self-storage business and has been a passive real estate investment vehicle. APLP's purpose was and is to invest in projects and to gather and distribute income—however earned—to the Arredondo family for the next 200 years. APLP never had any employees and, in order to protect its assets, never played any role in the daily operations of any of its investments. APLP was, though, a funding source for many projects. The general and limited partners of APLP meet only once per year.

Caesar and Carlos were the original general partners and 50% owners of APLP; however, in 1987, they amended the APLP partnership agreement, selling their interests in APLP to the then-limited partners of APLP—The 1987 Trust for the Grandchildren of Caesar A. Arredondo and Carolyn Abad Arredondo and Trust "A" for the Grandchildren of

---

[2] These "Westy trademarks" include the "WESTY" and "WESTY'S" marks as well as the image of the West Highland White Terrier ("terrier image"), and the slogan "SELF-STORAGE MADE EASY."
[3] The parties do not dispute jurisdiction or venue in this Court.

Carlos A. Arredondo and Mari V. Arredondo. These two trusts became the general partners of APLP, and Caesar and Carlos became the trustees of these trusts.[4] The limited partners and owners of APLP are the children, grandchildren, and various trusts that benefit the lineal descendants of Carlos and Caesar.

Caesar founded A&Co., a limited liability company, in 1961 and was eventually joined by his brother, Carlos, who worked with Caesar at A&Co. for 39 years. A&Co. is the working operation and corporate form of Caesar and Carlos who, during the development of the Westy business, were the sole owners, directors, and shareholders of A&Co.[5] A&Co. had no other members of its board of directors, officers or advisors that assisted Carlos and Caesar in the daily operations of the business. A&Co. did, however, have an office in Stamford, Connecticut and employees, including a secretary and receptionist. The management and daily operations of all Westy facilities has always been performed by A&Co. through a number of management contracts.

In late 1988, Caesar conceived the idea of owning and operating "high-end" self-storage facilities. The concept was designed to provide a safe and clean environment with well-dressed, polite employees and a "hotel-like" feel. Caesar thought of using the image of a West Highland White Terrier, or "Westy," to embody this concept. After many discussions and interchanges of ideas regarding this potential business, the brothers agreed to pursue high-end self-storage and began to investigate potential properties on which to construct the facilities. Carlos and Caesar settled on a location in Port Chester, New York. On June 29, 1989, APLP, through A&Co., entered into a contract to purchase the land in

---

[4] These trusts were later replaced by the new "2000 Trusts," with each trust receiving 50% of the outstanding units of APLP.

[5] Caesar now owns and operates A&Co. in conjunction with his two sons who, as of 2003, each own a 20% interest in A&Co.

Port Chester on which the Westy self-storage facility was to be built. Carlos signed the purchase agreement on behalf of APLP, in his capacity as trustee. On the actual deed of purchase, however, Westy's Port Chester Limited Partnership ("WPCLP") was listed as the purchaser. The press release announcing the Port Chester Westy facility asserted that A&Co. was the developer and owner and contained a quote from Caesar discussing the benefits of the project.

It is undisputed that, based on the advice of counsel, Carlos and Caesar created WPCLP on January 11, 1990 to insulate APLP from liability. Initially, A&Co. was the sole general partner and APLP was the sole limited partner of WPCLP. On March 1, 1990, the general partner of WPCLP was changed from A&Co. to Westy's Self-Storage Campus, Inc. ("WSSCI"), a company which was owned and controlled by Caesar and Carlos. Although APLP held a 99% interest in WPCLP, WSSCI—and therefore Carlos and Caesar—had exclusive control over the business of WPCLP and over the operation and management of the Port Chester property. On February 21, 1991, the 1987 Trusts that were the general partners of APLP replaced WSSCI as general partner of WPCLP. Although APLP was then the general partner of WPCLP, APLP never had any control over the training or hiring of the Westy associates who represent the Westy brand at Westy facilities or over the daily management of the facilities. This training and management is conducted solely by A&Co. Caesar noted that the level of scrutiny and attention to detail in the process of hiring and training Westy associates sets the Westy brand apart from other self-storage facilities.

Also during 1990, Caesar and Carlos worked on designing the Westy trademark. Carlos and Caesar controlled what the design would look like, and A&Co. paid for the design to be altered and adjusted by a graphic artist. APLP never exercised control or had

any input over the design of the trademark.

In March 1990, APLP received a permit to build the Port Chester Westy facility; however, WPCLP entered into the contract to build the facility. That same month, Caesar, on A&Co. stationery, requested permission from the village of Port Chester to erect a "Westy's" sign in front of the Port Chester property. Carlos had determined that approximately 9000 cars drove by that property and saw the sign. Although WPCLP paid for the construction of the sign from the WPCLP checking account, APLP supplied the money for that bank account. APLP also paid for the construction of the Port Chester Westy facility and for a promotional flier advertising the Port Chester Westy.

In August 1990, preliminary investigations were underway to place an advertisement in the Yellow Pages about the Port Chester facility. WPCLP purchased Yellow and White Pages advertisements utilizing the "Westy's" name and logo in September 1990; however, APLP funded these promotional materials. These advertisements ran from February 1991 through December 1991. Westy's Port Chester opened for business in May 1991. The name of WPCLP was later changed to Port Chester Project LLC. The limited partners of APLP had no input on this name change even though APLP is the sole member of Port Chester Project.

During this same time period, in May 1989, Caesar and Carlos began investigating certain properties in Milford, Connecticut on which to develop a Westy facility to be owned by themselves as individuals, rather than by APLP. Carlos and Caesar took numerous steps toward opening the Westy in Milford, including purchasing the land in July 1989,[6]

---

[6] The "purchase" of the Milford land was really a property exchange whereby Carlos gave land in North Carolina to the buyer in exchange for the Milford property.

conducting soil sampling, designing the sewer systems, developing precast plans, and creating a rendering of the building with the "Westy's" name on it. Caesar and Carlos undertook these actions in Milford while simultaneously developing the Port Chester facility. Caesar and Carlos additionally created drawings and documents depicting the "Westy's" name and logo and submitted them to the Town of Milford for various approvals and permits; however, there is no evidence that they engaged in the kind of advertising done in Port Chester or that they used these documents for advertising purposes. Although Carlos and Caesar clearly desired to build a Westy facility in Milford during this time, they never built a Westy facility on the property purchased in 1989 due to zoning issues.[7] Caesar and Carlos, however, did subsequently build a Milford Westy on a different site.

Sometime in 1991, Caesar and Carlos decided to form Westy's Connecticut, Inc. ("WCI I") and Westy's New York, Inc. ("WNY I") to manage the existing and anticipated Westy facilities in Connecticut and New York, respectively. The certificate of incorporation for WCI I was filed on March 8, 1991.[8] Neither WCI I nor WNY I had any employees; rather, both companies had "management agreements" with A&Co. authorizing A&Co. to do the actual management work at the Westy facilities. Although WNY I had management responsibilities over the Port Chester facility, it did not have any ownership of that facility.[9]

It is clear that Carlos and Caesar intended and took steps to register the Westy's trademark in WCI I, including retaining Attorney Alan Shaver to investigate whether registration of the marks was possible. On March 11, 1991, Attorney Shaver filed a

---

[7] Caesar and Carlos also had preliminary plans to build Westy's facilities in Norwalk and Trumbull, Connecticut during this same period; however, none of these Westy's facilities were constructed during that time.
[8] According to other documentary evidence, it appears that the certificates of incorporation for WNY I were filed at the same time as the certificate for WCI I.
[9] Only Caesar owned WNY I; however, both brothers owned WCI I equally.

trademark application to register the trademarks with WCI I. The application cited a date of first use of "as early as January 1, 1991." On November 6, 1991, Attorney Shaver notified Carlos that the U.S. Trademark Office approved the application to register the "WESTY'S" trademark.[10] Carlos wrote "GREAT!" on this fax indicating that he was pleased that the Patent Office had approved the trademark registration. Shaver's communications to Carlos regarding the trademark registration were addressed to Carlos with A&Co. as the relevant company recipient. The Patent Office issued an official certificate of registration to WCI I for the WESTY'S mark on February 18, 1992 and for the "design of dog" mark on March 3, 1992. On January 1, 1992, Carlos (on behalf of WCI I) signed a licensing agreement permitting WNY I to utilize the "Westy" marks.

The next Westy to open was the Tuckahoe, New York facility in November 1996. APLP owned and paid for the land and building for the Tuckahoe facility, as well as for the advertising and marketing; however, Carlos and Caesar personally guaranteed a number of APLP loans for this and other subsequent Westy's facilities, and A&Co. managed the daily operations of the facilities.

Both WCI I and WNY I were eventually dissolved: Caesar and Carlos voluntarily dissolved WCI I on April 22, 1992, and the Connecticut Office of the Secretary of State dissolved WNY I on October 1, 1993 for failure to file an organization report within two years. At that time, Carlos and Caesar were not aware that the dissolution of WNY I had occurred. Subsequently, Caesar and Carlos wished to re-incorporate these companies, and on July 29, 1996, a certificate of incorporation was filed for Westy Connecticut ("WCI II").[11]

---

[10] Attorney Shaver indicated that he had not received any notice of action regarding the "design of dog" mark as of that date.

[11] WNY was also reincorporated.

Caesar and Carlos intended WCI II to be a continuation of WCI I—specifically, they wanted WCI II to hold the Westy trademarks and again be equally owned by Carlos and Caesar.

On December 18, 1996, Attorney Jeffrey Stephens verified for Carlos that WCI II was the owner of the Westy marks. In 1998, Attorney Stephens filed a statement of use with the patent office on behalf of WCI II, paid for by WCI II. The trademark registration, however, was later cancelled for reasons that are somewhat unclear. In 1998 and 1999, Stephens also filed applications to register the trademarks of "Westy at Your Door" and "Self-Storage Made Easy" on behalf of WCI II. In 2002, A&Co. handled a settlement proceeding with U-Haul regarding possible confusion of the "Self-Storage Made Easy" mark with U-Haul's similar trademark, "storage made easier." APLP played no part in defending the "Self-Storage Made Easy" mark.

In August 1997, WCI's shareholders—Carlos and Caesar—voted to change the name of the storage facilities from Westy's to Westy. APLP and its limited partners had no decision making power or input concerning the name change.

In December 1999, Carlos decided to leave the self-storage development business and to sell his interests in A&Co, WCI II,[12] and WNY II to Caesar. Attorney Stephens drafted the sales agreement based on terms dictated by Carlos. In this agreement, Carlos agreed to transfer "all rights and claims to any assets" of A&Co., including "trademark rights and vehicles" to Caesar. Carlos admitted that it was his intention to give his half of WCI II and A&Co. to Caesar, and "that included the trademark rights." The brothers believed that the trademarks had been assigned from WCI II to A&Co. on December 28,

---

[12] WCI II and WNY II were dissolved in March 2000 after Carlos's departure from A&Co., and A&Co. took over the management of the Westy facilities directly without these two entities as intermediaries.

1999 for the price of $20,000, and an assignment was executed at that time. Carlos's personal tax returns show a capital gain of $10,000 relating to his sale of the trademarks at that time. Carlos also agreed to release "CAESAR and the LLC from any claim, known or unknown, that he may have against either or both of them arising from his ownership of an interest in the LLC or any actions relating to the operation of the LLC." Carlos's signature on the sale agreement does not mention his trusteeship or APLP.

At the time Carlos left A&Co., seven Westy storage facilities existed—four were located on real estate owned by APLP and three were located on real estate personally owned by Caesar and Carlos. As of March 2002, APLP requested, and Caesar agreed on behalf of A&Co., that no additional Westy facilities would be built for APLP. As of October 2009, sixteen Westy storage facilities existed. Five of these existing facilities are unrelated to Carlos or his family.

On August 30, 2002, A&Co., through Caesar's son Edward, filed an application to register the Westy trademarks in the name of A&Co. In September 2002, Fabiola Arredondo, Carlos's daughter, raised to Carlos the trademark concept of "first use." She had previously asked her father if the trademarks belonged to APLP, and her father told her to "leave it alone." On October 30, 2002, after speaking with counsel, Carlos, in his capacity as trustee, wrote a letter to Caesar, in his capacity as trustee, advising Caesar that APLP was the first user of the marks and offering to grant any present or future limited partners of APLP a royalty-free license to use the Westy marks. Caesar rejected that offer and stated that A&Co. owned the marks. On September 3, 2002, Carlos, in his capacity as trustee of the 2000 trust, filed an opposition to the trademark registration. Carlos, in his capacity as trustee, commenced this suit in December 2002.

**III.    Conclusions of Law**

Generally, trademark rights are acquired and maintained through priority of use, not by registration. ITC Ltd v. Punchgini, Inc., 482 F.3d 135, 146–47 (2d Cir. 2007); Sengoku Works Ltd. v. RMC Int'l, Ltd., 96 F.3d 1217, 1219 (9th Cir. 1996). Moreover, inventing or conceiving the mark is not alone sufficient to create ownership of the mark; rather, ownership requires actual and continuous use in commerce. See Buti v. Impressa Perosa, S.R.L., 935 F. Supp. 458, 468 (S.D.N.Y. 1996).

For service marks, such as the marks at issue in this case, the "use in commerce" requirement is satisfied when the mark is "used or displayed in the sale or advertising of services" and "either . . . the services are rendered in commerce" or "the services are rendered in more than one State." Aycock Eng'g, Inc. v. Airflite, Inc., 560 F.3d 1350, 1357 (Fed. Cir. 2009). Merely advertising services that are non-existent at the time of the advertisement or that may only be hypothetically available in the future is insufficient to constitute "use." Am. Express Co. v. Goetz, 515 F.3d 156, 161 (2d Cir. 2008); cf. Lunatrex, LLC v. Cafasso, 674 F. Supp. 2d 1060, 1072 (S.D.Ind. 2009) (noting that "use of the mark in 'advertising brochures, catalogs, newspaper ads, and articles in newspapers and trade publications' " is sufficient to constitute "use in commerce"). Although much of the initial advertising for Westy's Port Chester was displayed prior to the opening of that facility, this advertising continued once the Port Chester facility opened for business. Moreover, no other Westy facility offered services until 1996 and the Westy mark was not "used in commerce" in conjunction with another Westy facility until years after Port Chester opened. Therefore, it is clear that the "first use" of the Westy marks took place at the Westy's Port Chester Facility.

That the mark was first used in Port Chester does not decide the question of ownership here.  This is not the typical situation in which one company, completely separate from a competitor, first uses a specific mark in commerce.  Here, a number of different entities and individuals contributed, in some way, to the creation of the Westy facility at Port Chester.  Because of the number of different entities that were involved in the conception, funding, purchase, construction, advertising, management, and day-to-day operation and control of the Port Chester facility, no one single entity can conclusively be determined to be the "first user" of the Westy marks.  See Lunatrex, LLC, 674 F. Supp. 2d at 1072 (holding that because all of the members of the team used the mark at some point in different ways to refer to the same thing, it is unlikely that the "first user" theory would establish ownership).  Therefore, the Court must look to other factors to determine who owns the Westy trademarks.  See Omega Nutrition U.S.A. Inc. v. Spectrum Mktg., Inc., 756 F. Supp. 435, 438 (N.D.Cal. 1991).  In doing so, the Court must balance the equities to determine which entity's "use" is sufficient to warrant trademark protection.  De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc., 440 F. Supp. 2d 249, 272 (S.D.N.Y. 2006).

The defendants propose a number of trademark ownership theories including "related companies" and "joint ventures."[13]  Due to the method by which Caesar and Carlos conducted business (as Caesar testified, the two brothers "never sat down with an attorney and discussed [in] what and whose name [they] were behaving . . . . [they] just functioned."), the relationship between Caesar and Carlos, A&Co., APLP, and WPCLP does not fit the traditional criteria of applying either a "joint venture" or "related companies" approach.

---

[13]  The defendants also propound the "leading lights" theory of ownership; however, the Court finds this theory inapplicable to the case at hand.

However, whether examining related companies, joint endeavors, or even relationships between manufacturers and distributors, to determine the ownership of a trademark in the situation where "first use" is indeterminable, district courts focus primarily on the issue of "control"—not actual legal control, but rather who controlled the mark with respect to the nature and quality of the goods offered. Bell v. Streetwise Records, Ltd., 640 F. Supp. 575, 580 (D.Mass. 1986) ("[I]n the case of joint endeavors, where prior ownership by one of several claimants cannot be established, the legal task is to determine which party controls or determines the nature and quality of the goods which have been marketed under the mark in question." (internal quotations omitted)); see Liebowitz v. Elsevier Sci. Ltd., 927 F. Supp. 688, 696 (S.D.N.Y. 1996) ("[W]hoever controls the quality of the goods marketed under the trademark is the source and therefore owns the trademark."); see also Estate of Coll-Monge v. Inner Peace Movement, 524 F.3d 1341, 1348 (D.C. Cir. 2008) (examining control and oversight in the situation of related companies); Sengoku Works Ltd., 96 F.3d at 1220 (looking at control as one of the factors in determining who owns the trademark as between a manufacturer and distributor).

Although APLP did contribute a substantial sum of money to the construction and advertising of the Port Chester facility, payment does not necessarily equate to control, and the Court must examine the contributions of the other individuals and entities in the form of time and product development. See Lunatrex, 674 F. Supp. 2d at 1074. The question is whether one person or entity made "visible and disproportionately valuable contributions" to Westy Port Chester. Id.

Here, Caesar and Carlos, through the corporate form of A&Co., made such disproportionately valuable contributions. In their capacity as the principals of A&Co.,

Caesar and Carlos created the Westy concept and brand and managed the Port Chester facility, as well as every subsequent Westy facility. A&Co. ensured that the quality of the services at each Westy facility reached their ideal standard of "high end" by hiring and training the Westy associates and managing the day-to-day operations of the facilities. The quality of the services offered and the behavior of the Westy employees is what the Westy trademarks represent. APLP had no input on this daily management or employee training.

Aside from daily management of the Westy facilities and the Westy concept, Caesar and Carlos, through A&Co., controlled the development of the Westy marks and their initial use in commerce. Although conception of the mark is alone insufficient to confer trademark rights, "the question of who originally conceived of a particular mark may have some bearing upon the controlling issue of who first used the mark in commerce." Rick v. Buchansky, 609 F. Supp. 1522, 1531 (S.D.N.Y. 1985); see also Sengoku Works Ltd., 96 F.3d at 1220 (noting that in determining whether the manufacturer or distributor owned the mark, who conceived of the mark was one of the factors to be considered). Here, Caesar conceived the idea of using the "terrier image" to embody the Westy concept. The design was created and developed by Carlos and Caesar together while at A&Co., and the fine-tuning of the design was paid for by A&Co. APLP had no input, pecuniary or creative, over the development of the trademarks or any alterations to the trademarks that may have occurred, including the change of the trademark from "Westy's" to "Westy." APLP also played no role in the negotiations between A&Co. and U-Haul over the use of the "Self-Storage Made Easy" mark. This settlement was reached solely by Caesar on behalf of

A&Co.[14]

Moreover, during the development of the first Westy facility at Port Chester, Caesar and Carlos, through WPCLP and A&Co., controlled how the Westy marks were used by seeking permission to erect, and subsequently erecting, a large concrete sign advertising the Port Chester Westy and by researching and implementing Yellow Page advertisements. Aside from paying for these promotional endeavors via the WPCLP checking account, APLP had no input; specifically, APLP had no input on the methods or style of advertising for any Westy facility. A&Co. is also the entity that the public would most associate with the Westy business. Specifically, A&Co. was announced in the initial Port Chester press release as the owner of the Westy facility, and A&Co. is the only consistent presence at each Westy facility.

Finally, although no Westy facility was constructed on the original Milford property, the actions of Carlos and Caesar in attempting to build a Milford Westy for themselves as individual investors—and in subsequently constructing three Westy facilities for themselves as individual investors—are relevant to the issue of ownership and control. Specifically, none of the limited partners in APLP had any input on whether non-APLP Westy facilities could be built.

As discussed above, the relationship between Carlos and Caesar and their various corporate forms and limited liability companies is complex and sometimes inconsistent. Throughout the trial and the history of the Westy self-storage facility development, "Caesar and Carlos," "C&C," and A&Co. were often used by the brothers and other witnesses

---

[14] Although this settlement was reached after Carlos had ceased his involvement with A&Co. and the Westy business, it is still relevant to demonstrate who was defending, and thereby also controlling, the Westy trademarks.

interchangeably. In a legal sense, of course, these entities are not interchangeable.[15] The lack of clarity or confusion at times over whether the brothers were acting through their corporate forms, particularly A&Co., stems largely from the lack of consistent involvement of legal counsel. Neither Carlos nor Caesar has legal training, and the brothers involved lawyers in their business dealings only on an episodic and infrequent basis, and then only for very specific tasks. Therefore, their lack of complete adherence to the corporate form is understandable.

Caesar and Carlos, however, were particularly diligent in creating and utilizing various corporate entities to limit their own personal liability in connection with the Westy facilities. Specifically, the brothers created WNY, WCI, and the various project LLCs to protect the ultimate owner of the real estate, APLP—or themselves—as individuals. This diligence extended to protecting the trademarks; indeed, Carlos and Caesar never intended or desired the trademarks to be owned by themselves as individuals, but rather as A&Co., which then "placed" the marks in other entities.[16] Even during the registration process, Attorney Shaver sent faxes and messages about the trademarks and their registration to Carlos with Arredondo & Co. listed as the company that Carlos was representing, demonstrating the protection of the corporate form. Moreover, the brothers' initial registration of the trademarks in WCI I, and their desire to continue this registration in WCI II, demonstrates their intent to protect the trademarks and Westy business through a

---

[15] For example, the Westy facilities owned by C&C are not actually owned by A&Co., but rather by Caesar and Carlos individually.

[16] Again, Caesar and Carlos had no legal training and due to the informal way in which they operated, Caesar and Carlos equated "placing" the trademarks in WCI I and WCI II with establishing ownership. This "placement," however, was more akin to an implied license from A&Co. to WCI I and subsequently WCI II.

corporate form.[17]  Therefore, the Court finds that when the brothers acted in connection with the management, creation, and development of the Westy facilities and the Westy concept, as well as the management and control of the trademark, they intended to and did act through the protection of their corporate working arm—A&Co.

Although the relationship of the brothers to A&Co. is complex, and the history of the trademark licensing opaque, what is crystal clear is that APLP did not exercise control over the trademarks at any time.  APLP was a completely passive vehicle whose only actions were to fund and benefit from investments.  APLP had only one meeting per year, had no employees, and never made any of the key decisions regarding the trademark or the daily management of the Westy facility.  Therefore, APLP did not exercise any control over the trademarks or the quality of the Westy services and is not the owner of the Westy trademarks.

Plaintiff states that this Court's ruling in Carpenteri v. Marini, No. 3:05-CV-00766 (JCH), 2006 WL 2349586 (D.Conn. July 11, 2006), demonstrates that APLP is the owner of the Westy marks.  In Carpenteri, although the plaintiff had no ownership interest in his wife's new restaurant (which she owned and operated with other individuals), the plaintiff assumed responsibility for organizing, planning, and setting up this restaurant (GC Too) and provided the funds to open it.  Id. at *2.  He chose menu items, made maintenance decisions, paid for advertising, and inspected GC Too to make sure the products were up to quality standards.  Id.  Shortly after opening, GC Too began using the trademarks at issue, which

---

[17] Although the brothers initially registered the trademarks in WCI, WCI is not the owner of the trademarks.  The registrations for the trademarks in WCI I or II have lapsed, and WCI I ceased to exist for a number of years while the trademarks were still being used.  More importantly, WCI never had any employees and did not control the development of the trademark, the use of the trademark in commerce, or the quality of the goods or services that the trademark represented.  These actions were all conducted by A&Co.  Thus, WCI is not the owner of the marks in question.

the plaintiff claimed to have created. Id. Thereafter, the plaintiff also began utilizing those trademarks at his own, separate restaurant. Id. When plaintiff's wife sold her interest in GC Too, plaintiff filed a trademark registration for one of the marks and then sued for ownership. See id. at *3. The Court granted summary judgment for the defendants, stating that GC Too was clearly the first user of the trademark and that plaintiff's theories that he was the "de facto owner" of GC Too and or that GC Too was a "related company" failed. See id. at *4–*6.

Carpenteri, however, is distinguishable from the facts here. Unlike the situation facing this court, in Carpenteri there was a clear first user of the marks: the defendant's restaurant, GC Too. Moreover, the plaintiff in Carpenteri was never an officer or shareholder in any of the entities that owned GC Too. Conversely, here, Caesar and Carlos, through A&Co. and later WSSCI, were general partners of WPCLP, which owned the Westy Port Chester facility. Additionally, unlike in Carpenteri, there was no other person or entity which also exercised control over the day-to-day operations of the Port Chester Westy facility; here, only A&Co. managed and controlled every aspect of the Westy business at every Westy facility. Finally, to the extent that Carpenteri holds that a licensing agreement or formal arrangement regarding ownership of the trademarks is required to satisfy the "control" requirement, see id. at *6, this Court disagrees and finds that "other forms of oversight" such as the continuous control of many aspects and use of the trademark in this case, may be sufficient to confer ownership rights in similar situations. See Estate of Coll-Monge, 524 F.3d at 1348; see also Robi v. Reed, 173 F. 3d 736 (9th Cir. 1999) (holding that manager/singer who had continuous involvement with the musical group, created the group's name, managed the group, and founded the group owned the group's name).

Thus, Caesar and Carlos, through A&Co., created and developed the Westy trademarks, controlled the management and day-to-day operations of all Westy facilities, were the common presence in each facility ensuring the uniformity of the Westy service, and directed all of the hiring and training that is crucial to upholding the quality of the Westy brand.  Therefore, A&Co. is the original owner of the trademarks.  See Rick v. Buchansky, 609 F. Supp. 1522, 1532 (S.D.N.Y. 1985) (individual who created name, managed the group's appearances, paid for expenses, was the one who was continuous throughout all of the different members of the group, made key personnel decisions owned the trademark); see also Robi v. Reed, 173 F. 3d 736 (9th Cir. 1999).

The 2000 Agreement arranging for Carlos's departure from A&Co., WCI II, and WNY II clearly indicates that Carlos transferred the rights he has through A&Co. to the trademarks to Caesar.  Carlos's testimony affirmatively shows that knew he was transferring his rights to the trademarks and that he intended to give his share of the trademarks to Caesar and cease his involvement with the Westy business.  Therefore, Carlos's assignment of the trademarks is effective, and A&Co. is the owner of the Westy trademarks.[18]

---

[18]  Because the Court finds that A&Co. is the owner of the trademarks, the Court does not address the defendants' affirmative defenses.

### IV. Conclusion

Accordingly, JUDGMENT SHALL ENTER FOR THE DEFENDANTS and the Clerk is directed to close this case.

**SO ORDERED.**

Dated this 30th day of November 2010, at Hartford, Connecticut.

/s/ Christopher F. Droney
CHRISTOPHER F. DRONEY
UNITED STATES DISTRICT JUDGE